UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA
and STATE OF WEST VIRGINIA

                       Plaintiffs,

                                           Civil Action No.  1:18cv195

         v.

EXXON MOBIL CORPORATION,

                       Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## REMEDIAL DESIGN/REMEDIAL ACTION

## CONSENT DECREE

**TABLE OF CONTENTS**

I.        BACKGROUND ...........................................................................................1
II.       JURISDICTION .........................................................................................2
III.      PARTIES BOUND ......................................................................................2
IV.       DEFINITIONS ............................................................................................3
V.        GENERAL PROVISIONS ..........................................................................7
VI.       PERFORMANCE OF THE WORK ............................................................8
VII.      REMEDY REVIEW ...................................................................................10
VIII.     PROPERTY REQUIREMENTS ................................................................11
IX.       FINANCIAL ASSURANCE .......................................................................15
X.        PAYMENTS FOR RESPONSE COSTS ....................................................19
XI.       INDEMNIFICATION AND INSURANCE ................................................22
XII.      FORCE MAJEURE .....................................................................................23
XIII.     DISPUTE RESOLUTION ...........................................................................24
XIV.      STIPULATED PENALTIES ........................................................................26
XV.       COVENANTS BY PLAINTIFFS ................................................................29
XVI.      COVENANTS BY SD ..................................................................................32
XVII.     EFFECT OF SETTLEMENT; CONTRIBUTION .....................................34
XVIII.    ACCESS TO INFORMATION ....................................................................35
XIX.      RETENTION OF RECORDS .....................................................................36
XX.       NOTICES AND SUBMISSIONS ...............................................................36
XXI.      RETENTION OF JURISDICTION ............................................................38
XXII.     APPENDICES ..............................................................................................38
XXIII.    MODIFICATION .........................................................................................38
XXIV.     LODGING AND OPPORTUNITY FOR PUBLIC COMMENT ...............39
XXV.      SIGNATORIES/SERVICE ..........................................................................39
XXVI.     FINAL JUDGMENT ...................................................................................39

# I.   BACKGROUND

A.     The United States of America (United States), on behalf of the Administrator of the United States Environmental Protection Agency (EPA), filed a complaint in this matter pursuant to Sections 106 and 107 of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), as amended, 42 U.S.C. §§ 9606 and 9607.

B.     The United States in its complaint seeks, *inter alia*: (1) reimbursement of costs incurred by EPA and the Department of Justice (DOJ) for response actions at the Sharon Steel Corp/Fairmont Coke Works Superfund Site in Fairmont, West Virginia (Site), together with accrued interest; and (2) performance of response actions by the defendant at the Site consistent with the National Contingency Plan, 40 C.F.R. Part 300 (NCP).

C.     In accordance with the NCP and Section 121(f)(1)(F) of CERCLA, 42 U.S.C. § 9621(f)(1)(F), EPA notified the State of West Virginia (the State) on November 8, 2017, of negotiations with Exxon Mobil Corporation (Settling Defendant or SD) regarding the implementation of the remedial design and remedial action (RD/RA) for the Site, and EPA has provided the State with an opportunity to participate in such negotiations and be a party to this Consent Decree (CD).

D.     The State has also filed a complaint against the defendant in this Court alleging that the defendant is liable to the State under Section 107 of CERCLA, 42 U.S.C. § 9607, the West Virginia Hazardous Waste Management Act (§ 22-18-1 et seq.), and the West Virginia Hazardous Waste Emergency Response Fund Act (§ 22-19-1 et seq.).

E.     In accordance with Section 122(j)(1) of CERCLA, 42 U.S.C. § 9622(j)(1), EPA notified the United States Department of the Interior on November 8, 2017, of negotiations with SD regarding the release of hazardous substances that may have resulted in injury to the natural resources under federal trusteeship and encouraged the trustee to participate in the negotiation of this CD.

F.     SD does not admit any liability to Plaintiffs arising out of the transactions or occurrences alleged in the complaint[s], nor does it acknowledge that the release or threatened release of hazardous substances at or from the Site constitutes an imminent and substantial endangerment to the public health or welfare or the environment.

G.     Pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, EPA placed the Site on the National Priorities List (NPL), set forth at 40 C.F.R. Part 300, Appendix B, by publication in the Federal Register on December 23, 1996, 61 Fed. Reg. 67656.

H.     In response to a release or a substantial threat of a release of hazardous substances at or from the Site, SD commenced a Remedial Investigation and Feasibility Study (RI/FS) for the Site pursuant to 40 C.F.R. § 300.430 and Administrative Order on Consent for Remedial Investigation/Feasibility Study, EPA Docket No. III-970-103-DC on September 17, 1997 (RI/FS Order).

I.     On December 11, 1998, EPA and SD entered into a Removal Order on Consent, EPA Docket No. III-99-0004-DC (Removal Order). Issuance of the Removal Order temporarily suspended the requirements of the RI/FS Order until after the non-time-critical removal action activities required by the Removal Order were complete. The Removal Order was subsequently

modified. On May 24, 1999, SD, EPA, WVDEP, and local stakeholders, including the City of Fairmont, entered into a formal Project XL (eXcellence and Leadership) Agreement to use a modified approach from the standard Superfund process.

J.      SD completed a Remedial Investigation (RI) Report and a Feasibility Study (FS) Report on June 16, 2016.

K.      Pursuant to Section 117 of CERCLA, 42 U.S.C. § 9617, EPA published notice of the completion of the FS and of the Proposed Remedial Action Plan (Proposed Plan) for remedial action on July 9, 2016, in a major local newspaper of general circulation. EPA provided an opportunity for written and oral comments from the public on the Proposed Plan for remedial action. A copy of the transcript of the public meeting is available to the public as part of the administrative record upon which the Director of the Hazardous Site Cleanup Division, EPA Region III, based the selection of the response action.

L.      The decision by EPA on the remedial action to be implemented at the Site is embodied in a final Record of Decision (ROD), executed on December 19, 2017, on which the State has given its concurrence. The ROD includes a responsiveness summary to the public comments. Notice of the selected remedial action was published in accordance with Section 117(b) of CERCLA, 42 U.S.C. § 9617(b).

M.      Based on the information presently available to EPA and the State, EPA and the State believe that the Work will be properly and promptly conducted by SD if conducted in accordance with this CD and its appendices.

N.      Solely for the purposes of Section 113(j) of CERCLA, 42 U.S.C. § 9613(j), the remedy set forth in the ROD and the Work to be performed by SD shall constitute a response action taken or ordered by the President for which judicial review shall be limited to the administrative record.

O.      The Parties recognize, and the Court by entering this CD finds, that this CD has been negotiated by the Parties in good faith and implementation of this CD will expedite the cleanup of the Site and will avoid prolonged and complicated litigation between the Parties, and that this CD is fair, reasonable, and in the public interest.

NOW, THEREFORE, it is hereby Ordered, Adjudged, and Decreed:

## II.      JURISDICTION

1.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1367, and 1345, and 42 U.S.C. §§ 9606, 9607, and 9613(b). This Court also has personal jurisdiction over SD. Solely for the purposes of this CD and the underlying complaint[s], SD waives all objections and defenses that it may have to jurisdiction of the Court or to venue in this District. SD shall not challenge the terms of this CD or this Court's jurisdiction to enter and enforce this CD.

## III.      PARTIES BOUND

2.      This CD is binding upon the United States and the State and upon SD and its successors and assigns. Any change in ownership or corporate or other legal status of SD

including, but not limited to, any transfer of assets or real or personal property, shall in no way alter SD's responsibilities under this CD.

3.      SD shall provide a copy of this CD to each contractor hired to perform the Work and to each person representing SD with respect to the Site or the Work, and shall condition all contracts entered into hereunder upon performance of the Work in conformity with the terms of this CD. SD or its contractors shall provide written notice of the CD to all subcontractors hired to perform any portion of the Work. SD shall nonetheless be responsible for ensuring that its contractors and subcontractors perform the Work in accordance with the terms of this CD. Regarding the activities undertaken pursuant to this CD, each contractor and subcontractor shall be deemed to be in a contractual relationship with SD within the meaning of Section 107(b)(3) of CERCLA, 42 U.S.C. § 9607(b)(3).

## IV.   DEFINITIONS

4.      Unless otherwise expressly provided in this CD, terms used in this CD that are defined in CERCLA or in regulations promulgated under CERCLA shall have the meaning assigned to them in CERCLA or in such regulations. Whenever terms listed below are used in this CD or its appendices, the following definitions shall apply solely for purposes of this CD:

"Affected Property" shall mean all real property at the Site, except for Unnamed Tributary #1 and Surrounding Area.

"Big John's Salvage-Hoult Road Superfund Site" or "BJS Site" shall mean the property located along Hoult Road on the east side of the city of Fairmont, Marion County, West Virginia historically used in the operation of a coal tar refining facility and for salvage operations and waste disposal by Big John Salvage, and surrounding areas where contamination from such operations has come to be located, including Unnamed Tributary #1 and Surrounding Area, and other areas as defined in the BJS Site Consent Decree.

"BJS Site Consent Decree" shall be the Consent Decree entered by the court on October 10, 2012, in *United States, et al., v. Exxon Mobil Corporation, et al.,* Civil Action No. 1:08-cv-124 (N.D. W. Va.).

"CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act, as amended, 42 U.S.C. §§ 9601-9675.

"Consent Decree" or "CD" shall mean this consent decree and all appendices attached hereto (listed in Section XXII). In the event of conflict between this CD and any appendix, this CD shall control.

"Day" or "day" shall mean a calendar day. In computing any period of time under this CD, where the last day would fall on a Saturday, Sunday, or federal or State holiday, the period shall run until the close of business of the next day other than a Saturday, Sunday, or federal or state holiday.

"DOJ" shall mean the United States Department of Justice and its successor departments, agencies, or instrumentalities.

3

"Effective Date" shall mean the date upon which the approval of this CD is recorded on the Court's docket.

"EPA" shall mean the United States Environmental Protection Agency and its successor departments, agencies, or instrumentalities.

"EPA Hazardous Substance Superfund" shall mean the Hazardous Substance Superfund established by the Internal Revenue Code, 26 U.S.C. § 9507.

"Future Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, that the United States incurs in reviewing or developing deliverables submitted pursuant to this CD, in overseeing implementation of the Work, or otherwise implementing, overseeing, or enforcing this CD, including, but not limited to, payroll costs, contractor costs, travel costs, laboratory costs, the costs incurred pursuant to ¶ 11 (Emergencies and Releases), ¶ 12 (Community Involvement) (including the costs of any technical assistance grant under Section 117(e) of CERCLA, 42 U.S.C. § 9617(e)), ¶ 31 (Access to Financial Assurance), Section VII (Remedy Review) (including EPA's costs of performing such reviews), Section VIII (Property Requirements) (including the cost of attorney time and any monies paid to secure or enforce access or land, water, or other resource use restrictions and/or to secure, implement, monitor, maintain, or enforce Institutional Controls including the amount of just compensation), and Section XIII (Dispute Resolution), and all litigation costs. Future Response Costs shall also include all Interim Response Costs.

"Institutional Controls" or "ICs" shall mean Proprietary Controls and state or local laws, regulations, ordinances, zoning restrictions, or other governmental controls or notices that: (a) limit land, water, or other resource use to minimize the potential for human exposure to Waste Material at or in connection with the Site; (b) limit land, water, or other resource use to implement, ensure non-interference with, or ensure the protectiveness of the RA; and/or (c) provide information intended to modify or guide human behavior at or in connection with the Site.

"Interim Response Costs" shall mean all response costs, including, but not limited to, direct and indirect costs, (a) paid by the United States in connection with the Site between November 20, 2017 and the Effective Date, or (b) incurred prior to the Effective Date but paid after that date.

"Interest" shall mean interest at the rate specified for interest on investments of the EPA Hazardous Substance Superfund, compounded annually on October 1 of each year, in accordance with 42 U.S.C. § 9607(a). The applicable rate of interest shall be the rate in effect at the time the interest accrues. The rate of interest is subject to change on October 1 of each year. Rates are available online at https://www.epa.gov/superfund/superfund-interest-rates.

"National Contingency Plan" or "NCP" shall mean the National Oil and Hazardous Substances Pollution Contingency Plan promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300, and any amendments thereto.

"Non-Settling Owner" shall mean any person, other than SD, that owns or controls any Affected Property, including the Fairmont Coke Works Custodial Trust and the West Virginia

State Armory Board. The clause "Non-Settling Owner's Affected Property" means Affected Property owned or controlled by Non-Settling Owner.

"Operation and Maintenance" or "O&M" shall mean all activities required to operate, maintain, and monitor the effectiveness of the RA as specified in the SOW or any EPA-approved O&M Plan.

"Paragraph" or "¶" shall mean a portion of this CD identified by an Arabic numeral or an upper or lower case letter.

"Parties" shall mean the United States, the State of West Virginia, and the SD.

"Past Response Costs" shall mean all response costs, including, but not limited to, direct and indirect costs, that the United States paid at or in connection with the Site through November 20, 2017, plus Interest on all such costs that has accrued pursuant to 42 U.S.C. § 9607(a) through such date.

"Performance Standards" or "PS" shall mean the cleanup levels and other measures of achievement of the Remedial Action Objectives, as set forth in the ROD and the SOW.

"Plaintiffs" shall mean the United States and the State of West Virginia.

"Prior Encumbrances" shall mean all recorded matters that affect title to the Affected Property, including all prior liens, claims, rights (such as easements), mortgages, and other encumbrances.

"Proprietary Controls" shall mean easements or covenants running with the land that (a) limit land, water, or other resource use and/or provide access rights and (b) are created pursuant to common law or statutory law by an instrument that is recorded in the appropriate land records office.

"RCRA" shall mean the Solid Waste Disposal Act, 42 U.S.C. §§ 6901-6992 (also known as the Resource Conservation and Recovery Act).

"Record of Decision" or "ROD" shall mean (1) the EPA Record of Decision relating to the Sharon Steel/Fairmont Coke Works Superfund Site signed on December 19, 2017, by the Director of the Hazardous Site Cleanup Division, EPA Region III, or her delegate, and all attachments thereto, and (2) any Explanations of Significant Difference EPA subsequently issues and (3) any memoranda with minor modifications that EPA places in the RD/RA case file in connection therewith. The ROD is attached as Appendix A.

"Release Line" shall mean the surveyed transect established by the parties to the BJS Site Consent Decree to legally separate responsibility for contaminant remediation between the BJS Site and the adjacent FCW Site. The Release Line extends from the point labeled "Point 1" to the point labeled "Point 44," as depicted generally (and with GPS coordinates) on the map attached as Appendix B.

"Remedial Action" or "RA" shall mean the remedial action selected in the ROD that will be implemented in accordance with the SOW, the Remedial Design, and the Remedial Action Work Plan.

"Remedial Design" or "RD" shall mean those activities to be undertaken by SD to develop final plans and specifications for the RA as stated in the SOW.

"Section" shall mean a portion of this CD identified by a Roman numeral.

"Settling Defendant" or "SD" shall mean Exxon Mobil Corporation.

"Sharon Steel/Fairmont Coke Works Special Account" shall mean the special account, within the EPA Hazardous Substance Superfund, established for the Site by EPA pursuant to Section 122(b)(3) of CERCLA, 42 U.S.C. § 9622(b)(3).

"Site" or "FCW Site" shall mean the Sharon Steel/Fairmont Coke Works Superfund Site, encompassing approximately 97 acres, located south of Suncrest Avenue in Fairmont, Marion County, West Virginia, and depicted generally on the map attached as Appendix B. The Site includes no portion of the Monongahela River.

"State" shall mean the State of West Virginia.

"State Future Response Costs" shall mean all response costs, including, but not limited to, direct and indirect costs and attorney's fees as defined in Section 101(25) of CERCLA, 42 U.S.C. § 9601(25), and Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), that are incurred pursuant to this Consent Decree associated with the Site after the Effective Date.

"Statement of Work" or "SOW" shall mean the document describing the activities SD must perform to implement the RD, the RA, and O&M regarding the Site, which is attached as Appendix C.

"Supervising Contractor" shall mean the principal contractor retained by SD to supervise and direct the implementation of the Work under this CD.

"Transfer" shall mean to sell, assign, convey, lease, mortgage, or grant a security interest in, or where used as a noun, a sale, assignment, conveyance, or other disposition of any interest by operation of law or otherwise.

"United States" shall mean the United States of America and each department, agency, and instrumentality of the United States, including EPA, and any federal natural resource trustee.

"Unnamed Tributary #1" shall mean the network of intermittent streams draining the western portion of the FCW Site and which receives drainage and discharge from both the BJS Site and the FCW Site. Unnamed Tributary #1 discharges to the Monongahela River.

"Unnamed Tributary #1 and Surrounding Area" shall mean the area between the BJS Site eastern property boundary and the surveyed "Release Line" south of the watercourse denoted "Northern Drainage Way and "Unnamed Tributary No. 1," as depicted on the Site map attached as Appendix B.  This area includes all portions of the watercourses west and north of the release line, but no portion of the Monongahela River.

"WVDEP" shall mean the West Virginia Department of Environmental Protection and any successor departments or agencies of the State.

"Waste Material" shall mean (1) any "hazardous substance" under Section 101(14) of CERCLA, 42 U.S.C. § 9601(14); (2) any pollutant or contaminant under Section 101(33) of CERCLA, 42 U.S.C. § 9601(33); and (3) any "solid waste" under Section 1004(27) of RCRA, 42 U.S.C. § 6903(27).

"Work" shall mean all activities and obligations SD is required to perform under this CD, except the activities required under Section XIX (Retention of Records).

## V.   GENERAL PROVISIONS

5.     **Objectives of the Parties**. The objectives of the Parties in entering into this CD are to protect public health or welfare or the environment by the design and implementation of response actions at the Site by SD, to pay certain response costs of Plaintiffs, and to resolve the claims of Plaintiffs against SD as provided in this CD.

6.     **Commitments by SD.** SD shall finance and perform the Work in accordance with this CD and all deliverables developed by SD and approved or modified by EPA pursuant to this CD. SD shall pay the United States for its response costs and the State for its response costs as provided in this CD.

7.     **Compliance with Applicable Law**. Nothing in this CD limits SD's obligation to comply with the requirements of all applicable federal and state laws and regulations. SD must also comply with all applicable or relevant and appropriate requirements of all federal and state environmental laws as set forth in the ROD and the SOW. The activities conducted pursuant to this CD, if approved by EPA, shall be deemed to be consistent with the NCP as provided in Section 300.700(c)(3)(ii) of the NCP.

8.     **Permits**

a.     As provided in Section 121(e) of CERCLA, 42 U.S.C. § 9621(e), and Section 300.400(e) of the NCP, no permit shall be required for any portion of the Work conducted entirely on-Site (i.e., within the areal extent of contamination or in very close proximity to the contamination and necessary for implementation of the Work). Where any portion of the Work that is not on-Site requires a federal or state permit or approval, SD shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals.

b.     SD may seek relief under the provisions of Section XII (Force Majeure) for any delay in the performance of the Work resulting from a failure to obtain, or a delay in obtaining, any permit or approval referenced in ¶ 8.a and required for the Work, provided that it has submitted timely and complete applications and taken all other actions necessary to obtain all such permits or approvals.

c.     This CD is not, and shall not be construed to be, a permit issued pursuant to any federal or state statute or regulation.

# VI.   PERFORMANCE OF THE WORK

9.   **Coordination and Supervision**

a.   **Project Coordinators**

(1)   SD's Project Coordinator must have sufficient technical expertise to coordinate the Work. SD's Project Coordinator may not be an attorney representing SD in this matter and may not act as the Supervising Contractor. SD's Project Coordinator may assign other representatives, including other contractors, to assist in coordinating the Work.

(2)   EPA shall designate and notify SD of EPA's Project Coordinator and Alternate Project Coordinator. EPA may designate other representatives, which may include its employees, contractors and/or consultants, to oversee the Work. EPA's Project Coordinator/Alternate Project Coordinator will have the same authority as a remedial project manager and/or an on-scene coordinator, as described in the NCP. This includes the authority to halt the Work and/or to conduct or direct any necessary response action when he or she determines that conditions at the Site constitute an emergency or may present an immediate threat to public health or welfare or the environment due to a release or threatened release of Waste Material.

(3)   The State shall designate and notify EPA and SD of its Project Coordinator and Alternate Project Coordinator. The State may designate other representatives, including its employees, contractors and/or consultants to oversee the Work. For any meetings and inspections in which EPA's Project Coordinator participates, the State's Project Coordinator also may participate. SD shall notify the State reasonably in advance of any such meetings or inspections.

(4)   SD's Project Coordinators shall meet with EPA's and the State's Project Coordinators at least quarterly.

b.   **Supervising Contractor**. SD's proposed Supervising Contractor must have sufficient technical expertise to supervise the Work and a quality assurance system that complies with ANSI/ASQC E4-2004, Quality Systems for Environmental Data and Technology Programs: Requirements with Guidance for Use (American National Standard).

c.   **Procedures for Disapproval/Notice to Proceed**

(1)   SD shall designate, and notify EPA, within 10 days after the Effective Date, of the name[s], title[s], contact information, and qualifications of the SD's proposed Project Coordinator and Supervising Contractor, whose qualifications shall be subject to EPA's review for verification based on objective assessment criteria (e.g., experience, capacity, technical expertise) and do not have a conflict of interest with respect to the project.

(2)   EPA shall issue notices of disapproval and/or authorizations to proceed regarding the proposed Project Coordinator and Supervising Contractor, as applicable. If EPA issues a notice of disapproval, SD shall, within 30 days,

8

submit to EPA a list of supplemental proposed Project Coordinators and/or Supervising Contractors, as applicable, including a description of the qualifications of each. EPA shall issue a notice of disapproval or authorization to proceed regarding each supplemental proposed coordinator and/or contractor. SD may select any coordinator/contractor covered by an authorization to proceed and shall, within 21 days, notify EPA of SD's selection. EPA may disapprove a previously approved Project Coordinator or Supervising Contractor at any time. In such event, SDs shall submit a list of proposed replacements in accordance with this Paragraph.

(3)    SD may change its Project Coordinator and/or Supervising Contractor, as applicable, by following the procedures of ¶¶ 9.c(1) and 9.c(2).

(4)    Notwithstanding the procedures of ¶¶ 9.c(1) through 9.c(3), SD has proposed, and EPA has authorized SD to proceed, regarding the following Project Coordinator and Supervising Contractor:

> Project Coordinator:  Bruce Frink, Exxon Mobil Corporation, 16057 Tampa Palms Blvd. West, #214, Tampa, FL 33647; Telephone (813) 991-7413; Email bruce.r.frink@exxonmobil.com
>
> Supervising Contractor:  Robert J. Anderson, ARCADIS U.S., Inc., 6041 Wallace Road Extension, Suite 300, Wexford, PA 15090; Telephone (724) 742-9180 x527; Email rob.anderson@arcadis-US.com

10.    **Performance of Work in Accordance with SOW**. SD shall: (a) develop the RD; (b) perform the RA; and (c) operate, maintain, and monitor the effectiveness of the RA; all in accordance with the SOW and all EPA-approved, conditionally-approved, or modified deliverables as required by the SOW. All deliverables required to be submitted for approval under the CD or SOW shall be subject to approval by EPA in accordance with ¶ 6.6 (Approval of Deliverables) of the SOW.

11.    **Emergencies and Releases**. SD shall comply with the emergency and release response and reporting requirements under ¶ 4.4 (Emergency Response and Reporting) of the SOW. Subject to Section XV (Covenants by Plaintiffs), nothing in this CD, including ¶ 4.4 of the SOW, limits any authority of Plaintiffs: (a) to take all appropriate action to protect human health and the environment or to prevent, abate, respond to, or minimize an actual or threatened release of Waste Material on, at, or from the Site, or (b) to direct or order such action, or seek an order from the Court, to protect human health and the environment or to prevent, abate, respond to, or minimize an actual or threatened release of Waste Material on, at, or from the Site. If, due to SD's failure to take appropriate response action under ¶ 4.4 of the SOW, EPA or, as appropriate, the State, take such action instead, SD shall reimburse EPA and the State under Section X (Payments for Response Costs) for all costs of the response action.

12.    **Community Involvement**. If requested by EPA, SD shall conduct community involvement activities under EPA's oversight as provided for in, and in accordance with, Section 2 (Community Involvement) of the SOW. Such activities may include, but are not limited to, designation of a Community Involvement Coordinator. Costs incurred by the United

States under this Section constitute Future Response Costs to be reimbursed under Section X (Payments for Response Costs).

13. **Modification of SOW or Related Deliverables**

a. If EPA determines that it is necessary to modify the Work specified in the SOW and/or in deliverables developed under the SOW to achieve and/or maintain the Performance Standards or to carry out and maintain the effectiveness of the RA, and such modification is consistent with the Scope of the Remedy set forth in ¶ 1.3 of the SOW, then EPA may notify SD of such modification. If SD objects to the modification it may, within 30 days after EPA's notification, seek dispute resolution under Section XIII (Dispute Resolution).

b. The SOW and/or related work plans or deliverables shall be modified: (1) in accordance with the modification issued by EPA; or (2) if SD invokes dispute resolution, in accordance with the final resolution of the dispute. The modification shall be incorporated into and enforceable under this CD, and SD shall implement all work required by such modification. SD shall incorporate the modification into the deliverables required under the SOW, as appropriate.

c. The EPA Project Coordinator may approve extensions to any schedule in the SOW or any work plan approved by EPA under the SOW without the signatures of the Parties or approval of the Court.

d. Nothing in this Paragraph shall be construed to limit EPA's authority to require performance of further response actions as otherwise provided in this CD.

14. Nothing in this CD, the SOW, or any deliverable required under the SOW constitutes a warranty or representation of any kind by Plaintiffs that compliance with the work requirements set forth in the SOW or related deliverable will achieve the Performance Standards.

## VII. REMEDY REVIEW

15. **Periodic Review**. SD shall conduct, in accordance with ¶ 4.8 (Periodic Review Support Plan) of the SOW, studies and investigations to support EPA's reviews of whether the RA is protective of human health and the environment (which reviews shall be included as part of overseeing implementation of the Work) under Section 121(c) of CERCLA, 42 U.S.C. § 9621(c), and applicable regulations.

16. **EPA Selection of Further Response Actions**. If EPA determines, at any time, that the RA is not protective of human health and the environment, EPA may select further response actions for the Site in accordance with the requirements of CERCLA and the NCP.

17. **Opportunity to Comment**. SD and, if required by Section 113(k)(2) or 117 of CERCLA, 42 U.S.C. § 9613(k)(2) or 9617, the public will be provided with an opportunity to comment on any further response actions proposed by EPA as a result of the review conducted pursuant to Section 121(c) of CERCLA and to submit written comments for the record during the comment period.

18. **SD's Obligation to Perform Further Response Actions**. If EPA selects further response actions relating to the Site, EPA may require SD to perform such further response

(7)     Implementing the Work pursuant to the conditions set forth in ¶ 70 (Work Takeover);

(8)     Inspecting and copying records, operating logs, contracts, or other documents maintained or generated by SD or its agents, consistent with Section XVIII (Access to Information);

(9)     Assessing SD's compliance with the CD;

(10)     Determining whether the Affected Property is being used in a manner that is prohibited or restricted, or that may need to be prohibited or restricted under the CD; and

(11)     Implementing, monitoring, maintaining, reporting on, and enforcing any land, water, or other resource use restrictions and Institutional Controls.

b.     **Land, Water, or Other Resource Use Restrictions**. The following is a list of land, water, or other resource use restrictions applicable to the Affected Property:

(1)     Prohibiting residential land use and the extraction of groundwater from the aquifer beneath the Site for use as a potable water source;

(2)     Ensuring that future construction workers who are required to work in a subsurface trench that may be subject to a hazardous atmosphere, are notified and standard precautions, such as OSHA-mandated protocol to provide ventilation and proper respiratory protection, are required; and

(3)     Ensuring that any new structures within a geographical area referred to as the Vapor Intrusion Protection Area at the Site will be constructed with vapor mitigation methods to minimize potential risk of inhalation of contaminants unless owner or developer demonstrates to EPA's satisfaction that VI mitigation is not necessary.

21.     **Proprietary Controls.** SD shall, with respect to any Non-Settling Owner's Affected Property, use best efforts to secure Non-Settling Owner's cooperation in executing and recording, in accordance with the procedures of this ¶ 21, Proprietary Controls that: (i) grant a right of access to conduct any activity regarding the CD, including those activities listed in ¶ 20.a (Access Requirements); and (ii) grant the right to enforce the land, water, or other resource use restrictions set forth in ¶ 20.b (Land, Water, or Other Resource Use Restrictions).

a.     **Grantees**. The Proprietary Controls must be granted to one or more of the following persons and their representatives, as determined by EPA: the United States, the State, SD, and other appropriate grantees. Proprietary Controls in the nature of a Uniform Environmental Covenants Act (UECA) document granted to persons other than the United States must include a designation that EPA (and/or the State as appropriate) is either an "agency" or a party expressly granted the right of access and the right to enforce the covenants allowing EPA and/or the State to maintain the right to enforce the Proprietary Controls without acquiring an interest in real property.

actions, but only to the extent that the reopener conditions in ¶ 66 or 67 (United States' Pre- and Post-Certification Reservations) are satisfied. SD may invoke the procedures set forth in Section XIII (Dispute Resolution) to dispute (a) EPA's determination that the reopener conditions of ¶ 66 or 67 are satisfied, (b) EPA's determination that the RA is not protective of human health and the environment, or (c) EPA's selection of the further response actions. Disputes regarding EPA's determination that the RA is not protective or EPA's selection of further response actions shall be resolved pursuant to ¶ 50 (Record Review).

19.     **Submission of Plans**. If SD is required to perform further response actions pursuant to ¶ 18, SD shall submit a plan for such response action to EPA for approval in accordance with the procedures of Section VI (Performance of the Work). SD shall implement the approved plan in accordance with this CD.

## VIII.  PROPERTY REQUIREMENTS

20.     **Agreements Regarding Access and Non-Interference**. SD shall, with respect to any Non-Settling Owner's Affected Property, use best efforts to secure from such Non-Settling Owner an agreement, enforceable by SD and by Plaintiffs, providing that such Non-Settling Owner will: (i) provide Plaintiffs and SD, their representatives, contractors, and subcontractors with access at all reasonable times to such Affected Property to conduct any activity under the CD, including those listed in ¶ 20.a (Access Requirements); and (ii) refrain from using such Affected Property in any manner that EPA determines will pose an unacceptable risk to human health or to the environment due to exposure to Waste Material, or interfere with or adversely affect the implementation, integrity, or protectiveness of the Remedial Action, including the restrictions listed in ¶ 20.b (Land, Water, or Other Resource Use Restrictions).  If SD has secured any of these agreements, they may be used to meet the requirements of this provision, upon submission and formal approval of EPA.  SD shall provide a copy of such access and use restriction agreement(s) to EPA and the State.

a.     **Access Requirements**. The following is a list of activities for which access is required regarding the Affected Property:

(1)     Implementing and monitoring the Work;

(2)     Verifying any data or information submitted to the United States or the State;

(3)     Conducting investigations regarding contamination at or near the Site;

(4)     Obtaining samples;

(5)     Assessing the need for, planning, or implementing additional response actions at or near the Site;

(6)     Assessing implementation of quality assurance and quality control practices as defined in the approved construction quality assurance quality control plan as provided in the SOW;

b.      **Initial Title Evidence**. SD shall, within 45 days after the Effective Date:

(1)      **Record Title Evidence**. Submit to EPA a title insurance commitment or other title evidence acceptable to EPA that: (i) names the proposed insured or the party in whose favor the title evidence runs, or the party who will hold the real estate interest, or if that party is uncertain, names the United States, the State, the SD, or "To Be Determined;" (ii) covers the Affected Property that is to be encumbered; (iii) demonstrates that the person or entity that will execute and record the Proprietary Controls is the owner of such Affected Property; (iv) identifies all record matters that affect title to the Affected Property, including all prior liens, claims, rights (such as easements), mortgages, and other encumbrances (collectively, "Prior Encumbrances"); and (v) includes complete, legible copies of such Prior Encumbrances; and

(2)      **Non-Record Title Evidence**. Submit to EPA a report of the results of an investigation, including a physical inspection of the Affected Property, which identifies non-record matters that could affect the title, such as unrecorded leases or encroachments.

c.      **Release or Subordination of Prior Liens, Claims, and Encumbrances**

(1)      SD shall secure the release, subordination, modification, or relocation of all Prior Encumbrances on the title to the Affected Property revealed by the title evidence or otherwise known to any SD, unless EPA waives this requirement as provided under ¶¶ 21.c(2)-(4).

(2)      SD may, by the deadline under ¶ 21.b (Initial Title Evidence), submit an initial request for waiver of the requirements of ¶ 21.c(1) regarding one or more Prior Encumbrances, on the grounds that such Prior Encumbrances cannot defeat or adversely affect the rights to be granted by the Proprietary Controls and cannot interfere with the remedy or result in unacceptable exposure to Waste Material.

(3)      SD may, within 90 days after the Effective Date, or if an initial waiver request has been filed, within 45 days after EPA's determination on the initial waiver request, submit a final request for a waiver of the requirements of ¶ 21.c(1) regarding any particular Prior Encumbrance on the grounds that SD could not obtain the release, subordination, modification, or relocation of such Prior Encumbrance despite best efforts.

(4)      The initial and final waiver requests must include supporting evidence including descriptions of and copies of the Prior Encumbrances and maps showing areas affected by the Prior Encumbrances. The final waiver request also must include evidence of efforts made to secure release, subordination, modification, or relocation of the Prior Encumbrances.

(5)      SD shall complete its obligations under ¶ 21.c(1) regarding all Prior Encumbrances: within 180 days after the Effective Date; or if an initial waiver request has been filed, within 135 days after EPA's determination on the

initial waiver request; or if a final waiver request has been filed, within 90 days after EPA's determination on the final waiver request.

d.     **Update to Title Evidence and Recording of Proprietary Controls**

(1)     SD shall submit to EPA for review and approval, by the deadline specified in ¶ 21.c(5), all draft Proprietary Controls and draft instruments addressing Prior Encumbrances. The Proprietary Controls must be in substantially the form attached hereto as Appendix D.

(2)     Upon EPA's approval of the proposed Proprietary Controls and instruments addressing Prior Encumbrances, SD shall, within 30 days, update the original title insurance commitment (or other evidence of title acceptable to EPA) under ¶ 21.b (Initial Title Evidence). If the updated title examination indicates that no liens, claims, rights, or encumbrances have been recorded since the effective date of the original commitment (or other title evidence), SD shall promptly secure the recordation of the Proprietary Controls and instruments addressing Prior Encumbrances in the appropriate land records. Otherwise, SD shall secure the release, subordination, modification, or relocation under ¶ 21.c(1), or the waiver under ¶¶ 21.c(2)-(4), regarding any newly-discovered liens, claims, rights, and encumbrances, prior to recording the Proprietary Controls and instruments addressing Prior Encumbrances.

(3)     If SD submitted a title insurance commitment under ¶ 21.b(1) (Record Title Evidence), then upon the recording of the Proprietary Controls and instruments addressing Prior Encumbrances, SD shall obtain a title insurance policy that: (i) is consistent with the original title insurance commitment; (ii) is for $100,000 or other amount approved by EPA; (iii) is issued to the United States, SD, or other person approved by EPA; and (iv) is issued on a current American Land Title Association (ALTA) form or other form approved by EPA.

(4)     SD shall, within 30 days after recording the Proprietary Controls and instruments addressing Prior Encumbrances, or such other deadline approved by EPA, provide to the United States and to all grantees of the Proprietary Controls: (i) certified copies of the recorded Proprietary Controls and instruments addressing Prior Encumbrances showing the clerk's recording stamps; and (ii) the title insurance policy(ies) or other approved form of updated title evidence dated as of the date of recording of the Proprietary Controls and instruments.

e.     SD shall monitor and at least annually (or at such other interval as EPA may agree in writing) report on all Proprietary Controls required under this CD, and shall cooperate in EPA or State efforts to enforce Proprietary Controls.

22.     **Best Efforts**. As used in this Section, "best efforts" means the efforts that a reasonable person in the position of SD would use so as to achieve the goal in a timely manner, including the cost of employing professional assistance and the payment of reasonable sums of money to secure access and/or use restriction agreements, Proprietary Controls, releases, subordinations, modifications, or relocations of Prior Encumbrances that affect the title to the Affected Property, as applicable. If SD is unable to accomplish what is required through "best

efforts" in a timely manner, it shall notify EPA, and include a description of the steps taken to comply with the requirements. If the United States deems it appropriate, it may assist SD, or take independent action, in obtaining such access and/or use restrictions, Proprietary Controls, releases, subordinations, modifications, or relocations of Prior Encumbrances that affect the title to the Affected Property, as applicable. All costs incurred by the United States in providing such assistance or taking such action, including the cost of attorney time and the amount of monetary consideration or just compensation paid, constitute Future Response Costs to be reimbursed under Section X (Payments for Response Costs).

23.     If EPA determines in a decision document prepared in accordance with the NCP that Institutional Controls in the form of state or local laws, regulations, ordinances, zoning restrictions, or other governmental controls or notices are needed, SD shall cooperate with EPA's and the State's efforts to secure and ensure compliance with such Institutional Controls.

24.     In the event of any Transfer of the Affected Property, unless the United States otherwise consents in writing, SD shall continue to comply with its obligations under the CD, including its obligation to secure access and monitor compliance with any land, water, or other resource use restrictions regarding the Affected Property, and to monitor, and report on compliance with Institutional Controls.

25.     Notwithstanding any provision of the CD, Plaintiffs retain all of their access authorities and rights, as well as all of their rights to require land, water, or other resource use restrictions and Institutional Controls, including enforcement authorities related thereto, under CERCLA, RCRA, and any other applicable statute or regulations.

## IX.    FINANCIAL ASSURANCE

26.     In order to ensure completion of the Work, SD shall secure financial assurance, initially in the amount of $2,798,000 ("Estimated Cost of the Work"), for the benefit of EPA. The financial assurance must be one or more of the mechanisms listed below, in a form substantially identical to the relevant sample documents available from EPA or under the "Financial Assurance - Settlements" category on the Cleanup Enforcement Model Language and Sample Documents Database at https://cfpub.epa.gov/compliance/models/, and satisfactory to EPA. SD may use multiple mechanisms if they are limited to surety bonds guaranteeing payment, letters of credit, and/or trust funds.

a.     A surety bond guaranteeing payment and/or performance of the Work that is issued by a surety company among those listed as acceptable sureties on federal bonds as set forth in Circular 570 of the U.S. Department of the Treasury;

b.     An irrevocable letter of credit, payable to or at the direction of EPA, that is issued by an entity that has the authority to issue letters of credit and whose letter-of-credit operations are regulated and examined by a federal or state agency;

c.     A trust fund established for the benefit of EPA that is administered by a trustee that has the authority to act as a trustee and whose trust operations are regulated and examined by a federal or state agency;

d.     A demonstration by SD that it meets the relevant test criteria of ¶ 28; or

15

e.    A guarantee to fund or perform the Work executed in favor of EPA by a company: (1) that is a direct or indirect parent company of SD or has a "substantial business relationship" (as defined in 40 C.F.R. § 264.141(h)) with SD; and (2) can demonstrate to EPA's satisfaction that it meets the financial test criteria of ¶ 28.

27.    SD seeking to provide financial assurance under ¶ 26.a, 26.b or 26.c, shall, within 30 days of the Effective Date, obtain EPA's approval of the form of SD's financial assurance. Within 30 days of such approval, SD shall secure all executed and/or otherwise finalized mechanisms or other documents consistent with the EPA-approved form of financial assurance and shall submit such mechanisms and documents to the following person:

<div align="center">

Karen Melvin, Director (3HS00)
Hazardous Site Cleanup Division
EPA Region III
1650 Arch Street
Philadelphia, PA 19103

</div>

and provide copies to the United States, and to EPA and the State as specified in Section XX (Notices and Submissions).

28.    SD seeking to provide financial assurance by means of a demonstration or guarantee under ¶ 26.d or 26.e, must, within 30 days of the Effective Date:

a.    Demonstrate that:

(1)    The SD or guarantor has:

i.    Two of the following three ratios: a ratio of total liabilities to net worth less than 2.0; a ratio of the sum of net income plus depreciation, depletion, and amortization to total liabilities greater than 0.1; and a ratio of current assets to current liabilities greater than 1.5; and

ii.    Net working capital and tangible net worth each at least six times the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations financially assured through the use of a financial test or guarantee; and

iii.    Tangible net worth of at least $10 million; and

iv.    Assets located in the United States amounting to at least 90 percent of total assets or at least six times the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations financially assured through the use of a financial test or guarantee; or

(2)    The SD or guarantor has:

<div align="center">

16

</div>

      i.       A current rating for its senior unsecured debt of AAA, AA, A, or BBB as issued by Standard and Poor's or Aaa, Aa, A or Baa as issued by Moody's; and

      ii.     Tangible net worth at least six times the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations financially assured through the use of a financial test or guarantee; and

      iii.    Tangible net worth of at least $10 million; and

      iv.    Assets located in the United States amounting to at least 90 percent of total assets or at least six times the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations financially assured through the use of a financial test or guarantee; and

      b.     Submit to EPA for the SD or guarantor: (1) a copy of an independent certified public accountant's report of the entity's financial statements for the latest completed fiscal year, which must not express an adverse opinion or disclaimer of opinion; and (2) a letter from its chief financial officer and a report from an independent certified public accountant substantially identical to the sample letter and reports available from EPA or under the "Financial Assurance - Settlements" subject list category on the Cleanup Enforcement Model Language and Sample Documents Database at https://cfpub.epa.gov/compliance/models/.

      29.     If SD is providing financial assurance by means of a demonstration or guarantee under ¶ 26.d or 26.e, SD must also:

      a.     Annually resubmit the documents described in ¶ 28.b within 90 days after the close of the SD's or guarantor's fiscal year;

      b.     Notify EPA within 30 days after the SD or guarantor determines that it no longer satisfies the relevant financial test criteria and requirements set forth in this Section; and

      c.     Provide to EPA, within 30 days of EPA's request, reports of the financial condition of the SD or guarantor in addition to those specified in ¶ 28.b; EPA may make such a request at any time based on a belief that the SD or guarantor may no longer meet the financial test requirements of this Section.

      30.     SD shall diligently monitor the adequacy of the financial assurance. If SD becomes aware of any information indicating that the financial assurance provided under this Section is inadequate or otherwise no longer satisfies the requirements of this Section, SD shall notify EPA of such information within 7 days. If EPA determines that the financial assurance provided under this Section is inadequate or otherwise no longer satisfies the requirements of this Section, EPA will notify SD of such determination. SD shall, within 30 days after notifying EPA or receiving notice from EPA under this Paragraph, secure and submit to EPA for approval a proposal for a revised or alternative financial assurance mechanism that satisfies the requirements of this Section. EPA may extend this deadline for such time as is reasonably

necessary for SD, in the exercise of due diligence, to secure and submit to EPA a proposal for a revised or alternative financial assurance mechanism, not to exceed 60 days. SD shall follow the procedures of ¶ 32 (Modification of Financial Assurance) in seeking approval of, and submitting documentation for, the revised or alternative financial assurance mechanism. SD's inability to secure financial assurance in accordance with this Section does not excuse performance of any other obligation under this CD.

31.    **Access to Financial Assurance**

a.      If EPA issues a notice of implementation of a Work Takeover under ¶ 70.b, then, in accordance with any applicable financial assurance mechanism, EPA is entitled to: (1) the performance of the Work; and/or (2) require that any funds guaranteed be paid in accordance with ¶ 31.d.

b.      If EPA is notified by the issuer of a financial assurance mechanism that it intends to cancel the mechanism, and the SD fails to provide an alternative financial assurance mechanism in accordance with this Section at least 30 days prior to the cancellation date, the funds guaranteed under such mechanism must be paid prior to cancellation in accordance with ¶ 31.d.

c.      If, upon issuance of a notice of implementation of a Work Takeover under ¶ 70.b, either: (1) EPA is unable for any reason to promptly secure the resources guaranteed under any applicable financial assurance mechanism, whether in cash or in kind, to continue and complete the Work; or (2) the financial assurance is a demonstration or guarantee under ¶ 26.d or 26.e, then EPA is entitled to demand an amount, as determined by EPA, sufficient to cover the cost of the remaining Work to be performed. SD shall, within 30 days of such demand, pay the amount demanded as directed by EPA.

d.      Any amounts required to be paid under this ¶ 31 shall be, as directed by EPA: (i) paid to EPA in order to facilitate the completion of the Work by EPA or by another person; or (ii) deposited into an interest-bearing account, established at a duly chartered bank or trust company that is insured by the FDIC, in order to facilitate the completion of the Work by another person. If payment is made to EPA, EPA may deposit the payment into the EPA Hazardous Substance Superfund or into the Sharon Steel/Fairmont Coke Works Special Account within the EPA Hazardous Substance Superfund to be retained and used to conduct or finance response actions at or in connection with the Site, or to be transferred by EPA to the EPA Hazardous Substance Superfund.

e.      All EPA Work Takeover costs not paid under this ¶ 31 must be reimbursed as Future Response Costs under Section X (Payments for Response Costs).

32.    **Modification of Amount, Form, or Terms of Financial Assurance**. SD may submit, no more than once during each calendar year after the first anniversary of the Effective Date or at any other time agreed to by the Parties, a request to reduce the amount, or change the form or terms, of the financial assurance mechanism. Any such request must be submitted to EPA in accordance with ¶ 27, and must include an estimate of the cost of the remaining Work, an explanation of the bases for the cost calculation, and a description of the proposed changes, if any, to the form or terms of the financial assurance. EPA will notify SD of its decision to approve or disapprove a requested reduction or change pursuant to this Paragraph. SD may

reduce the amount of the financial assurance mechanism only in accordance with: (a) EPA's approval; or (b) if there is a dispute, the agreement, final administrative decision, or final judicial decision resolving such dispute under Section XIII (Dispute Resolution). SD may change the form or terms of the financial assurance mechanism only in accordance with EPA's approval. Any decision made by EPA on a request submitted under this Paragraph to change the form or terms of a financial assurance mechanism shall not be subject to challenge by SD pursuant to the dispute resolution provisions of this CD or in any other forum. Within 30 days after receipt of EPA's approval of, or the agreement or decision resolving a dispute relating to, the requested modifications pursuant to this Paragraph, SD shall submit to EPA documentation of the reduced, revised, or alternative financial assurance mechanism in accordance with ¶ 27.

33.     **Release, Cancellation, or Discontinuation of Financial Assurance**. SD may release, cancel, or discontinue any financial assurance provided under this Section only: (a) if EPA issues a Certification of Work Completion under ¶ 4.9 (Certification of Work Completion) of the SOW; (b) in accordance with EPA's approval of such release, cancellation, or discontinuation; or (c) if there is a dispute regarding the release, cancellation or discontinuance of any financial assurance, in accordance with the agreement, final administrative decision, or final judicial decision resolving such dispute under Section XIII (Dispute Resolution).

## X.     PAYMENTS FOR RESPONSE COSTS

34.     **Payment by SD for United States Past Response Costs**.

a.     Within 60 days after the Effective Date, SD shall pay to EPA $250,000.00 in payment for Past Response Costs. Payment shall be made in accordance with ¶ 36.a (instructions for Past Response Cost payments).

b.     **Deposit of Past Response Costs Payment**. The amount to be paid by SD pursuant to ¶ 34.a shall be deposited by EPA in the Sharon Steel/Fairmont Coke Works Special Account to be retained and used to conduct or finance response actions at or in connection with the Site, or to be transferred by EPA to the EPA Hazardous Substance Superfund.

35.     **Payments by SD for Future Response Costs and State Future Response Costs**. SD shall pay to EPA all Future Response Costs, and to the State all State Future Response Costs, not inconsistent with the NCP.

a.     **Periodic Bills**. On a periodic basis, EPA will send SD a bill requiring payment that includes an itemized cost summary including direct and indirect costs incurred by EPA, its contractors, and DOJ, and brief but specific descriptions of the work performed by each contractor during the billing period. For each EPA employee who charged time during the billing period against the Site, EPA will provide the Superfund activity codes charged and descriptions of those codes.  SD shall make all payments within 60 days after SD's receipt of each bill requiring payment, except as otherwise provided in ¶ 37, in accordance with ¶ 36.b (instructions for Future Response Cost payments).

b.     **Deposit of Future Response Costs Payments**. The total amount to be paid by SD pursuant to ¶ 35.a (Periodic Bills) shall be deposited by EPA in the Sharon Steel/Fairmont Coke Works Special Account to be retained and used to conduct or finance response actions at or in connection with the Site, or to be transferred by EPA to the EPA

Hazardous Substance Superfund, provided, however, that EPA may deposit a Future Response Costs payment directly into the EPA Hazardous Substance Superfund if, at the time the payment is received, EPA estimates that the Sharon Steel/Fairmont Coke Works Special Account balance is sufficient to address currently anticipated future response actions to be conducted or financed by EPA at or in connection with the Site. Any decision by EPA to deposit a Future Response Costs payment directly into the EPA Hazardous Substance Superfund for this reason shall not be subject to challenge by SD pursuant to the dispute resolution provisions of this CD or in any other forum.

c.   **Payments by SD to State.** The State will send SD a bill requiring payment of State Future Response Costs that includes a cost invoice on a periodic basis. SD shall make all payments within 60 days after SD's receipt of each bill requiring payment, except as otherwise provided in ¶ 37 (Contesting Future Response Costs). SD shall make all payments to the State required by this Paragraph by official bank check(s) made payable to the West Virginia Department of Environmental Protection. SD shall send the bank check(s) to:

> West Virginia Department of Environmental Protection
> Office of Environmental Remediation
> Attn: Greg Null
> 601 57th Street Southeast
> Charleston, WV 25304

36.   **Payment Instructions for SD**

a.   **Past Response Cost Payments**.

(1)   The Financial Litigation Unit (FLU) of the United States Attorney's Office for the Northern District of West Virginia shall provide SD, in accordance with ¶ 92, with instructions regarding making payments to DOJ on behalf of EPA. The instructions must include a Consolidated Debt Collection System (CDCS) number to identify payments made under this CD.

(2)   For all payments subject to this ¶ 36.a, SD shall make such payment by Fedwire Electronic Funds Transfer (EFT) to the U.S. DOJ account, in accordance with the instructions provided under ¶ 36.a(1), and including references to the CDCS Number, Site/Spill ID Number 036E, and DJ Number 90-11-3-06663/2.

(3)   For each payment made under this ¶ 36.a, SD shall send notices, including references to the CDCS, Site/Spill ID Number 036E, and DJ Number 90-11-3-06663/2, to the United States, EPA, and the EPA Cincinnati Finance Center, all in accordance with ¶ 92.

b.   **Future Response Cost Payments and Stipulated Penalties**

(1)   For all payments subject to this ¶ 36.b, SD shall make such payment by Fedwire EFT, referencing the Site/Spill ID Number 036E and DJ Number. 90-11-3-06663/2. The Fedwire EFT payment must be sent as follows:

Federal Reserve Bank of New York
ABA = 021030004
Account = 68010727
SWIFT address = FRNYUS33
33 Liberty Street
New York NY 10045
Field Tag 4200 of the Fedwire message should read
    "D 68010727 Environmental Protection Agency"

(2)    For all payments made under this ¶ 36.b, SD must include references to the Site/Spill ID and DJ numbers. At the time of any payment required to be made in accordance with ¶ 36.b, SD shall send notices that payment has been made to the United States, EPA, and the EPA Cincinnati Finance Center, all in accordance with ¶ 92. All notices must include references to the Site/Spill ID Number 036E and DJ Number 90-11-3-06663/2.

37.    **Contesting Future Response Costs**. SD may submit a Notice of Dispute, initiating the procedures of Section XIII (Dispute Resolution), regarding any Future Response Costs or any State Future Response Costs billed under ¶ 35 (Payments by SD for Future Response Costs and State Future Response Costs) if it determines that EPA or the State has made a mathematical error or included a cost item that is not within the definition of Future Response Costs or State Future Response Costs, or if it believes EPA or the State incurred excess costs as a direct result of an EPA or State action that was inconsistent with a specific provision or provisions of the NCP. Such Notice of Dispute shall be submitted in writing within 60 days after receipt of the bill and must be sent to the United States (if the United States' accounting is being disputed) or the State (if the State's accounting is being disputed) pursuant to Section XX (Notices and Submissions). Such Notice of Dispute shall specifically identify the contested Future Response Costs or State Future Response Costs and the basis for objection. If SD submits a Notice of Dispute, SD shall within the 60-day period, also as a requirement for initiating the dispute, (a) pay all uncontested Future Response Costs to the United States and all uncontested State Future Response Costs to the State, and (b) establish, in a duly chartered bank or trust company, an interest-bearing escrow account that is insured by the Federal Deposit Insurance Corporation (FDIC), and remit to that escrow account funds equivalent to the amount of the contested Future Response Costs or State Future Response Costs. SD shall send to the United States or the State, as appropriate, as provided in Section XX (Notices and Submissions), a copy of the transmittal letter and check paying the uncontested Future Response Costs or State Future Response Costs, and a copy of the correspondence that establishes and funds the escrow account, including, but not limited to, information containing the identity of the bank and bank account under which the escrow account is established as well as a bank statement showing the initial balance of the escrow account. If the United States or the State prevails in the dispute, SD shall pay the sums due (with accrued interest) to the United States or the State, if State costs are disputed within 7 days after the resolution of the dispute. If SD prevails concerning any aspect of the contested costs, SD shall pay that portion of the costs (plus associated accrued interest) for which it did not prevail to the United States or the State, if State costs are disputed within 7 days after the resolution of the dispute. SD shall be disbursed any balance of the escrow account. All payments to the United States under this Paragraph shall be made in accordance with ¶ 36.b (instructions for Future Response Cost payments). The dispute resolution procedures set forth in

this Paragraph in conjunction with the procedures set forth in Section XIII (Dispute Resolution) shall be the exclusive mechanisms for resolving disputes regarding SD's obligation to reimburse the United States and the State for their Future Response Costs.

38.     **Interest**. In the event that any payment for Past Response Costs or for Future Response Costs required under this Section is not made by the date required, SD shall pay Interest on the unpaid balance. The Interest on Past Response Costs shall begin to accrue on the Effective Date. The Interest on Future Response Costs and State Future Response Costs shall begin to accrue on the date of the bill. The Interest shall accrue through the date of SD's payment. Payments of Interest made under this Paragraph shall be in addition to such other remedies or sanctions available to Plaintiffs by virtue of SD's failure to make timely payments under this Section including, but not limited to, payment of stipulated penalties pursuant to Section XIV (Stipulated Penalties).

## XI.     INDEMNIFICATION AND INSURANCE

39.     **SD's Indemnification of the United States and the State**

a.     The United States and the State do not assume any liability by entering into this CD or by virtue of any designation of SD as EPA's authorized representatives under Section 104(e) of CERCLA, 42 U.S.C. § 9604(e). SD shall indemnify, save, and hold harmless the United States and the State and their officials, agents, employees, contractors, subcontractors, and representatives for or from any and all claims or causes of action arising from, or on account of, negligent or other wrongful acts or omissions of SD, its officers, directors, employees, agents, contractors, subcontractors, and any persons acting on SD's behalf or under its control, in carrying out activities pursuant to this CD, including, but not limited to, any claims arising from any designation of SD as EPA's authorized representatives under Section 104(e) of CERCLA. Further, SD agrees to pay the United States and the State all costs it incurs including, but not limited to, attorneys' fees and other expenses of litigation and settlement arising from, or on account of, claims made against the United States and the State based on negligent or other wrongful acts or omissions of SD, its officers, directors, employees, agents, contractors, subcontractors, and any persons acting on its behalf or under its control, in carrying out activities pursuant to this CD. Neither the United States nor the State shall be held out as a party to any contract entered into by or on behalf of SD in carrying out activities pursuant to this CD. Neither SD nor any such contractor shall be considered an agent of the United States or the State.

b.     The United States and the State, respectively, shall give SD notice of any claim for which the United States or the State plans to seek indemnification pursuant to this ¶ 39, and shall consult with SD prior to settling such claim.

40.     SD covenants not to sue and agrees not to assert any claims or causes of action against the United States and the State, respectively, for damages or reimbursement or for set-off of any payments made or to be made to the United States or the State, arising from or on account of any contract, agreement, or arrangement between SD and any person for performance of Work on or relating to the Site, including, but not limited to, claims on account of construction delays. In addition, SD shall indemnify, save and hold harmless the United States and the State with respect to any and all claims for damages or reimbursement arising from or on account of any

contract, agreement, or arrangement between SD and any person for performance of Work on or relating to the Site, including, but not limited to, claims on account of construction delays.

41.     **Insurance**. No later than 15 days before commencing any on-site Work, SD shall secure, and shall maintain until the first anniversary after issuance of EPA's Certification of RA Completion pursuant to ¶ 4.7 (Certification of RA Completion) of the SOW, commercial general liability insurance with limits of liability of $1 million per occurrence, automobile liability insurance with limits of liability of $1 million per accident, and umbrella liability insurance with limits of liability of $5 million in excess of the required commercial general liability and automobile liability limits, naming the United States and the State as additional insureds with respect to all liability arising out of the activities performed by or on behalf of SD pursuant to this CD. In addition, for the duration of this CD, SD shall satisfy, or shall ensure that its contractors or subcontractors satisfy, all applicable laws and regulations regarding the provision of worker's compensation insurance for all persons performing the Work on behalf of SD in furtherance of this CD. Prior to commencement of the Work, SD shall provide to EPA and the State certificates of such insurance and a copy of each insurance policy. SD shall resubmit such certificates and copies of policies each year on the anniversary of the Effective Date. If SD demonstrates by evidence satisfactory to EPA and the State that any contractor or subcontractor maintains insurance equivalent to that described above, or insurance covering the same risks but in a lesser amount, then, with respect to that contractor or subcontractor, SD needs to provide only that portion of the insurance described above that is not maintained by the contractor or subcontractor. SD shall ensure that all submittals to EPA under this Paragraph identify the Sharon Steel/Fairmont Coke Works Site, Fairmont, WV and the civil action number of this case.

## XII.   FORCE MAJEURE

42.     "Force majeure," for purposes of this CD, is defined as any event arising from causes beyond the control of SD, of any entity controlled by SD, or of SD's contractors that delays or prevents the performance of any obligation under this CD despite SD's best efforts to fulfill the obligation. The requirement that SD exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure and best efforts to address the effects of any potential force majeure (a) as it is occurring and (b) following the potential force majeure such that the delay and any adverse effects of the delay are minimized to the greatest extent possible. "Force majeure" does not include financial inability to complete the Work or a failure to achieve the Performance Standards.

43.     If any event occurs or has occurred that may delay the performance of any obligation under this CD for which SD intends or may intend to assert a claim of force majeure, SD shall notify EPA's Project Coordinator orally or, in his or her absence, EPA's Alternate Project Coordinator or, in the event both of EPA's designated representatives are unavailable, the Director of the Hazardous Site Cleanup Division, EPA Region III, within 3 days of when SD first knew that the event might cause a delay. Within 10 days thereafter, SD shall provide in writing to EPA and the State an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; SD's rationale for attributing such delay to a force majeure; and a statement as to whether, in the opinion of SD, such event may cause or contribute to an endangerment to public health or welfare, or the environment. SD shall include with any notice

23

all available documentation supporting its claim that the delay was attributable to a force majeure. SD shall be deemed to know of any circumstance of which SD, any entity controlled by SD, or SD's contractors or subcontractors knew or should have known. Failure to comply with the above requirements regarding an event shall preclude SD from asserting any claim of force majeure regarding that event, provided, however, that if EPA, despite the late or incomplete notice, is able to assess to its satisfaction whether the event is a force majeure under ¶ 42 and whether SD has exercised its best efforts under ¶ 42, EPA may, in its unreviewable discretion, excuse in writing SD's failure to submit timely or complete notices under this Paragraph.

44.    If EPA agrees that the delay or anticipated delay is attributable to a force majeure, the time for performance of the obligations under this CD that are affected by the force majeure will be extended by EPA for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the force majeure shall not, of itself, extend the time for performance of any other obligation. If EPA does not agree that the delay or anticipated delay has been or will be caused by a force majeure, EPA will notify SD in writing of its decision. If EPA agrees that the delay is attributable to a force majeure, EPA will notify SD in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure.

45.    If SD elects to invoke the dispute resolution procedures set forth in Section XIII (Dispute Resolution) regarding EPA's decision, it shall do so no later than 15 days after receipt of EPA's notice. In any such proceeding, SD shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that SD complied with the requirements of ¶¶ 42 and 43. If SD carries this burden, the delay at issue shall be deemed not to be a violation by SD of the affected obligation of this CD identified to EPA and the Court.

46.    The failure by EPA to timely complete any obligation under the CD or under the SOW is not a violation of the CD; if such failure prevents SD from meeting one or more deadlines in the SOW, SD may seek relief under this Section.

## XIII.  DISPUTE RESOLUTION

47.    Unless otherwise expressly provided for in this CD, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes under or relating to this CD. However, the procedures set forth in this Section shall not apply to actions by the United States to enforce obligations of SD that have not been disputed in accordance with this Section.

48.    A dispute shall be considered to have arisen when SD sends EPA a written Notice of Dispute. Any dispute under or relating to this CD shall in the first instance be the subject of informal negotiations between the parties to the dispute. The period for informal negotiations shall not exceed 20 days from the time the dispute arises, unless it is modified by written agreement of the parties to the dispute.

49.     **Statements of Position**

    a.     In the event that the parties cannot resolve a dispute by informal negotiations under the preceding Paragraph, then the position advanced by EPA shall be considered binding unless, within 10 days after the conclusion of the informal negotiation period, SD invokes the formal dispute resolution procedures of this Section by serving on the United States and the State a written Statement of Position on the matter in dispute, including, but not limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by SD. The Statement of Position shall specify SD's position as to whether formal dispute resolution should proceed under ¶ 50 (Record Review) or 51.

    b.     Within 14 days after receipt of SD's Statement of Position, EPA will serve on SD its Statement of Position, including, but not limited to, any factual data, analysis, or opinion supporting that position and all supporting documentation relied upon by EPA. EPA's Statement of Position shall include a statement as to whether formal dispute resolution should proceed under ¶ 50 (Record Review) or 51. Within 14 days after receipt of EPA's Statement of Position, SD may submit a Reply.

    c.     If there is disagreement between EPA and SD as to whether dispute resolution should proceed under ¶ 50 (Record Review) or 51, the parties to the dispute shall follow the procedures set forth in the Paragraph determined by EPA to be applicable. However, if SD ultimately appeals to the Court to resolve the dispute, the Court shall determine which Paragraph is applicable in accordance with the standards of applicability set forth in ¶¶ 50 and 51.

50.     **Record Review**. Formal dispute resolution for disputes pertaining to the selection or adequacy of any response action and all other disputes that are accorded review on the administrative record under applicable principles of administrative law shall be conducted pursuant to the procedures set forth in this Paragraph. For purposes of this Paragraph, the adequacy of any response action includes, without limitation, the adequacy or appropriateness of plans, procedures to implement plans, or any other items requiring approval by EPA under this CD, and the adequacy of the performance of response actions taken pursuant to this CD. Nothing in this CD shall be construed to allow any dispute by SD regarding the validity of the ROD's provisions.

    a.     An administrative record of the dispute shall be maintained by EPA and shall contain all statements of position and reply, including supporting documentation, submitted pursuant to this Section. Where appropriate, EPA may allow submission of supplemental statements of position by the parties to the dispute.

    b.     The Director of the Hazardous Site Cleanup Division, EPA Region III, will issue a final administrative decision resolving the dispute based on the administrative record described in ¶ 50.a. This decision shall be binding upon SD, subject only to the right to seek judicial review pursuant to ¶¶ 50.c and 50.d.

    c.     Any administrative decision made by EPA pursuant to ¶ 50.b shall be reviewable by this Court, provided that a motion for judicial review of the decision is filed by SD with the Court and served on all Parties within 10 days after receipt of EPA's decision. The motion shall include a description of the matter in dispute, the efforts made by the parties to

resolve it, the relief requested, and the schedule, if any, within which the dispute must be resolved to ensure orderly implementation of this CD. The United States may file a response to SD's motion.

        d.     In proceedings on any dispute governed by this Paragraph, SD shall have the burden of demonstrating that the decision of the Hazardous Site Cleanup Division Director is arbitrary and capricious or otherwise not in accordance with law. Judicial review of EPA's decision shall be on the administrative record compiled pursuant to ¶ 50.a.

    51.    Formal dispute resolution for disputes that neither pertain to the selection or adequacy of any response action nor are otherwise accorded review on the administrative record under applicable principles of administrative law, shall be governed by this Paragraph.

        a.     The Director of the Hazardous Site Cleanup Division, EPA Region III, will issue a final decision resolving the dispute based on the statements of position and reply, if any, served under ¶ 49. The Hazardous Site Cleanup Division Director's decision shall be binding on SD unless, within 10 days after receipt of the decision, SD files with the Court and serves on the parties a motion for judicial review of the decision setting forth the matter in dispute, the efforts made by the parties to resolve it, the relief requested, and the schedule, if any, within which the dispute must be resolved to ensure orderly implementation of the CD. The United States may file a response to SD's motion.

        b.     Notwithstanding ¶ M (CERCLA § 113(j) record review of ROD and Work) of Section I (Background), judicial review of any dispute governed by this Paragraph shall be governed by applicable principles of law.

    52.    The invocation of formal dispute resolution procedures under this Section does not extend, postpone, or affect in any way any obligation of SD under this CD, except as provided in ¶ 37 (Contesting Future Response Costs), as agreed by EPA, or as determined by the Court. Stipulated penalties with respect to the disputed matter shall continue to accrue, but payment shall be stayed pending resolution of the dispute, as provided in ¶ 60. Notwithstanding the stay of payment, stipulated penalties shall accrue from the first day of noncompliance with any applicable provision of this CD. In the event that SD does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section XIV (Stipulated Penalties).

## XIV.  STIPULATED PENALTIES

    53.    SD shall be liable to the United States for stipulated penalties in the amounts set forth in ¶¶ 54.a and 55 for failure to comply with the obligations specified in ¶¶ 54.b and 55, unless excused under Section XII (Force Majeure). "Comply" as used in the previous sentence includes compliance by SD with all applicable requirements of this CD, within the deadlines established under this CD. If an initially submitted or resubmitted deliverable contains a material defect, and the deliverable is disapproved or modified by EPA under ¶ 6.6(a) (Initial Submissions) or 6.6(b) (Resubmissions) of the SOW due to such material defect, then the material defect shall constitute a lack of compliance for purposes of this Paragraph.

54.   **Stipulated Penalty Amounts - Payments, Financial Assurance, Major Deliverables, and Other Milestones**

a.   The following stipulated penalties shall accrue per violation per day for any noncompliance identified in ¶ 54.b:

| Period of Noncompliance | Penalty Per Violation Per Day |
|---|---|
| 1st through 14th day | $3,000 |
| 15th through 30th day | $5,000 |
| 31st day and beyond | $10,000 |

b.   **Obligations**

(1)   Timely designation of a Project Coordinator and Supervising Contractor, including replacements thereof, under ¶ 9 (Coordination and Supervision);

(2)   Emergency and release response and reporting requirements under ¶ 11 (Emergencies and Releases);

(3)   Performance of studies and investigations to support EPA's reviews under ¶ 15 (Periodic Review);

(4)   Submission of plans for, and performance of, further response actions under ¶ 19 (Submission of Plans);

(5)   Requirements regarding access and non-interference under ¶ 20 (Agreements Regarding Access and Non-Interference);

(6)   Establishment and maintenance of financial assurance in accordance with Section IX (Financial Assurance);

(7)   Payment of any amount due under Section X (Payments for Response Costs);

(8)   Establishment of an escrow account to hold any disputed Future Response Costs under ¶ 37 (Contesting Future Response Costs);

(9)   Notification of delay requirements under ¶ 43;

(10)   Timely payment of stipulated penalties demanded under Section XIV (Stipulated Penalties);

(11)   Providing requested information and documents under ¶ 84;

(12)   Record retention and notice requirements under Section XIX (Retention of Records); and

(13)   Timely submission of the following deliverables in accordance with the schedules and requirements of the SOW, including resubmission following disapproval by EPA:

27

        i.      Remedial Design Work Plan under Section 3 and ¶ 7.2;

        ii.     Final Remedial Design under ¶¶ 3.7 and 7.2;

        iii.    Remedial Action Work Plan under ¶¶ 4.1 and 7.3.

55.    **Stipulated Penalty Amounts – Other Deliverables**. The following stipulated penalties shall accrue per violation per day for failure to submit timely or adequate deliverables pursuant to the CD other than those specified in Paragraph 54.b:

| Period of Noncompliance | Penalty Per Violation Per Day |
|---|---|
| 1st through 14th day | $2,000 |
| 15th through 30th day | $4,000 |
| 31st day and beyond | $7,000 |

56.    In the event that EPA assumes performance of a portion or all of the Work pursuant to ¶ 70 (Work Takeover), SD shall be liable for a stipulated penalty in the amount of $1,000,000. Stipulated penalties under this Paragraph are in addition to the remedies available under ¶¶ 31 (Access to Financial Assurance) and 70 (Work Takeover).

57.    All penalties shall begin to accrue on the day after the complete performance is due or the day a violation occurs and shall continue to accrue through the final day of the correction of the noncompliance or completion of the activity. However, stipulated penalties shall not accrue: (a) with respect to a deficient submission under ¶ 6.6 (Approval of Deliverables) of the SOW, during the period, if any, beginning on the 31st day after EPA's receipt of such submission until the date that EPA notifies SD of any deficiency; (b) with respect to a decision by the Director of the Hazardous Site Cleanup Division, EPA Region III, under ¶ 50.b or 51.a of Section XIII (Dispute Resolution), during the period, if any, beginning on the 21st day after the date that SD's reply to EPA's Statement of Position is received until the date that the Director issues a final decision regarding such dispute; or (c) with respect to judicial review by this Court of any dispute under Section XIII (Dispute Resolution), during the period, if any, beginning on the 31st day after the Court's receipt of the final submission regarding the dispute until the date that the Court issues a final decision regarding such dispute. Nothing in this CD shall prevent the simultaneous accrual of separate penalties for separate violations of this CD.

58.    Following EPA's determination that SD has failed to comply with a requirement of this CD, EPA may give SD written notification of the same and describe the noncompliance. EPA may send SD a written demand for payment of the penalties. However, penalties shall accrue as provided in the preceding Paragraph regardless of whether EPA has notified SD of a violation.

59.    All penalties accruing under this Section shall be due and payable to the United States within 45 days after SD's receipt from EPA of a demand for payment of the penalties, unless SD invoke the Dispute Resolution procedures under Section XIII (Dispute Resolution) within the 60-day period. All payments to the United States under this Section shall indicate that the payment is for stipulated penalties and shall be made in accordance with ¶ 36.b (instructions for Future Response Cost Payments and Stipulated Penalties).

60.     Penalties shall continue to accrue as provided in ¶ 57 during any dispute resolution period, but need not be paid until the following:

a.      If the dispute is resolved by agreement of the parties or by a decision of EPA that is not appealed to this Court, accrued penalties determined to be owed shall be paid to EPA within 15 days after the agreement or the receipt of EPA's decision or order;

b.      If the dispute is appealed to this Court and the United States prevails in whole or in part, SD shall pay all accrued penalties determined by the Court to be owed to EPA within 60 days after receipt of the Court's decision or order, except as provided in ¶ 60.c;

c.      If the District Court's decision is appealed by any Party, SD shall pay all accrued penalties determined by the District Court to be owed to the United States and the State into an interest-bearing escrow account, established at a duly chartered bank or trust company that is insured by the FDIC, within 60 days after receipt of the Court's decision or order. Penalties shall be paid into this account as they continue to accrue, at least every 60 days. Within 15 days after receipt of the final appellate court decision, the escrow agent shall pay the balance of the account to EPA or to SD to the extent that they prevail.

61.     If SD fails to pay stipulated penalties when due, SD shall pay Interest on the unpaid stipulated penalties as follows: (a) if SD has timely invoked dispute resolution such that the obligation to pay stipulated penalties has been stayed pending the outcome of dispute resolution, Interest shall accrue from the date stipulated penalties are due pursuant to ¶ 60 until the date of payment; and (b) if SD fails to timely invoke dispute resolution, Interest shall accrue from the date of demand under ¶ 59 until the date of payment. If SD fails to pay stipulated penalties and Interest when due, the United States may institute proceedings to collect the penalties and Interest.

62.     The payment of penalties and Interest, if any, shall not alter in any way SD's obligation to complete the performance of the Work required under this CD.

63.     Nothing in this CD shall be construed as prohibiting, altering, or in any way limiting the ability of the United States or the State to seek any other remedies or sanctions available by virtue of SD's violation of this CD or of the statutes and regulations upon which it is based, including, but not limited to, penalties pursuant to Section 122(*l*) of CERCLA, 42 U.S.C. § 9622(*l*), provided, however, that the United States shall not seek civil penalties pursuant to Section 122(*l*) of CERCLA for any violation for which a stipulated penalty is provided in this CD, except in the case of a willful violation of this CD.

64.     Notwithstanding any other provision of this Section, the United States may, in its unreviewable discretion, waive any portion of stipulated penalties that have accrued pursuant to this CD.

## XV.    COVENANTS BY PLAINTIFFS

### 65.    Covenants for SD by United States

Except as provided in ¶¶ 66, 67 (United States' Pre- and Post-Certification Reservations), and 69 (General Reservations of Rights), the United States covenants not to sue or to take administrative action against SD pursuant to Sections 106 and 107(a) of CERCLA and Section 7003 of RCRA

relating to the Site. Except with respect to future liability, these covenants shall take effect upon the Effective Date. With respect to future liability, these covenants shall take effect upon Certification of RA Completion by EPA pursuant to ¶ 4.7 (Certification of RA Completion) of the SOW. These covenants are conditioned upon the satisfactory performance by SD of its obligations under this CD. These covenants extend only to SD and do not extend to any other person.

66.     **United States' Pre-Certification Reservations**. Notwithstanding any other provision of this CD, the United States reserves, and this CD is without prejudice to, the right to institute proceedings in this action or in a new action, and/or to issue an administrative order, seeking to compel SD to perform further response actions relating to the Site and/or to pay the United States for additional costs of response if, (a) prior to Certification of RA Completion, (1) conditions at the Site, previously unknown to EPA, are discovered, or (2) information, previously unknown to EPA, is received, in whole or in part, and (b) EPA determines that these previously unknown conditions or information together with any other relevant information indicates that the RA is not protective of human health or the environment.

67.     **United States' Post-Certification Reservations**. Notwithstanding any other provision of this CD, the United States reserves, and this CD is without prejudice to, the right to institute proceedings in this action or in a new action, and/or to issue an administrative order, seeking to compel SD to perform further response actions relating to the Site and/or to pay the United States for additional costs of response if, (a) subsequent to Certification of RA Completion, (1) conditions at the Site, previously unknown to EPA, are discovered, or (2) information, previously unknown to EPA, is received, in whole or in part, and (b) EPA determines that these previously unknown conditions or this information together with other relevant information indicate that the RA is not protective of human health or the environment.

68.     For purposes of ¶ 66 (United States' Pre-Certification Reservations), the information and the conditions known to EPA will include only that information and those conditions known to EPA as of the date the ROD was signed and set forth in the ROD for the Site or the administrative record for the ROD. For purposes of ¶ 67 (United States' Post-Certification Reservations), the information and the conditions known to EPA shall include only that information and those conditions known to EPA as of the date of Certification of RA Completion and set forth in the ROD, the administrative record for the ROD, the post-ROD administrative record, or in any information received by EPA pursuant to the requirements of this CD prior to Certification of RA Completion.

69.     **General Reservations of Rights**. The United States reserves, and this CD is without prejudice to, all rights against SD with respect to all matters not expressly included within Plaintiff's covenants. Notwithstanding any other provision of this CD other than Paragraph 71, the United States reserves all rights against SD with respect to:

a.     liability for failure by SD to meet a requirement of this CD;

b.     liability for future work required in the Monongahela River identified in any future EPA decision documents issued with respect to either the Site or the BJS Site and for studies required to support such decision documents;

        c.     liability for future costs including, but not limited to, direct and indirect costs that the United States incurs in the Monongahela River that are not pursuant to this Consent Decree;

        d.     liability arising from the past, present, or future disposal, release, or threat of release of Waste Material outside of the Site;

        e.     liability based on the ownership of the Site by SD when such ownership commences after signature of this CD by SD;

        f.     liability based on the operation of the Site by SD when such operation commences after signature of this CD by SD and does not arise solely from SD's performance of the Work;

        g.     liability based on SD's transportation, treatment, storage, or disposal, or arrangement for transportation, treatment, storage, or disposal of Waste Material at or in connection with the Site, other than as provided in the ROD, the Work, or otherwise ordered by EPA, after signature of this CD;

        h.     liability for damages for injury to, destruction of, or loss of natural resources, and for the costs of any natural resource damage assessments;

        i.     criminal liability;

        j.     liability for violations of federal or state law that occur during or after implementation of the Work; and

        k.     liability, prior to achievement of Performance Standards, for additional response actions that EPA determines are necessary to achieve and maintain Performance Standards or to carry out and maintain the effectiveness of the remedy set forth in the ROD, but that cannot be required pursuant to ¶ 13 (Modification of SOW or Related Deliverables).

70.    **Work Takeover**

        a.     In the event EPA determines that SD: (1) has ceased implementation of any portion of the Work; (2) is seriously or repeatedly deficient or late in its performance of the Work; or (3) is implementing the Work in a manner that may cause an endangerment to human health or the environment, EPA may issue a written notice ("Work Takeover Notice") to SD. Any Work Takeover Notice issued by EPA will specify the grounds upon which such notice was issued and will provide SD a period of 30 days within which to remedy the circumstances giving rise to EPA's issuance of such notice.

        b.     If, after expiration of the 30-day notice period specified in ¶ 70.a, SD has not remedied to EPA's satisfaction the circumstances giving rise to EPA's issuance of the relevant Work Takeover Notice, EPA may at any time thereafter assume the performance of all or any portion(s) of the Work as EPA deems necessary ("Work Takeover"). EPA will notify SD in writing (which writing may be electronic) if EPA determines that implementation of a Work Takeover is warranted under this ¶ 70.b. Funding of Work Takeover costs is addressed under ¶ 31 (Access to Financial Assurance).

c.     SD may invoke the procedures set forth in ¶ 50 (Record Review), to dispute EPA's implementation of a Work Takeover under ¶ 70.b. However, notwithstanding SD's invocation of such dispute resolution procedures, and during the pendency of any such dispute, EPA may in its sole discretion commence and continue a Work Takeover under ¶ 70.b until the earlier of (1) the date that SD remedy, to EPA's satisfaction, the circumstances giving rise to EPA's issuance of the relevant Work Takeover Notice, or (2) the date that a final decision is rendered in accordance with ¶ 50 (Record Review) requiring EPA to terminate such Work Takeover.

71.     Notwithstanding any other provision of this CD, the United States and the State retain all authority and reserve all rights to take any and all response actions authorized by law. However, nothing in this CD shall affect the covenants not to sue provided to SD in the consent decree approved by this Court in *United States and the State of West Virginia v. Exxon Mobil Corporation, et al.*, No. 1:08-cv-00124-IMK (N.D. W.Va. Oct. 10, 2012).  In addition, nothing in the CD shall affect the covenants not to sue provided in the consent decree approved by this Court in *State of West Virginia v. Exxon Mobil Corporation et al.*, No. 1:01CV15 (N.D. W.Va. Jan. 24, 2003). ExxonMobil agrees that, notwithstanding the covenant not to sue in the latter consent decree, which all Parties agree remains effective and as to which there is no waiver, ExxonMobil shall pay State Future Response Costs as required by this CD, as if they were deemed Future Oversight Costs of the State as defined under the consent decree in No. 1:01CV15 (Jan. 24, 2003).

## XVI.  COVENANTS BY SD

72.     **Covenants by SD**. Subject to the reservations in ¶ 74, SD covenants not to sue and agrees not to assert any claims or causes of action against the United States or the State with respect to the Site and this CD, including, but not limited to:

a.     any direct or indirect claim for reimbursement from the EPA Hazardous Substance Superfund through CERCLA §§ 106(b)(2), 107, 111, 112 or 113, or any other provision of law;

b.     any claims under CERCLA §§ 107 or 113, RCRA Section 7002(a), 42 U.S.C. § 6972(a), or state law regarding the Site Past Response Costs, Future Response Costs, State Future Response Costs, SD's Past Response Costs, SD's Future Response Costs, and this CD; or

c.     any claims arising out of response actions at or in connection with the Site, including any claim under the United States Constitution, the West Virginia Constitution, the Tucker Act, 28 U.S.C. § 1491, the Equal Access to Justice Act, 28 U.S.C. § 2412, or at common law.

73.     Except as provided in ¶¶ 76 (Waiver of Claims by SD) and 83 (Res Judicata and Other Defenses), the covenants in this Section shall not apply if the United States or the State brings a cause of action or issues an order pursuant to any of the reservations in Section XV (Covenants by Plaintiffs), other than in ¶¶ 69.a (claims for failure to meet a requirement of the CD), 69.i (criminal liability), and 69.j (violations of federal/state law during or after implementation of the Work), but only to the extent that SD's claims arise from the same

response action, response costs, or damages that the United States or the State is seeking pursuant to the applicable reservation.

74.     SD reserves, and this CD is without prejudice to, claims against the United States and the State of West Virginia, subject to the provisions of Chapter 171 of Title 28 of the United States Code or its equivalent under West Virginia law, and brought pursuant to any statute other than CERCLA or RCRA and for which the waiver of sovereign immunity is found in a statute other than CERCLA or RCRA, for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the United States or the State of West Virginia, as that term is defined in 28 U.S.C. § 2671 or its equivalent under West Virginia law, while acting within the scope of his or her office or employment under circumstances where the United States or the State of West Virginia, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. However, the foregoing shall not include any claim based on EPA's selection of response actions, or the oversight or approval of SD's deliverables or activities.

75.     Nothing in this CD shall be deemed to constitute approval or preauthorization of a claim within the meaning of Section 111 of CERCLA, 42 U.S.C. § 9611, or 40 C.F.R. § 300.700(d).

76.     **Waiver of Claims by SD**

        a.      SD agrees not to assert any claims and to waive all claims or causes of action (including but not limited to claims or causes of action under Sections 107(a) and 113 of CERCLA) that it may have:

                (1)     **De Micromis Waiver**. For all matters relating to the Site against any person where the person's liability to SD with respect to the Site is based solely on having arranged for disposal or treatment, or for transport for disposal or treatment, of hazardous substances at the Site, or having accepted for transport for disposal or treatment of hazardous substances at the Site, if all or part of the disposal, treatment, or transport occurred before April 1, 2001, and the total amount of material containing hazardous substances contributed by such person to the Site was less than 110 gallons of liquid materials or 200 pounds of solid materials.

        b.      **Exceptions to Waiver**

                (1)     The waiver under this ¶ 76 shall not apply with respect to any defense, claim, or cause of action that a SD may have against any person otherwise covered by such waiver if such person asserts a claim or cause of action relating to the Site against such SD.

77.     SD agrees not to seek judicial review of the final rule listing the Site on the NPL based on a claim that changed site conditions that resulted from the performance of the Work in any way affected the basis for listing the Site.

## XVII. EFFECT OF SETTLEMENT; CONTRIBUTION

78.     Except as provided in ¶ 76 (Waiver of Claims by SD), nothing in this CD shall be construed to create any rights in, or grant any cause of action to, any person not a Party to this CD. Except as provided in Section XVI (Covenants by SD), each of the Parties expressly reserves any and all rights (including, but not limited to, pursuant to Section 113 of CERCLA, 42 U.S.C. § 9613), defenses, claims, demands, and causes of action that each Party may have with respect to any matter, transaction, or occurrence relating in any way to the Site against any person not a Party hereto. Nothing in this CD diminishes the right of the United States, pursuant to Section 113(f)(2) and (3) of CERCLA, 42 U.S.C. § 9613(f)(2)-(3), to pursue any such persons to obtain additional response costs or response action and to enter into settlements that give rise to contribution protection pursuant to Section 113(f)(2).

79.     The Parties agree, and by entering this CD this Court finds, that this CD constitutes a judicially-approved settlement pursuant to which SD has, as of the Effective Date, resolved liability to the United States within the meaning of Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), and is entitled, as of the Effective Date, to protection from contribution actions or claims as provided by Section 113(f)(2) of CERCLA, or as may be otherwise provided by law, for the "matters addressed" in this CD.

The "matters addressed" in this CD are all response actions taken or to be taken and all response costs incurred or to be incurred, at or in connection with the Site, by the United States or any other person; provided, however, that if the United States exercises rights under the reservations in Section XV (Covenants by Plaintiffs), other than in ¶¶ 69.a (claims for failure to meet a requirement of the CD), 69.i (criminal liability), or 69.j (violations of federal/state law during or after implementation of the Work), the "matters addressed" in this CD will no longer include those response costs or response actions that are within the scope of the exercised reservation.

80.     The Parties further agree, and by entering this CD this Court finds, that the complaint filed by the United States in this action is a civil action within the meaning of Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), and that this CD constitutes a judicially-approved settlement pursuant to which the SD has, as of the Effective Date, resolved liability to the United States within the meaning of Section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B).

81.     SD shall, with respect to any suit or claim brought by it for matters related to this CD, notify the United States and the State in writing no later than 60 days prior to the initiation of such suit or claim.

82.     SD shall, with respect to any suit or claim brought against it for matters related to this CD, notify in writing the United States and the State within 10 days after service of the complaint. In addition, SD shall notify the United States and the State within 10 days after service or receipt of any Motion for Summary Judgment and within 10 days after receipt of any order from a court setting a case for trial.

83.     **Res Judicata and Other Defenses**. In any subsequent administrative or judicial proceeding initiated by the United States or the State for injunctive relief, recovery of response costs, or other appropriate relief relating to the Site, SD shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue

preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States or the State in the subsequent proceeding were or should have been brought in the instant case; provided, however, that nothing in this Paragraph affects the enforceability of the covenants not to sue set forth in Section XV (Covenants by Plaintiffs).

# XVIII.    ACCESS TO INFORMATION

84.    SD shall provide to EPA and the State, upon request, copies of all records, reports, documents, and other information (including records, reports, documents, and other information in electronic form) (hereinafter referred to as "Records") within SD's possession or control or that of its contractors or agents relating to activities at the Site or to the implementation of this CD, including, but not limited to, sampling, analysis, chain of custody records, manifests, trucking logs, receipts, reports, sample traffic routing, correspondence, or other documents or information regarding the Work. SD shall also make available to EPA and the State, for purposes of investigation, information gathering, or testimony, its employees, agents, or representatives with knowledge of relevant facts concerning the performance of the Work.

85.    **Privileged and Protected Claims**

a.    SD may assert that all or part of a Record requested by Plaintiffs is privileged or protected as provided under federal law, in lieu of providing the Record, provided SD complies with ¶ 85.b, and except as provided in ¶ 85.c.

b.    If SD asserts a claim of privilege or protection, it shall provide Plaintiffs with the following information regarding such Record: its title; its date; the name, title, affiliation (e.g., company or firm), and address of the author, of each addressee, and of each recipient; a description of the Record's contents; and the privilege or protection asserted. If a claim of privilege or protection applies only to a portion of a Record, SD shall provide the Record to Plaintiffs in redacted form to mask the privileged or protected portion only. SD shall retain all Records that it claims to be privileged or protected until Plaintiffs have had a reasonable opportunity to dispute the privilege or protection claim and any such dispute has been resolved in the SD's favor.

c.    SD may make no claim of privilege or protection regarding: (1) any data regarding the Site, including, but not limited to, all sampling, analytical, monitoring, hydrogeologic, scientific, chemical, radiological or engineering data, or the portion of any other Record that evidences conditions at or around the Site; or (2) the portion of any Record that SD is required to create or generate pursuant to this CD.

86.    **Business Confidential Claims**. SD may assert that all or part of a Record provided to Plaintiffs under this Section or Section XIX (Retention of Records) is business confidential to the extent permitted by and in accordance with Section 104(e)(7) of CERCLA, 42 U.S.C. § 9604(e)(7), and 40 C.F.R. § 2.203(b). SD shall segregate and clearly identify all Records or parts thereof submitted under this CD for which SD asserts business confidentiality claims. Records that SD claims to be confidential business information will be afforded the protection specified in 40 C.F.R. Part 2, Subpart B. If no claim of confidentiality accompanies Records when they are submitted to EPA and the State, or if EPA has notified SD that the

Records are not confidential under the standards of Section 104(e)(7) of CERCLA or 40 C.F.R. Part 2, Subpart B, the public may be given access to such Records without further notice to SD.

87.     If relevant to the proceeding, the Parties agree that validated sampling or monitoring data generated in accordance with the SOW and reviewed and approved by EPA shall be admissible as evidence, without objection, in any proceeding under this CD.

88.     Notwithstanding any provision of this CD, Plaintiffs retain all of their information gathering and inspection authorities and rights, including enforcement actions related thereto, under CERCLA, RCRA, and any other applicable statutes or regulations.

## XIX.   RETENTION OF RECORDS

89.     Until 10 years after EPA's Certification of Work Completion under ¶ 4.9 (Certification of Work Completion) of the SOW, SD shall preserve and retain all non-identical copies of Records (including Records in electronic form) now in its possession or control or that come into its possession or control that relate in any manner to its liability under CERCLA with respect to the Site, and all Records that relate to the liability of any other person under CERCLA with respect to the Site. SD must also retain, and instruct its contractors and agents to preserve, for the same period of time specified above all non-identical copies of the last draft or final version of any Records (including Records in electronic form) now in its possession or control or that come into its possession or control that relate in any manner to the performance of the Work, provided, however, that SD (and its contractors and agents) must retain, in addition, copies of all data generated during the performance of the Work and not contained in the aforementioned Records required to be retained. Each of the above record retention requirements shall apply regardless of any corporate retention policy to the contrary.

90.     At the conclusion of this record retention period, SD shall notify the United States and the State at least 90 days prior to the destruction of any such Records, and, upon request by the United States or the State, and except as provided in ¶ 85 (Privileged and Protected Claims), SD shall deliver any such Records to EPA or the State.

91.     SD certifies that, to the best of its knowledge and belief, after diligent inquiry, it has not altered, mutilated, discarded, destroyed, or otherwise disposed of any Records (other than identical copies) relating to its potential liability regarding the Site since April 15, 1997 and that it has fully complied with any and all EPA requests for information regarding the Site pursuant to Sections 104(e) and 122(e)(3)(B) of CERCLA, 42 U.S.C. §§ 9604(e) and 9622(e)(3)(B), and Section 3007 of RCRA, 42 U.S.C. § 6927.

## XX.   NOTICES AND SUBMISSIONS

92.     All approvals, consents, deliverables, modifications, notices, notifications, objections, proposals, reports, and requests specified in this CD must be in writing unless otherwise specified. Whenever, under this CD, notice is required to be given, or a report or other document is required to be sent, by one Party to another, it must be directed to the person(s) specified below at the address(es) specified below. Any Party may change the person and/or address applicable to it by providing notice of such change to all Parties. All notices under this Section are effective upon receipt, unless otherwise specified. Notices required to be sent to EPA, and not to the United States, should not be sent to the DOJ. Except as otherwise provided,

notice to a Party by email (if that option is provided below) or by regular mail in accordance with this Section satisfies any notice requirement of the CD regarding such Party.

**As to the United States**:

EES Case Management Unit
U.S. Department of Justice
Environment and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044-7611
eescdcopy.enrd@usdoj.gov
Re: DJ # 90-11-3-06663/2

**As to EPA**:

Karen Melvin (3HS00)
Director, Hazardous Site Cleanup Division
U.S. Environmental Protection Agency
Region III
1650 Arch Street
Philadelphia, PA  19103
melvin.karen@epa.gov

**and**:

Eric Newman (3HS23)
EPA Project Coordinator
U.S. Environmental Protection Agency
Region III
newman.eric@epa.gov
215-814-3237

**As to EPA Cincinnati Finance Center**:

EPA Cincinnati Finance Center
26 W. Martin Luther King Drive
Cincinnati, Ohio 45268
cinwd_acctsreceivable@epa.gov

**As to the State**:

William F. Huggins, Jr.
State Project Coordinator
131A Peninsula Street
Wheeling, WV 26003
William.Huggins@wv.gov
(304) 238-1220

**As to SD**:                                    Bruce Frink, Exxon Mobil Corporation
                                                16057 Tampa Palms Blvd. West, #214
                                                Tampa, FL 33647
                                                bruce.r.frink@exxonmobil.com
                                                (813) 991-7413

                                                And

                                                Kevin J. Vaughan
                                                22777 Springwoods Village Parkway
                                                N1.4A.481
                                                Spring TX 77389
                                                (832) 625-8251
                                                kevin.j.vaughan@exxonmobil.com

## XXI.  RETENTION OF JURISDICTION

93.    This Court retains jurisdiction over both the subject matter of this CD and SD for the duration of the performance of the terms and provisions of this CD for the purpose of enabling any of the Parties to apply to the Court at any time for such further order, direction, and relief as may be necessary or appropriate for the construction or modification of this CD, or to effectuate or enforce compliance with its terms, or to resolve disputes in accordance with Section XIII (Dispute Resolution).

## XXII. APPENDICES

94.    The following appendices are attached to and incorporated into this CD:

"Appendix A" is the ROD signed on December 19, 2017.

"Appendix B" is the description and/or map of the Site.

"Appendix C" is the SOW.

"Appendix D" is the draft form of Proprietary Controls.

## XXIII.    MODIFICATION

95.    Except as provided in ¶ 13 (Modification of SOW or Related Deliverables), material modifications to this CD, including the SOW, shall be in writing, signed by the United States and SD, and shall be effective upon approval by the Court. Except as provided in ¶ 13, non-material modifications to this CD, including the SOW, shall be in writing and shall be effective when signed by duly authorized representatives of the United States and SD. All modifications to the CD, other than the SOW, also shall be signed by the State, or a duly authorized representative of the State, as appropriate. A modification to the SOW shall be considered material if it implements a ROD amendment that fundamentally alters the basic features of the selected remedy within the meaning of 40 C.F.R. § 300.435(c)(2)(ii). Before

providing its approval to any modification to the SOW, the United States will provide the State with a reasonable opportunity to review and comment on the proposed modification.

96.     Nothing in this CD shall be deemed to alter the Court's power to enforce, supervise, or approve modifications to this CD.

## XXIV.     LODGING AND OPPORTUNITY FOR PUBLIC COMMENT

97.     This CD shall be lodged with the Court for at least 30 days for public notice and comment in accordance with Section 122(d)(2) of CERCLA, 42 U.S.C. § 9622(d)(2), and 28 C.F.R. § 50.7. The United States reserves the right to withdraw or withhold its consent if the comments regarding the CD disclose facts or considerations that indicate that the CD is inappropriate, improper, or inadequate. SD consents to the entry of this CD without further notice.

98.     If for any reason the Court should decline to approve this CD in the form presented, this agreement is voidable at the sole discretion of any Party and the terms of the agreement may not be used as evidence in any litigation between the Parties.

## XXV. SIGNATORIES/SERVICE

99.     Each undersigned representative of SD and the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice and the Cabinet Secretary for the West Virginia Department of Environmental Protection certifies that he or she is fully authorized to enter into the terms and conditions of this CD and to execute and legally bind such Party to this document.

100.     SD agrees not to oppose entry of this CD by this Court or to challenge any provision of this CD unless the United States has notified SD in writing that it no longer supports entry of the CD.

101.     SD shall identify, on the attached signature page, the name, address, and telephone number of an agent who is authorized to accept service of process by mail on behalf of that Party with respect to all matters arising under or relating to this CD. SD agrees to accept service in that manner and to waive the formal service requirements set forth in Rule 4 of the Federal Rules of Civil Procedure and any applicable local rules of this Court, including, but not limited to, service of a summons. SD needs not file an answer to the complaint in this action unless or until the Court expressly declines to enter this CD.

## XXVI.     FINAL JUDGMENT

102.     This CD and its appendices constitute the final, complete, and exclusive agreement and understanding among the Parties regarding the settlement embodied in the CD. The Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this CD.

103.     Upon entry of this CD by the Court, this CD shall constitute a final judgment between and among the United States, the State, and SD. The Court enters this judgment as a final judgment under Fed. R. Civ. P. 54 and 58.

SO ORDERED THIS 21st  DAY OF MARCH, 2019.

_Tom 8 Klul_
United States District Judge

Signature Page for CD regarding the Sharon Steel/Fairmont Coke Works Superfund Site

**FOR THE UNITED STATES OF AMERICA:**

*10/10/18*
Date

Nathaniel Douglas
Deputy Section Chief
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section
Washington, D.C. 20530

*10 OCT 18*
Date

Joshua Van Eaton
Senior Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section
P.O. Box 7611
Washington, D.C. 20044-7611

William J. Powell
United States Attorney

_____
Date

By:    /s/ Helen Campbell Altmeyer
       Helen Campbell Altmeyer
       Assistant United States Attorney
       WV Bar #117
       United States Attorney's Office
       P.O. Box 591
       Wheeling, WV 26003
       Phone: (304) 234-0100
       Fax:    (304) 234-0112
       Email: Helen.Altmeyer@usdoj.gov

41

Signature Page for CD regarding the Sharon Steel/Fairmont Coke Superfund Site

9·25·2018
_____
Date

_____
Cosmo Servidio
Regional Administrator, Region III
U.S. Environmental Protection Agency
1650 Arch Street
Philadelphia, PA  19103


_____
Date

_____
Mary Coe
Regional Counsel, Region III
U.S. Environmental Protection Agency
1650 Arch Street
Philadelphia, PA  19103


_____
Date

_____
Susan T. Hodges
Senior Assistant Regional Counsel, Region III
U.S. Environmental Protection Agency
1650 Arch Street
Philadelphia, PA  19103

42

Signature Page for CD regarding the Sharon Steel/Fairmont Coke Works Superfund Site

**FOR THE STATE OF WEST VIRGINIA:**

9-17-18
Dated

Robert D. Rice
Director
West Virginia Department of Environmental Protection
Division of Land Restoration
601-57th Street SE
Charleston, WV 25304

43

Signature Page for CD regarding the Sharon Steel/Fairmont Coke Works Superfund Site

**FOR <u>EXXON MOBIL CORPORATION</u>:**
[Print name of Settling Defendant]

8/30/2018
Dated

Name (print): Chris Troy
Title:  EMES - North Area - Project Execution Manager
Address:  38 Varick Street; Brooklyn, NY 11222

Agent Authorized to Accept Service   Name (print):  Kevin J. Vaughan
on Behalf of Above-signed Party:       Title:          Senior Counsel, Environmental & Safety
                                        Company:    Exxon Mobil Corporation
                                        Address:      22777 Springwoods Village Pkwy.
                                                        Spring, TX  77389
                                        Phone:        832-625-8251
                                        email:         kevin.j.vaughan@exxonmobil.com

# APPENDIX A

Appendix A



## U.S. ENVIRONMENTAL PROTECTION AGENCY
## REGION III

# RECORD OF DECISION

**Sharon Steel/Fairmont Coke Works Superfund Site**
**Fairmont, Marion County, West Virginia**

**December 2017**

[PAGE INTENTIONALLY LEFT BLANK]

AR442831

# Table of Contents

List of Acronyms………………………………………………………………………... iii

DECLARATION FOR THE RECORD OF DECISION.................................................... 1
    Site Name and Location.......................................................................................... 1
    Statement of Basis and Purpose............................................................................. 1
    Assessment of the Site ........................................................................................... 1
    Description of the Selected Remedy ....................................................................... 1
    Statutory Determination.......................................................................................... 3
    ROD Data Certification Checklist .......................................................................... 3
    Authorizing Signature ............................................................................................ 3
DECISION SUMMARY ................................................................................................... 4
1.0 SITE NAME, LOCATION, AND DESCRIPTION ..................................................... 4
2.0 SITE HISTORY AND ENFORCEMENT ACTIVITIES............................................. 5
3.0 HIGHLIGHTS OF COMMUNITY PARTICIPATION ............................................. 10
4.0 SCOPE AND ROLE OF OPERABLE UNIT........................................................... 11
5.0 SITE CHARACTERISTICS....................................................................................... 11
6.0 CURRENT AND POTENTIAL FUTURE LAND AND RESOURCE USES ..................... 19
7.0 SUMMARY OF SITE RISKS .................................................................................... 20
8.0 REMEDIAL ACTION OBJECTIVES ....................................................................... 27
9.0 DESCRIPTION OF REMEDIAL ACTION ALTERNATIVES................................... 28
10.0 SUMMARY OF COMPARATIVE ANALYSIS OF ALTERNATIVES ........................... 34
11.0 PRINCIPAL THREAT WASTES ............................................................................. 43
12.0 SELECTED REMEDY ............................................................................................. 43
13.0 STATUTORY DETERMINATIONS ....................................................................... 47
14.0 DOCUMENTATION OF SIGNIFICANT CHANGES ............................................. 49
15.0 STATE ROLE............................................................................................................ 49

APPENDIX A:  FIGURES

APPENDIX B:  TABLES AND ATTACHMENTS

APPENDIX C:  RESPONSIVENESS SUMMARY

APPENDIX D:  ADMINISTRATIVE RECORD INDEX

APPENDIX E:  WVDEP CONCURRENCE LETTER

AR442832

## ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| ARAR | Applicable or Relevant and Appropriate Requirement |
| bgs | below ground surface |
| BRA | Baseline Risk Assessment |
| BJS | Big John's Salvage-Hoult Road Superfund Site |
| BTU | British Thermal Units |
| CERCLA | Comprehensive Environmental Response, Compensation, and Liability Act |
| CFR | Code of Federal Regulations |
| CHA | Coke Handling Area |
| COC | Contaminant or Chemical of Concern |
| COPC | Contaminant or Chemical of Potential Concern |
| CSA | Coal Storage Area |
| CSM | Conceptual Site Model |
| EE/CA | Engineering Evaluation/Cost Analysis |
| EPA | U.S. Environmental Protection Agency |
| EPC | Exposure Point Concentration |
| FCW | Fairmont Coke Works |
| FCT | Fairmont Coke Works Site Custodial Trust |
| FCLP | Fairmont Community Liaison Panel |
| FPA | Former Process Area |
| FWMA | Former Waste Management Area |
| ft | feet |
| GW/SW | Ground Water/Surface Water |
| HI | Hazard Index |
| HQ | Hazard Quotient |
| HHRA | Human Health Risk Assessment |
| ICs | Institutional Controls |
| IEUBK | Integrated Exposure Uptake Biokinetic |
| IRIS | Integrated Risk Information System |
| ISCO | In-situ Chemical Oxidation |
| LOS | Light Oil Storage Area |
| LT/PRB | Limestone Trench/Permeable Reactive Barrier |
| MCL | Maximum Contaminant Level |
| mg/L | milligrams per liter |
| MNA | Monitored Natural Attenuation |
| MW | Monitoring Well |
| NA | Not Applicable |
| NCP | National Oil and Hazardous Substances Contingency Plan |
| NPL | National Priorities List |
| O&M | Operations Monitoring & Maintenance |
| OSHA | Occupational Safety and Health Administration |
| PPE | Personal Protective Equipment |
| PAH | Polynuclear Aromatic Hydrocarbon |
| PCB | Polychlorinated Biphenyl |
| PPRTD | Provisional Peer Reviewed Toxicity Database |
| PRG | Preliminary Remediation Goal |
| RfD | Reference Dose |
| RfC | Reference Concentration |
| RAO | Remedial Action Objective |

AR442833

| | |
|---|---|
| RCRA | Resource Conservation and Recovery Act |
| RI/FS | Remedial Investigation and Feasibility Study |
| ROD | Record of Decision |
| RME | Reasonable Maximum Exposure |
| S | Soil/Sediment |
| SLERA | Screening Level Ecological Risk Assessment |
| SL | Slope Factor |
| TBC | To-Be-Considered |
| U.S.C. | United States Code |
| μg/dL | micrograms per deciliter |
| μg/L | micrograms per liter |
| VIPA | Vapor Intrusion Protection Area |
| VOC | Volatile Organic Compound |
| WVDEP | West Virginia Department of Environmental Protection |
| WVPDES | West Virginia Pollutant Discharge Elimination System |
| WVSP | West Virginia State Police |
| WVSWQS | West Virginia Surface Water Quality Standards |

AR442834

[PAGE INTENTIONALLY LEFT BLANK]

AR442835

# DECLARATION FOR THE RECORD OF DECISION

## SITE NAME AND LOCATION

Sharon Steel/Fairmont Coke Works Site
Fairmont, Marion County, West Virginia
National Superfund Database Identification Number: WVD000800441

## STATEMENT OF BASIS AND PURPOSE

In this Record of Decision (ROD) the U.S. Environmental Protection Agency (EPA) has selected the final remedy (Selected Remedy or Remedy) for the Sharon Steel/Fairmont Coke Works Site (FCW Site or Site) located in Fairmont, Marion County, West Virginia, which was chosen in accordance with the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (CERCLA), 42 U.S.C. §§ 9601 et seq., and to the extent practicable, the National Oil and Hazardous Substances Pollution Contingency Plan (NCP), 40 C.F.R. Part 300 et seq., as amended.

This ROD is based on the Administrative Record for the Site, which has been developed in accordance with Section 113(k) of CERCLA, 42 U.S.C. § 9613(k). This Administrative Record File is available for review online at http://www.epa.gov/arweb, at the EPA Region III Records Center in Philadelphia, Pennsylvania, and at the Marion County Public Library in Fairmont, West Virginia. The Administrative Record Index (Appendix D) identifies each document contained in the Administrative Record upon which the Selected Remedy is based.

The State of West Virginia has concurred with the Selected Remedy.

## ASSESSMENT OF THE SITE

The response action selected in this ROD is necessary to protect the public health or welfare or the environment from actual or threatened releases of hazardous substances, pollutants or contaminants from this Site which may present an imminent and substantial endangerment to public health or welfare.

## DESCRIPTION OF THE SELECTED REMEDY

The Selected Remedy is Alternative 5, Limestone Trench/Permeable Reactive Barrier (LT/PRB); Remediation of Wetlands; Institutional Controls (ICs). The Selected Remedy consists of the following elements:

1. Remediate the plume of contaminated groundwater using a Limestone Trench/Permeable Reactive Barrier at the western end of the Site so that non-point source subsurface discharge to the Unnamed Tributary does not contribute to an exceedance to the West Virginia Water Quality Standards appropriate for secondary use recreation and protection of aquatic life. Additionally, the concentration of manganese in surface water must achieve

1

its risk-based Performance Standard for protection of recreational use (children).  The specific Performance Standards are shown below:

- pH                                   6-9
- iron                               1.5     milligrams per liter (mg/L)
- aluminum                    0.75    mg/L
- cyanide (as free cyanide HCN+CN-)    22      micrograms per liter ($\mu$g/L)
- benzene                        51      $\mu$g/L
- manganese                  6*      mg/L

       *      risk-based standard for recreational use (child)

2. Apply amendment of organic material capable of reducing bioavailability of inorganic contaminants of concern (COCs) to Wetland Areas 1 and 3.  The specific amendments and application rates will be determined during the Remedial Design.  Disturbed areas will be seeded with a native wetland seed mix.  Wetland Area 2 does not warrant remediation due to its small size, inconsistent hydrology, and limited ecological functions.

3. Maintain existing ICs preventing residential land use and the extraction of groundwater from the aquifer beneath the Site for use as a potable water source.  Additional ICs will be implemented to require vapor mitigation for any new habitable buildings constructed within the Vapor Intrusion Protection Area (VIPA) (Figure 9) unless a building-specific vapor intrusion evaluation determines mitigation to be unnecessary.  The default pre-emptive vapor mitigation will include, at a minimum, a foundation vapor barrier and subsurface piping for a passive subslab venting system that can be converted to an active sub-slab depressurization system if necessary.  Prior to occupancy, indoor air samples will be collected from within the building to confirm the efficacy of the passive venting system.  If indoor air sample concentrations are equal to or exceed EPA risk-based criteria, the passive venting system will be activated and operated as an active subslab depressurization system, until such time as EPA, in consultation with the West Virginia Department of Environmental Protection (WVDEP), determines that the subsurface contamination no longer poses a vapor intrusion risk.  ICs will also identify the VIPA as an area where construction workers required to work in a subsurface trench may be subject to conditions where a hazardous atmosphere could reasonably be expected to exist and standard precautions such as OSHA-mandated protocol to provide ventilation and proper respiratory protection would be required.  In addition, ICs will prohibit any activity that would interfere with the operation of the LT/PRB and groundwater monitoring wells.

4. Long-term groundwater, surface water and pore water monitoring to measure the performance of the LT/PRB in accordance with the EPA-approved design.  Long-term groundwater monitoring will also be required at the perimeter of the Site to confirm that groundwater with COCs exceeding Maximum Contaminant Levels (MCLs) or risk-based goals remains within the Site boundary.

The estimated timeframe to reach the Performance Standards for the Selected Remedy is 4 years.  The cost is estimated to be $2,798,000.

AR442837

## STATUTORY DETERMINATION

The Selected Remedy is protective of human health and the environment; complies with all Federal and State requirements that are legally applicable or relevant and appropriate to the remedial action; is cost-effective; and utilizes permanent solutions and alternative treatment technologies to the maximum extent practicable.

This Remedy also satisfies the statutory preference for treatment as a principal element of the Remedy, because the Remedy reduces the toxicity, mobility, or volume of hazardous substances, pollutants, or contaminants, as a principal element through treatment.

The Selected Remedy will result in hazardous substances, pollutants, or contaminants remaining on-Site above levels that allow unlimited use and unrestricted exposure. Therefore, a statutory review of the Site will be conducted no less often than every five years after initiation of remedial action in accordance with Section 121(c) of CERCLA, 42 U.S.C. § 9621(c), to ensure that the Remedy is, and will be, protective of human health and the environment.

## ROD DATA CERTIFICATION CHECKLIST

The following information is included in the Decision Summary of this ROD, while additional information can be found in the Administrative Record File for the Site:

- Contaminants of concern (COCs) and their respective concentrations;
- Baseline risk represented by the COCs;
- Cleanup levels established for COCs and the basis for these levels;
- How source materials constituting principal threats are addressed;
- Current and reasonably anticipated future land use assumptions and current and potential future beneficial uses of groundwater used in the baseline risk assessment and ROD;
- Potential land and groundwater use that will be available at the Site as a result of the Selected Remedy;
- Estimated capital, annual operation, monitoring and maintenance (O&M), and total present worth costs, discount rate, and the number of years over which the Remedy cost estimates are projected; and
- Key factors that led to selecting the Remedy.

## AUTHORIZING SIGNATURE

This ROD documents the Selected Remedy at the FCW Site and is based on the Administrative Record for the Site. EPA selected this Remedy with the concurrence of WVDEP. The Director of the Hazardous Sites Cleanup Division for EPA Region III hereby approves this ROD.

Karen Melvin, Director
Hazardous Site Cleanup Division
EPA Region III

DEC 1 9 2017

Date

3

# DECISION SUMMARY

This Record of Decision (ROD) is issued by the United States Environmental Protection Agency (EPA), the lead agency for the Sharon Steel/Fairmont Coke Works Site (FCW Site or Site) under the National Oil and Hazardous Substances Pollution Contingency Plan (NCP), 40 C. F. R. Part 300, pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, (CERCLA), in consultation with the West Virginia Department of Environmental Protection (WVDEP), the support agency.  The National Superfund Database Identification Number for the Site is WVD000800441.  This ROD is based on documents contained in the Administrative Record file for the Site.  The Administrative Record can be viewed online at https://semspub.epa.gov/src/collections/03/AR/WVD000800441, and select the **Remedial** Collection Description.

# 1.0 SITE NAME, LOCATION, AND DESCRIPTION

The FCW Site is located in Fairmont, Marion County, West Virginia (Figure 1).  The Site consists of 97 acres along the southern edge of Suncrest Boulevard approximately 1,600 feet east of the Monongahela River.  The FCW Site (Figure 2) is south-southeast of, and adjacent to, the Big John's Salvage Superfund (BJS Site).  Approximately 55 acres of the FCW Site was used for historical industrial operations.  Approximately 7 acres located along the periphery to the north and northeast was formerly residential and commercial properties that were purchased and incorporated into the FCW Site.  The remaining 35 acres include a wooded hillside that descends to the Monongahela River at the western portion of the FCW Site.  The geographic coordinates of the approximate center of the Site are +39.493610 degrees north latitude, and -80.114440 degrees west longitude.  The western drainage from the FCW Site shares a common drainage system (the Unnamed Tributary) with the BJS Site.

The extent of contamination from the FCW Site includes the developed portions of the Site property and extends into the Monongahela River downstream (north) of the Site.  Land surrounding the FCW Site is a mixture of industrial, commercial and residential properties.  In 2013, the Fairmont Armed Forces Reserve Center (National Guard Armory) was constructed along the southern boundary of the Site.  Lafayette Street was extended across the center of the Site where it intersects with 201st Artillery Drive, providing access to the National Guard Armory.  In April 2017, the West Virginia State Police Troop 1 Headquarters (WVSP) was constructed and began operations on an approximately 3-acre parcel in the southern portion of the Site.  Current and future land use of the FCW Site is subject to existing deed restrictions prohibiting residential use.  The reasonably anticipated future land use at the FCW Site is commercial/civic, light industrial or recreational.  All residential, commercial and governmental properties in the area are served by the public water supply drawn from the Monongahela River and processed through a filtration plant prior to distribution.

All environmental investigations and response actions undertaken at the Site from September 1997 through the present have been funded by ExxonMobil Corporation (ExxonMobil) in accordance with Administrative Orders on Consent discussed in more detail below.  ExxonMobil

AR442839

prepared the Remedial Investigation/Feasibility Study (RI/FS) and provided technical assistance to EPA throughout the process.

# 2.0 SITE HISTORY AND ENFORCEMENT ACTIVITIES

The "Proposed Rule" proposing the Site to the National Priorities List (NPL) was published in the *Federal Register* on June 17, 1996. The "Final Rule" adding the Site to the NPL was published in the *Federal Register* on December 23, 1996 (61 Fed. Reg. 67656).

## 2.1. History of Activities that Led to Contamination

In 1918, Domestic Coke Corporation, a predecessor of ExxonMobil purchased the FCW Site for the construction and operation of a 60-oven by-product coke facility (Coke Plant or Plant). Domestic Coke Corporation operated the Coke Plant from 1920 through 1948. Sharon Steel Corporation (Sharon Steel) acquired the property and Plant in 1948 and operated it until 1979, when the facility shut down. In 1991, Sharon Steel filed for bankruptcy and ownership of the Site was transferred to FAC, Inc., a subsidiary of Sharon Steel. In June 1998, Green Bluff Development, Inc. (Green Bluff), a subsidiary of ExxonMobil, purchased the Site to facilitate cleanup.

During operation, the Coke Plant processed approximately 1,000 tons of coal daily to produce coke. By-products were produced from the coke-making process and included coal tar, phenol, ammonium sulfate, benzene, toluene, xylene, and coke oven gas. Process facilities included: coke ovens, coal and coke handling facilities, by-product recovery structures, coal tar tanks, other product and production intermediate tanks, gas scrubbers, and machinery and maintenance buildings. Coal tar was sold to Reilly Tar and Chemical Corporation (located on the adjacent property now referred to as the BJS Site). Coke oven gas was distributed by the local utility company.

Plant wastes were disposed of in on-Site landfills, sludge ponds, and waste piles located at the western portion of the Site. From 1920 through 1979 solid wastes were deposited in two on-Site landfills: the North Landfill and the South Landfill. Starting in the early 1960s, process water from the Coke Plant was treated in two wastewater oxidation impoundments. The impoundments were constructed along a former drainage ditch on the west end of the Plant production area and discharged to Sharon Steel Run. Tar sludge from the oil recovery operations was placed in a pit referred to as the Waste Tar Pit, located in the central plant area (northeast area of the Site) near the decanter tanks. Breeze (fine grained residue from coal and coke handling) was deposited in the Breeze Pile, adjacent to the North Landfill.

## 2.2. History of Previous Environmental Investigations and Removal Actions

### EPA Removal Actions

At the request of the West Virginia Department of Natural Resources (WVDNR), which later changed its name to the West Virginia Department of Environmental Protection (WVDEP), EPA

AR442840

completed a removal assessment at the Site.  Based on that assessment, from May 1993 through August 2, 1996, EPA completed an emergency removal action at the FCW Site to stabilize the Site.  During this removal action EPA removed the contents of approximately 250 containers of unknown laboratory chemicals and several large above-ground tanks.  EPA disposed of suspected asbestos-containing building materials, approximately 650 gallons of PCB-containing oil, and separated and disposed approximately 26,100 gallons of emulsified oil from water remaining on-Site.  EPA treated and properly disposed of approximately 1.5 million gallons of benzene-contaminated water from the FCW Site.  Several large tanks were decontaminated and dismantled.  Other response actions performed by EPA included, but were not limited to, consolidation, re-grading and temporary containment of various waste materials to minimize erosion from the Site while EPA could plan for a more comprehensive cleanup.  The FCW Site was listed on the NPL on December 23, 1996.

### ExxonMobil Removal Actions

On September 17, 1997, EPA and ExxonMobil entered into an Administrative Order on Consent for Remedial Investigation/Feasibility Study (RI/FS), EPA Docket No. III-97-103-DC (RI/FS Order).  Shortly thereafter, ExxonMobil proposed that EPA consider an alternative strategy for the investigation, risk assessment and selection and implementation of the response action at the FCW Site.  For a description of this alternative strategy, see Overview of Project XL Cleanup Approach on Page 9.  With WVDEP concurrence, EPA approved ExxonMobil's proposal to conduct a non-time critical removal to address the major source areas to be followed by an RI/FS and ROD to address contaminated groundwater and any other concerns which may exist due to post-removal residual contamination.  On December 11, 1998 EPA and ExxonMobil entered into a Removal Order on Consent, EPA Docket No. III-99-0004-DC (Removal Order).  Issuance of the Removal Order temporarily suspended the requirements of the RI/FS Order until after the non-time-critical removal action activities were complete.

ExxonMobil prepared and implemented an Expanded Site Investigation Work Plan pursuant to the Removal Order.  The Site was divided into two geographic areas: Former Waste Management Area (FWMA) and the Former Process Area (FPA).  The FWMA, located on the northwestern portion of the Site, included two landfills (north and south), oxidation ponds, a sludge impoundment and an area known as the breeze wash out area (Figure 2).  The FPA, located on the southeastern portion of the Site, included the former production area, the coke ovens and the Light Oil Storage (LOS) Area.

ExxonMobil conducted Engineering Evaluations/Cost Analysis (EE/CAs) at the FWMA and FPA in two phases, with Phase I at the FWMA and Phase II at the FPA.  Both Phase I and Phase II EE/CAs were conducted by ExxonMobil with EPA and WVDEP oversight.  Action Memoranda approving the Phase I and Phase II EE/CAs were issued by EPA on June 6, 2000 and July 23, 2003, respectively.

The Phase I Action Memorandum selected the following response action:

- Excavate waste materials and contaminated soils from the North Landfill, the Breeze Washout Area, the Sludge Impoundment and Former Oxidation Pond;

AR442841

- Excavated materials with a high British Thermal Unit (BTU) value will be segregated and transported to an off-Site energy recycling facility;
- Excavated materials and soil exceeding Site-specific cleanup standards that are not amenable to the BTU recycling process will be consolidated into the South Landfill; and,
- Construct a multi-layered cap that meets the substantive requirements of Resource Conservation and Recovery Act (RCRA) Subtitle C at the South Landfill.

Prior to issuance of the Phase II Action Memorandum, ExxonMobil completed pilot-scale treatability studies indicating that most of the waste materials and contaminated soil in the FWMA, including the South Landfill, were amenable to recycling for energy recovery through an on-Site treatment/blending process. The BTU-rich wastes could be recycled to generate a synthetic coal fuel product (synfuel). Subsequently, EPA approved ExxonMobil's proposal to excavate and segregate wastes from the South Landfill, in addition to other source areas in the FWMA for recycling, thereby rendering the multi-layered cap unnecessary.

The Phase II Action Memorandum selected the following response action:

- Excavate designated hot spot areas in the FPA exceeding Site-specific soil cleanup standards;
- Evaluate excavated materials from both FWMA and FPA for inclusion with the on-Site recycling process used to generate synfuel; and,
- Transport excavated waste and contaminated soil not amenable to the BTU recycling process off-Site to appropriately permitted treatment and/or disposal facilities.

The response actions outlined in the Phase I and Phase II Action Memoranda began in 2003 and were completed in September 2011. Major components of the removal action include excavation and recycling, and treatment and/or disposal of wastes and contaminated soils exceeding Site-specific cleanup standards from the FWMA and the FPA. See Attachment A for Soil Site-Specific Cleanup Standards established for removal actions. In addition, materials were excavated from the LOS Area and the Coal Storage Area (CSA) and Coke Handling Area (CHA). All off-site treatment and/or disposal activities were carried out in accordance with CERCLA § 121(d)(3) and 40 Code of Federal Regulations (CFR) § 300.440. During the period of February 2003 through December 2010, the following material was removed from the Site:

- 6,943.46 tons of high BTU waste materials was shipped off-Site for energy recovery to the Piney Creek Power Plant in Clarion, PA;
- 24,095.35 tons of contaminated soil determined to be RCRA-characteristic hazardous waste were shipped to RCRA-permitted facilities for treatment and/or disposal;
- 214,246.32 tons of contaminated but non-hazardous soils and debris were disposed of at appropriately permitted landfills; and
- 486,110.87 tons of synthetic fuel were generated by blending excavated wastes from Site landfills with coal and other amendments. This blended material was tested and it was determined that it was not a RCRA-characteristic waste. The product was subsequently shipped off-Site for energy recovery at the Grant Town Power Plant in Grant Town, WV.

AR442842

A systematic post-excavation confirmation sampling program was conducted using 50 feet (ft) by 50 ft grids to demonstrate that source removal and risk reduction goals were achieved. Detailed descriptions of the removal actions completed are available in the following area-specific reports:

- Former Process Area Closeout Report (July 2011)
- Former Waste Management Area Closeout Report (August 2011)
- Former Light Oil Storage Area Closeout Report (August 2011)
- Coal Storage Area/Coke Handling Area Hot Spot Removal Report (July 2010)
- Final Pollution Report #455 (September 28, 2011)

The soil removal actions were performed to achieve risk-based cleanup standards that were established for various areas of the Site (Attachment A). Removal actions were completed in the North and South Landfills and the Byproducts Area to achieve site-specific cleanup standards established in the Action Memoranda for the protection of human health and underlying groundwater. Additional contaminants were added to the cleanup standards as new information became available during excavation activities to increase the likelihood that the Site could be safely reused when the removal was completed. The primary COCs driving the removal activities were benzene, naphthalene, polycyclic aromatic hydrocarbons (PAHs) such as benzo (a) pyrene, and arsenic.

As planned, after completion of Non-Time Critical Removal work the temporary suspension of the RI/FS Order was lifted on September 28, 2011. The RI/FS was performed in accordance with the RI/FS Work Plan approved by EPA on August 30, 2012, as amended, to address contaminated groundwater and any other remaining residual contamination requiring action to mitigate unacceptable risk to human health and the environment. A description of the RI findings is summarized below in Section 5.0 (Site Characteristics).

### 2.3. History of Enforcement Activities

The following is a summary of enforcement actions taken at the Site:

Sharon Steel filed for bankruptcy on November 30, 1992 and was subsequently liquidated. FAC, Inc., a subsidiary of Sharon Steel, became the Site property owner of record. In September 1993, EPA issued General Notice Letters to Sharon Steel informing it of potential liability for response costs at the FCW Site and received no response.

In April 1997, EPA issued General/Special Notice Letters to ExxonMobil informing it of its potential liability for response costs and inviting ExxonMobil to perform an RI/FS at the FCW Site. On September 17, 1997, EPA and ExxonMobil entered into an RI/FS Order.

Green Bluff, a subsidiary of ExxonMobil created for the sole purpose of expediting the cleanup process, purchased the FCW Site from FAC, Inc. in June 1998.

AR442843

**Overview of Project XL Cleanup Approach**
**Relevant Modifications to Standard Superfund Protocol**

On May 24, 1999, ExxonMobil, EPA, WVDEP and local stakeholders including the City of Fairmont entered into a formal Project XL (e**X**cellence and **L**eadership) Agreement[1] to use a modified approach from the standard Superfund process at the Sharon Steel/Fairmont Coke Works Site (FCW Site). EPA's Project XL Program was a national pilot program developed to test innovative environmental management strategies to achieve better and more cost-effective environmental and public health protections. The concept at the FCW Site was to streamline the cleanup by working directly with the local community to envision a future redevelopment objective for the property and to work "smartly" to make the vision a reality. In addition to meeting the threshold protection requirements outlined in the NCP, ExxonMobil agreed to undertake beneficial restorative actions which were beyond EPA's authority to require under CERCLA. In return, EPA agreed to provide regulatory flexibility within its discretion rather than strict adherence to the traditional Superfund process.

Actions performed by ExxonMobil to obtain superior environmental benefit include:

- Enhanced stakeholder involvement in decision making through formation of the Fairmont Community Liaison Panel early in the process.
- Dismantled and properly disposed the huge dilapidated industrial complex remaining on the abandoned Site to eliminate a barrier to redevelopment, prior to any finding of environmental risk linked directly to structures.
- Acquired the 97-acre Site from previous owner to facilitate expedited response actions.
- Completed large removal actions by excavating wastes and contaminated soil, thereby minimizing legacy on-Site management of contaminated materials and enhancing future redevelopment options.
- Recycled high-BTU wastes excavated from on-Site landfills by creating a synthetic coal product used to generate more than 527,000 megawatts of electricity – enough to power more than 42,000 typical West Virginian homes for one year.

Regulatory flexibilities supported by Stakeholders and accepted by EPA include:

- Future use of the Site would remain commercial/industrial (i.e., no residential land use scenario for the Site).
- The risk assessment process would establish preliminary remediation goals (PRGs) at the $1 \times 10^{-4}$ risk level (the upper boundary of the acceptable risk range) rather than the standard "point of departure" of $1 \times 10^{-6}$ for carcinogens. *As a practical matter, actual risk reduction achieved by past response actions were significantly better.*
- Groundwater beneath the Site would not be used for potable purposes. The "point of compliance" is the Site boundary or the point of surface expression (Unnamed Tributary).

[1] The Project XL Agreement was negotiated between the parties and published in the Federal Register (64 FR 17663, April 12, 1999) for public comment prior to being finalized.

On December 11, 1998, EPA and ExxonMobil entered into a Removal Order temporarily suspending the RI/FS Order until the Removal Response Actions, discussed above, could be completed.

On September 13, 2002, EPA entered into a Consent Decree (Civil Action No. 1:01CV15) with ExxonMobil and Green Bluff, pursuant to Section 107 of CERCLA for reimbursement of $1,500,000 in past response costs.

On January 24, 2003, ExxonMobil and Green Bluff, entered into a Consent Decree with the State of West Virginia (Civil Action No. 1:02CV160) pursuant to CERCLA wherein the settling defendants agreed to, among other things, a) pay the State of West Virginia $500,000 for natural resources damages, b) establish a "Custodial Trust" with $2,000,000 to fund redevelopment at the Site with the State of West Virginia, the designated Trustee, and, c) transfer ownership of the FCW Site to the Custodial Trust to facilitate redevelopment of the Site. Green Bluff transferred ownership of the FCW Site to the Custodial Trust on March 20, 2004.

Prior to transferring property ownership of the Site to the Custodial Trust, Green Bluff, the City of Fairmont and West Virginia Department of Environmental Protection (collectively referred to as the "Parties") established a Declaration of Deed Restrictions (i.e., institutional control) limiting how the Site could be used in the future. The Declaration of Deed Restrictions was modified by

AR442844

the Parties on October 11, 2006, as recorded in the Marion County Clerk's office in Deed Book 1017 at page 89 through 371.  The primary land use restrictions applied to the FCW Site are:

- no residential use, and
- no groundwater shall be extracted from beneath the Site for potable use.

Following completion of the non-time critical removal work, on September 28, 2011, the temporary suspension of the RI/FS Order between EPA and ExxonMobil was lifted and the RI/FS Report was completed in June 2016.


# 3.0 HIGHLIGHTS OF COMMUNITY PARTICIPATION

Throughout the course of its involvement with the Site, EPA has used a variety of means to learn of local stakeholder concerns and interests and keep the public informed of Site activities.  Routine activities included issuing informational Fact Sheets, holding public meetings with formal public comment periods during key decision points and actively participating in the Fairmont Community Liaison Panel (FCLP) established as part of the Project XL Agreement described in more detail on Page 9.  The FCLP was involved in establishing the reasonable future land use assumptions and associated land use restrictions placed on the FCW Site.

The FCLP was created to serve as a forum for open discussion of topics related to the FCW Site and met periodically throughout performance of the removal response actions.  The FCLP included a cross section of community members including local officials, representatives of health professionals, law enforcement, clergy, local businesses and residents along with representatives of WVDEP, EPA and ExxonMobil.  FCLP meetings were held several times per year to provide updates on ongoing cleanup activities and foster interaction between the community, the regulators overseeing the work and ExxonMobil performing the work.  FCLP meetings were held in the community, open to the public, and advertised in the local and regional newspapers.

On July 9, 2016, pursuant to Section 113(k)(2)(B) of CERCLA, 42 U.S.C. § 113(k)(2)(B), EPA released for public comment the Proposed Remedial Action Plan (Proposed Plan) setting forth EPA's preferred remedial alternative for the Site.  The Proposed Plan was based on documents contained in the Administrative Record File.  EPA made these documents available to the public in the EPA Administrative Record Room in EPA Region III's office located at 1650 Arch Street in Philadelphia, Pennsylvania, and at the local information repository at the Marion County Public Library located at 321 Monroe Street in Fairmont, West Virginia.  A notice of availability of these documents was published in the *Times West Virginian* on July 9, 2016.  EPA opened a 30-day public comment period on July 9, 2016, to receive comments on EPA's preferred alternatives and the other alternatives identified in the Proposed Plan.  Comments received during this public comment period, as well as EPA's response to such comments, are summarized in the Responsiveness Summary section of this ROD.  EPA and WVDEP also held a public meeting on July 14, 2016 at the Armed Forces Reserve Center located at 201st Artillery Drive in Fairmont, West Virginia.  Further discussion of community activities is presented in Section 10.9 (Community Acceptance) and the Responsiveness Summary.

10

More detailed documentation on the information contained in this ROD may be found in the Administrative Record which contains the RI/FS, and other information used by EPA in the decision making process.  EPA encourages the public to review the Administrative Record in order to gain a more comprehensive understanding of the Site and the activities that have been and will be conducted there.  The Administrative Record can be viewed at the Marion County Public Library located at 321 Monroe Street in Fairmont, West Virginia and is also available at the EPA Region III Office located at 1650 Arch Street in Philadelphia, Pennsylvania.  To review the Administrative Record at EPA's Philadelphia office, contact Mr. Paul Van Reed, Administrative Record Coordinator, at (215) 814-3157.  The Administrative Record can be viewed online at https://semspub.epa.gov/src/collections/03/AR/WVD000800441, and select the **Remedial** Collection Description.  Copies of this ROD are available for public review in these information repositories.

# 4.0 SCOPE AND ROLE OF OPERABLE UNIT

The Selected Remedy is intended to be the final remedy for the Site.  Previous removal actions were implemented across the Site to eliminate waste materials and contaminated soils that presented a principle threat to human health and the environment when considering current and future land use at the Site.  During these removal actions waste materials and contaminated soils that presented a continuing source of contamination migrating to the underlying groundwater were excavated.  The role of the Selected Remedy is to address any residual contamination remaining in underlying groundwater or Site soil/sediment that present an unacceptable risk to human health and the environment.

The Selected Remedy will treat contaminated groundwater migrating toward the Site boundary and non-point source, subsurface discharges to surface water.  Contaminated sediments in wetland areas will be remediated.  ICs will be implemented to require that future buildings be constructed with vapor mitigation, as appropriate.

# 5.0 SITE CHARACTERISTICS

This section of the ROD describes the Conceptual Site Model (CSM) and provides an overview of the Site's characteristics, the sampling strategy used during the Site investigations, and the nature and extent of contamination remaining.  Additional information regarding the nature and extent of contamination can be found in the RI/FS and other documents included in the Administrative Record.

## 5.1. Site Geology and Hydrogeology

The Site is located within an ancient meander of the Monongahela River, which was filled in with sediments as that river shifted to its present-day course after the last period of glaciation. The glacial Lake Monongahela, formed when the ancient Monongahela River was blocked by ice sheets to the north, drained and created the relatively flat remnant lake plain surface on which the Site was developed.  The Site sits in a small valley with slopes extending up along the northern

AR442846

and southern property boundaries.  The Site geology has been divided into three main units: fill, alluvium, and bedrock.

The fill unit is a mixture of reworked silt, sand, coal, gravel, and other debris present from ground surface to the top of the alluvium.  This unit contains the shallow groundwater zone which is perched on the underlying fine-grained alluvium.  The shallow groundwater zone is mostly absent in the LOS Area and a large part of the western side of the Site.  A shallow groundwater-divide between the By-Products Area and the LOS Area causes shallow groundwater in the By-Products Area to flow west while shallow groundwater within the CSA/CHA and, where present within the LOS Area, flows to the east-southeast.  Groundwater flow velocities in this zone were calculated to be less than 1 foot per year.

The alluvium is made of Quaternary aged sediments that directly underlie the fill unit and extend down to the surface of bedrock.  Where the fill unit is absent, the alluvium unit occurs at the ground surface.  The alluvium unit is made of native clay, silt, and sand layers deposited as either river or lake sediment.  The combination of differing depositional environments and erosion through time has resulted in a varied alluvium composition laterally and vertically across the Site.  Generally, the lower portion of the alluvial unit is more permeable and contains the intermediate groundwater zone.  The upper layers of the unit tend to be finer-grained clay and silty clay which inhibits the downward migration of the perched shallow groundwater.  Where these low permeability layers are absent the shallow groundwater zone may leach to the underlying intermediate zone.  Groundwater in the intermediate zone generally flows toward a groundwater trough in the central portion of the Site before flowing west toward the Unnamed Tributary (Figure 3).  In some western portions of the Site the intermediate zone is likely divided into separate flow zones separated by thin clay lenses.  Groundwater flow velocity in the intermediate zone was calculated to range between 67 and 83 feet per year.

The bedrock beneath the Site is an interbedded sequence of Pennsylvanian aged shale, mudstone, siltstone, limestone, and sandstone of the Conemaugh Group.  The upper portion of the series outcrops in the hillside just southwest of the Site.  The Conemaugh Group contains the bedrock groundwater zone which generally flows to the west toward the Unnamed Tributary.  Groundwater in the bedrock zone flows with a calculated velocity of approximately 1 foot per year.  The weathered upper portion of the bedrock groundwater zone may be in direct hydraulic connection to the intermediate zone as there is a measured downward head gradient between lower portions of the intermediate zone and the weathered bedrock in the eastern portion of the Site and an upward vertical gradient in the vicinity of the Unnamed Tributary in the western portion of the Site.  Based on the elevation of the tributary compared to the top of bedrock, and the upward vertical gradients observed between bedrock and the intermediate zone in this area, the tributary is acting as a hydrogeologic boundary for shallow bedrock groundwater at the Site.

### 5.1.1.  Surface Water

The Unnamed Tributary flows through a relatively steep ravine along the boundary between the FCW Site and the Big John's Salvage Superfund Site (BJS Site) further to the west, before discharging to the Monongahela River approximately 1,600 feet downstream.  The segment of the Unnamed Tributary that bisects the two Superfund Sites receives both surface water runoff

AR442847

and subsurface groundwater discharge from both Sites. Pursuant to a Consent Decree (Civil Action No. 1:08CV124) for the BJS Site entered in US District Court on October 10, 2012, a surveyed transect, formally referred to as the "Release Line," was established to legally separate responsibility for contaminant remediation in this area. The BJS Site project has accepted responsibility for remediating any unacceptable environmental conditions on its side of the Release Line. The Fairmont Coke Works Superfund project remains responsible for remediating any unacceptable environmental conditions east of the Release Line and to prohibit any unacceptable migration of contaminants or pollutants beyond the Release Line. There are two small streams flowing from the FCW Site to the Unnamed Tributary (Figure 2).

### 5.1.2.   Wetlands

Three wetland areas are present on the relatively flat portion of the Site. The largest of these areas, Wetland Area 1 (SWA-1 on Figure 2) is a perennial wetland area located in the vicinity of the former North Landfill in the northwestern portion of the Site. This area extends a few hundred feet along the northern perimeter of the Site and surface water in this wetland drains west to the Unnamed Tributary. Wetlands Area 1 is characterized by a narrow band of cattails (*Typha sp.*) and other hydrophilic plants such as soft rush (*Juncus effusus*), hop sedge (*Carex lupulina*) and black willow (*Salix nigra*). Wetland Area 3 is in the southeast corner of the Site, in the former CSA/CHA. Wetland Area 3 habitat is a combination of wetland and tributary characterized by a small drainage area along the southeastern perimeter of the Site and several low-lying wet areas. The topography suggests that water in this area may have or previously had a hydrological connection to Hickman Run further southeast of the Site. Wetland Area 2 is located in the Byproducts Area and is limited both spatially and temporally.

## 5.2.   Nature and Extent of Contamination

This section presents an understanding of the nature and extent of contamination following Removal Response Actions discussed above in Section 2.2 (History of Previous Environmental Investigations and Removal Actions), under current Site conditions.

### 5.2.1.   Soil

A total of 861 soil samples, including 242 post-removal confirmation samples, were taken to characterize the current extent of contamination at the Site. These sample locations are shown on Figure 4. The confirmation samples from the FWMA and FPA demonstrate that the Removal Response Actions in these areas substantially reduced Site-related contamination and achieved the cleanup standards (Attachment A) set forth in the Phase I and Phase II Action Memoranda. Nevertheless, these data were evaluated again in the context of the Site-wide Human Health and Ecological Risk Assessments completed in the June 2016 RI, to assess risk from any remaining contamination.

A Human Health Risk Assessment (HHRA) was conducted on soil sample analytical results from on-Site and adjacent commercial and residential properties to determine if levels of soil contaminants exceeded EPA's acceptable risk range. The on-Site soil was found to have elevated levels of arsenic and PAHs making the Site unsuitable for residential use. Worker and recreational exposures to soil are within the acceptable risk range.

13

AR442848

Lead was detected above screening levels in several random sampling points at the Site, but the vast majority of samples contained lead concentrations within acceptable ranges. A lead evaluation concluded that lead concentrations in surface and subsurface soils do not present a significant hazard based on a comparison with EPA target levels. Therefore, lead hot spots appear to be localized and should not pose a concern.

Historical sampling results from 1994 indicated that a single sample collected from the backyard of a residential property had elevated concentrations of PAHs. In 2014 a thorough sampling program using the incremental sampling protocol in that backyard demonstrated that there is no unacceptable risk. The more complete sampling effort demonstrated lower concentrations, suggesting that the historical sample was localized and not representative of the yard as a whole.

### 5.2.2. Groundwater/Groundwater to Surface Water

The nature and extent of groundwater contamination at the Site was characterized through the installation and monitoring of 62 groundwater monitoring wells installed in shallow, intermediate and deep (bedrock) water bearing units. The locations of all 62 wells can be viewed on Figure 2. There are 25 monitoring wells completed in the shallow groundwater zone, depicted with a monitoring well number ending in an "S." There are 28 monitoring wells completed in the intermediate groundwater zone, depicted with a monitoring well number ending in an "I." There are 9 monitoring wells completed in the bedrock groundwater zone, depicted with a monitoring well number ending in an "D." In addition to the 62 permanent monitoring wells referenced above, 8 extremely shallow wells were completed along the floodplain of the Unnamed Tributary and are depicted on Figure 2 with a monitoring well number beginning with "GW/SW."

Groundwater analytical results for the shallow groundwater zone are presented on Figure 5. Figure 5 shows COCs detected above their applicable Maximum Contaminant Levels (MCLs) promulgated at 40 C.F.R. Part 141 pursuant to Section 1412 of the Safe Drinking Water Act, 42 U.S.C. § 300g-1. The following metals were detected at one or more monitoring well (MW) above their respective MCLs: antimony, beryllium, cadmium, lead, selenium and thallium. The distribution of elevated concentrations of metals in the shallow groundwater zone was sporadic and primarily located in the interior of the Site. Benzene is present above its MCL in MW-12S in an area near the former North Landfill. Groundwater monitoring along the perimeter of the Site indicates that groundwater contamination in the shallow groundwater zone does not extend beyond the Site boundary.

Groundwater analytical results for the intermediate groundwater zone are presented on Figure 6 (COCs detected above MCLs). The following inorganics, often referred to as metals, were detected at one or more monitoring well above their respective MCLs: arsenic, antimony, beryllium, cadmium, chromium, lead, selenium and thallium. The distribution of elevated concentrations of inorganics in the intermediate groundwater zone is more wide-spread than distribution in the shallow groundwater zone. Most intermediate monitoring wells have detected at least one metal at a concentration above its MCL. The groundwater located in the FWMA between the former North and South Landfills is contaminated with the most inorganic contaminants (MW-9I, MW-11I, MW-14I, MW-16I and MW-29I). In addition to the inorganics

14

AR442849

exceeding MCLs described above, the groundwater within the intermediate groundwater zone in the western boundary area is extremely acidic (pH levels in the 2.4 to 5.0 range) with very high concentrations of aluminum (up to 169 mg/L), iron (up to 1520 mg/L) (Figure 7), and manganese (up to 66 mg/L).

There is a benzene plume observed in the FWMA between the former North and South Landfills extending toward the western boundary of the Site (Figure 8). The benzene plume does not extend beyond the northern or southern Site property boundary. The benzene plume within the intermediate groundwater zone is considered to be within the "water table" aquifer in the context of evaluating the potential for vapor intrusion to buildings because the perched/shallow groundwater zone is discontinuous. The highest concentrations of benzene have been observed at MW-16. Concentrations of benzene within the intermediate zone have trended downward but remain well above the MCL (5 µg/L benzene). For example, benzene at MW-16 was 24,000 µg/L in 1999 and 1,100 µg/L in the same well in 2015. Additional wells were installed along the western boundary of the Site in 2014 to determine if the benzene plume, or groundwater with inorganic contaminants or very acidic pH levels, discharges to, or migrates beneath, the Unnamed Tributary. It was determined that groundwater from the intermediate and weathered bedrock zone discharges to the Unnamed Tributary, which forms the hydrologic boundary to groundwater along the western portion of the Site.

The terrain slopes steeply, approximately 30 feet in elevation, down to a small flood plain adjacent to the Unnamed Tributary. A series of wells, referred to as Groundwater/Surface Water wells (GW/SW), were installed along the base of the slope between the known benzene plume and the stream to evaluate groundwater-to-surface water migration. Analytical results for the GW/SW wells are presented on Figure 6. Elevated benzene was detected at GW/SW-7 (1,800 µg/L), GW/SW-6 (5 µg/L) and GW/SW-8 (6.6 µg/L). Benzene was not detected at elevated levels in the other GW/SW locations. Most of the GW/SW wells contained elevated levels of iron (up to 259 mg/L) and manganese (up to 37 mg/L). The manganese in several GW/SW samples was of potential concern if children were to play in this water as it emerges from the ground, or if it migrated to surface water undiluted. GW/SW-7 and GW/SW-8 measured very low pH levels at 2.88 and 2.39, respectively. Groundwater discharging to the Unnamed Tributary likely contributes to the exceedance of the West Virginia Surface Water Quality Standards (WVSWQS) for pH (6.0-9.0), aluminum (0.75 mg/L), iron (1.5 mg/L) and benzene (51 µg/L).

The bedrock groundwater zone has generally not been impacted by Site related contaminants. Site related COCs were not detected or detected below their respective MCLs in the bedrock zone wells, except for arsenic in MW-2D, which has been above the MCL since September 2010. MW-2D is located at the far eastern edge of the Site, indicating that the source of the elevated arsenic may be off-Site. No specific off-Site source has been identified.

### 5.2.3. Surface Water/Sediment in Wetland Area

A Screening-Level Ecological Risk Assessment (SLERA) was conducted on the surface water and sediment in the three on-Site wetland areas. Concentrations of the following metals: arsenic, cadmium, copper, iron, lead, manganese, nickel, selenium, silver and zinc were identified in sediment at one or more of the three wetland areas (discussed further below) at levels that

AR442850

present potential risk to amphibians, aquatic invertebrates, and insect-eating birds, such as red-winged blackbirds.  Concentrations of cobalt, nickel and zinc were identified in surface water at levels that present potential risk to amphibians, aquatic invertebrates, and insectivorous birds.

### 5.2.4.  Biota

A SLERA was completed for the Site as part of the RI.  This assessment identified contaminants of potential concern (COPCs) based on published toxicity data and conservative assumptions regarding exposure and ecological effects.  The SLERA evaluated site-wide soil data in addition to surface water and sediment data collected in the vicinity of the three wetland areas on the Site.  In addition, shallow groundwater data (ranging in depth from approximately 1 to 5 ft bgs) upgradient of the Unnamed Tributary was collected for the purpose of evaluating the potential for groundwater from the western portion of the FCW Site to affect the Unnamed Tributary.  The objective of the SLERA was to assess potential risks to ecological receptors as a result of possible exposure to COCs remaining after Removal Response Activities were completed.

The SLERA considered a full array of the types of plants and animals that may be present at the Site.  For Site soil the SLERA included plants, soil and wetland invertebrates (e.g., earthworms and benthic invertebrates), terrestrial mammals and birds.  Because it is not feasible to evaluate the relationship of COPCs to every species at the Site, specific receptors were selected to represent the organisms that could be present most frequently or are likely to be sensitive to the effects of Site-related COPCs.

The following ecological receptor populations were considered in the SLERA to evaluate soil exposures:

- Plants and soil invertebrates

- Insectivorous small mammals (short-tailed shrew [*Blarina brevicauda*])

- Herbivorous small mammals (meadow vole [*Microtus pennsylvanicus*])

- Herbivorous large mammals (white-tailed deer [*Odocoileus virginianus*])

- Insectivorous birds (American woodcock [*Scolopax minor*])

- Carnivorous birds (red-tailed hawk [*Buteo jamaicensis*])

To evaluate potential exposures to on-Site wetlands as well as sediments and surface water in the Unnamed Tributary, the following receptors were also considered:

- Benthic invertebrates

- Amphibians

- Herbivorous mammals (muskrat [*Ondatra zibethicus*])

16

AR442851

- Insectivorous birds (red-winged blackbird [*Agelaius phoeniceus*] for wetland exposure and Eastern phoebe [*Sayornis phoebe*] for exposure in the Unnamed Tributary)

The SLERA determined that potentially unacceptable risk would be presented to ecological receptors living in two on-Site wetland areas (Wetland Areas 1 and 3) due to arsenic, cadmium, copper, iron, lead, manganese, nickel, selenium, silver and zinc found in sediment and cobalt, nickel and zinc in surface water. Shallow groundwater characterized by very acidic conditions and high concentrations of dissolved aluminum, iron, manganese and benzene is likely a non-point source subsurface discharge to the Unnamed Tributary. The subsurface discharges to the surface water likely contribute to in-stream concentrations of aluminum and iron greater than levels known to be protective of aquatic life. See Section 7.3 (Ecological Risks) for additional information.

### 5.3. Establishment of Vapor Intrusion Protection Area (VIPA)

Because of the presence of volatile organic chemicals (VOCs) in shallow groundwater, the possibility of vapor intrusion is a potential concern for buildings that could be constructed on the Site in the future.

Vapor intrusion is the migration of VOCs from the subsurface into overlying buildings through cracks, joints and utility openings. Depending on site-specific conditions, VOCs in contaminated groundwater can emit vapors that may migrate through subsurface soil and into air spaces of overlying buildings. In most cases, VOC concentrations are low such that vapors are not present at detectable concentrations. However, in extreme cases, the vapors accumulate in buildings to levels that may pose safety hazards, acute health effects or aesthetic problems.

Groundwater monitoring demonstrates that the contaminated groundwater plume in which VOCs exceed their respective MCLs has been confined to the Site (Figure 9) and there are no existing habitable buildings[1] on or off the Site close enough to the VOC plume to be at risk. However, groundwater within the FWMA is contaminated with benzene, a VOC, measured at concentrations several orders of magnitude above its MCL (5 µg/L benzene) and the water table is relatively shallow. In addition, other factors such as elevated benzene concentrations in the deep soil in the LOS Area and buried subsurface pipes and debris throughout the FPA exist. The subsurface debris has the potential of creating a preferential path for vapor migration in the vadose zone.

EPA's Vapor Intrusion guidance[2] recommends collecting and weighing "multiple lines of evidence" to evaluate whether potentially unacceptable vapor intrusion exposure may occur under reasonably expected future conditions, such as construction of new buildings on the Site. EPA has determined that there is potential for vapor intrusion into future buildings constructed on Site where benzene exceeds its respective MCLs by several orders of magnitude in the shallow groundwater or other relevant factors exist. However, it is impossible to complete a definitive study without specific information regarding both the location of any such future building and

---

1 The only existing buildings on Site are the abandoned Administrative Building and the new WVSP in an area without potential for vapor intrusion. Off-Site buildings were evaluated and determined not to be at risk for vapor intrusion from Site-related VOCs

2 Technical Guide for Assessing and Mitigating the Vapor Intrusion Pathway from Subsurface Sources to Indoor Air (OSWER 9200-154, June 2015)

AR442852

the materials and techniques used for construction. Accordingly, EPA has established a VIPA encompassing the areas that, based on the presence of VOCs in the subsurface, a vapor intrusion investigation or pre-emptive mitigation must be conducted for future habitable buildings. See Figure 9 for the map defining the proposed VIPA.

### 5.4. Conceptual Site Model

A CSM was developed to identify which human or ecological exposure pathways were complete or could be potentially complete in the future. A CSM is used to ensure that all sources of contamination, exposure pathways and people and wildlife potentially using the Site are considered in a risk assessment and presents an overall understanding of a site. The types of potential "receptors" that were considered in the human health and ecological risk assessments along with exposure media, and exposure pathways, are presented in Figures 10 and 11, respectively.

The current[3] and likely future use of the Site is for commercial/industrial/civic site workers. The Site is zoned Highway Commercial which includes commercial, civic and light industrial land uses, and a Declaration of Deed Restrictions has been recorded on the title to the Site land records that prohibit residential use and prohibit use of underlying groundwater for potable purposes. Future exposure to soil may occur if the Site is redeveloped. Therefore, risks from exposure to Site soils were evaluated. Residential soil risks were assessed in the HHRA. The results of the screening analysis show that even after the extensive removal actions performed at the Site, the residential risks from soil exposures under baseline conditions would be unacceptable. As stated previously, there is an environmental covenant which prevents residential development of the Site, therefore, this analysis was a hypothetical future use. Contact with shallow groundwater could occur by future construction workers during construction activities. Although the Site and surrounding community are served by a public water supply, hypothetical future residential exposures to groundwater were also evaluated.

As discussed in Section 5.3 (Biota), the CSM for ecological receptors considered site-wide soil, surface water and sediment data collected in the vicinity of the wetland areas. In addition, shallow groundwater data upgradient of the Unnamed Tributary was considered for the aquatic life and wildlife living near Unnamed Tributary. The CSM considered plants, soil and wetland invertebrates (e.g., earthworms and benthic invertebrates), terrestrial mammals and birds that may be present at the Site. The SLERA assessed potential risks to these ecological receptors as a result of exposure to COCs remaining after removal activities.

---

3 The recent construction of the WV State Police Troop 1 HQ on a parcel in the former CSA/CHA makes the on-Site Worker scenario a current use. Civic/governmental building land use is similar to commercial and industrial with respect to potential exposure considerations.

AR442853

# 6.0 CURRENT AND POTENTIAL FUTURE LAND AND RESOURCE USES

Ownership of the 97-acre Site was conveyed to the Fairmont Coke Works Site Custodial Trust (FCT) to promote and facilitate the beneficial reuse of the Site property after the appropriate response actions are completed.  The State of West Virginia is the Trustee for the FCT. Approximately 62 acres of the Site are relatively flat land particularly well suited for redevelopment.  The remaining 35 acres include a steep wooded hillside that descends to the Monongahela River at the western portion of the FCW Site, which would limit redevelopment opportunities.

The Project XL Agreement, discussed briefly on Page 9, resulted in significant engagement with local officials and citizens to determine the most appropriate future use for the Site property including structured discussions with an active Community Liaison Panel and subcommittees focused on property redevelopment.  The community's decisions regarding the type of future reuse they would like to see has been incorporated by the City of Fairmont in the Planning and Zoning Code.

The FCW Site is currently zoned Highway Commercial, which allows for a variety of commercial/civic uses; residential use is specifically prohibited by the 2006 Declaration of Deed Restrictions discussed at Page 9.  The West Virginia State Police Troop 1 Headquarters (WVSP) became the first redeveloped parcel on the Site when the new WVSP facility opened in April 2017. The WVSP was built on the southern portion of the Site and represents the only current use.  The reasonably anticipated future land use at the FCW Site is commercial with the potential for industrial or recreational development.  Current and future land use of the FCW Site is subject to existing deed restrictions prohibiting residential use.

Land use surrounding the FCW Site is a mixture of industrial, commercial and residential properties.  In 2013, the Fairmont Armed Forces Reserve Center (National Guard Armory) was constructed along the southern boundary of the Site.  Lafayette Street was extended across the center of the Site where it intersects with 201st Artillery Drive, providing access to the National Guard Armory and the WVSP.  The area north of Suncrest Avenue is zoned Neighborhood Residential.  All residential and commercial properties in the area are served by the public water supply drawn from the Monongahela River and processed through a filtration plant prior to distribution.

Existing deed restrictions prohibit the current and future use of groundwater beneath the FCW Site for potable uses.  Groundwater generally flows west and discharges to the Unnamed Tributary.  There are two small streams flowing from the FCW Site to the Unnamed Tributary. Current and future use of the wetlands/surface water on the Site is secondary use recreation and providing habitat for wildlife.  The terrain at the western end of the Site slopes steeply down to the Unnamed Tributary which discharges to the Monongahela River approximately 1,600 feet downstream (north) of the Site.  The steep terrain makes it difficult to access the Unnamed Tributary from the Site.

AR442854

# 7.0 SUMMARY OF SITE RISKS

As part of the RI/FS, a baseline risk assessment (BRA) was completed to determine the risk that may be presented to human health or the environment by any contaminants remaining at the Site. A BRA is an analysis of the potential adverse human health and ecological effects of releases of hazardous substances from the Site in the absence of any additional actions or controls to mitigate such releases, under current and future land and resource uses.  The BRA includes a HHRA and a Screening-Level Ecological Risk Assessment (SLERA).  It provides the basis for taking action and identifies the contaminants and exposure pathways that need to be addressed if remedial action is determined to be necessary.  This section of the ROD summarizes the results of the BRA for the Site.

## 7.1. Selection of Contaminants of Concern

The current uses of the area surrounding the Site include industrial businesses to the east, and residential usage in the adjacent neighborhood.  The BRA evaluated and determined the Site does not present unacceptable risk to people living and working on properties surrounding the Site.

The BRA evaluated the future use of Site soils under trespasser, recreational, worker, and residential scenarios; the residential scenarios were mainly used to verify whether existing prohibitions continue to be warranted.  Future recreational and current trespasser exposures to surface water were evaluated.  For groundwater, future residential use, and the potential for migration of on-Site contaminants to usable wells, was assessed.  Also considered were the migration of VOCs from the subsurface into local buildings, and the inhalation of VOCs by construction workers doing subsurface excavation related to future Site redevelopment.  All of these risks were acceptable except where indicated in the Risk Characterization Summary Tables 1 (carcinogens) and 2 (non-carcinogens).

As summarized in Tables 1 and 2, the HHRA determined that there are no unacceptable risks to people at the Site under current land use scenarios.  The HHRA determined that there may be potentially unacceptable risk presented to people under certain future land use scenarios considered.  Manganese in surface water is a COC when considering the recreational land use scenario (for children).  Benzene and cyanide are COCs in groundwater when considering the potential for industrial/commercial workers land use scenarios, specifically related to the potential for these compounds to migrate from the subsurface into new buildings constructed within the VIPA, or from construction workers being exposed to groundwater during trench digging.

The HHRA estimated cancer risks and non-cancer health hazards from exposures to chemicals at the Site.  The HHRA quantitatively evaluates cancer risks and non-cancer hazards.  Consistent with EPA's policies and guidance, the HHRA quantified cancer risks and non-cancer hazards as the total exposure to Contaminants of Potential Concern (COPCs) in the absence of remedial action and ICs, such as ICs preventing residential land use or the extraction of groundwater from the aquifer beneath the Site for use as a potable water source.  From the COPCs, the HHRA

20

AR442855

identified those contaminants that drive the need for a remedial action.  This subset of COPCs is referred to as COCs, and is the primary focus of the response action selected in this ROD.

The HHRA determined that COCs remain in soil and ground water beneath the Site at concentrations that would present an unacceptable risk to hypothetical residential users.  The COCs in groundwater are benzene, aluminum, arsenic, chromium, cobalt, iron, manganese, nickel, lead, cyanide and thallium.  In the event that the Site were used for residential use in the future, COCs in soil would be arsenic and PAHs, such as benzo (a) pyrene.  In accordance with the terms of the Project XL Agreement discussed on Page 9, future use of the Site will not include residential use.  Based on the findings of the risk assessment, the property and groundwater beneath the Site is not safe for residential land use.

There are no existing buildings on the Site in areas potentially vulnerable to soil vapor intrusion however conditions exist that warrant precautions be taken should new buildings be constructed within the proposed VIPA.   Consistent with EPA guidance, EPA is requiring that any future buildings constructed within the VIPA (Figure 9) should incorporate pre-emptive vapor-intrusion mitigation unless a building-specific vapor intrusion evaluation determines mitigation to be unnecessary.

Lead was detected above screening levels in several random sampling points at the Site, but the majority of samples were within acceptable risk ranges.  Based on a lead evaluation for hypothetical residential and future industrial/commercial workers, it was concluded that lead concentrations in surface and subsurface soils do not present a significant hazard based on a comparison with EPA target levels [i.e., statistics for all scenarios indicated less than 5 percent of an exposed population would be likely to exceed the EPA blood lead concentration threshold (i.e., threshold of 10 micrograms per deciliter ($\mu$g/dL)].  After EPA issued a memo[4] in December 2016 that indicated blood-lead levels lower than 10 $\mu$g/dL may be of concern, ARCADIS on behalf of ExxonMobil submitted an updated lead evaluation for the Site.  The update confirms the original conclusions: groundwater exceeds the lead Action Level, and average soil lead concentrations are not a concern for permitted land uses.  Lead hot spots appear to be localized and should not pose a concern.

### 7.2. Human Health Risk Assessment Definitions and Process.

A four-step process is used for assessing site-related human health risks for a reasonable maximum exposure (RME) scenario.  The process includes:

- Hazard Identification – uses the analytical data collected to identify the COPCs at the site for each medium with consideration of a number of factors explained below;

- Exposure Assessment - estimates the magnitude of actual and/or potential human exposures, the frequency and duration of these exposures, and the pathways (e.g., ingesting fish) by which humans are potentially exposed;

---

4 Memorandum titled "Updated Scientific Considerations for Lead in Soil Cleanups," signed by Mathy Stanislaus, Assistant Administrator, Office of Land and Emergency Management (December 22, 2016)

AR442856

- Toxicity Assessment - determines the types of adverse health effects associated with chemical exposures, and the relationship between magnitude of exposure (dose) and severity of adverse effects (response); and

- Risk Characterization - summarizes and combines outputs of the exposure and toxicity assessments to provide a quantitative assessment of site-related risks.  The risk characterization also identifies contaminants with concentrations which exceed acceptable levels, defined by the National Contingency Plan (NCP) as an excess lifetime cancer risk greater than $1 \times 10^{-4}$ to $1 \times 10^{-6}$ or a Hazard Index (HI) greater than 1; contaminants at these concentrations are considered contaminants of concern (COCs) and are typically those that will require remediation at the site.  Also included in this section is a discussion of the uncertainties associated with these risks.

The cancer risk and non-cancer hazard estimates in the HHRA are based on RME scenarios and were developed by taking into account various health protective estimates about the frequency and duration of an individual's exposure to chemicals selected as COCs as well as the toxicity of the contaminants.

Each of these steps is described below.

### 7.2.1.  Hazard Identification

In this step of the HHRA process, the COPCs were identified in each medium based on such factors as toxicity, frequency of occurrence, fate and transport of the contaminants in the environment, concentrations, mobility, persistence, and bioaccumulation.  Analytical information that was collected to determine the nature and extent of contamination revealed the presence of contaminants in soils, surface water, sediments, and groundwater.  Based on this information, the risk assessment focused on contaminants which may pose significant risk to human health, referred to as COCs.  A comprehensive list of all COPCs can be found in the HHRA that is in the Administrative Record file for this ROD.  A summary of those substances determined to be COCs is included in Table 3.

### 7.2.2.  Exposure Assessment

Consistent with Superfund policy and guidance, the HHRA is a baseline risk assessment and, therefore, assumes no additional remediation or ICs will be implemented to mitigate or remove hazardous substance releases.  Cancer risks and non-cancer hazard indices (HI) were calculated based on an estimate of the RME expected to occur under current and future conditions at the Site.  The RME is defined as the highest exposure that is reasonably expected to occur at a site.

Typically, exposures are evaluated using a statistical estimate of the exposure point concentration (EPC), which is usually an upper bound estimate of the average concentration for each contaminant, but in some cases it may be the maximum detected concentration.  A summary of the EPCs for the COCs in each medium can be found in Table 3 while a comprehensive list of the EPCs for all COPCs can be found in the HHRA, available in the Administrative Record file for this action.

AR442857

Exposure pathways were identified for each potentially exposed population and each potential exposure scenario.  The main exposure pathways and receptors evaluated in the HHRA are also found in Table 3.

### 7.2.3.   Toxicity Assessment

In this step, the types of adverse health effects associated with contaminant exposures and the relationship between the magnitude of exposure and severity of adverse health effects were determined.  Potential health effects are contaminant-specific and may include the risk of developing cancer over a lifetime or other non-cancer health effects, such as changes in the normal functions of organs within the body (e.g., changes in the effectiveness of the immune system).  Some contaminants are capable of causing both cancer and non-cancer health effects.

Under current EPA guidelines, the likelihood of carcinogenic risks and non-cancer hazards as a result of exposure to site-related contaminants is considered separately.  Consistent with current EPA policy, it was assumed that the toxic effects of the Site-related chemicals would be additive for non-carcinogens that affected the same target organs, and for carcinogens.  Thus, cancer risks and non-cancer hazards associated with exposures to individual COPCs were summed to indicate the potential risks and hazards associated with mixtures of potential carcinogens and non-carcinogens, respectively.

Toxicity data for the HHRA were provided by the Integrated Risk Information System (IRIS) database, the Provisional Peer Reviewed Toxicity Database (PPRTD), or another source that is identified as an appropriate reference for toxicity values consistent with the May 2013 Tier 3 Toxicity Value White Paper (http://www.epa.gov/oswer/ risk assessment/pdf/tier3-oxicityvaluewhitepaper.pdf).  This information is presented in Table 4 (non-cancer toxicity data summary) and Table 5 (cancer toxicity data summary).  Additional toxicity information for all COPCs is presented in the HHRA, available in the Administrative Record file for this action.

### 7.2.4.   Risk Characterization

Non-carcinogenic hazards were assessed using the HI approach, based on a comparison of expected contaminant intakes and benchmark comparison levels of intake (reference doses, reference concentrations).  Reference doses (RfDs) and reference concentrations (RfCs) are estimates of daily exposure levels for humans (including sensitive individuals) which are thought to be safe over a lifetime of exposure.  The estimated intake of chemicals identified in environmental media (e.g., the amount of a chemical ingested from contaminated soils) is compared to the RfD or the RfC to derive the Hazard Quotient (HQ) for the contaminant in the particular medium.  The HI is obtained by adding the HQs for all compounds within a particular medium that impacts a particular receptor population.

The HQ for oral and dermal exposures is calculated as below.  The HQ for inhalation exposures is calculated using a similar model that incorporates the RfC, rather than the RfD.

23

HQ = Intake/RfD

Where:        HQ = hazard quotient;
              Intake = estimated intake for a chemical (mg/kg-day); and
              RfD = reference dose (mg/kg-day).

The intake and the RfD represent the same exposure period (i.e., chronic, subchronic, or acute).

The key concept for a non-cancer HI is that a "threshold level" (measured as an HI of 1 or less) exists below which non-cancer health effects are not expected to occur. Above an HI of 1, effects will not necessarily occur, but can no longer be ruled out.

As previously stated, the HI is calculated by summing the HQs for all contaminants for likely exposure scenarios for a specific population. An HI greater than 1 indicates that the potential exists for non-carcinogenic health effects to occur as a result of site-related exposures, with the potential for health effects increasing as the HI increases. When the HI is calculated for all contaminants for a specific population that exceeds an HI = 1, separate HI values are then calculated for those contaminants which are known to act on the same target organ. These discrete HI values are then compared to the acceptable limit of an HI = 1 to evaluate the potential for non-cancer health effects on a specific target organ. The HI provides a useful reference point for gauging the potential significance of multiple contaminant exposures within a single medium or across media. A summary of the non-carcinogenic hazards associated with these chemicals for each exposure pathway is presented in Table 4.

Non-cancer values exceeding the goal of protection of an HI = 1 are an HI= 2 for the child recreational user attributable to manganese in surface water; and an HI = 24 for the construction worker working in a trench at the Site attributable to benzene, and potentially cyanide, vapors migrating from groundwater and subsurface soil to the trench. The Site will not be used for residential purposes due to legal land use restrictions. However, for completeness, the HHRA documented that several additional compounds would be identified as COCs if the Site property were used for residential purposes (and the HIs would be 4 for child resident exposure to soil, 200 for child residential exposure to groundwater, 100 for adult residential exposure to groundwater, and 4 for residential vapor intrusion).

All other non-carcinogenic hazards associated with exposure to air, surface water, sediments and soil for various receptors identified in the CSM (Figure 10) are below EPA's goal of protection of an HI = 1.

For carcinogens, risks are generally expressed as the incremental probability of an individual developing cancer over a lifetime as a result of exposure to a carcinogen, using the cancer slope factor (SF) for oral and dermal exposures and the inhalation unit risk (IUR) for inhalation exposures. Excess lifetime cancer risk for oral and dermal exposures is calculated from the following equation, while the equation for inhalation exposures uses the IUR, rather than the SF:

24

AR442859

Risk = LADD x SF

Where:    Risk = a unitless probability (e.g., 1 x 10$^{-4}$) of an individual developing cancer;
          LADD = lifetime average daily dose averaged over 70 years (mg/kg-day); and
          SF = cancer slope factor, expressed as [1/(mg/kg-day)].

These risks are probabilities that are usually expressed in scientific notation (such as 1 x 10$^{-4}$). An excess lifetime cancer risk of 1 x 10$^{-4}$ indicates that one additional incidence of cancer may occur in a population of 10,000 people who are exposed under the conditions identified in the assessment. As stated in the NCP, the acceptable risk range for site-related exposure is 10$^{-6}$ (one in a million) to 10$^{-4}$ (one in ten thousand).

Results of the HHRA presented in Table 1 indicate that the cancer risks from the current and reasonably anticipated future uses of the Site were all less than 1 x 10$^{-4}$, meaning that the cancer risk did not exceed the threshold for triging action at the Site due to potential exposure of known or suspected carcinogens. The reasonably anticipate future use of the Site includes all the scenarios evaluated in the CSM (Table 10) excluding the residential use scenarios. As stated in Section 2.3, this Site is subject to a Declaration of Deed Restrictions prohibiting residential land use and extraction of groundwater beneath the Site for use as a potable water source. The Project XL Agreement established that cleanup goals at the Site would be based on commercial and industrial use[5], not residential use. Nevertheless, the HHRA considered residential land use as a hypothetical future use of this Site, primarily to determine whether past cleanup actions had achieved residual concentrations of hazardous substances low enough to render subsequent residential use safe. The residential assessment supports the need to continue the Site use restrictions.

Results of the HHRA presented in Table 1 indicate that the cancer risks to hypothetical future residents living on the Site would be 3 x 10$^{-4}$, or approximately 3 in ten thousand, due to exposure to arsenic and PAHs in site soil, which exceeds the goal of protection of 1 x 10$^{-4}$. Also, cancer risk to hypothetical residents drinking groundwater or breathing air in homes constructed in the VIPA without vapor controls was determined to exceed the NCP acceptable risk range.

### 7.3. Ecological Risks

A SLERA was completed for the Site as part of the RI. This assessment identified potential contaminants of concern (PCOCs) based on published toxicity data and conservative assumptions regarding exposure and ecological effects. The SLERA evaluated site-wide soil data in addition to surface water and sediment data collected in the vicinity of the three wetland areas on the Site. In addition, shallow groundwater data (ranging in depth from approximately 1 to 5 ft bgs) upgradient of the Unnamed Tributary were collected for the purpose of evaluating the potential for groundwater from the western portion of the FCW Site to affect the Unnamed Tributary. The SLERA considered plants, soil and wetland invertebrates (e.g., earthworms and

---

[5] The risk assessment also considered and determined that there is no unacceptable cancer risk or non-cancer hazard presented to Off-Site residents or Off-Site Workers living and working on properties adjacent the Site.

AR442860

benthic invertebrates), terrestrial mammals and birds that may be present at the Site.  The objective of the SLERA was to assess potential risks to these ecological receptors as a result of exposure to COCs remaining at the Site after removal activities were completed.

The SLERA concluded that potentially unacceptable risk would be presented by Site contaminants to amphibians, to the eastern phoebe and the red-winged blackbird associated with the on-Site Wetlands.  Elevated levels of arsenic, cadmium, copper, iron, lead, manganese, nickel, selenium, silver and zinc were identified in wetland sediment.  Elevated levels of cobalt, nickel and zinc were identified in surface water.

The Unnamed Tributary flows between the FCW Site and the BJS Site, receiving groundwater recharge from groundwater flowing beneath both of the Superfund Sites.  Shallow groundwater and groundwater/surface water interface sample results were used to evaluate potential ecological impacts to the Unnamed Tributary.  Although uncertainty is associated with potential dilution and volatilization that may occur after discharging to surface water, these samples provided a conservative means of evaluating the influence of groundwater on the Unnamed Tributary.

To determine the potential for ecological effects, the concentrations in the GW/SW samples were compared to the West Virginia Surface Water Quality Standards (WV 47CSR2).  Some constituents were found to exceed water quality standards for surface water, including aluminum, iron, cadmium and lead (GW/SW-001 only).  However, the points with exceedances for the most constituents and the largest exceedances were GW/SW-007 and GW/SW-008 (including elevated benzene and very low pH).  These samples are not actual surface water samples; GW/SW-007 and 008 appear to be more representative of groundwater samples in the intermediate zone.  Of the six sample locations closest to the Unnamed Tributary, only iron and pH consistently exceeded the WVSWQS.

### 7.4. Summary of Human Health and Ecological Risks

The BRA indicates that current land use exposures to Site-related media do not result in unacceptable risks to human health.  The BRA also confirms that existing land use restrictions prohibiting residential use of the Site and potable use of groundwater beneath the Site are appropriate and should be maintained.  Future construction workers involved in subsurface work, such as installing utilities in a trench deeper than 4 ft, may be exposed to unacceptable risk levels due to inhalation of the ambient air in the trench if appropriate precautions are not taken.
A hypothetical future recreational land use scenario determined that contact with soil on the Site would not exceed the acceptable risk range; however, recreational contact with surface water or groundwater migrating to the Unnamed Tributary by children may exceed the acceptable risk range due to the presence of manganese.

In addition, vapor intrusion is a potential concern for future on-Site buildings due to the presence of benzene, and potentially free cyanide, in the subsurface.

The BRA determined that potentially unacceptable risk would be presented to ecological receptors living in two on-Site wetland areas (Wetland Areas 1 and 3) due to arsenic, cadmium,

AR442861

copper, iron, lead, manganese, nickel, selenium, silver and zinc found in sediment and cobalt, nickel and zinc in surface water. Shallow groundwater characterized by very acidic conditions and high concentrations of dissolved aluminum, iron, manganese and benzene is likely a non-point source subsurface discharge to the Unnamed Tributary. The subsurface discharges to the surface water likely contribute to in-stream concentrations of aluminum and iron greater than levels known to be protective of aquatic life.

### 7.5. Basis for Action

Based upon the results of the RI, the HHRA, and ERA, EPA has determined that the response action selected in this ROD is necessary to protect public health or welfare or the environment from actual or threatened releases of hazardous substances, pollutants or contaminants into the environment.

## 8.0 REMEDIAL ACTION OBJECTIVES

To protect the public and the environment from potential current and future health risks, the following Remedial Action Objectives (RAOs) have been developed to address the contaminated groundwater, and sediments in wetland areas at the Site:

- Prevent the migration of groundwater containing COCs at concentrations greater than the Performance Standards into surface water. Areas to the north, south and east are upgradient from the Site and groundwater flows from the Site boundary towards the east-west centerline before turning westward and discharging into the Unnamed Tributary, with flow towards the Unnamed Tributary becoming more direct with depth. The Unnamed Tributary acts as a hydrologic barrier to groundwater flow, preventing groundwater from ever reaching the Site boundary. See Section 12.2 (Description of the Selected Remedy and Performance Standard) for the list of Performance Standards.

- Mitigate the potential human health risks for future construction workers involved in redevelopment of the Site who may breathe VOCs in the ambient air of a trench on-Site.

- Mitigate the potential for vapor intrusion of VOCs detected in groundwater and soil within the VIPA into indoor air of potential future on-Site buildings, as appropriate.

- Mitigate potential ecological risks to receptors which may contact surface water and sediments in wetland areas on-Site.

Land use restrictions have been placed on the FCW Site through local zoning regulations and enforceable deed restrictions implemented in accordance with the Project XL Agreement. To affirm that certain land use restrictions must remain in effect to ensure continued protectiveness, the following use restrictions are adopted as a common element to each of the response actions evaluated in this ROD:

- Residential use of the Site is prohibited.

27

AR442862

- Extraction of groundwater from beneath the Site for potable use is prohibited.

# 9.0  DESCRIPTION OF REMEDIAL ACTION ALTERNATIVES

The 2016 FS discusses a range of alternatives evaluated based on their ability to address risks presented by the Site.  Together with the other documents in the Administrative Record, the FS provides information supporting the alternative ultimately selected by EPA in this ROD.  As noted above, based on the potential impacts to human health and the environment, the following areas of the Site warrant additional cleanup action to minimize potential exposure to hazardous substances:

- Soil/Sediment (S) in the Wetland Areas
- Groundwater (GW) along the western Site boundary area (for the protection of surface water)

The remedial alternatives presented in the FS consist of the following:

- Alternative 1:  No Further Action
- Alternative 2:  Limited Actions (Monitored Natural Attenuation and Institutional Controls)
- Alternative 3:  Groundwater Extraction, Treatment, and Discharge; Remediation of Wetlands; Institutional Controls
- Alternative 4:  In-Situ Chemical Oxidation (ISCO), Remediation of Wetlands; Institutional Controls
- Alternative 5:  Limestone Trench/Permeable Reactive Barrier (LT/PRB); Remediation of Wetlands; Institutional Controls

Common Elements to All Alternatives

Each of the alternatives, except the No Further Action alternative, includes the specific requirement to maintain ICs preventing residential land use and the extraction of groundwater from the aquifer beneath the Site for use as a potable water source.  In addition, ICs would be implemented to require pre-emptive vapor mitigation for any new habitable buildings constructed within the VIPA (Figure 9) unless a building-specific vapor intrusion evaluation determines mitigation to be unnecessary.   The default pre-emptive vapor mitigation would include, at a minimum, a foundation vapor barrier and subsurface piping for a passive subslab venting system that can be converted to an active sub-slab depressurization system if necessary.  Prior to occupancy, indoor air samples shall be collected from within the building to confirm the efficacy of the passive venting system.  If indoor air sample concentrations are equal to or exceed EPA risk-based criteria, the passive venting system shall be activated and operated as an active subslab depressurization system, until such time as EPA, in consultation with WVDEP, determines that the subsurface contamination no longer poses a vapor intrusion risk.  At that time, the active venting system may revert to a passive venting system.  ICs would also identify the VIPA as an area where construction workers who are required to work in a subsurface trench may be subject to conditions where a hazardous atmosphere could reasonably be expected to exist and standard precautions such as OSHA-mandated protocol to provide ventilation and

28

proper respiratory protection would be required.  ICs may include, but are not limited to, restrictive covenants, deed notices, and/or local ordinances.

Because each of the Alternatives evaluated would result in hazardous substances, pollutants, or contaminants remaining on-Site above levels that allow for unlimited land use and unrestricted exposure, a statutory review will be conducted no less than every five years to ensure that the remedy is, or will be, protective of human health and the environment.

**Alternative 1:  No Further Action**

Estimated Capital Cost: $0
Estimated Annual Cost: $0 ($17,000 every five years)
Estimated Present Worth Cost:  $36,600
Estimated Time to Completion:  Immediate

The NCP requires that EPA consider a "No Action" alternative for every Superfund site to establish a baseline or reference point, against which each of the other Remedial Action alternatives are compared.  In the event that the other identified Alternatives do not offer substantial benefits in the protection of human health and the environment, the No Action Alternative may be considered a feasible approach.  This Alternative leaves the Site in its current state and all current and potential future risks would remain.  Previous response actions addressed contaminated surface soil such that the Site can be safely reused for recreational, commercial or industrial purposes with the exception of future worker exposure in construction trenches and child recreational exposure to surface water at the western end of the Site.  Also, ecological receptors would continue to be exposed to elevated risks due to inorganic contaminants in sediments within the wetland areas on the Site.  In addition, non-point source subsurface discharge of shallow groundwater with acidic conditions and elevated concentrations of COCs would continue to contribute to an exceedance of WVSWQS in the Unnamed Tributary.  Habitable buildings constructed above or near surficial groundwater contaminated with VOCs would be potentially subject to vapor intrusion.  If the existing ICs listed in the Declaration of Deed Restrictions were to be lifted as a potential future use scenario, hypothetical future residents would be potentially subject to unacceptable health risks due to consumption of underlying groundwater, direct and frequent contact with Site soils and breathing soil vapor that has the potential to migrate into their on-Site homes.  In the event the existing ICs were to be altered to allow recreational use in the area of surface water on the western end of the Site an unacceptable risk to small children exposed to stream water.  Since significant response actions have already been implemented across the Site, the "no action" alternative is better described as "no further action."

**Alternative 2:  Limited Actions (Monitored Natural Attenuation and Institutional Controls**

Estimated Capital Cost: $92,100
Estimated Annual Cost: $51,350 (plus $17,000 every five years)
Estimated Present Worth Cost:  $767,000
Estimated Time to Completion:  30 years (for cost estimating purposes)

29

AR442864

Alternative 2 combines the Remedial Actions described in Alternatives S-2 and GW-2 in the RI/FS, as modified by EPA.

This Alternative relies on Monitored Natural Attenuation (MNA) to achieve Performance Standards at the Site boundary, or at the "release line" along the western end of the Site. (See Section 5.1.1 for additional discussion about the "release line".) Natural attenuation processes (biodegradation, dispersion, dilution, sorption, volatilization and chemical or biological stabilization, transformation, or destruction of constituents), under favorable conditions, act without human intervention to reduce the mass, toxicity, mobility, volume, or concentration of constituents in soil and groundwater. MNA would be relied upon to reduce concentrations of COCs (primarily iron, manganese and benzene and increase pH), so that groundwater flowing beneath the Site and discharging to the Unnamed Tributary does not contribute to an exceedence of the WVSWQS. The primary source material has been removed and natural degradation and attenuation of benzene in groundwater has been demonstrated to be occurring. Groundwater acidity and concentrations of inorganic contaminants appear to be stable. Periodic groundwater monitoring would be used to document the decline of COCs via natural attenuation processes. A long-term monitoring plan would be carried out using a network of monitoring wells, supplemented with new monitoring wells, as necessary. For cost estimation purposes, it is assumed that four new well clusters (eight new wells) would be installed as sentinel wells at the western Site boundary and Performance Standards would be achieved in 30 years.

Under Alternative 2, no active remediation or treatment of contaminated soils or sediments in the wetlands would be conducted to reduce or prevent ecological exposure. Natural seasonal cycles would be relied upon to gradually increase the soil organic carbon as successive stands of decomposed plant materials accumulate in the wetland sediments and decrease the bioavailability of the inorganic contaminants.

**Alternative 3: Groundwater Extraction, Treatment, and Discharge; Remediation of Wetlands; Institutional Controls**

Estimated Capital Cost: $1,513,000
Estimated Annual Cost: $354,350 (plus $17,000 every five years)
Estimated Present Worth Cost: $5,410,000
Estimated Construction Time: 2 years
Estimated Time to Achieve RAOs: 1 year

Alternative 3 combines the Remedial Actions described in Alternatives S-2, S-3 and GW-3 in the RI/FS, as modified by EPA.

Under Alternative 3, a groundwater extraction and treatment system (groundwater treatment system) would be designed and operated to contain the migration of COCs in groundwater and to reduce the overall time necessary to achieve Performance Standards for groundwater discharging to the Unnamed Tributary. An array of groundwater extraction wells would be installed in a line generally perpendicular to the contaminated plume. Each well creates a cone of depression, or radial area of influence, as water is withdrawn from the aquifer. The wells are installed at close

AR442865

proximity so that the cones of depression overlap and, collectively, create a capture zone that prevents contaminated groundwater from by-passing the recovery well network.  A water treatment plant would be constructed and operated to treat the recovered groundwater prior to its discharge to the Unnamed Tributary, or if accommodation can be made, the City of Fairmont Sewer System.  Treated plant effluent would meet the substantive requirements of a West Virginia Pollutant Discharge Elimination System permit (WV 47 CSR 10).

For cost estimation purposes it was assumed that approximately seven extraction wells would be installed in the shallow and intermediate zones to intercept contaminated groundwater migrating beneath the western end of the Site.  Recovered groundwater would be pumped to an on-Site water treatment plant.  The conceptual groundwater treatment system would include the following processes in sequence: equalization tank; pH adjustment/metal precipitation to remove aluminum, iron and manganese; and air stripping and/or activated carbon technologies to achieve West Virginia Pollutant Discharge Elimination System (WVPDES) discharge limits prior to the effluent being discharged to either surface water or the local sanitary sewer authority.  The actual number and location of extraction wells, the design flow rate and components of the groundwater treatment system would be determined during the design.

A groundwater monitoring program would be implemented to demonstrate that contaminated groundwater is being contained under the Site and not discharging to the surface water at concentrations that contribute to an exceedance of WVSWQS (WV 47 CSR 2).  Additional monitoring wells will be installed as necessary to demonstrate such containment.

Wetland Areas 1 and 3 would be treated with an amendment capable of binding inorganic contaminants, rendering them less bioavailable to ecological receptors.  An amendment, such as a blend of humic acid, fulvic acid, and humin, or other organic matter would be applied to the areas with elevated concentrations of inorganic COCs (cadmium, copper, lead, selenium and zinc).  The specific amendments and application rates will be determined during the Remedial Design.  Disturbed areas would be seeded with a native wetland seed mix.  The effectiveness of the remedy would be assessed by the survival of wetland plant species that are sensitive to metal toxicity.  Wetland Area 2 does not warrant remediation due to its small size, inconsistent hydrology, and limited ecological functions.

In addition to the ICs described in Common Elements to All Alternatives, above, an IC would be established to prohibit any activity that would adversely impact the operation of the groundwater treatment system.

**Alternative 4:    In-Situ Chemical Oxidation; Remediation of Wetlands; Institutional Controls**

Estimated Capital Cost: $2,445,000
Estimated Annual Cost: $106,350 first 3 years; $56,350 thereafter (plus $17,000 every five
    years)
Estimated Present Worth Cost:  $3,236,000
Estimated Time to Completion:  2 year

AR442866

Alternative 4 combines the Remedial Actions described in Alternatives S-2, S-3 and GW-4 in the RI/FS, as modified by EPA.

Alternative 4 involves in-situ treatment of groundwater contaminants in the saturated subsurface with a chemical oxidant such as hydrogen peroxide. Chemical oxidation works when the oxidant comes into direct contact with an organic compound, such as benzene, and destroys it by converting the contaminant to innocuous compounds, such as carbon dioxide and water. The reaction is different when the contaminant is an inorganic chemical, such as iron or manganese. The oxidant would react with the dissolved inorganic chemicals to form a metallic oxide precipitate that would settle out of the groundwater. The chemical oxidant, such as hydrogen peroxide, is typically injected directly into the subsurface and allowed to flow with the groundwater into contaminated areas.

For cost estimation purposes, it is assumed that each injection point would extend 40 feet bgs and treat groundwater within a 5 to 10-foot radius. Approximately 250 injection points would be required within a 58,000 square feet area to treat the impacted groundwater zone. A minimum of four treatment events would be required over a one to two-year period. The actual configuration of the oxidant injection field, including depth and spacing of injectors and type of oxidant, would be determined during the design process.

The reduction of aluminum, iron, manganese and benzene in groundwater would achieve the Remedial Action Objective of preventing contaminated groundwater from flowing into the surface water at concentrations exceeding Performance Standards. A groundwater monitoring plan would be implemented to measure the effectiveness of the in-situ treatment system, including the groundwater flow patterns. The application of oxidant into the aquifer would be performed in a manner consistent with the substantive provisions of WV 47 CSR 13 governing underground injection wells.

This alternative includes the wetland remediation actions described in Alternative 3, above. In addition to the ICs described in Common Elements to All Alternatives, above, an IC would be established to prohibit any activity that would adversely impact the operation of the injection points.

### Alternative 5:   Limestone Trench/Permeable Reactive Barrier (LT/PRB; Remediation of Wetlands; Institutional Controls

Estimated Capital Cost: $1,790,000
Estimated Annual Cost: $65,350 (plus $17,000 every five years)
Estimated Present Worth Cost:  $2,798,000
Estimated Time to Completion:  1 year

Alternative 5 combines the Remedial Actions described in Alternatives S-2, S-3 and GW-5 in the RI/FS, as modified by EPA.

Under Alternative 5, a Limestone Trench/Permeable Reactive Barrier (LT/PRB) would be installed across the extreme western portion of the Site to provide passive, in-situ treatment to

AR442867

groundwater passing through the permeable trench/barrier.  Alternative 5 would build upon a pilot-scale study performed by ExxonMobil at the Site.  The pilot-scale study performed included the placement of mushroom soil with the limestone in an anoxic (i.e., low oxygen) limestone trench.  (Attachment B – Pilot Scale Summary)

The LT/PRB would include a trench, extending from the surface to the base of the intermediate aquifer, aligned perpendicular to the natural groundwater flow path.  It would be filled with appropriate material (i.e., treatment media) capable of adjusting geochemical conditions in the groundwater to favor removal of contaminants through degradation and/or precipitation.  The treatment media would likely include limestone to increase alkalinity and raise the pH of the passing groundwater; other materials such as organic compost would be included as appropriate to create optimal conditions for treatment.

Benzene is amenable to both aerobic and anaerobic biodegradation and both processes are occurring at various locations within the plume depending on the geochemistry and associated microbes.  Benzene is currently degrading via aerobic biodegradation at the outer edges of the plume, where dissolved oxygen is higher.  This passive in-situ treatment technology works best when little oxygen is available (anoxic conditions) until after the groundwater moves through the PRB.  When the dissolved metals such as iron and manganese are exposed to available oxygen, insoluble hydroxides are formed and precipitate out of the groundwater.  The anoxic conditions also support the anaerobic biodegradation of benzene.  If the precipitation occurs within the PRB, effective lifespan of the treatment system is reduced.

The LT/PRB configuration may utilize "funnel and gate" and/or French drain concepts to influence groundwater flow.  With a funnel and gate configuration, sections of impermeable walls are used to strategically divert the groundwater flow through the reactive zones and minimize by-pass.  French drains are used to create areas of greater flow and may be utilized to convey treated groundwater to precipitation zones.  For cost estimation purposes it is assumed that the LT/PRB would be approximately 18 feet deep and extend approximately 200 feet to the northeast from the western end of the PRB installed during the pilot study (Figure 12).  The actual configuration of the LT/PRB, including alignment, composition of treatment media and wall thickness would be determined during the Remedial Design.

The reduction of iron, manganese and benzene in groundwater would achieve the RAO of preventing contaminated groundwater from flowing into the stream at concentrations that contribute to an exceedance of Performance Standards.  A groundwater monitoring plan would be implemented to measure the effectiveness of the in-situ treatment system, including the groundwater flow patterns and effective permeability of the LT/PRB.   Since any impediment to flow through a PRB system can have serious consequences to overall system performance, hydraulic integrity testing of the system would be conducted to document it is both constructed and operating as planned.  The Remedial Design would include an operations and maintenance plan addressing periodic monitoring and maintenance, including but not limited to replacement of sacrificial treatment media.

AR442868

Appropriate erosion and sediment controls consistent with best management practices will be implemented during the period of ground disturbance. Excavated soils will be sampled and contaminated material disposed off-site at an appropriately permitted facility.

This alternative includes the wetland remediation actions described in Alternative 3, above. In addition to the ICs described in Common Elements, an IC would be established to prohibit any activity that would adversely impact the operation of the LT/PRB.

# 10.0 SUMMARY OF COMPARATIVE ANALYSIS OF ALTERNATIVES

### Criteria Used to Compare Cleanup Alternatives

The remedial alternatives summarized in this ROD have been evaluated against the nine decision criteria set forth in the National Oil and Hazardous Substances Pollution Contingency Plan (NCP) (see 40 C.F.R. § 300.430(e)(9)). These nine criteria are organized into three categories which are: threshold criteria, primary balancing criteria, and modifying criteria. Threshold criteria must be satisfied in order for an alternative to be eligible for selection. Primary balancing criteria are used to weigh major trade-offs between alternatives. Modifying criteria are formally taken into account after public comment has been received. The nine criteria are set forth below:

**Threshold Criteria**

1. ***Overall Protectiveness of Human Health and the Environment*** addresses whether a remedy provides adequate protection of human health and the environment from unacceptable risks posed by hazardous substances or pollutants or contaminants and describes how risks are eliminated, reduced, or controlled through treatment, engineering controls, or institutional controls.

2. ***Compliance with Applicable or Relevant and Appropriate Requirements*** (ARARs) addresses whether a remedy will meet all of the applicable, or relevant and appropriate requirements of Federal and State environmental statutes and regulations and/or whether there are grounds for invoking a waiver.

**Primary Balancing Criteria:**

3. ***Long-Term Effectiveness*** considers the ability of a remedy to maintain reliable protection of human health and the environment over time once cleanup goals are achieved.

4. ***Reduction of Toxicity, Mobility, or Volume Through Treatment*** addresses the degree to which treatment will be used to reduce the toxicity, mobility, or volume of the contaminants causing site risks.

AR442869

5.  ***Short-Term Effectiveness*** addresses the period of time needed to achieve protection and any adverse impacts on human health and the environment that may be posed during the construction and implementation period until cleanup goals are achieved.

6.  ***Implementability*** addresses the technical and administrative feasibility of a remedy, including the availability of materials and services needed to implement a particular option.

7.  ***Cost*** includes estimated capital and annual operation and maintenance costs, as well as present worth cost.  Present Worth cost is the total cost of a remedy over time in today's dollar value.  Cost estimates area expected to be accurate within a range of +50 to -30 percent.

**<u>Modifying</u> <u>Criteria</u>:**

8.  ***State Acceptance*** indicates whether the State concurs with, opposes, or has no comment on the remedy.

9.  ***Community Acceptance*** considers the public's general response to the alternatives described in the Proposed Plan, underlying RI/FS Reports and other documents in the Administrative Record.

The above criteria are used to evaluate the advantages and disadvantages of each alternative in order to select an appropriate remedy.  The following is a brief summary evaluating and comparing each remedial alternative for the Site against the nine criteria.

### 10.1.    Overall Protection of Human Health and the Environment

A primary requirement of CERCLA is that the selected remedial alternative be protective of human health and the environment.  A remedy is protective if it reduces current and potential future risks to acceptable levels within the established risk range posed by each exposure pathway at the Site.

Overall protection of human health and the environment addresses whether each alternative reduces current and potential future risks to acceptable levels and describes how risks posed through each exposure pathway are eliminated, reduced, or controlled through treatment, engineering controls and/or ICs.

Alternative 1 (No Further Action) would not provide adequate protection of human health and the environment.  Groundwater containing elevated concentrations of iron, manganese and acidic pH would continue to discharge to the Unnamed Tributary, contributing to unsafe conditions to ecological receptors.  The elevated manganese would continue to present an unacceptable risk to small child recreational users under a future recreational use scenario.  Elevated concentrations of inorganic COCs in the wetland areas would continue to present unacceptable risk to amphibians and birds.  People working in future buildings constructed in areas overlying VOC-contaminated groundwater may be at risk of exposure to unsafe levels of VOCs in the indoor air.

AR442870

Construction worker exposure to subsurface contaminants in trenches would go unmanaged. Alternative 1 was retained for comparison purposes.

Alternative 2 (MNA and ICs) would likely not provide adequate protection of human health and the environment. MNA would likely reduce dissolved benzene sufficiently to achieve the Performance Standard for that contaminant within a reasonable timeframe, but groundwater containing elevated concentrations of iron, manganese and acidic pH would continue to discharge to the Unnamed Tributary, contributing to unsafe conditions to ecological receptors. The elevated manganese would continue to present an unacceptable risk to small children recreational users under a future recreational use scenario. Elevated concentrations of inorganic COCs in the wetland areas would continue to present unacceptable risk to amphibians and birds until sufficient organic material is naturally deposited in the area. ICs requiring vapor mitigation systems would prevent risk of vapor intrusion to future habitable buildings.

Alternative 3 (Groundwater Pump and Treat, Wetland Remediation and ICs), Alternative 4 (ISCO, Wetland Remediation and ICs) and Alternative 5 (LT/PRB, Wetland Remediation and ICs) would achieve protection of human health and the environment by preventing and mitigating exposure and achieving Performance Standards. Both Alternatives 3 and 5 would intercept contaminated groundwater migrating toward the Unnamed Tributary. Alternative 3 would extract the groundwater and treat that water ex-situ prior to discharging treated water. Alternative 5 would utilize an in-situ treatment process. Alternative 4 would target all groundwater within the treatment zone for in-situ treatment by chemical oxidation. The hazards related to handling the chemical oxidant on-Site can be safely managed using industry standard operating practices. Alternatives 3, 4 and 5 would treat sediments in wetland areas to reduce bioavailability of elevated inorganic COCs. ICs would prevent future risks due to potential vapor intrusion into buildings and would address construction worker exposure to trenches. The treatment components of Alternatives 3, 4 and 5 would constitute permanent solutions which would be protective of human health and the environment.

## 10.2.    Compliance with ARARs

Any cleanup alternative selected by EPA must comply with all applicable or relevant and appropriate federal and state environmental requirements or provide the basis upon which such requirement(s) can be waived. ARARs include substantive provisions of any promulgated Federal or more stringent State environmental standards, requirements, criteria, or limitations that are determined to be legally applicable or relevant and appropriate requirements for a CERCLA site or action. *Applicable* requirements are those clean-up standards, standards of control, and other substantive environmental protection requirements, criteria, or limitations promulgated under Federal or State law that specifically address a hazardous substance, pollutant, contaminant, remedial action, location, or other circumstance found at a CERCLA site. *Relevant and appropriate* requirements are requirements that, while not legally "applicable" to circumstances at a particular CERCLA site, address problems or situations sufficiently similar to those encountered at the site that their use is well-suited.

EPA will also consider to-be-considered material (TBCs) along with ARARs. TBCs are non-promulgated advisories or guidance issued by federal or state governments that are not legally

AR442871

binding and do not have the status of potential ARARs.  However, EPA may use the TBCs in determining the necessary level of cleanup for protection of human health and the environment.

A complete listing of ARARs and TBCs for the remedial alternatives developed for the FCW Site is presented in Table 6 to this ROD.

Alternative 1 would not comply with ARARs because shallow groundwater would continue to passively discharge to the Unnamed Tributary and contribute to an exceedance of acceptable surface water quality standards in the Unnamed Tributary.

Alternative 2 is also unlikely to achieve ARARs in the Unnamed Tributary within a reasonable time period.  The natural buffering capacity of the formation soils in the western end of Site extending to the Unnamed Tributary has been depleted, therefore low pH and high dissolved metals are not expected to attenuate within a reasonable timeframe.  Accordingly, elevated aluminum and iron concentrations in shallow groundwater are expected to continue to recharge the Unnamed Tributary and contribute to in-stream concentrations exceeding ARARs.

Alternatives 3, 4 and 5 would eventually meet the contaminant-specific ARARs pertaining to the groundwater COCs passively discharging to the Unnamed Tributary.  Alternative 3 would utilize a series of groundwater recovery wells to intercept the contaminated groundwater prior to its migration to the Unnamed Tributary, thereby reducing the flux of subsurface discharge to the stream.  The recovered groundwater would be pumped through a groundwater treatment system and effluent would meet appropriate WVPDES discharge standards (WV 47 CSR 2).  Alternative 4 would oxidize the benzene to harmless compounds and cause the inorganic contaminants to precipitate out of the groundwater before they migrate to the Unnamed Tributary.  The application of oxidant into the aquifer would be performed in a manner consistent with the substantive provisions of WV 47 CSR 13 governing underground injection wells.  Alternative 5 would utilize a LT/PRB to reduce contaminants in groundwater to meet Performance Standards prior to its passive discharge to the Unnamed Tributary.  Any excess soil excavated during LT/PRB construction would be properly contained, sampled and disposed of in an appropriate manner.

Alternatives 2, 3, 4 and 5 would include groundwater monitoring along the perimeter of the Site to confirm that groundwater migrating beyond the Site boundary remains in compliance with Federal and State ARARs (WV 64 CSR 3-10).

## 10.3.    Long-Term Effectiveness and Permanence

Alternatives 3, 4 and 5 would have a high degree of long-term effectiveness through the application of organic matter in the wetland areas and implementation of ICs to ensure future buildings subject to vapor intrusion are constructed with vapor mitigation measures, if necessary.

Alternative 3 would achieve surface water performance standards by reducing the migration of contaminated groundwater from the area of low pH/high metals toward the Unnamed Tributary.  Alternative 3 would rely on the continued operation of the groundwater treatment system to

AR442872

maintain its long-term effectiveness. The permanence of the control of groundwater migration would be linked to the perpetual operation of the groundwater treatment system. Alternative 3 would utilize well understood technologies for capture and treatment of contaminated groundwater and would be effective in maintaining reliable protection of human health and the environment over time once cleanup goals are achieved downgradient of the interception point. The high concentration of iron and other inorganics in groundwater would require a robust maintenance schedule to rehabilitate well screens and manage solids at the plant. Operations and maintenance would be carried out in a manner that minimizes downtime of the groundwater treatment system, including recovery wells.

Alternative 4 would achieve its initial degree of effectiveness based on how successful the field injections are in delivering the oxidant to the contaminants in-situ. A series of oxidant injection events would be scheduled over the first several years. Each injection event would be expected to be followed by a reduction in contaminant concentrations in the aquifer as benzene is degraded to harmless compounds and the metals precipitate out of the dissolved phase. As time passes after the oxidant injection, a "rebound" of higher concentrations in the groundwater is expected as contaminants are desorbed from subsurface formation soils. Additional oxidant injection events would be scheduled over time, as necessary. Chemical oxidation of benzene would be a permanent non-reversible process. Precipitation of the inorganic contaminants would be stable if the pH does not revert to acidic conditions. Long-term effectiveness and permanence would be achieved by permanently reducing concentrations of COCs in the aquifer so that subsurface non-point source discharge to the surface water would not contribute to an exceedance in performance standards.

Alternative 5 would utilize a LT/PRB to passively adjust the geochemistry of the groundwater within and downgradient of the wall. The passive treatment of acidic and metal-rich groundwater as it flows though the LT/PRB would ensure that the groundwater naturally recharging the Unnamed Tributary achieves performance standards. Based on the observations of a pilot-scale study completed at the Site, the anoxic conditions and the presence of organic substrate would support the anaerobic biodegradation of benzene. Benzene biodegradation would be permanent. Precipitation of the inorganic contaminants would be stable downgradient of the LT/PRB provided the pH does not revert to acidic conditions. Alternative 5 does not require the daily active operational presence that Alternative 3 does, but the LT/PRB does require periodic performance monitoring and less frequent replacement or reworking of reactive media to maintain long-term effectiveness.

### 10.4.      Reduction of Toxicity, Mobility, or Volume through Treatment

Section 121(b) of CERCLA, 42 U.S.C. § 9621(b), establishes a preference for Remedial Actions that include treatment that permanently and significantly reduces the toxicity, mobility, or volume of contaminants.

Alternatives 3, 4 and 5 reduces toxicity and mobility of inorganic contaminants in the wetland areas through application of organic matter. The treatment of the wetland areas with organic material will reduce the concentration and bioavailability of inorganic COCs in the sediment.

38

Alternative 3 would utilize a series of groundwater extraction wells as an engineering control to prevent contaminated groundwater from migrating to the Unnamed Tributary. The contaminant mass from the groundwater would continue to be removed from the environment and conveyed to the water treatment plant. Alternative 3 does achieve a reduction of toxicity, mobility or volume through treatment of the recovered contaminated groundwater. The water treatment would likely employ chemical precipitation to remove metals such as iron and manganese; air stripping and/or carbon filtration would be employed for benzene. Due to the relatively small mass of benzene that would be removed from the water each day, the treatment plant would likely utilize an air stripper with no air pollution control system required. The benzene would be safely released to the air untreated. The water treatment plant would generate two basic waste streams, a filter cake and spent carbon (if carbon filtration is utilized) in addition to a treated effluent.

Alternative 4 involves injecting a chemical oxidant into the saturated subsurface to cause a chemical reaction with the COCs. If the chemical oxidant can be effectively delivered into the subsurface so the reagent comes into direct contact with the COCs, ISCO would reduce toxicity of benzene by degrading it to innocuous compounds. ISCO should also reduce the mobility of dissolved inorganic contaminants by causing a chemical reaction that results in the dissolved inorganic chemical becoming a solid and dropping out of the groundwater. The oxidation process works well in a controlled laboratory environment but may be difficult to implement effectively in the field environment such as this Site due to discontinuous water bearing formations, highly variable transmissivity, high intrinsic oxygen demand within the formation soils and other complicating factors.

Alternative 5 would involve in-situ treatment of contaminated groundwater as it passively flows through the LT/PRB. The limestone media would increase the pH and alkalinity of the groundwater and dissolved metals would form an insoluble metallic oxide precipitate that would settle out of the groundwater when it moves into an oxygen-rich zone. The treatment process would reduce the toxicity, mobility and volume of inorganic contaminants via precipitation. Aerobic biodegradation of benzene would continue to occur at the oxygen-rich outer perimeter of the plume. The design and specific media to be used in the LT/PRB would promote anaerobic biodegradation (methanogenesis) of benzene within the PRB which is a non-reversible process. Alternative 5 achieves reduction of toxicity, mobility or volume through treatment, because it treats both organic and inorganic COCs effectively and reliably.

### 10.5.    Short-Term Effectiveness

Alternative 3 would take approximately 18 months to design and another 6 months to construct the groundwater pump and treat system. There would be minimal short-term risks presented to the community during extraction well installation, subsurface pipeline installation and materials delivery for the water treatment plant. The water treatment plant would employ well understood technologies to minimize any risks presented by air emissions, effluent discharge, and sludge storage and handling. Alternative 3 would achieve the objective by reducing the non-point source discharge rate to the surface water. The quality of the groundwater discharging to the stream, and therefore the porewater quality in the impacted reach, would likely remain at a low pH level with elevated metals concentrations. Proper health and safety procedures and PPE

AR442874

would protect workers during the construction and operation of the treatment plant and collection of long-term monitoring samples.

It is estimated that Alternative 4 would take approximately 3 years to perform a series of oxidation applications into the subsurface.  The effectiveness of the ISCO depends on the ability to deliver sufficient oxidant mass to the locations where the contaminants occur in the natural environment.  The relatively low permeability of the saturated zone makes delivering the oxidant to the subsurface very difficult.  The oxidant, for example hydrogen peroxide, does not maintain its ability to oxidize contaminants for very long once injected into the environment.  The oxidant will react with any amenable compound as it will not selectively react with only the COCs.  There are some short-term risks inherent to storing and handling strong oxidants on Site.

Short-term effectiveness of Alternative 5 would be better than both Alternative 3 and 4.  Alternative 5 would also take approximately 18 months to design and another 6 months to construct the LT/PRB.  There would be minimal short-term risks presented to the community during excavation of the trench and constructing the wall with limestone and other media, such as mushroom compost, as appropriate.  Soil excavated during trench construction is not expected to be significantly contaminated and will be managed through standard engineering controls.  Once constructed, the LT/PRB would function passively, beneath the ground surface.  As groundwater flows through the permeable wall, the limestone would slowly dissolve and calcium carbonate would gradually infuse the saturated zone downgradient of the wall.  When the dissolved metals such as iron and manganese in a solution of approaching neutral pH-levels are exposed to available oxygen, insoluble hydroxides are formed and precipitate out of the groundwater.  Minimal risks would be presented to Site workers conducting periodic long-term monitoring to document performance of the remedy.  Alternative 5 is expected to meet the RAOs approximately 2 years after installation.  Proper health and safety procedures and PPE would protect workers during the construction and collection of long-term monitoring samples.

## 10.6.    Implementability

This evaluation criterion addresses the difficulties and unknowns associated with implementing the cleanup technologies associated with each alternative, including the ability and time necessary to obtain required permits and approvals, the availability of services and materials, and the reliability and effectiveness of monitoring.

Alternatives 3 and 5 can reasonably be implemented using commonly employed engineering and construction methods, equipment, materials, and personnel.  The groundwater treatment system would require more day-to-day man power to monitor and maintain the system.  Well screens are expected to foul frequently due to high dissolved metals concentrations.  Administratively, the water treatment plant will require a WVPDES-type discharge permit and routine water quality monitoring.  Treatment plant sludge, or filter cake, will be tested and disposed in an appropriately permitted disposal facility.  If the Fairmont Publicly Owned Treatment Works were to accept the captured groundwater for final treatment and discharge, then pretreatment of groundwater would be more simple because the pretreatment standards would be less stringent.

AR442875

Alternative 4 is technically difficult to implement due to the challenge in delivering sufficient oxidant to the subsurface contaminants due to aquifer heterogeneity and by high natural oxidant demand due to geochemistry (high concentration of metals) in the formation soils. The successful chemical reaction requires the molecular collision between the oxidant and the target COCs. The oxidant will readily react with naturally occurring, non-COCs and does not maintain its ability to oxidize contaminants for very long time once injected into the subsurface. The oxidant would not move quickly through the relatively low permeability soils and would be quickly exhausted by the reducing environment. Conditions are likely to require multiple injections over time. If the chemical oxidant can be effectively delivered into the subsurface so the reagent comes into direct contact with the COCs, ISCO would reduce toxicity of benzene by degrading it to innocuous compounds. ISCO should also reduce the mobility of dissolved inorganic contaminants by causing a chemical reaction that results in the dissolved inorganic chemical becoming a solid and dropping out of the groundwater. The oxidation process works well in a controlled laboratory environment

Alternative 5, LT/PRB, is both technically and administratively feasible, however the performance of the wall would need to be monitored over time and periodic maintenance will be necessary. Once the LT/PRB is in place, it would operate passively with less day-to-day activity required than Alternative 3. The LT/PRB would be designed in a manner to optimize performance. The iron and manganese hydroxide solids can precipitate within the trench, and coat the surface of the limestone thereby reducing the effectiveness of the treatment media and the permeability of the wall. The design can utilize "low tech" engineering methods to convey treated groundwater to precipitation zones, thereby reducing the build-up of precipitates within the wall. Long-term monitoring would be required to determine when the reactive media requires reworking or replacement.

For all of the Alternatives presented in this ROD, regulatory and technical personnel are available to perform the 5-year reviews effectively, and companies are available to perform the requisite monitoring under all Alternatives. Alternatives 3, 4 and 5 also include an IC that would provide notice to future construction workers that may be involved with subsurface work associated with future redevelopment at the Site, such as installing utilities in a trench deeper than 4 ft, that a hazardous atmosphere could reasonably be expected to exist and standard precautions such as OSHA-mandated protocol to provide ventilation and proper respiratory protection would be required.

### 10.7.    Cost

Evaluation of costs for each Alternative generally includes calculation of direct and indirect capital costs, and annual operations, monitoring and maintenance (O&M) costs, both calculated on a present worth basis. An estimated capital, annual O&M, and total present worth cost for each of the Alternatives has been calculated for comparative purposes, and is presented in Table 7, below.

Direct capital costs include costs of construction, equipment, building and services, and waste disposal. Indirect capital costs include engineering expenses, start-up and shutdown, and contingency allowances. Annual O&M costs include labor and material, chemicals, energy, and

AR442876

fuel; administrative costs and purchased services; monitoring costs; and insurance, taxes, and license costs.  For cost estimation purposes, a period of 30 years has been used for O&M.  The actual cost for each alternative is expected to be in a range from 50 percent higher than the costs estimated to 30 percent lower than the costs estimated.  The evaluation was based on the Feasibility Study cost estimates.  The present worth is based on both the capital and O&M costs, and provides the means of comparing the cost of different Alternatives.  The present worth cost estimates includes capital construction and 30 years of long-term operation of the groundwater treatment system using a 7% discount rate.

| Table 7 Summary of Estimated Costs | | | |
|---|---|---|---|
| | **Capital Cost** | **Annual O&M Cost** | **Present Worth**[6] |
| Alternative 1 | $0 | $0 | $36,600 |
| Alternative 2 | $92,100 | $51,350 | $767,000 |
| Alternative 3 | $1,513,000 | $354,350 | $5,410,000 |
| Alternative 4 | $2,445,000 | $106,350 | $3,236,000 |
| Alternative 5 | $1,790,000 | $65,350 | $2,798,000 |

### 10.8.     State Acceptance

The State of West Virginia supports the selection of Alternative 5 and has concurred on this ROD.

### 10.9.     Community Acceptance

A notice of availability of the Proposed Plan and the Administrative Record was published in the *Times West Virginian*.  A public comment period was held to solicit comments on the Proposed Plan from the community from July 9, 2016 to August 8, 2016.  In addition, a Fact Sheet was mailed to surrounding neighborhoods and a public meeting was held on July 14, 2016 to present the Proposed Plan to the local community and further solicit input from the citizens.  All public comments received from the community were supportive of Alternative 5, EPA's "preferred alternative" in the Proposed Plan.  A transcript of the public meeting is included in the Administrative Record.  A summary of the comments received during the public comment period and EPA's responses are included in the Responsiveness Summary, which is Appendix C of this ROD.

---

6 Present Worth calculations assume a 7% discount rate

AR442877

# 11.0 PRINCIPAL THREAT WASTES

The NCP, at 40 CFR § 300.430(a)(l)(iii)(A), establishes an expectation that EPA will use treatment to address any principal threats posed by a site, whenever practicable.  "Principal threat" wastes are generally defined as source materials (contaminated materials that act as a reservoir for migration of contamination to groundwater, surface water, or air, or acts as a source for direct exposure) considered to be highly toxic or highly mobile such that risks from such materials cannot be effectively reduced through containment, or which would present a significant risk to human health or the environment should exposure occur.  EPA addressed all materials constituting a "principal threat" source material during previous removal actions described in Section 2.2 (History of Previous Environmental Investigations and Removal Actions).  EPA does not consider the residual contamination in wetland areas or groundwater to be "principal threat" wastes.

# 12.0 SELECTED REMEDY

Based upon the requirements of CERCLA, the results of the investigations, the detailed analysis of the Alternatives, and state and public comments, EPA has determined that Alternative 5 best satisfies the requirements of CERCLA Section 121, 42 U.S.C. § 9621, and provides the best balance of tradeoffs among the Remedial Alternatives with respect to the NCP's nine evaluation criteria, 40 CFR § 300.430(e)(9).  The Agency's Selected Remedy is Alternative 5: Limestone Trench/Permeable Reactive Barrier (LT/PRB); Remediation of Wetlands; Institutional Controls, and Long-Term Monitoring.

## 12.1.     Summary of the Rationale for the Selected Remedy

Alternative 1 (No Action) was not selected because it is not protective of human health and the environment. Alternative 2 (MNA, ICs) is not protective of human health and the environment because the acidic groundwater and associated high dissolved metals concentrations would persist, and as such the ARARs would not be achieved under this Alternative within a reasonable time period.

Alternative 5 (LT/PRB, Wetland Remediation, ICs), Alternative 4 (ISCO, Wetland Remediation, ICs) and Alternative 3 (Groundwater Pump and Treat, Wetland Remediation, ICs) are each expected to achieve RAOs.  However, Alternative 5 rated higher than Alternative 3 particularly when considering Long-Term Effectiveness and Permanence, Reduction of Toxicity, Mobility and Volume through Treatment, and Cost-Effectiveness.  Alternative 5 achieves the groundwater RAO through passive, in-situ treatment that will improve the quality of the groundwater naturally recharging the Unnamed Tributary with minimal obvious on-Site presence of constructed facilities and active personnel.  This reduced on-Site presence will best support the community interest of establishing beneficial reuse of the Site property.  Alternative 5 also rated higher than Alternative 4 with respect to Implementability due to the high degree of uncertainty associated with the technical feasibility of ISCO.  Specifically, the prevalence of low permeability soils and high natural oxidant demand across the Site would likely make it difficult to successfully deliver sufficient oxidant to subsurface contaminants as described in Alternative

AR442878

4.  The Wetland Remediation and ICs provisions were common to Alternatives 3, 4 and 5 and, therefore, were not deciding factors in the selection of Alternative 5 as the Selected Remedy. The State of West Virginia concurs with EPA's Selected Remedy and all public comments received during the 30-day public comment period were supportive of the Selected Remedy.

### 12.2.    Description of the Selected Remedy and Performance Standards

The Selected Remedy is Alternative 5, Limestone Trench/Permeable Reactive Barrier (LT/PRB); Remediation of Wetlands; Institutional Controls.

The major components of the Selected Remedy consist of the following elements:

A.  Perform pre-design groundwater sampling and hydrostratigraphic characterization to refine understanding of the concentrations and flow paths for benzene, metals and pH in groundwater and optimize permeable reactive wall alignment at the western portion of the Site.  Perform treatability study(s) to determine the most appropriate treatment media to utilize in the reactive permeable barrier designed to elevate pH and otherwise achieve Performance Standards.

B.  Install a LT/PRB extending from the surface to the base of the intermediate aquifer (may include upper weathered bedrock zone as appropriate), nominally aligned perpendicular to the natural flow of groundwater.  The specific treatment media and 3-dimensional wall alignment will be determined during the Remedial Design.  Adequacy of the LT/PRB will be measured by achieving the Performance Standards identified below.  Non-point source subsurface discharge to the Unnamed Tributary must not contribute to an exceedance to the West Virginia Surface Water Quality Standards appropriate for secondary use recreation and protection of aquatic life.  Additionally, the concentration of manganese in surface water must achieve its risk-based Performance Standard for protection of recreational use (children).  The specific Performance Standards are shown below:

- pH                                            6-9
- iron                                          1.5      mg/L
- aluminum                                      0.75     mg/L
- cyanide (as free cyanide HCN+CN⁻)             22       $\mu$g/L
- benzene                                       51       $\mu$g/L
- manganese                                     6*       mg/L

*     risk-based standard for recreational use (child)

C.  Apply amendment of organic material capable of reducing bioavailability of inorganic COCs to Wetland Areas 1 and 3.  The specific amendments and application rates will be determined during the Remedial Design.  Disturbed areas shall be seeded with a native wetland seed mix.  The effectiveness of the remedy will be assessed by the survival of wetland plant species that are sensitive to metal toxicity.  Successful wetland remediation will achieve:

AR442879

- 80% cover of planted species after one year;
- 90% cover after three years;
- less than 10% invasive species; and,
- cover plants must not show evidence of metal toxicity.

**D.** Maintain the existing Institutional Controls to prevent residential land use and the extraction of groundwater from the aquifer beneath the Site for use as a potable water source. Additional ICs will be implemented to require vapor mitigation for any new habitable buildings constructed within the Vapor Intrusion Protection Area (Figure 9) unless a building-specific vapor intrusion evaluation determines mitigation to be unnecessary. The default pre-emptive vapor mitigation will include, at a minimum, a foundation vapor barrier and subsurface piping for a passive subslab venting system that can be converted to an active sub-slab depressurization system if necessary. Prior to occupancy, indoor air samples will be collected from within the building to confirm the efficacy of the passive venting system. If indoor air sample concentrations are equal or exceed EPA risk-based criteria, the passive venting system will be activated and operated as an active subslab depressurization system, until such time as EPA, in consultation with WVDEP, determines that the subsurface contamination no longer poses a vapor intrusion risk. ICs will also identify the VIPA as an area where construction workers required to work in a subsurface trench may be subject to conditions where a hazardous atmosphere could reasonably be expected to exist and standard precautions such as OSHA-mandated protocol to provide ventilation and proper respiratory protection will be required. In addition, ICs will prohibit any activity that would interfere with the operation of the LT/PRB system including groundwater monitoring wells.

**E.** Perform long-term groundwater, surface water and porewater monitoring to measure the performance of the LT/PRB in accordance with the EPA-approved design. The design must include a robust operation maintenance and monitoring plan capable of demonstrating groundwater flow patterns and the continued effectiveness of the treatment system over time. Long-term groundwater monitoring at the perimeter of the Site will also be required to confirm that groundwater with COCs exceeding MCLs or risk-based goals remains within the Site boundary.

The estimated timeframe to reach the Performance Standards for the Selected Remedy is 4 years. The cost is estimated to be $2,798,000.

### 12.3.    Cost Estimate for the Selected Remedy

Table 8 presents a detailed summary of the estimated costs to implement the Selected Remedy. The information in this cost estimate summary table is based on the best available information regarding the anticipated scope of Alternative 5. Changes in the cost elements are likely to occur as a result of new information and data collected during the engineering and design of the Selected Remedy. Changes may be documented in the form of a memorandum in the Administrative Record, an ESD, or ROD amendment depending on how significant any such

AR442880

changes are.  This is an order-of-magnitude engineering cost estimate that is expected to be within +50 to –30 percent of the actual project cost.

The estimated costs to implement this Remedy are listed below and include installation of the LT/PRB, application of organic amendments in wetland areas and operation and maintenance of the permeable reactive barrier, including groundwater monitoring for a period of 30 years.

Estimated Capital Cost: $1,790,000
Estimated Annual Cost: $65,350 (plus $17,000 every five years)
Estimated Present Worth Cost: $2,798,000
Estimated Time to Completion:  2 year

### 12.4.    Expected Outcome of the Selected Remedy

The portion of the FCW Site east of the LT/PRB installation construction site (approximately 45 acres) is immediately available for commercial, industrial or recreational use consistent with existing land use restrictions.  Buildings constructed in the VIPA will need to include vapor control measures.  Existing ICs prohibiting residential land use and the extraction of groundwater from the aquifer beneath the Site for use as a potable water source will remain in place.  Wetland habitat quality will be enhanced during the first construction season through application of organic amendments to reduce bioavailability of elevated metal concentrations.  The passive treatment of acidic and metal-rich groundwater as it flows though the LT/PRB will ensure that the groundwater naturally recharging the Unnamed Tributary will not contribute to an exceedance to the West Virginia Surface Water Quality Standards appropriate for secondary use recreation and protection of aquatic life.  RAOs are expected to be met 2 years after installation of the LT/PRB.

The specific Performance Standards are shown below:

- pH                                                  6-9
- iron                                                1.5      mg/L
- aluminum                                     0.75    mg/L
- cyanide (as free cyanide HCN+CN-)    22      µg/L
- benzene                                         51       µg/L
- manganese                                     6*       mg/L

\*    risk-based performance standard for the protection of recreational use (child)

The reasonably anticipated future land use at the FCW Site is commercial with the potential for industrial or recreational development.  Current and future land use of the FCW Site is subject to existing deed restrictions prohibiting residential use.  An initial redevelopment project was successfully completed in spring 2017 with the construction of the West Virginia State Police Troop 1 Headquarters, on a 3.8-acre parcel on the northwestern portion of the FCW Site.  EPA, WVDEP and other stakeholders coordinated with the development team for the project.

AR442881

# 13.0 STATUTORY DETERMINATIONS

Under CERCLA (42 U.S.C. § 9621) and the NCP (40 C.F.R. § 300.430(f)(5)(ii)), EPA must select remedies that are protective of human health and the environment, comply with ARARs, are cost effective, and utilize permanent solutions and alternative treatment technologies or resource recovery to the maximum extent possible.  There is also a preference for remedies that use treatment that permanently and significantly reduce the volume, toxicity, or mobility of hazardous wastes as a principal element.  The following sections discuss how the Selected Remedy meets these statutory requirements.

### 13.1.    Protection of Human Health and the Environment

The Selected Remedy, Alternative 5, will protect human health and the environment by providing in-situ treatment of contaminated groundwater as it passively flows through the permeable reactive barrier to be constructed upgradient of the Unnamed Tributary.  The LT/PRB will neutralize pH and abate concentrations of COCs downgradient so that groundwater discharging to surface water is protective of the Unnamed Tributary designated uses.  The Selected Remedy will be protective of environmental receptors in the wetland areas through the application of organic amendments in Wetland Areas 1 and 3.  The remediation method will reduce bioavailability of elevated inorganic COCs and improve conditions for plants and wildlife.  ICs will ensure that the future reuse of the Site property will be limited to commercial, industrial or recreational land use scenarios and groundwater beneath the Site will not be used for potable purposes.  In addition, ICs addressing construction methods for future habitable buildings constructed within the VIPA will be protective of future workers at the Site.  The implementation of the Selected Remedy will not pose unacceptable short-term risks or cross-media impacts.

### 13.2.    Compliance with Applicable or Relevant and Appropriate Requirements

The NCP (40 C.F.R. § 300.430(f)(5)(ii)(B) and (C)) requires that a ROD describe Federal and State ARARs that the Remedy will attain or provide a justification for any waivers.  ARARs include substantive provisions of any promulgated Federal or more stringent State environmental standards, requirements, criteria, or limitations that are determined to be legally applicable or relevant and appropriate requirements for a CERCLA site or action.  *Applicable* requirements are those clean-up standards, standards of control, and other substantive environmental protection requirements, criteria, or limitations promulgated under Federal or State law that specifically address a hazardous substance, pollutant, contaminant, remedial action, location, or other circumstance found at a CERCLA site.  *Relevant and appropriate* requirements are requirements that, while not legally "applicable" to circumstances at a particular CERCLA site, address problems or situations sufficiently similar to those encountered at the site that their use is well-suited.

The Selected Remedy will comply with all Federal and State requirements, standards, criteria and limitations that are applicable or relevant and appropriate, as required by Section 121(c) of CERCLA, 42 U.S.C. § 9621(c).  Such requirements, standards, criteria and limitations are identified in Table 6 of this ROD.

AR442882

### 13.3. Cost Effectiveness

Section 300.430(f)(1)(ii)(D) of the NCP, 40 C.F.R. § 300.430(f)(1)(ii)(D), requires EPA to evaluate cost effectiveness by comparing all of the Alternatives that meet the threshold criteria against long-term effectiveness and permanence, short-term effectiveness, and reduction of toxicity, mobility or volume through treatment (collectively referred to as "overall effectiveness"). The NCP further states that overall effectiveness is then compared to cost to ensure that the remedy is cost effective and that its costs are proportional to its overall effectiveness.

EPA concludes, following an evaluation of these criteria, that the Selected Remedy is cost effective in providing overall protection in proportion to costs and meets all other requirements of CERCLA. The estimated present worth cost of the Selected Remedy is $2,798,000.

### 13.4. Utilization of Permanent Solutions and Alternative Treatment Technologies to the Maximum Extent Practicable

The Selected Remedy complies with the statutory mandate to utilize permanent solutions, alternative treatment technologies, and resource recovery alternatives to the maximum extent practicable.

The principal threats once presented by hazardous substances at the FWC Site were treated through earlier removal response actions that included recycling high-BTU wastes excavated from on-Site landfills by creating a synthetic coal product used to generate more than 527,000 megawatts of electricity.

This Selected Remedy will provide in-situ treatment of residually contaminated groundwater at the western portion of the Site as the water flows through the LT/PRB. The LT/PRB will increase the pH of the groundwater and decrease the solubility of the inorganic contaminants, thereby improving conditions for biodegradation of benzene. The application of organic matter in the wetland areas provides treatment by chemically binding inorganic contaminants and rendering them less bioavailable. EPA has determined that the Selected Remedy represents the maximum extent practicable to which permanent solutions and treatment technologies can be utilized at the Site.

### 13.5. Preference for Treatment as a Principal Element

There are no "principal threats" remaining at the Site, however the Selected Remedy does address the contaminated groundwater though in-situ treatment in a permeable reactive barrier. By utilizing treatment as a significant portion of the remedy, the statutory preference for remedies that employ treatment as a principal element is satisfied.

### 13.6. Five-Year Review Requirements

This Remedy will result in hazardous substances, pollutants, or contaminants remaining on-Site above levels that would otherwise allow for unlimited use and unrestricted

AR442883

exposure. Pursuant to Section 121(c) of CERCLA, statutory reviews will be conducted no less often than once every five years after the initiation of construction to ensure that the Remedy remains protective of human health and environment.

## 14.0 DOCUMENTATION OF SIGNIFICANT CHANGES

The Proposed Plan for the FCW Site was released for public comment on July 9, 2016 and  the comment period closed on August 8, 2016.  EPA held a public meeting on July 14, 2016, to discuss the remedy selection process and present the Preferred Alternative in the Proposed Plan. EPA has reviewed and responded to verbal and written comments submitted during the public comment period in Appendix C of this ROD, the Responsiveness Summary.  There are no significant changes from the Preferred Alternative presented in the Proposed Plan.

## 15.0 STATE ROLE

WVDEP, on behalf of the State of West Virginia, has reviewed the Remedial Alternatives presented in this ROD and has provided its concurrence with the Selected Remedy.  WVDEP's concurrence letter is included in Appendix E.

AR442884

[PAGE INTENTIONALLY LEFT BLANK]

AR442885

# APPENDIX A

# FIGURES

AR442886

[PAGE INTENTIONALLY LEFT BLANK]

AR442887



SITE LOCATION

REFERENCE: BASE MAP USGS 7.5. MIN. TOPO. QUAD., GRANT TOWN, RIVESVILLE, FAIRMONT WEST, FAIRMONT EAST, WEST VIRGINIA, 2014.

Approximate Scale: 1 in. = 2000 ft.

AREA LOCATION

WEST VIRGINIA

EXXONMOBIL ENVIRONMENTAL SERVICES COMPANY
FAIRMONT COKE WORKS SITE
FAIRMONT, WEST VIRGINIA

SITE LOCATION MAP

FIGURE
1

AR442888



**LEGEND:**

EXISTING MONITORING WELL

GROUND WATER/SURFACE WATER SAMPLE
(COLLECTED NOVEMBER 2012)

ABANDONED MONITORING WELL

RELEASE LINE

POTENTIAL SOURCE AREA
(EE/CA, IT, FEB. 2000)

APPROXIMATE PROPERTY
BOUNDARY

CORRUGATED METAL PIPE (CMP)

SEASONALLY WET AREA
(AS DETERMINED ON 11/19/2015)

**HISTORIC POTENTIAL SOURCE AREAS**

| 1 | PSA1 — FORMER LIGHT OIL STORAGE AREA |
| 2 | PSA2 — FORMER BYPRODUCTS AREA |
| 3 | PSA3 — FORMER COKE BATTERY |
| 4A | NORTH LANDFILL |
| 4B | SOUTH LANDFILL |
| 5 | FORMER BREEZE WASHOUT AREA AND BREEZE PILE |
| 6 | FORMER IMPOUNDMENT |
| 7 | WASTE SLUDGE AND BREEZE STORAGE AREA |
| 8A | FORMER SLUDGE STORAGE AREA |
| 8B | FORMER OXIDATION IMPOUNDMENT NO. 1 |

**NOTE:**

1. AERIAL PHOTOGRAPH FROM GOOGLE
   EARTH PRO, DATED SEPTEMBER 2013.

2. HORIZONTAL DATUM IS NAD 83 WV
   SPCS – NORTH ZONE. VERTICAL DATUM
   IS NAVD 1988.

**EXXONMOBIL ENVIRONMENTAL SERVICES COMPANY**
**FAIRMONT COKE WORKS SITE**
**FAIRMONT, WEST VIRGINIA**

**SITE MAP**

FIGURE
2

GRAPHIC SCALE
0    100'    200'

AR442889



EXXONMOBIL ENVIRONMENTAL SERVICES COMPANY
FAIRMONT COKE WORKS SITE
FAIRMONT, WEST VIRGINIA

**INTERMEDIATE ZONE GROUND WATER
CONTOUR MAP - NOVEMBER 5, 2012**

FIGURE
3

**LEGEND:**

EXISITING MONITORING WELL

ABANDONED MONITORING WELL

SEEP (NO LONGER PRESENT)

GROUND WATER ELEVATION (FT AMSL)

(958.16)

959 — GROUND WATER ELEVATION CONTOUR
(DASHED WHERE INFERRED)

INFERRED GROUND WATER FLOW DIRECTION

RELEASE LINE

POTENTIAL SOURCE AREA (EE/CA, IT, FEB. 2000)

APPROXIMATE PROPERTY BOUNDARY

**HISTORIC POTENTIAL SOURCE AREAS**

1    PSA1 - FORMER LIGHT OIL STORAGE AREA
2    PSA2 - FORMER BYPRODUCTS AREA
3    PSA3 - FORMER COKE BATTERY
4A   NORTH LANDFILL
4B   SOUTH LANDFILL
5    FORMER BREEZE WASHOUT AREA
6    FORMER IMPOUNDMENT
7    WASTE SLUDGE AND BREEZE STORAGE AREA
8A   FORMER SLUDGE STORAGE AREA
8B   FORMER OXIDATION IMPOUNDMENT NO. 1

**NOTES:**

1.   AERIAL PHOTOGRAPH FROM GOOGLE
     EARTH PRO, SEPTEMBER 2013.

2.   NA = NOT ACCESSIBLE

3.   * = WELLS SCREENED IN DIFFERENT
     LITHOLOGIC INTERVAL - NOT USED FOR
     CONTOURING.

GRAPHIC SCALE

AR442890



LEGEND:

- APPROXIMATE PROPERTY BOUNDARY
- AREA WHERE CONFIRMATION SAMPLES WERE COLLECTED
- HISTORICAL/POTENTIAL SOURCE AREAS (REMOVED)
- RELEASE LINE
- POTENTIAL SOURCE AREA (EE/CA, IT, FEB. 2000)
- TEST TRENCH (ARCADIS, FEBRUARY 2010)
- HISTORICAL INVESTIGATION/REMOVAL AREA
- APPROXIMATE LIMITS OF EXCAVATION (2009)
- APPROXIMATE LOCATION OF ALD/RCB
- APPROXIMATE LOCATION OF PHYTOPLOT

HISTORIC POTENTIAL SOURCE AREAS

1   PSA1 – FORMER LIGHT OIL STORAGE AREA
2   PSA2 – FORMER BYPRODUCTS AREA
3   PSA3 – FORMER COKE BATTERY
4A  NORTH LANDFILL
4B  SOUTH LANDFILL
5   FORMER BREEZE WASHOUT AREA
6   FORMER IMPOUNDMENT
7   WASTE SLUDGE AND BREEZE STORAGE AREA
8A  FORMER SLUDGE STORAGE AREA
8B  FORMER OXIDATION IMPOUNDMENT NO. 1

LEGEND (CON'T):

- SOIL BORING LOCATION (ARCADIS 2008 THROUGH 2010)
- TEST PIT LOCATION (WESTON, 1994)
- SURFACE WATER SAMPLE LOCATION (WESTON, 1994)
- SOIL BORING LOCATIONS (ICF KAISER, 1994)
- SOIL BORING LOCATION (CDM, 2007)
- SOIL BORING/TEMPORARY MONITORING WELL (ARCADIS, FEBRUARY 2010)
- SOIL BORING (ARCADIS, FEBRUARY 2010)
- SOIL BORING (ARCADIS, FEBRUARY 2010)
- HISTORICAL SOIL BORING LOCATION
- SURFACE SAMPLE (ARCADIS 2014)

- EXISITING MONITORING WELL
- GROUND WATER/SURFACE WATER SAMPLE (COLLECTED NOVEMBER 2012)
- SEDIMENT SAMPLE (COLLECTED NOVEMBER 2012)
- ABANDONED MONITORING WELL
- SEEP (NO LONGER PRESENT)
- CONFIRMATION SAMPLE (SURVEYED LOCATION)
- CONFIRMATION SAMPLE (APPROXIMATE LOCATION)

- SURFACE WATER SAMPLE LOCATION
- SEDIMENT SAMPLE LOCATION
- HISTORICAL SEDIMENT SAMPLE (WESTON, APRIL 1994)
- HISTORICAL SURFACE SOIL/SURFACE WATER SAMPLE (DECEMBER 1998)
- HISTORICAL SURFACE WATER SAMPLE
- HISTORICAL SOIL BORING (WESTON, APRIL 1994)
- HISTORICAL TEST PIT (CDM, APRIL 2007)
- HISTORICAL TEST PIT (WESTON, APRIL 1994)
- SURFACE SOIL SAMPLE
- VISUAL CHARACTERIZATION SAMPLING LOCATION
- SURFACE WATER AND SOIL SAMPLE LOCATION (DEC. 2015)
- HISTORICAL SURFACE SOIL SAMPLE

EXXONMOBIL ENVIRONMENTAL SERVICES COMPANY
FAIRMONT COKE WORKS SITE
FAIRMONT, WEST VIRGINIA

CURRENT CONDITIONS
SAMPLE LOCATION MAP

NOTE:
1.  AERIAL PHOTOGRAPH FROM GOOGLE EARTH PRO, SEPTEMBER 2013.

FIGURE 4

AR442891



**LEGEND:**

EXISTING MONITORING WELL

GROUND WATER/SURFACE WATER SAMPLE
(COLLECTED NOVEMBER 2012)

SEDIMENT SAMPLE (COLLECTED NOVEMBER 2012)

RELEASE LINE

POTENTIAL SOURCE AREA (EE/CA, IT, FEB. 2000)

APPROXIMATE PROPERTY BOUNDARY

**HISTORIC POTENTIAL SOURCE AREA**

| 1 | PSA1 – FORMER LIGHT OIL STORAGE AREA |
| 2 | PSA2 – FORMER BYPRODUCTS AREA |
| 3 | PSA3 – FORMER COKE BATTERY |
| 4A | NORTH LANDFILL |
| 4B | SOUTH LANDFILL |
| 5 | FORMER BREEZE WASHOUT AREA |
| 6 | FORMER IMPOUNDMENT |
| 7 | WASTE SLUDGE AND BREEZE STORAGE AREA |
| 8A | FORMER SLUDGE STORAGE AREA |
| 8B | FORMER OXIDATION IMPOUNDMENT NO. 1 |

**NOTES:**

1. AERIAL PHOTOGRAPH FROM GOOGLE EARTH PRO, SEPTEMBER 2013.

2. BOLD AND HIGHLIGHTED VALUES ARE ABOVE THE NOVEMBER 2012 USEPA MAXIMUM CONTAMINANT LEVEL (MCL).

3. RESULTS FOR VOCs, SVOCs AND CYANIDE ARE IN MICROGRAMS PER LITER ($\mu g/L$).

4. RESULTS FOR INORGANICS–FILTERED ARE IN MILLIGRAMS PER LITER (mg/L).

5. TOTAL INORGANIC CONCENTRATIONS WERE NOT CONSIDERED.

DATA QUALIFIERS:

U   – THE COMPOUND WAS ANALYZED FOR BUT NOT DETECTED AT THE ASSOCIATED QUANTITATION LIMIT.
B   – THE COMPOUND WAS FOUND IN THE ASSOCIATED LABORATORY METHOD BLANK.
D   – CONCENTRATION IS BASED ON A DILUTED SAMPLE ANALYSIS.
J   – ESTIMATED CONCENTRATION.
UL – THE COMPOUND WAS NOT DETECTED, QUANTITATION LIMIT IS PROBABLY HIGHER.
HT3 – SAMPLE RECEIVED WITH INSUFFICIENT HOLDING TIME REMAINING FOR ANALYSIS TO BE PERFORMED WITHIN
          METHOD'S HOLDING TIME REQUIREMENTS.
UB – COMPOUND CONSIDERED NON–DETECT AT THE LISTED VALUE DUE TO ASSOCIATED BLANK CONTAMINATION.
K   – THE COMPOUND WAS POSITIVELY IDENTIFIED; HOWEVER, THE ASSOCIATED NUMERICAL VALUE IS AN ESTIMATED
          CONCENTRATION ONLY AND THE REPORTED VALUE MAY BE BIASED HIGH.
L   – THE COMPOUND WAS POSITIVELY IDENTIFIED; HOWEVER, THE ASSOCIATED NUMERICAL VALUE IS AN ESTIMATED
          CONCENTRATION ONLY AND THE REPORTED VALUE MAY BE BIASED LOW.
NA – NOT ANALYZED.
WNPTS – WELL NOT PRESENT AT TIME OF SAMPLING
*  – THE MCL FOR CYANIDE (200 $\mu g/L$) IS BASED ON FREE CYANIDE; TOTAL CYANIDE CONCENTRATIONS ARE NOT
          COMPARED TO THE MCL

GRAPHIC SCALE
0        100'        200'

EXXONMOBIL ENVIRONMENTAL SERVICES COMPANY
FAIRMONT COKE WORKS SITE
FAIRMONT, WEST VIRGINIA

**CONSTITUENTS DETECTED ABOVE MCLs
IN PERCHED ZONE GROUND WATER -
2012 TO 2015**

FIGURE
**5**

AR442892



BIG JOHN SALVAGE SITE
SUNCREST BOULEVARD
BYPRODUCTS AREA
DAVIS ELECTRIC
MOUND AVE.
BLUE FLAME GAS SERVICE
KANAWHA SCALE
FORMER LOS AREA
WASTE MANAGEMENT AREA
UNNAMED TRIBUTARY
UNDEVELOPED AREA
COKE BATTERY (PSA-3)
COKE HANDLING AREA
ADMINISTRATION AREA
LAFAYETTE STREET
COAL STORAGE AREA
FAIRMONT ARMED FORCES RESERVE CENTER
FORMER COAL STORAGE AND COKE HANDLING AREA
WS THOMAS TRANSFER
4A
4B
5
6
7
8A
8B
1
2
3

| GWSW-004 | | |
|---|---|---|
| Date: | 11/26/12 | 03/30/15 |
| All Analytes | No Exceedances | No Exceedances |

| MW-17I | | |
|---|---|---|
| Date: | 11/05/12 | 06/05/14 |
| All Analytes | No Exceedances | No Exceedances |

| MW-29I | | |
|---|---|---|
| Date: | 11/12/12 | 06/11/14 |
| All Analytes | No Exceedances | No Exceedances |

| MW-28I | | |
|---|---|---|
| Date: | 11/08/12 | 06/04/14 |
| Cyanides | | |
| Total Cyanide | 660* | 153 UB [75.0 UB] |

| MW-34I | |
|---|---|
| Date: | 06/10/14 |
| All Analytes | No Exceedances |

| MW-33I | |
|---|---|
| Date: | 06/12/14 |
| Inorganics-Filtered | |
| Lead | 0.103 J |
| Thallium | 0.00882 J |

| MW-32I | |
|---|---|
| Date: | 06/10/14 |
| All Analytes | No Exceedances |

| MW-27I | | |
|---|---|---|
| Date: | 11/08/12 | 06/09/14 |
| All Analytes | No Exceedances | No Exceedances |

| MW-27ID | | |
|---|---|---|
| Date: | 11/08/12 | 06/09/14 |
| All Analytes | No Exceedances | No Exceedances |

| MW-26I | | |
|---|---|---|
| Date: | 06/09/14 | 09/17/14 |
| Cyanides | | |
| Total Cyanide | 2,620* | 320* |
| Free Cyanide | NA | 9.4 |

| MW-26ID | | |
|---|---|---|
| Date: | 11/14/12 | 06/10/14 |
| All Analytes | No Exceedances | No Exceedances |

| MW-6I | | |
|---|---|---|
| Date: | 11/12/12 | 06/10/14 |
| All Analytes | No Exceedances | No Exceedances |

| MW-30S | | |
|---|---|---|
| Date: | 11/07/12 | 06/11/14 |
| All Analytes | No Exceedances | No Exceedances |

| MW-30I | | |
|---|---|---|
| Date: | 11/14/12 | 06/11/14 |
| All Analytes | No Exceedances | No Exceedances |

| MW-23I | | |
|---|---|---|
| Date: | 11/13/12 | 06/11/14 |
| All Analytes | No Exceedances | No Exceedances |

| MW-22I | | |
|---|---|---|
| Date: | 11/12/12 | 06/06/14 |
| SVOCs | | |
| bis(2-Ethylhexyl)phthalate | 8.56 J | 9.90 UB |

| MW-24I | | |
|---|---|---|
| Date: | 11/08/12 | 06/11/14 |
| SVOCs | | |
| Benzo(a)pyrene | 1.92 U | 1.15 J |
| Pentachlorophenol | 24.0 U | 2.38 J |

| MW-25I | | |
|---|---|---|
| Date: | 11/13/12 | 06/06/14 |
| SVOCs | | |
| bis(2-Ethylhexyl)phthalate | 11.6 | 10.1 UB |

| GWSW-003 | | |
|---|---|---|
| Date: | 11/26/12 | 03/30/15 |
| All Analytes | No Exceedances | No Exceedances |

| GWSW-007 | |
|---|---|
| Date: | 03/30/15 |
| VOCs | |
| Bezene | 1,800 D |
| Inorganics-Filtered | |
| Arsenic | 0.0292 J |
| Beryllium | 0.0315 |
| Chromium, Total | 0.277 J |
| Lead | 0.0384 |

| MW-36I | | |
|---|---|---|
| Date: | 06/09/14 | 04/01/15 |
| VOCs | | |
| Benzene | 183 | 20.0 |
| Inorganics-Filtered | | |
| Beryllium | 0.0400 U | 0.0318 |
| Chromium, Total | 0.0500 U | 0.307 |
| Lead | 0.0500 U | 0.0371 |

| GWSW-008 | |
|---|---|
| Date: | 03/30/15 |
| VOCs | |
| Bezene | 6.60 |
| Inorganics-Filtered | |
| Arsenic | 0.0285 J |
| Beryllium | 0.0101 |

| MW-35S | | |
|---|---|---|
| Date: | 06/12/14 | 04/01/15 |
| VOCs | | |
| Benzene | NA | 38.0 J |
| Inorganics-Filtered | | |
| Beryllium | 0.0380 | 0.0219 |
| Chromium, Total | 0.0840 | 0.184 |
| Lead | 0.0265 J | 0.0300 U |

| MW-35I | | |
|---|---|---|
| Date: | 06/12/14 | 04/01/15 |
| VOCs | | |
| Benzene | NA | 1,100 D |
| Inorganics-Filtered | | |
| Antimony | 0.100 U | 0.166 J |
| Cadmium | 0.0100 U | 0.0120 J |
| Lead | 0.228 | 1.50 U |
| Selenium | 0.0990 J | 0.0677 J |

| GWSW-002R | |
|---|---|
| Date: | 03/31/15 |
| Inorganics-Filtered | |
| Antimony | 0.0259 J |

| MW-16I | | |
|---|---|---|
| Date: | 06/05/14 | 03/31/15 |
| VOCs | | |
| Benzene | 2,140 D | 1,100 D |
| Inorganics-Filtered | | |
| Antimony | 0.0100 U | 0.0180 J |
| Beryllium | 0.00840 | 0.00690 J |

| MW-16S | | |
|---|---|---|
| Date: | 06/05/14 | 03/31/15 |
| VOCs | | |
| Benzene | 229 D | 230 D [220 D] |
| Inorganics-Filtered | | |
| Antimony | 0.0100 U | 0.0131 J [0.0102 J] |

| GWSW-001 | | |
|---|---|---|
| Date: | 11/26/12 | 03/30/15 |
| SVOCs | | |
| bis(2-Ethylhexyl)phthalate | 9.43 U [13.7] | 5.00 U |
| Inorganics-Filtered | | |
| Arsenic | 0.0100 U [0.0100 U] | 0.0314 J |

| GWSW-006 | |
|---|---|
| Date: | 03/30/15 |
| VOCs | |
| Bezene | 40.0 D |
| Inorganics-Filtered | |
| Arsenic | 0.0316 J |

| MW-14I | | |
|---|---|---|
| Date: | 11/07/12 | 06/03/14 |
| VOCs | | |
| Benzene | 844 D | 894 D |
| Inorganics-Filtered | | |
| Beryllium | 0.0500 J | 0.0270 J |
| Chromium VI | 0.800 LJ | 10.0 U |
| Lead | 0.500 U | 0.0210 J |
| Selenium | 1.00 U | 0.0530 J |
| Thallium | 0.00200 U | 0.00472 J |

| GWSW-005 | |
|---|---|
| Date: | 03/30/15 |
| Inorganics-Filtered | |
| Arsenic | 0.0475 |

| MW-21I | | |
|---|---|---|
| Date: | 11/13/12 | 06/12/14 |
| Cyanides | | |
| Total Cyanide | 291 K* | 124 J |

| MW-15I | | |
|---|---|---|
| Date: | 11/13/12 | 06/09/14 |
| Inorganics-Filtered | | |
| Chromium VI | 0.0100 UL | 0.500 J |

| MW-11I | | |
|---|---|---|
| Date: | 11/15/12 | 06/04/14 |
| VOCs | | |
| Benzene | 91.7 | 117 J |
| Inorganics-Filtered | | |
| Beryllium | 0.0150 J | 0.0400 U |
| Cadmium | 0.0100 | 0.0100 U |
| Lead | 0.0210 J | 0.0500 UJ |
| Cyanides | | |
| Total Cyanide | 304* | 29.0 |

| MW-12I | | |
|---|---|---|
| Date: | 11/08/12 | 06/10/14 |
| Inorganics-Filtered | | |
| Lead | 0.0123 | 0.0158 |

| MW-9I | | |
|---|---|---|
| Date: | 11/14/12 | 06/12/14 |
| VOCs | | |
| Benzene | 48.5 | 24.0 |
| Inorganics-Filtered | | |
| Arsenic | 0.0820 KJ | R |
| Beryllium | 0.0480 | 0.0200 J |
| Lead | 0.0310 J | 0.319 J |
| Selenium | 0.259 | 0.0620 J |

| MW-18I | | |
|---|---|---|
| Date: | 11/14/12 | 06/12/14 |
| All Analytes | No Exceedances | No Exceedances |

| MW-1ID | | |
|---|---|---|
| Date: | 11/06/12 | 06/05/14 |
| All Analytes | No Exceedances | No Exceedances |

| MW-2I | | |
|---|---|---|
| Date: | 11/07/12 | 06/04/14 |
| All Analytes | No Exceedances | No Exceedances |

| MW-31ID | | |
|---|---|---|
| Date: | 11/13/12 | 06/11/14 |
| Inorganics-Filtered | | |
| Arsenic | 0.0129 | 0.0100 U |

| MW-19I | | |
|---|---|---|
| Date: | 11/13/12 | 06/11/14 |
| All Analytes | No Exceedances | No Exceedances |

| MW-1I | | |
|---|---|---|
| Date: | 11/06/12 | 06/05/14 |
| Inorganics-Filtered | | |
| Selenium | 0.0557 | 0.0690 J |

0 120' 240'
GRAPHIC SCALE

LEGEND:

- EXISITING MONITORING WELL
- GROUND WATER/SURFACE WATER SAMPLE (COLLECTED NOVEMBER 2012)
- SEDIMENT SAMPLE (COLLECTED NOVEMBER 2012)
- RELEASE LINE
- POTENTIAL SOURCE AREA (EE/CA, IT, FEB. 2000)
- APPROXIMATE PROPERTY BOUNDARY

HISTORIC POTENTIAL SOURCE AREAS

| | |
|---|---|
| 1 | PSA1 – FORMER LIGHT OIL STORAGE AREA |
| 2 | PSA2 – FORMER BYPRODUCTS AREA |
| 3 | PSA3 – FORMER COKE BATTERY |
| 4A | NORTH LANDFILL |
| 4B | SOUTH LANDFILL |
| 5 | FORMER BREEZE WASHOUT AREA |
| 6 | FORMER IMPOUNDMENT |
| 7 | WASTE SLUDGE AND BREEZE STORAGE AREA |
| 8A | FORMER SLUDGE STORAGE AREA |
| 8B | FORMER OXIDATION IMPOUNDMENT NO. 1 |

NOTES:

1. AERIAL PHOTOGRAPH FROM BING MAPS, MARCH 2013.
2. BOLD AND HIGHLIGHTED VALUES ARE ABOVE THE NOVEMBER 2012 USEPA MAXIMUM CONTAMINANT LEVEL (MCL).
3. RESULTS FOR VOCs, SVOCs AND CYANIDE ARE IN MICROGRAMS PER LITER (μg/L).
4. RESULTS FOR INORGRANICS–FILTERED ARE IN MILLIGRAMS PER LITER (mg/L).
5. TOTAL INORGANIC CONCENTRATIONS WERE NOT CONSIDERED.
6. MW–16S AND MW–35S ARE SCREENED N THE UPPER INTERMEDIATE GROUNDWATER ZONE AND THEREFORE, ARE INCLUDED IN THIS FIGURE.

DATA QUALIFIERS:

U – THE COMPOUND WAS ANALYZED FOR BUT NOT DETECTED AT THE ASSOCIATED QUANTITATION LIMIT.
B – THE COMPOUND WAS FOUND IN THE ASSOCIATED LABORATORY METHOD BLANK.
D – CONCENTRATION IS BASED ON A DILUTED SAMPLE ANALYSIS.
J – ESTIMATED CONCENTRATION.
UL– THE COMPOUND WAS NOT DETECTED, QUANTITATION LIMIT IS PROBABLY HIGHER.
UB – COMPOUND CONSIDERED NON–DETECT AT THE LISTED VALUE DUE TO ASSOCIATED BLANK CONTAMINATION.
K – THE COMPOUND WAS POSITIVELY IDENTIFIED; HOWEVER, THE ASSOCIATED NUMERICAL VALUE IS AN ESTIMATED CONCENTRATION ONLY AND THE REPORTED VALUE MAY BE BIASED HIGH.
L – THE COMPOUND WAS POSITIVELY IDENTIFIED; HOWEVER, THE ASSOCIATED NUMERICAL VALUE IS AN ESTIMATED CONCENTRATION ONLY AND THE REPORTED VALUE MAY BE BIASED LOW.
R – SAMPLE RESULT WAS REJECTED DURING VALIDATION.
NA – NOT ANALYZED.
[] – DUPLICATE SAMPLE RESULT.
WNPTS – WELL NOT PRESENT AT TIME OF SAMPLING.
* – THE MCL OF CYANIDE (200 μg/L) IS BASED ON FREE CYANIDE; TOTAL CYANIDE CONCENTRATIONS ARE NOT COMPARED TO THE MCL.

EXXONMOBIL ENVIRONMENTAL SERVICES COMPANY
FAIRMONT COKE WORKS SITE
FAIRMONT, WEST VIRGINIA

# CONSTITUENTS DETECTED ABOVE MCLs IN INTERMEDIATE ZONE GROUND WATER - 2012 TO 2015

FIGURE
6

CITY: SYRACUSE, NY DIV/GROUP: ENV/CAD DB: G. STOWELL, E. KRAHMER, R. BASSETT PIC: E. LYNCH PM/TM: R. PRICE TR: C. FOSTER LYR: ON=*;OFF=REF, (FRZ)
G:\ENVCAD\SYRACUSE\ACT\B0085925\1601\0501\DWG\EPA\85925C01.dwg LAYOUT: 6 SAVED: 6/24/2016 1:54 PM ACADVER: 19.1S (LMS TECH) PAGESETUP: ---- PLOTSTYLETABLE: PLTFULL.CTB PLOTTED: 6/24/2016 2:21 PM BY: SCHILLING, ADAM
XREFS: 85925XLD 85925X01 IMAGES: 85925X11.jp2 PROJECTNAME: ----



**GWSW-004**
| Fe | 11.1 |
|----|------|
| pH | 6.49 |

pH<7

**GWSW-003**
| Fe | 0.371 J |
|----|---------|
| pH | 6.77 |

1.5

10

BIG JOHN SALVAGE SITE

**GWSW-007**
| Fe | 199 |
|----|-----|
| pH | 2.88 |

**MW-16I**
| Fe | 195 J |
|----|-------|
| pH | 3.14 |

18" CMP

100

7

**GWSW-008**
| Fe | 199 |
|----|-----|
| pH | 2.39 |

**MW-16S**
| Fe | 55.3* |
|----|-------|
| pH | 5.97 |

**MW-36I**
| Fe | 24.7 |
|----|------|
| pH | 2.91 |

1,000

pH<3

**GWSW-006**
| Fe | 187 |
|----|-----|
| pH | 6.93 |

**MW-35S**
| Fe | 40.4 |
|----|------|
| pH | 2.48 |

pH<7

**MW-35I**
| Fe | 1,520 |
|----|-------|
| pH | 5.23 |

**GWSW-005**
| Fe | 267 |
|----|-----|
| pH | 6.97 |

pH<7

18" CMP

pH<7

100

pH<0

**UNNAMED TRIBUTARY**

**GWSW-002R**
| Fe | 259 |
|----|-----|
| pH | 5.79 |

100

**MW-21I**
| Fe | 53.2* |
|----|-------|
| pH | 7.22 |

UNDEVELOPED AREA

**GWSW-001**
| Fe | 192 |
|----|-----|
| pH | 6.31 |

6

8B

5

4A

LEGEND:
- EXISTING MONITORING WELL
- GROUND WATER/SURFACE WATER SAMPLE
- SEDIMENT SAMPLE (COLLECTED NOVEMBER 2012)

- RELEASE LINE
- POTENTIAL SOURCE AREA (EE/CA, IT, FEB. 2000)
- APPROXIMATE PROPERTY BOUNDARY

**HISTORIC POTENTIAL SOURCE AREAS**
- 4A  NORTH LANDFILL
- 6   FORMER IMPOUNDMENT
- 7   WASTE SLUDGE AND BREEZE STORAGE AREA
- 8A  FORMER SLUDGE STORAGE AREA
- 8B  FORMER OXIDATION IMPOUNDMENT NO. 1
- ROUX ANOXIC LIMESTONE TRENCH
- PHYTOPLOT

IRON KEY:
(DASHED WHERE INFERRED)
- 1.5 mg/L
- 10 mg/L
- 100 mg/L
- 1,000 mg/L
- NO DATA AVAILABLE
- APPROXIMATE pH BOUNDARIES

NOTES:
1. AERIAL PHOTOGRAPH FROM GOOGLE EARTH PRO, SEPTEMBER 2013.
2. IRON (Fe) CONCENTRATIONS IN MILLIGRAMS PER LITER (mg/L).
3. pH RESULTS ARE PRESENTED IN STANDARD UNITS.
4. * = JUNE 2014 RESULT.
5. MW–36I IRON CONCENTRATION NOT USED FOR CONTOURING.
6. MANGANESE EXTENT IS SIMILAR TO IRON DISTRIBUTION.
7. J = ESTIMATED CONCENTRATION.
8. MW–16S AND MW–35S ARE SCREENED IN THE UPPER INTERMEDIATE GROUNDWATER ZONE AND THEREFORE, ARE SHOWN ON THIS FIGURE (BUT WERE NOT USED FOR CONTOURING).

GRAPHIC SCALE
0    30'   60'

EXXONMOBIL ENVIRONMENTAL SERVICES COMPANY
FAIRMONT COKE WORKS SITE
FAIRMONT, WEST VIRGINIA

**IRON AND pH DISTRIBUTION ON WESTERN PORTION OF SITE - MARCH/APRIL 2015**

FIGURE
**7**

AR442894



LEGEND:

● EXISTING MONITORING WELL

▪ GROUND WATER/SURFACE WATER SAMPLE (COLLECTED NOVEMBER 2012)

▪ SEDIMENT SAMPLE (COLLECTED NOVEMBER 2012)

RELEASE LINE

POTENTIAL SOURCE AREA (EE/CA, IT, FEB. 2000)

APPROXIMATE PROPERTY BOUNDARY

HISTORIC POTENTIAL SOURCE AREAS

1    PSA1 – FORMER LIGHT OIL STORAGE AREA
2    PSA2 – FORMER BYPRODUCTS AREA
3    PSA3 – FORMER COKE BATTERY
4A   NORTH LANDFILL
4B   SOUTH LANDFILL
5    FORMER BREEZE WASHOUT AREA
6    FORMER IMPOUNDMENT
7    WASTE SLUDGE AND BREEZE STORAGE AREA
8A   FORMER SLUDGE STORAGE AREA
8B   FORMER OXIDATION IMPOUNDMENT NO. 1

BENZENE CONCENTRATION

>/= 5 µg/L
>/= 50 µg/L
>/= 100 µg/L
>/= 1,000 µg/L
>/= 10,000 µg/L

[ ] DASHED WHERE INFERRED

NOTES:

1. AERIAL PHOTOGRAPH FROM GOOGLE EARTH PRO, SEPTEMBER 2013.

2. MW–16S AND MW–35S ARE SCREENED IN THE UPPER INTERMEDIATE GROUNDWATER ZONE AND THEREFORE, ARE SHOWN ON THIS FIGURE.

3. RESULTS ARE IN MICROGRAMS PER LITER (µg/L).

4. pH RESULTS ARE PRESENTED IN STANDARD UNITS.

DATA QUALIFIERS:

U – THE COMPOUND WAS ANALYZED FOR BUT NOT DETECTED AT THE ASSOCIATED QUANTITATION LIMIT.
B – THE COMPOUND WAS FOUND IN THE ASSOCIATED LABORATORY METHOD BLANK.
J – ESTIMATED CONCENTRATION.
D – ANALYZED AT A DILUTION.

EXXONMOBIL ENVIRONMENTAL SERVICES COMPANY
FAIRMONT COKE WORKS SITE
FAIRMONT, WEST VIRGINIA

INFERRED EXTENT OF BENZENE AND pH
IN GROUND WATER 2014-2015

FIGURE
8

AR442895



**HISTORIC POTENTIAL SOURCE AREAS**

| | |
|---|---|
| 1 | PSA1 – FORMER LIGHT OIL STORAGE AREA |
| 2 | PSA2 – FORMER BYPRODUCTS AREA |
| 3 | PSA3 – FORMER COKE BATTERY |
| 4A | NORTH LANDFILL |
| 4B | SOUTH LANDFILL |
| 5 | FORMER BREEZE WASHOUT AREA |
| 6 | FORMER IMPOUNDMENT |
| 7 | WASTE SLUDGE AND BREEZE STORAGE AREA |
| 8A | FORMER SLUDGE STORAGE AREA |
| 8B | FORMER OXIDATION IMPOUNDMENT NO. 1 |

**LEGEND:**

- APPROXIMATE PROPERTY BOUNDARY
- RELEASE LINE (BJS SITE)
- POTENTIAL SOURCE AREA (EE/CA, IT, FEB. 2000)
- HISTORICAL INVESTIGATION/ REMOVAL AREA
- VI RESTRICTION
- 100' BUFFER AROUND BENZENE IN GROUNDWATER > 5 µg/L

| COLOR KEY | | mg/Kg |
|---|---|---|
| GREEN | | ND |
| BLUE | | >ND–0.1 |
| PURPLE | | >0.1–1 |
| YELLOW | | >1–10 |
| ORANGE | | >10–100 |
| RED | | >100 |

NOTE:

1. ALL SOIL CONCENTRATIONS ARE IN MILLIGRAMS PER KILOGRAM (mg/Kg).
2. AERIAL PHOTOGRAPH FROM GOOGLE EARTH PRO, SEPTEMBER 2013.
3. COLOR DOTS REPRESENT BENZENE CONCENTRATION (PER "COLOR KEY") IN SOIL AT THE GIVEN LOCATION. WHERE MULTIPLE DEPTHS WERE SAMPLED AT A GIVEN LOCATION, COLOR DOT REPRESENTS MAXIMUM CONCENTRATION MEASURED.

EXXONMOBIL ENVIRONMENTAL SERVICES COMPANY
FAIRMONT COKE WORKS SITE
FAIRMONT, WEST VIRGINIA

# VAPOR INTRUSION PROTECTION AREA

FIGURE
9

CITY: SYRACUSE, NY DIV/GROUP: ENV/CADD DB: G. STOWELL, E. KRAHMER, R. BASSETT PIC: E. LYNCH PM/TM: R. PRICE TR: C. FOSTER LYR: ON=*;OFF=REF, (FRZ)
G:\ENVCAD\SYRACUSE\ACT\B0085925\1601\00501\DWG\EPA85925C06.dwg LAYOUT: 9 SAVED: 6/24/2016 1:59 PM ACADVER: 19.1S (LMS TECH) PAGESETUP: ---- PLOTSTYLETABLE: PLTFULL.CTB PLOTTED: 6/24/2016 2:22 PM BY: SCHILLING, ADAM
XREFS: 85925X01 IMAGES: 85925X11.jp2 PROJECTNAME: ----
Points - BENZENE



POTENTIAL RECEPTORS (CURRENT / FUTURE)

| Exposure Medium | Exposure Pathway | TRESPASSER | OFF-SITE WORKER | OFF-SITE RESIDENT | ENVIRONMENTAL WORKER | ON-SITE WORKER | RECREATIONAL USER | HYPOTHETICAL ON-SITE RESIDENT | HYPOTHETICAL OFF-SITE RESIDENT | CONSTRUCTION WORKER |
|---|---|---|---|---|---|---|---|---|---|---|
| Tap Water | INGESTION | ○ | ◐ | ◐ | ○ | ○ | ○ | ● | ◐ | ○ |
| Tap Water | DERMAL | ○ | ◐ | ◐ | ○ | ○ | ○ | ● | ◐ | ○ |
| Tap Water | INHALATION | ○ | ◐ | ◐ | ○ | ○ | ○ | ● | ◐ | ○ |
| Homegrown Produce | INGESTION | ○ | ○ | ◐ | ○ | ○ | ○ | ● | ◐ | ○ |
| Surface Water | DERMAL | ● | ○ | ○ | ○ | ○ | ● | ○ | ○ | ○ |
| Surface Water | INGESTION | ● | ○ | ○ | ○ | ○ | ● | ○ | ○ | ○ |
| Trench Water | DERMAL | ○ | ○ | ○ | ● | ○ | ○ | ○ | ○ | ● |
| Trench Air | INHALATION | ○ | ○ | ○ | ● | ○ | ○ | ○ | ○ | ● |
| Indoor Air | INHALATION | ○ | ◐ | ● | ○ | ● | ○ | ● | ● | ○ |
| Soil | DERMAL | ● | ● | ● | ● | ● | ● | ● | ● | ● |
| Soil | INGESTION | ● | ● | ● | ● | ● | ● | ● | ● | ● |
| Homegrown Produce | INGESTION | ○ | ○ | ◐ | ○ | ○ | ○ | ◐ | ◐ | ○ |
| Ambient Air | INHALATION | ● | ● | ● | ● | ● | ● | ● | ● | ● |
| Ambient Air | INHALATION | ◐ | ◐ | ◐ | ● | ◐ | ◐ | ◐ | ◐ | ● |
| Indoor Air | INHALATION | ○ | ◐ | ◐ | ○ | ◐ | ○ | ◐ | ◐ | ○ |

**LEGEND**

● Potentially complete exposure pathway

◐ Potentially complete exposure pathway expected to be minor; not quantitatively evaluated

○ Incomplete exposure pathway

FAIRMONT COKE WORKS SITE, FAIRMONT, WEST VIRGINIA

**SITE-WIDE HUMAN HEALTH RISK ASSESSMENT**

**CONCEPTUAL SITE MODEL (CSM)**

FIGURE **10**

10/15/2014 SYRACUSE, NY-ENV/CAD-DJHOWES rev08/27/15
B0085925/1401/00601/HHRA/CDR/85925F02.CDR



| | | | | Onsite | | | Unnamed Tributary | |
|---|---|---|---|---|---|---|---|---|
| | | | | Terrestrial/Wetland Wildlife | Terrestrial/Wetland Plants | Soil/Sediment Invertebrates | Wetland Wildlife | Sediment Invertebrates |
| Surface Soil | Ingestion | | | x | NA | x | NA | NA |
| | Direct Contact/Uptake | | | x | x | x | NA | NA |
| | Food Chain | | | x | NA | NA | NA | NA |
| Air | Inhalation | | | o | NA | NA | NA | NA |
| Subsurface Soil | Ingestion | | | NA | NA | NA | NA | NA |
| | Direct Contact/Uptake | | | o | NA | o | NA | NA |
| | Food Chain | | | NA | NA | NA | NA | NA |
| Groundwater Seep | Ingestion | | | o | NA | o | NA | NA |
| | Direct Contact/Uptake | | | o | o | o | NA | NA |
| | Food Chain | | | NA | NA | NA | NA | NA |
| Surface Water | Ingestion | | | o | NA | NA | x | x |
| | Direct Contact/Uptake | | | o | o | o | x | x |
| | Food Chain | | | NA | NA | NA | NA | NA |
| Sediment | Ingestion | | | o | NA | NA | x | x |
| | Direct Contact/Uptake | | | o | o | o | x | x |
| | Food Chain | | | NA | NA | NA | x | NA |

NA    Pathway not applicable.
x     Complete Exposure Pathway
o     Potentially Complete Exposure Pathway

**Ecological Conceptual Site Model**
**Fairmont Coke Works**
**Fairmont, West Virginia**

**Figure 11**

AR442898



BIG JOHN
SALVAGE SITE

18" CMP

18" CMP

UNDEVELOPED AREA

UNNAMED
TRIBUTARY

5

4A

4B

8A

8B

7

6

**LEGEND:**

EXISITING MONITORING WELL

GROUND WATER/SURFACE WATER SAMPLE
(COLLECTED NOVEMBER 2012)

SEDIMENT SAMPLE (COLLECTED NOVEMBER 2012)

ABANDONED MONITORING WELL

SEEP (NO LONGER PRESENT)

PROPOSED MONITORING WELL CLUSTER

ROUX ANOXIC LIMESTONE TRENCH

PHYTOPLOT

INFERRED GROUND WATER FLOW DIRECTION –
INTERMEDIATE ZONE

RELEASE LINE

POTENTIAL SOURCE AREA (EE/CA, IT, FEB. 2000)

APPROXIMATE PROPERTY BOUNDARY

CONCEPTUAL PLACEMENT OF LT/PRB

**HISTORIC POTENTIAL SOURCE AREAS**

1    PSA1 – FORMER LIGHT OIL STORAGE AREA
2    PSA2 – FORMER BYPRODUCTS AREA
3    PSA3 – FORMER COKE BATTERY
4A   NORTH LANDFILL
4B   SOUTH LANDFILL
5    FORMER BREEZE WASHOUT AREA
6    FORMER IMPOUNDMENT
7    WASTE SLUDGE AND BREEZE STORAGE AREA
8A   FORMER SLUDGE STORAGE AREA
8B   FORMER OXIDATION IMPOUNDMENT NO. 1

**NOTES:**

1.   AERIAL PHOTOGRAPH FROM GOOGLE EARTH
     PRO, SEPTEMBER 2013.

2.   EXACT LOCATION OF PROPOSED
     MONITORING WELLS WILL BE DELINEATED
     DURING PRE–DESIGN INVESTIGATION.

GRAPHIC SCALE

EXXONMOBIL ENVIRONMENTAL SERVICES COMPANY
FAIRMONT COKE WORKS SITE
FAIRMONT, WEST VIRGINIA

**CONCEPTUAL LAYOUT OF
SELECTED REMEDY**

FIGURE

**12**

AR442899

# APPENDIX B

# TABLES AND ATTACHMENTS

AR442900

[PAGE INTENTIONALLY LEFT BLANK]

AR442901

Table 1A:  Risk Characterization Summary – Carcinogens / RI Appendix B          [pairs with Table 2A]

| Scenario Timeframe: | | | Future Use | | | | |
|---|---|---|---|---|---|---|---|
| Receptor Population: | | | Recreational | | | | |
| Receptor Age: | | | Child | | | | |
| Medium | Exposure Medium | Exposure Point | Chemical of Concern | Carcinogenic Risk | | | |
| | | | | Ingestion | Inhalation | Dermal | Exposure Routes Total |
| Shallow Groundwater/Surface Water | Shallow Groundwater/Surface Water | Child Recreational | Manganese | - | - | NA | NA |
| | | | | Shallow Groundwater/Surface Water risk total= | | | **0.E+00** |
| | | | | Total risk= | | | **0.E+00** |
| **Key** | | | | | | | |
| - :  Toxicity criteria are not available to quantitatively address this route of exposure.<br>NA:  Route of exposure is not applicable to this medium. | | | | | | | |

AR442902

Table 1B:  Risk Characterization Summary – Carcinogens / RAGS D Table 9.12 RME          [pairs with Table 2B]

| Scenario Timeframe: | | Future Use | | | | |
|---|---|---|---|---|---|---|
| Receptor Population: | | On-Site Residents | | | | |
| Receptor Age: | | Child and Adult | | | | |
| Medium | Exposure Medium | Exposure Point | Chemical of Concern | Carcinogenic Risk | | | |
| | | | | Ingestion | Inhalation | Dermal | Exposure Routes Total |
| Soil | Surface and Subsurface Soil | Child + Adult | Arsenic | 6E-5 | 6E-8 | 1E-5 | 7E-5 |
| | | | Benz[a]anthracene | 1E-5 | 3E-10 | 5E-6 | 2E-5 |
| | | | Benzo[a]pyrene | 1E-4 | 2E-9 | 4E-5 | 2E-4 |
| | | | Benzo[b]fluoranthene | 1E-5 | 2E-10 | 4E-6 | 2E-5 |
| | | | Dibenz[a,h]anthracene | 3E-5 | 7E-10 | 1E-5 | 5E-5 |
| | | | **Soil Risk Total=** | | | | **3E-4** |
| Groundwater | Potential future exposure through drinking and showering | Child + Adult | Benzene | 4E-4 | 6E-4* | 8E-5 | 1E-3 |
| | | | Aluminum | - | - | - | - |
| | | | Arsenic | 5E-4 | - | 4E-6 | 5E-4 |
| | | | Chromium[1] | - | - | - | 6E-4 |
| | | | Cobalt | - | - | - | - |
| | | | Iron | - | - | - | - |
| | | | Manganese | - | - | - | - |
| | | | Nickel | - | - | - | - |
| | | | Lead[2] | - | - | - | - |
| | | | Cyanide | - | - | - | - |
| | | | Thallium | - | - | - | - |
| | Produce irrigated by groundwater | Child + Adult | Benzene | NA | - | - | NA |
| | | | Aluminum | NA | - | - | NA |
| | | | Arsenic | 2E-5 | - | - | 2E-5 |
| | | | Chromium | NA | - | - | NA |
| | | | Cobalt | NA | - | - | NA |
| | | | Iron | NA | - | - | NA |
| | | | Manganese | NA | - | - | NA |
| | | | Nickel | NA | - | - | NA |
| | | | Lead[2] | - | - | - | NA |
| | | | Cyanide | NA | - | - | NA |

AR442903

| | | | Thallium | - | - | - | NA |
|---|---|---|---|---|---|---|---|
| | | | | | | **Groundwater Risk Total=** | **2E-3** |
| Groundwater | Indoor Air Vapor potentially migrating from groundwater and/or subsurface soil into building | Child + Adult | Benzene | - | 4E-4 | - | 4E-4 |
| | | | Cyanide | - | NA | - | NA |
| | | | | | | **Vapor Intrusion Risk Total=** | **4E-4** |
| | | | | | | **Total Risk=** | **2E-3** |

**Key**

- :  Toxicity criteria are not available to quantitatively address this route of exposure.
NA:  Route of exposure is not applicable to this medium.

These cancer risks have been rounded and focus on Chemicals of Concern. In addition to these risk-based chemicals of concern, the following chemicals also exceeded MCLs: antimony, beryllium, cadmium, selenium.
In addition to the risks from average groundwater concentrations summarized above, the most contaminated well had unacceptable concentrations of antimony, PCBs, PAHs, pentachlorophenol, and 4,6-dinitro-2-methylphenol (EPA 6/15/2016).

Cancer risks were shown under the "Adult" scenario in the HHRA risk tables, but actually consist of child + adult exposure, as described in further detail in the HHRA and as shown here.

[1]Based on Chromium VI. Risk displayed here is based on oral and dermal Cancer Slope Factors per EPA's 9/30/2013 review, based on CalEPA as cited in EPA's RSL Table and User's Guide.
[2]Lead risks are evaluated through blood-lead modeling. See Attachment E of the HHRA and ARCADIS memorandum 10/10/2017. Lead in water also exceeded its Action Level of 15 ug/L.

*EPA Region 3 found that the Foster and Chrostowski, 1987, showering model, which is typically used at Region 3 sites, could give different risk estimates than the Schaum/Andelman model described in the HHRA. However, the different models did not significantly change the outcome of these reports with respect to remedy selection, as the showering risks exceed a cancer risk of 1E-4 in either case (EPA 12/11/2014).

AR442904

Table 1C:  Risk Characterization Summary – Carcinogens / RAG Table 9.10 RME          [pairs with Table 2C]

| Scenario Timeframe: | | Future Use | | | | | |
|---|---|---|---|---|---|---|---|
| Receptor Population: | | Industrial or Commercial Worker | | | | | |
| Receptor Age: | | Adult | | | | | |
| Medium | Exposure Medium | Exposure Point | Chemical of Concern | Carcinogenic Risk | | | |
| | | | | Ingestion | Inhalation | Dermal | Exposure Routes Total |
| Groundwater | Indoor Air Vapor potentially migrating from groundwater and/or subsurface soil into building | Adult Industrial or Commercial Worker | Benzene | - | 8E-5 | - | 8E-5 |
| | | | Cyanide | - | NA | - | NA |
| | | | | | | **Vapor Intrusion Risk Total=** | **8E-5** |
| | | | | | | **Total Risk=** | **8E-5** |

**Key**

- :  Toxicity criteria are not available to quantitatively address this route of exposure.
NA:  Route of exposure is not applicable to this medium.

In addition to the vapor intrusion from groundwater quantified above, volatile constituents such as benzene, naphthalene, cyanide, and other VOCs were also detected in soil. No mathematical model exists for soil, but the presence of high concentrations of volatile constituents in both soil and groundwater supports the need for pre-emptive vapor mitigation for new buildings in VIPA (EPA review 12/11/2014, confirmed during review of soil risk update in June 2016).

AR442905

Table 1D:  Risk Characterization Summary – Carcinogens / RAGS D Table 9.13 RME        [pairs with Table 2D]

| Scenario Timeframe: | | Future Use | | | | | |
|---|---|---|---|---|---|---|---|
| Receptor Population: | | Construction Worker | | | | | |
| Receptor Age: | | Adult | | | | | |
| Medium | Exposure Medium | Exposure Point | Chemical of Concern | Carcinogenic Risk | | | |
| | | | | Ingestion | Inhalation | Dermal | Exposure Routes Total |
| Groundwater | Vapors from groundwater in a construction trench | Construction Worker | Benzene | - | 3E-5 | - | 3E-5 |
| | | | Cyanide | - | NA | - | NA |
| | | | | | | **Groundwater Vapor Risk Total=** | **3E-5** |
| | | | | | | **Total Risk=** | **3E-5** |

**Key**

- :  Toxicity criteria are not available to quantitatively address this route of exposure.
NA:  Route of exposure is not applicable to this medium.

AR442906

Table 2A:  Risk Characterization Summary – Non-Carcinogens / RI Appendix B     [pairs with Table 1A]

| Scenario Timeframe: | Future Use | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Receptor Population: | Recreational | | | | | | | |
| Receptor Age: | Child | | | | | | | |
| Medium | Exposure Medium | Exposure Point | Chemical of Concern | Primary Target Organ | Non-Carcinogenic Hazard Quotient | | | |
| | | | | | Ingestion | Inhalation | Dermal | Exposure Routes Total |
| Shallow Groundwater/Surface Water | Shallow Groundwater/Surface Water | Child Recreational | Manganese | Neurological | - | NA | - | 2* |
| | | | | Shallow Groundwater/Surface Water Hazard Index Total= | | | | 2 |
| | | | | Receptor Hazard Index= | | | | 2 |
| | | | | Neurological Hazard Index= | | | | 2 |

**Key**

NA:  Route of exposure is not applicable to this medium.
*EPA also considered each GWSW location individually; the maximum is shown here. GWSW data appeared in an update to the Human Health Risk Assessment. This update appeared in Appendix B to the RI and was reviewed by EPA on 7/16/2015 and 12/9/2015. The HI of 2 shown here is based on Table E-1.a of RI Appendix B, showing that 5.55 mg/L of manganese corresponds to an HI of 1; therefore the EPC of 12.9 mg/L corresponds to an HI of 2.

AR442907

Table 2B:  Risk Characterization Summary – Non-Carcinogens / RAGS D Tables 9.11 RME and 9.12 RME          [pairs with Table 1B]

| Scenario Timeframe: | Future Use | | | | | | |
|---|---|---|---|---|---|---|---|
| Receptor Population: | On-Site Residents | | | | | | |
| Receptor Age: | Child and Adult | | | | | | |
| Medium | Exposure Medium | Exposure Point | Chemical of Concern | Primary Target Organ | Non-Carcinogenic Hazard Quotient | | | |
| | | | | | Ingestion | Inhalation | Dermal | Exposure Routes Total |
| Soil | Surface and Subsurface Soil | Child | Arsenic | Skin, cardiovascular; developmental (inhalation) | 1 | 2E-3 | 0.2 | 1 |
| | | | Benz[a]anthracene | - | NA | NA | NA | NA |
| | | | Benzo[a]pyrene | - | NA | NA | NA | NA |
| | | | Benzo[b]fluoranthene | - | NA | NA | NA | NA |
| | | | Dibenz[a,h]anthracene | - | NA | NA | NA | NA |
| | | Adult | Arsenic | Skin, cardiovascular; developmental (inhalation) | 0.1 | 2E-3 | 0.02 | 0.1 |
| | | | Benz[a]anthracene | - | NA | NA | NA | NA |
| | | | Benzo[a]pyrene | - | NA | NA | NA | NA |
| | | | Benzo[b]fluoranthene | - | NA | NA | NA | NA |
| | | | Dibenz[a,h]anthracene | - | NA | NA | NA | NA |
| | | | | | | | **Soil Hazard Index Total Child =** | **1@** |
| | | | | | | | **Soil Hazard Index Total Adult =** | **0.1** |
| Groundwater | Potential future exposure through drinking and showering | Child | Benzene | Blood | 8 | 6* | 1 | 15 |
| | | | Aluminum | Neurological | 5 | - | 0.03 | 5 |
| | | | Arsenic | Skin, cardiovascular | 5 | - | 0.03 | 5 |
| | | | Chromium[1] | None reported | 8 | - | 4 | 12 |
| | | | Cobalt | Thyroid | 80 | - | 0.2 | 80 |
| | | | Iron | Gastrointestinal | 30 | - | 0.2 | 30 |
| | | | Manganese[2] | Neurological | 10 | - | 2 | 12 |
| | | | Nickel | Whole body | 1 | - | 0.4 | 1 |

AR442908

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Lead[3] | NA | NA | - | NA | NA |
| | | | Cyanide | Testes; thyroid (inhalation) | 3 | 10* | 0.02 | 13 |
| | | | Thallium[4] | Hair | - | - | - | 4 |
| | | Adult | Benzene | Blood | 4 | 6* | 0.8 | 11 |
| | | | Aluminum | Neurological | 2 | - | 0.02 | 2 |
| | | | Arsenic | Skin, cardiovascular | 2 | - | 0.02 | 2 |
| | | | Chromium[1] | None reported | 3 | - | 2 | 5 |
| | | | Cobalt | Thyroid | 30 | - | 0.1 | 30 |
| | | | Iron | Gastrointestinal | 10 | - | 0.1 | 10 |
| | | | Manganese[2] | Neurological | 5 | - | 1 | 6 |
| | | | Nickel | Whole body | 0.5 | - | 0.02 | 0.5 |
| | | | Lead[3] | NA | NA | - | NA | NA |
| | | | Cyanide | Testes; thyroid (inhalation) | 1 | 10* | 0.1 | 11 |
| | | | Thallium[4] | Hair | - | - | - | 2 |
| | Produce irrigated by groundwater | Child | Benzene | Blood | NA | - | - | NA |
| | | | Aluminum | Neurological | 0.02 | - | - | 0.02 |
| | | | Arsenic | Skin, cardiovascular | 0.2 | - | - | 0.2 |
| | | | Chromium[1] | None reported | 0.06 | - | - | 0.06 |
| | | | Cobalt | Thyroid | 2 | - | - | 2 |
| | | | Iron | Gastrointestinal | 0.1 | - | - | 0.1 |
| | | | Manganese[2] | Neurological | 3 | - | - | 3 |
| | | | Nickel | Whole body | 0.07 | - | - | 0.07 |
| | | | Lead[3] | NA | NA | - | - | NA |
| | | | Cyanide | Testes | NA | - | - | NA |
| | | | Thallium | Hair | - | - | - | NA |
| | | Adult | Benzene | Blood | NA | - | - | NA |
| | | | Aluminum | Neurological | 8E-3 | - | - | 8E-3 |
| | | | Arsenic | Skin, cardiovascular | 0.08 | - | - | 0.08 |
| | | | Chromium[1] | None reported | 0.03 | - | - | 0.03 |
| | | | Cobalt | Thyroid | 0.7 | - | - | 0.7 |

AR442909

| | | | Iron | Gastrointestinal | 0.06 | - | - | 0.06 |
|---|---|---|---|---|---|---|---|---|
| | | | Manganese[2] | Neurological | 1 | - | - | 1 |
| | | | Nickel | Whole body | 0.03 | - | - | 0.03 |
| | | | Lead[3] | NA | NA | - | - | NA |
| | | | Cyanide | Testes | NA | - | - | NA |
| | | | Thallium | Hair | - | - | - | NA |
| | | | | **Groundwater Hazard Index Total Child** | | | | **200** |
| | | | | **Groundwater Hazard Index Total Adult** | | | | **100** |
| Groundwater | Indoor Air Vapor potentially migrating from groundwater and/or subsurface soil into building | Child | Benzene | Blood | - | 4 | - | 4 |
| | | | Cyanide | Thyroid | - | 0.2 | - | 0.2 |
| | | Adult | Benzene | Blood | - | 4 | - | 4 |
| | | | Cyanide | Thyroid | - | 0.2 | - | 0.2 |
| | | | | **Vapor Intrusion Hazard Index Total Child =** | | | | **4** |
| | | | | **Vapor Intrusion Hazard Index Total Adult =** | | | | **4** |

| | **Child** | **Adult** |
|---|---|---|
| **Receptor Hazard Index=** | **200** | **100** |
| **Skin, cardiovascular Hazard Index=** | **6** | **2** |
| **Developmental Hazard Index=** | **2E-3** | **2E-3** |
| **Whole body Hazard Index=** | **1** | **0.5** |
| **Blood Hazard Index=** | **20** | **15** |
| **Testes (Reproductive) Hazard Index=** | **3** | **1** |
| **Thyroid Hazard Index=** | **90** | **40** |
| **Neurological Hazard Index=** | **20** | **9** |
| **Gastrointestinal Hazard Index=** | **30** | **10** |
| **Hair Hazard Index=** | **4** | **2** |
| **Indeterminate (none reported) Hazard Index=** | **12** | **5** |

**Key**

These Hazard Indices have been rounded and focus on Chemicals of Concern. In addition to these risk-based chemicals of concern, the following chemicals also exceeded MCLs: antimony, beryllium, cadmium, selenium.
In addition to the risks from average groundwater concentrations summarized above, the most contaminated well had unacceptable concentrations of antimony, PCBs, PAHs, pentachlorophenol, and 4,6-dinitro-2-methylphenol (EPA 6/15/2016).

AR442910

[1]Based on Chromium VI.

[2]EPA recommends adjusting the manganese RfD for diet and uncertainty, as noted on the Non-Cancer Toxicity Data Summary table. This would only increase the oral and dermal HI for manganese, which already exceed 1 (EPA review, 9/30/2013 and 12/11/2014).

[3]Lead risks are evaluated through blood-lead modeling. See Attachment E of the HHRA and ARCADIS memo 10/10/2017. Lead in water also exceeded its Action Level of 15 ug/L.

[4]On 9/30/2013 and 12/11/2014, EPA recommended also considering the provisional toxicity values for thallium, which generated the provisional HIs shown above. Thallium also exceeded its MCL.

- :   Toxicity criteria are not available to quantitatively address this route of exposure.

NA:   Route of exposure is not applicable to this medium.

Lead in soil was detected well above concentrations of concern in several areas of the site, but the vast majority of samples, as well as the averages over large areas, were within acceptable ranges. Therefore, hot spots appear to be localized and should not pose a concern unless small exposure units are developed on site (EPA 6/15/2016 and ARCADIS 10/10/2017).

@ Represents site-wide soil. If more localized exposure units are considered, then the CSA CHA subarea would have an HI of approximately 8, largely due to arsenic (EPA 6/15/2016).

*EPA Region 3 found that the Foster and Chrostowski, 1987, showering model, which is typically used at Region 3 sites, could give different risk estimates (most notably a higher HI for cyanide) than the Schaum/Andelman model described in the HHRA. However, the different models did not significantly change the outcome of these reports with respect to remedy selection, as the showering risks exceed a HI of 1 in either case (EPA 12/11/2014).

AR442911

Table 2C:  Risk Characterization Summary – Non-Carcinogens / RAGS D Table 9.10 RME          [pairs with Table 1C]

| Scenario Timeframe: | Future Use | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Receptor Population: | Industrial or Commercial Worker | | | | | | | |
| Receptor Age: | Adult | | | | | | | |
| Medium | Exposure Medium | Exposure Point | Chemical of Concern | Primary Target Organ | Non-Carcinogenic Hazard Quotient | | | |
| | | | | | Ingestion | Inhalation | Dermal | Exposure Routes Total |
| Groundwater | Indoor Air Vapor potentially migrating from groundwater and/or subsurface soil into building | Adult Industrial or Commercial Worker | Benzene | Blood | - | 0.9 | - | 0.9 |
| | | | Cyanide | Thyroid | - | 0.04 | - | 0.04 |
| | | | | | Vapor Intrusion Hazard Index Total= | | | **0.9** |
| | | | | | Receptor Hazard Index= | | | **0.9** |
| | | | | | Blood Hazard Index= | | | **0.9** |
| | | | | | Thyroid Hazard Index= | | | **0.04** |

**Key**

- :  Toxicity criteria are not available to quantitatively address this route of exposure.
NA:  Route of exposure is not applicable to this medium.

In addition to the vapor intrusion from groundwater quantified above, volatile constituents such as benzene, naphthalene, cyanide, and other VOCs were also detected in soil. No mathematical model exists for soil, but the presence of high concentrations of volatile constituents in both soil and groundwater supports the need for pre-emptive vapor mitigation for new buildings in VIPA (EPA review 12/11/2014, confirmed during review of soil risk update in June 2016).

AR442912

Table 2D:  Risk Characterization Summary – Non-Carcinogens / RAGS D Table 9.13 RME          [pairs with Table 1D]

| Scenario Timeframe: | Future Use | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Receptor Population: | Construction Worker | | | | | | | |
| Receptor Age: | Adult | | | | | | | |
| Medium | Exposure Medium | Exposure Point | Chemical of Concern | Primary Target Organ | Non-Carcinogenic Hazard Quotient | | | |
| | | | | | Ingestion | Inhalation | Dermal | Exposure Routes Total |
| Groundwater | Vapors from groundwater in a construction trench | Construction Worker | Benzene | Blood | - | 4 | - | 4 |
| | | | Cyanide | Thyroid | - | 20 | - | 20 |
| | | | | | | Groundwater Vapor Hazard Index Total= | | 24 |
| | | | | | | Receptor Hazard Index= | | 24 |
| | | | | | | Blood Hazard Index= | | 4 |
| | | | | | | Thyroid Hazard Index= | | 20 |

**Key**

- :  Toxicity criteria are not available to quantitatively address this route of exposure.
NA:  Route of exposure is not applicable to this medium.

AR442913

Table 3:  Summary of Chemical of Concern and Medium-Specific Exposure Point Concentrations / RI Appendix B

| Scenario Timeframe: | Future Use | | | | | | |
|---|---|---|---|---|---|---|---|
| Medium: | Shallow Groundwater/Surface Water | | | | | | |
| Exposure Medium: | Shallow Groundwater/Surface Water | | | | | | |
| Exposure Point | Chemical of Concern | Concentration Detected | | Units | Frequency of Detection | Exposure Point Concentration | Exposure Point Concentration Units | Statistical Measure |
| | | Min | Max | | | | | |
| Child Recreational | Manganese | 6.3 | 12.9 | mg/L | 6/6 | 12.9 | mg/L | # Samples < 10 or # Detects < 5* |
| **Key**<br><br>mg/L:  milligrams per liter | | | | | | | | |

*EPA also considered each GWSW location individually; the maximum is shown here. GWSW data appeared in an update to the Human Health Risk Assessment. This update appeared in Appendix B to the RI and was reviewed by EPA on 7/16/2015 and 12/9/2015.

Table 3:  Summary of Chemical of Concern and Medium-Specific Exposure Point Concentrations / RAGS D Tables 2.1 and 3.2

| Scenario Timeframe: | | Future Use | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Medium: | | Soil | | | | | | |
| Exposure Medium: | | Surface and Subsurface Soil | | | | | | |
| Exposure Point | Chemical of Concern | Concentration Detected | | Units | Frequency of Detection | Exposure Point Concentration | Exposure Point Concentration Units | Statistical Measure |
| | | Min | Max | | | | | |
| On-Site Child and Adult Residents | Arsenic | 5.9E-01 | 1.5E+03 | mg/kg | 857/918 | 4.5E+01 | mg/kg | 95% UCL |
| | Benz[a]anthracene | 1.5E-02 | 2.6E+02 | mg/kg | 283/878 | 3.4E+00 | mg/kg | 95% UCL |
| | Benzo[a]pyrene | 1.2E-02 | 2.4E+02 | mg/kg | 297/878 | 2.9E+00 | mg/kg | 95% UCL |
| | Benzo[b]fluoranthene | 1.9E-02 | 2.6E+02 | mg/kg | 260/878 | 2.8E+00 | mg/kg | 95% UCL |
| | Dibenz[a,h]anthracene | 1.3E-02 | 4.8E+01 | mg/kg | 152/878 | 8.5E-01 | mg/kg | 95% UCL |
| **Key**<br><br>95% UCL:  95% Upper Confidence Limit<br>mg/kg:  milligrams per kilogram | | | | | | | | |

Table 3:  Summary of Chemical of Concern and Medium-Specific Exposure Point Concentrations / RAGS D Tables 2.6 and 3.7

| Scenario Timeframe: | | Future Use | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Medium: | | Groundwater | | | | | | |
| Exposure Medium: | | Groundwater; Produce irrigated by groundwater; Vapors from groundwater via intrusion or volatilization from construction trenches | | | | | | |
| Exposure Point | Chemical of Concern | Concentration Detected | | Units | Frequency of Detection | Exposure Point Concentration | Exposure Point Concentration Units | Statistical Measure |
| | | Min | Max | | | | | |
| On-Site Child and Adult Residents; Industrial or Commercial Worker; Construction Worker | Benzene | 2.6E-4 | 5.355 | mg/L | 76/285 | 0.52 | mg/L | 95% UCL |
| | Aluminum | 0.05 | 940 | mg/L | 224/271 | 71 | mg/L | 95% UCL |
| | Arsenic | 0.0037 | 0.371 | mg/L | 94/267 | 0.021 | mg/L | 95% UCL |
| | Chromium[1] | 0.003 | 3.1 | mg/L | 127/264 | 0.38 | mg/L | 95% UCL |
| | Cobalt | 5E-4 | 3.25 | mg/L | 181/272 | 0.37 | mg/L | 95% UCL |
| | Iron | 0.0551 | 2930 | mg/L | 262/269 | 360 | mg/L | 95% UCL |
| | Manganese | 0.001 | 108 | mg/L | 215/228 | 25 | mg/L | 95% UCL |
| | Nickel | 0.0021 | 4.09 | mg/L | 166/271 | 0.35 | mg/L | 95% UCL |
| | Lead | 0.002 | 0.209 | mg/L | 152/272 | 0.024 | mg/L | mean |
| | Cyanide[2] | 0.0094 | 0.029 | mg/L | 4/4 | 0.029 | mg/L | maximum |
| | Thallium | 2.1E-4 | 0.0089 | mg/L | 35/272 | 7E-4 | mg/L | 95% UCL |

**Key**

NA:  not available or not applicable
mg/L:  milligrams per liter

[1]Based on chromium VI
[2]Based on free cyanide

Unfiltered data used for all chemicals except manganese and selenium, as described on RAGS D Table 3.7 in the HHRA.
Thallium EPC from EPA review 9/30/2013.
In addition to these risk-based chemicals of concern, the following chemicals also exceeded MCLs: antimony (maximum 0.074 mg/L), beryllium (maximum 0.116 mg/L), cadmium (maximum 0.244 mg/L), selenium (maximum 0.259 mg/L)

The Exposure Point Concentrations listed above were used to estimate risks from hypothetical future potable use of groundwater via ingestion and dermal exposure. These concentrations also served as the basis for modeling of the following routes of exposure:

AR442916

Showering inhalation as described on RAGS D Table 3.8 and EPA's reviews on 9/30/2013 and 12/11/2014.

Plant uptake of inorganic metals in groundwater used as irrigation water as described on RAGS D Table 3.9, using the University of Tennessee (UT) root uptake (UT, 1999). See also Attachment D (Produce Uptake) of Appendix H (Final HHRA) of the Final Remedial Investigation/Feasibility Study Report, dated June 2016 (Final RI/FS) for input parameters and assumptions.

Volatilization of volatile constituents of potential concern from groundwater to indoor air, as described in RAGS D Tables 3.11 and 3.12, using the Office of Solid Waste and Emergency Response (OWSER) Vapor Intrusion Assessment Groundwater Concentration to Indoor Air Concentrations (GWC-IAC) Calculator (Version 2.0; USEPA 2012). See Tables 3.11.b and 3.12.b of Attachment B [Risk Assessment Guidance for Superfund (RAGS), Part D Tables] of Appendix H (Final HHRA) of the Final Remedial Investigation/Feasibility Study Report, dated June 2016 (Final RI/FS) for input parameters to Calculator. Free Cyanide is evaluated as Hydrogen Cyanide in the Calculator.

Volatilization of volatile constituents of potential concern (COPCs) from groundwater to trench air, as described in RAGS D Tables 3.13 and 3.14, using Virginia Department of Environmental Quality (VDEQ) model. Volatization Factors (VFs) for volatile COPCs (from VDEQ model; see Table 3.14.b for deviation and http://www.deq.virginia.gov/Programs/LandProtectionRevitalizationProgram/VoluntaryRemediationProgram/VRPRiskAssessmentGuidance/Guidance.aspx for rationale) were used to estimate air concentrations from groundwater as follows: $C_{gw}$ x VF = $C_{trench}$

Benzene and cyanide were the chemicals of concern for the vapor intrusion and trench scenarios.

AR442917

Table 4:  Non-Cancer Toxicity Data Summary / RAGS D Tables 5.1 and 5.2

**Pathway:  Ingestion, Dermal**

| Chemical of Concern | Chronic/ Subchronic | Oral RfD Value | Oral RfD Units | Dermal RfD | Dermal RfD Units | Primary Target Organ[1] | Combined Uncertainty/Mo difying Factors | Sources of RfD: Target Organ | Dates of RfD: Target Organ (MM/DD/YYYY)[2] |
|---|---|---|---|---|---|---|---|---|---|
| Benzene | Chronic | 4.0E-03 | mg/kg-day | 4.0E-03 | mg/kg-day | Blood | 300 | IRIS | 03/10/2013 |
| Benz[a]anthracene | Chronic | NA | | NA | | NA | NA | | 03/10/2013 |
| Benzo[a]pyrene | Chronic | NA | | NA | | NA | NA | | 03/10/2013 |
| Benzo[b]fluoranthene | Chronic | NA | | NA | | NA | NA | | 03/10/2013 |
| Dibenz[a,h]anthracene | Chronic | NA | | NA | | NA | NA | | 03/10/2013 |
| Aluminum | Chronic | 1.0E+00 | mg/kg-day | 1.0E+00 | mg/kg-day | Neurological | 100 | PPRTV | 03/10/2013 |
| Arsenic | Chronic | 3.0E-04 | mg/kg-day | 3.0E-04 | mg/kg-day | Skin, Cardiovascular | 3 | IRIS | 03/10/2013 |
| Chromium[3] | Chronic | 3.0E-03 | mg/kg-day | 7.5E-05 | mg/kg-day | None Reported | 900 | IRIS | 03/10/2013 |
| Cobalt | Chronic | 3.0E-04 | mg/kg-day | 3.0E-04 | mg/kg-day | Thyroid | 3000 | PPRTV | 03/10/2013 |
| Iron | Chronic | 7.0E-01 | mg/kg-day | 7.0E-01 | mg/kg-day | Gastrointestinal | 1.5 | PPRTV | 03/10/2013 |
| Manganese[4] | Chronic | 1.4E-01 | mg/kg-day | 5.6E-03 | mg/kg-day | Neurological | 1 | IRIS | 03/10/2013 |
| Nickel | Chronic | 2.0E-02 | mg/kg-day | 8.0E-04 | mg/kg-day | Whole Body | 300 | IRIS | 03/10/2013 |
| Lead[5] | Chronic | NA | | NA | | NA | NA | | 03/10/2013 |
| Cyanide (CN-) | Chronic | 6.0E-04 | mg/kg-day | 6.0E-04 | mg/kg-day | Testes | 3000 | IRIS | 03/10/2013 |
| Thallium[6] | Chronic | 1E-5 | mg/kd-day | 1E-5 | mg/kg-day | Hair | 3000 | PPRTV Appendix | 09/30/2013 |

**Pathway:  Inhalation**

| Chemical of Concern | Chronic/ Subchronic | Inhalation RfC | Inhalation RfC Units | Primary Target Organ[1] | Combined Uncertainty/Mo difying Factors | Sources of RfC:RfD: Target Organ | Dates (MM/DD/YYYY)[2] |
|---|---|---|---|---|---|---|---|
| Benzene | Chronic | 3.0E-02 | mg/m$^3$ | Blood | 300 | IRIS | 03/10/2013 |
| Benz[a]anthracene | Chronic | NA | | NA | NA | | 03/10/2013 |
| Benzo[a]pyrene | Chronic | NA | | NA | NA | | 03/10/2013 |

AR442918

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Benzo[b]fluoranthene | Chronic | NA | | NA | NA | | 03/10/2013 |
| Dibenz[a,h]anthracene | Chronic | NA | | NA | NA | | 03/10/2013 |
| Aluminum | Chronic | 5.0E-03 | mg/m$^3$ | Neurological | 300 | PPRTV | 03/10/2013 |
| Arsenic | Chronic | 1.5E-05 | mg/m$^3$ | Developmental | 30 | CalEPA | 03/10/2013 |
| Chromium[3] | Chronic | 1.0E-04 | mg/m$^3$ | Respiratory | 300 | IRIS | 03/10/2013 |
| Cobalt | Chronic | 6.0E-06 | mg/m$^3$ | Respiratory | 300 | PPRTV | 03/10/2013 |
| Iron | Chronic | NA | | NA | NA | | 03/10/2013 |
| Manganese | Chronic | 5.0E-05 | mg/m$^3$ | Neurological | 1000 | IRIS | 03/10/2013 |
| Nickel | Chronic | 9.0E-05 | mg/m$^3$ | Respiratory, Liver | 30 | ATSDR | 03/10/2013 |
| Lead[5] | Chronic | NA | | NA | NA | | 03/10/2013 |
| Cyanide (CN-) | Chronic | 8.0E-04 | mg/m$^3$ | Thyroid | 3000 | IRIS | 03/10/2013 |
| Thallium | Chronic | NA | | NA | NA | | |

**Key**

NA:  not available
mg/kg:  milligrams per kilogram
mg/kg-day:  milligrams per kilogram per day
RfC:  chronic reference concentration
RfD:  chronic reference dose
IRIS:  U.S. EPA Integrated Risk Information System
PPRTV:  Provisional Peer-Reviewed Toxicity Values
HEAST:  Health Effects Assessment Summary Tables
Cal EPA:  California Environmental Protection Agency
ATSDR:  Agency for Toxic Substances and Disease Registry

Notes:
[1]Primary target(s) listed are those associated with the critical effect(s) on which the RfD/RfC was based.
[2]Date is the date the database was searched.
[3]Based on Chromium VI.
[4]EPA recommends adjusting the manganese RfD for diet and uncertainty, resulting in an oral RfD of 2.4E-2 mg/kg/day as described in the IRIS file and as recorded in EPA's reviews on 9/30/2013 and 12/11/2014.
[5]Lead is evaluated separately using U.S. EPA lead models; see Attachment E of the HHRA and ARCADIS memo 10/10/2017.
[6]On 9/30/2013 and 12/11/2014, EPA recommended also considering the provisional toxicity values for thallium, which are shown above, and also appear in the RSL Table. The provisional value, target organ, and uncertainty factors originate in the 11/1/2012 appendix of the PPRTV for thallium.

Table 5:  Cancer Toxicity Data Summary / RAGS D Tables 6.1 and 6.2

| Pathway:  Oral/Dermal | | | | | | |
| Chemical of Concern | Oral Cancer Slope Factor | Dermal Cancer Slope Factor | Slope Factor Units | Weight of Evidence/Cancer Guideline Description[1] | Source | Date (MM/DD/YYYY)[2] |
|---|---|---|---|---|---|---|
| Benzene | 5.5E-02 | 5.5E-02 | (mg/kg-day)$^{-1}$ | A | IRIS | 03/10/2013 |
| Benz[a]anthracene | 7.3E-01 | 7.3E-01 | (mg/kg-day)$^{-1}$ | B2 | ECAO | 03/10/2013 |
| Benzo[a]pyrene | 7.3E+00 | 7.3E+00 | (mg/kg-day)$^{-1}$ | B2 | IRIS | 03/10/2013 |
| Benzo[b]fluoranthene | 7.3E-01 | 7.3E-01 | (mg/kg-day)$^{-1}$ | B2 | ECAO | 03/10/2013 |
| Dibenz[a,h]anthracene | 7.3E+00 | 7.3E+00 | (mg/kg-day)$^{-1}$ | B2 | ECAO | 03/10/2013 |
| Aluminum | NA | NA | | NA | | |
| Arsenic | 1.5E+00 | 1.5E+00 | (mg/kg-day)$^{-1}$ | A | IRIS | 03/10/2013 |
| Chromium[3] | 0.5 | 20 | (mg/kg-day)$^{-1}$ | | CalEPA | 09/30/2013 |
| Cobalt | NA | NA | | D | | 03/10/2013 |
| Iron | NA | NA | | D | | 03/10/2013 |
| Manganese | NA | NA | | D | | 03/10/2013 |
| Nickel | NA | NA | | NA | | |
| Lead[4] | NA | NA | | B2 | | 03/10/2013 |
| Cyanide | NA | NA | | D | | 03/10/2013 |
| Thallium | NA | NA | | | | |
| Pathway:  Inhalation | | | | | | |
| Chemical of Concern | Inhalation Unit Risk | Units | Weight of Evidence/Cancer Guideline Description[1] | | Source | Date (MM/DD/YYYY)[2] |
| Benzene | 7.8E-03 | (mg/m$^3$)$^{-1}$ | A | | IRIS | 03/10/2013 |
| Benz[a]anthracene | 1.1E-01 | (mg/m$^3$)$^{-1}$ | B2 | | CalEPA | 03/10/2013 |
| Benzo[a]pyrene | 1.1E+00 | (mg/m$^3$)$^{-1}$ | B2 | | CalEPA | 03/10/2013 |
| Benzo[b]fluoranthene | 1.1E-01 | (mg/m$^3$)$^{-1}$ | B2 | | CalEPA | 03/10/2013 |
| Dibenz[a,h]anthracene | 1.2E+00 | (mg/m$^3$)$^{-1}$ | B2 | | CalEPA | 03/10/2013 |
| Aluminum | NA | | NA | | | 03/10/2013 |
| Arsenic | 4.3E+00 | (mg/m$^3$)$^{-1}$ | A | | IRIS | 03/10/2013 |
| Chromium[3] | 1.2E+01 | (mg/m$^3$)$^{-1}$ | A | | IRIS | 09/30/2013 |
| Cobalt | 9.0E+00 | (mg/m$^3$)$^{-1}$ | A | | PPRTV | 03/10/2013 |
| Iron | NA | | D | | | 03/10/2013 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Manganese | NA | | D | | | 03/10/2013 |
| Nickel | 2.6E-01 | $(mg/m^3)^{-1}$ | NA | | CalEPA | 03/10/2013 |
| Lead[4] | NA | | B2 | | | 03/10/2013 |
| Cyanide | NA | | D | | | 03/10/2013 |
| Thallium | NA | | | | | |

**Key**

NA:  not available, not applicable, or not assessed
ECAO:  Environmental Criteria and Assessment Office
IRIS:  Integrated Risk Information System, U.S. EPA
PPRTV:  Provisional Peer-Reviewed Toxicity Values
CalEPA:  California Environmental Protection Agency
mg/kg-day:  milligram per kilogram per day

[1]U.S. EPA (1986) cancer weight-of-evidence categories
    Group A: Carcinogenic to Humans (sufficient evidence of carcinogenicity in humans)
    Group B: Probably Carcinogenic to Humans
    B1 - limited evidence of carcinogenicity in humans
    B2 - sufficient evidence of carcinogenicity in animals with inadequate or lack of evidence in humans
    Group C: Possible Human Carcinogen (limited evidence of carcinogenicity in animals and inadequate or lack of human data)
    Group D: Not Classifiable as to Human Carcinogenicity (inadequate or no evidence)
[2]Date is the date the database was searched.
[3]Based on Chromium VI. Oral and dermal CSFs per EPA's 9/30/2013 review, based on CalEPA as cited in EPA's RSL Table and User's Guide. EPA also recommended, in the 9/13/2013 review, including the adjustment to the inhalation IUR for chromium that would account for the likely composition of CrVI (a 1:6 adjustment, as described in the EPA RSL User's Guide). The adjusted IUR would then be 84 $m^3/mg$.
[4]Lead is evaluated separately using U.S. EPA lead models; see Attachment E to the HHRA and ARCADIS memo 10/10/2017.

AR442921

## TABLE 6
## ARARs FOR FAIRMONT COKE WORKS SELECTED REMEDY – ALTERNATIVE 5

| ARAR OR TBC | LEGAL CITATION | CLASSIFICATION | SUMMARY OF REQUIREMENT | FURTHER SPECIFICATION AND/OR DETAILS REGARDING ARARs IN THE CONTEXT OF REMEDIATION |
|---|---|---|---|---|
| **Chemical Specific** | | | | |
| WV Requirements Governing Groundwater Standards: Maximum Contaminant Levels (MCLs) and Maximum Contaminant Level Goals | WV 64 CSR 3-10 Adoption of Federal Standard<br><br>The following Federal standards are relevant and appropriate:<br>42 USC § 300(g-1); 40 CFR §§ 141.11-13; 40 CFR §§ 141.50-51; 40 CFR §§ 141.61-62 | Relevant and Appropriate | MCLs are enforceable standards for public drinking water supply systems which have at least 15 service connections or are used by at least 25 persons.  MCLGs are non-enforceable health-based goals for similar systems. These requirements are not directly applicable since ground water in the vicinity of the Site is not used as a private drinking water supply. However, under the circumstances of this Site, MCLs and MCLGs are relevant and appropriate requirements. | In accordance with the Fairmont Coke Works Project XL Agreement (64 FR 17663, April 12, 1999), the point of compliance for MCLs is the Site boundary.<br><br>Long-term ground water monitoring will be required to document that standards are being met at the Site boundary. |
| WV Requirements Governing [Surface] Water Quality Standards | WV 47 CSR 2-3.2(a)-(f), 4.1, 4.1(a) and 4.1(b), 6, 7.1.(c) and Appendix E | Relevant and Appropriate | These regulations control the discharge of industrial wastes and other wastes into the waters of the State, and establishes water quality standards for the waters of the State standing or flowing over the surface of the State. | Relevant and Appropriate to aggregate nonpoint source subsurface discharge to Unnamed Tributary.  The regulation requires that the in-stream water quality be protective of the respective State-designated use(s) and cites both quantitative and narrative standards which must be met in-stream. Appendix E lists contaminant-specific concentrations which must be met in-stream to be protective.  Section 12.2 of the ROD lists the COCs and respective performance standard which must be met in-stream. |
| **Action Specific** | | | | |
| Total Maximum Daily Loads (TMDLs) for the Unnamed Tributary at Sharon Steel Run, West Virginia<br>U.S. EPA, Region 3, September 2001 | Unnamed Tributary to the Monongahela River (RM-126.94) included on WV's 2012 Clean Water Act §303(d) list for aluminum impairments | TBC | EPA established Total Maximum Daily Loads (TMDLs) for the on-site streams for the protection of the Monongahela River.  The TMDLs established for the Unnamed Tributary, including nonpoint sources, are iron (1.5 mg/L) and pH within 6-9 range. | Note that EPA-established TMDLs are neither promulgated as rules, nor enforceable, and, therefore, are not ARARs. However, the respective TMDLs were at the same levels as required by WV 47 CSR 2. |

| ARAR OR TBC | LEGAL CITATION | CLASSIFICATION | SUMMARY OF REQUIREMENT | FURTHER SPECIFICATION AND/OR DETAILS REGARDING ARARs IN THE CONTEXT OF REMEDIATION |
|---|---|---|---|---|
| WV Air Pollution Control Act | WV 45 CSR 25-4.3 | Relevant and Appropriate | Facilities shall be designed, constructed, maintained and operated in a manner to minimize unplanned releases of hazardous constituents to the air. | During excavation, storage or use of LT/PRB treatment materials and other activities, measures will be employed to prevent unplanned releases of hazardous constituents, including fugitive air emissions. |
| West Virginia Uniform Environmental Covenants Act | WV Code Chapter 22, Article 22B | TBC | Procedures for implementing land and groundwater use restrictions | Standard protocols established in this act may be utilized to implement land and groundwater use restrictions described in the respective remedial alternatives. |
| WV Monitoring Well Construction and Abandonment Regulations | WV 47 CSR 60 | Applicable | Requirements for minimum acceptable standards for the design, installation, construction, and abandonment of monitoring wells | All monitoring well construction and abandonment will be completed in a manner consistent with these regulations. |
| **Location Specific** | | | | |
| Federal Protection of Wetlands Executive Order | Executive Order 11990 | TBC | Requires the federal agencies to minimize the destruction, loss, or degradation of wetlands and preserve and enhance the natural and beneficial values of wetlands. | Cleanup will be conducted in a manner which minimizes loss or degradation of wetland areas. |
| Fish and Wildlife Coordination Act | 16 U.S.C. §§ 661, 662, 663 and 665; 40 CFR Part 6.302(g) | Relevant and Appropriate | If waters of any stream or other body of water are proposed or authorized to be impounded, diverted, the channel deepened, or otherwise controlled or modified for any purpose, by any department or agency of the United States, consultation with the United States Fish and Wildlife Service is required, with a view to the conservation of wildlife resources. | EPA will continue to consult with USFWS and consider reasonable steps to minimize any adverse impact to wildlife resources during remediation of wetland sediment and contaminated groundwater mitigating to any water body. |

AR442923

**Note: Table 7 embedded in Text**

AR442924

Table 8: Detailed Cost Estimate of Selected Remedy

| Capital Costs | Quantity | Unit | Unit Rate | Cost |
|---|---|---|---|---|
| **Administrative Actions** | | | | |
| H&S Controls - HASP & SOPs - LT/PRB | 1 | LS | $3,000 | $3,000 |
| H&S Controls - HASP & SOPs - Monitoring & IC | 1 | LS | $3,000 | $3,000 |
| H&S Controls - HASP & SOPs - Soil Stabilization | 1 | LS | $3,000 | $3,000 |
| Land Use Controls Report - Monitoring & IC | 0 | LS | $5,000 | $0 |
| Preparation and Submittal of Deed Restrictions  - Monitoring & IC | 1 | LS | $5,000 | $5,000 |
| **Predesign Investigations** | | | | |
| Predesign Investigations and Pilot Testing | 1 | LS | $100,000 | $100,000 |
| **Limestone Trench/Permeable Reactive Barrier** | | | | |
| Permitting | | | | |
| Local Construction/Soil Conservation District | 1 | LS | $5,000 | $5,000 |
| Mobilization/Demobilization | | | | |
| Site Mobilization/Demobilization | 1 | LS | $45,000 | $45,000 |
| Site Specific Work Plan Preparations | 1 | LS | $7,500 | $7,500 |
| Utility Clearance | 1 | LS | $2,500 | $2,500 |
| Protection of Existing Monitoring Wells | 1 | LS | $1,000 | $1,000 |
| Surveying | 1 | LS | $5,000 | $5,000 |
| Site Preparation | | | | |
| Erosion Sedimentation Controls and BMPs | 1 | LS | $5,000 | $5,000 |
| Stabilized Construction Entrance | 1 | EA | $7,000 | $7,000 |
| Clearing, Grubbing Vegetation & Disposal | 1 | LS | $5,000 | $5,000 |
| Stockpile Management Area | 1 | LS | $10,000 | $10,000 |
| Permeable Reactive Barrier Construction | | | | |
| Soil Excavation + 20% Volume (Including Shoring Support) | 1,600 | CY | $200 | $320,000 |
| Stabilization of Wet Material (Assumes 75% of Total Volume) | 1,200 | CY | $35 | $42,000 |
| Portland Cement (3% by Weight) for Stabilization | 47 | Tons | $139 | $6,600 |
| Material Load-Out Activities | 1,600 | CY | $10 | $16,000 |
| Construction Dewatering - Pumps, Tanks, Hoses, etc. | 1 | LS | $20,000 | $20,000 |
| Frack Tank Storage (Costs include rental, decontamination) | 8 | EA | $7,500 | $60,000 |
| Limestone - Furnish & Install | 2,800 | Tons | $25 | $70,000 |
| Waste Characterization, Transportation, and Disposal | | | | |
| Transportation and Disposal of Non-Hazardous Soil Materials | 2,607 | Tons | $75 | $195,500 |
| Transportation and Disposal of Non-Hazardous Water | 160,000 | GAL | $1 | $128,000 |
| Waste Characterization Sampling | 8 | EA | $750 | $6,000 |
| Site Restoration | | | | |
| Topsoil | 40 | CY | $50 | $2,000 |
| Seeding/Mulching/Fertilize | 1 | LS | $1,500 | $1,500 |
| Installation of Monitoring Wells | | | | |
| Installation of Monitoring Wells | 4 | EA | $3,000 | $12,000 |
| IDW Classification & Disposal | 1 | LS | $2,000 | $2,000 |
| Permitting (4 Monitoring Wells) | 4 | EA | $300 | $1,200 |
| Surveying | 1 | LS | $2,000 | $2,000 |
| Installation Oversight & Supplies | 5 | EA | $2,000 | $10,000 |
| Site Controls | | | | |
| Air Monitoring and Dust Control | 1 | LS | $9,000 | $9,000 |
| Indirect Costs | | | | |
| Engineering Design (% of Installation & Equipment Costs) | 1 | LS | 15% | $149,500 |
| Project Management (% of Installation & Equipment Costs) | 1 | LS | 15% | $149,500 |
| Contingency (% of Installation & Equipment Costs) | 1 | LS | 15% | $149,500 |

AR442925

Table 8 – Detailed Cost Estimate of Selected Remedy

| Capital Costs | Quantity | Unit | Unit Rate | Cost |
|---|---|---|---|---|
| **Groundwater Monitoring & Institutional Controls** | | | | |
| Abandon Existing Well | | | | |
| Monitoring Well Abandonment | 30 | EA | $500 | $15,000 |
| Well Abandonment Oversight | 30 | EA | $500 | $15,000 |
| Well Abandonment Report | 1 | LS | $5,000 | $5,000 |
| Installation of Monitoring Wells | | | | |
| Installation of Monitoring Wells | 4 | EA | $3,000 | $12,000 |
| IDW Classification & Disposal | 1 | LS | $2,000 | $2,000 |
| Permitting (4 Monitoring Wells) | 4 | EA | $300 | $1,200 |
| Surveying | 1 | LS | $2,000 | $2,000 |
| Installation Oversight & Supplies | 5 | EA | $2,000 | $10,000 |
| Indirect Costs | | | | |
| Engineering Design (% of Installation & Abandonment Costs) | 1 | LS | 10% | $6,200 |
| Project Management (% of Installation & Abandonment Costs) | 1 | LS | 10% | $6,200 |
| Contingency (% of Installation & Abandonment Costs) | 1 | LS | 15% | $9,300 |
| **Soil Stabilization - Organic Amendment** | | | | |
| Permitting | | | | |
| Local Construction/Soil Conservation District | 1 | LS | $5,000 | $5,000 |
| Mobilization/Demobilization | | | | |
| Site Mobilization/Demobilization | 2 | Event | $7,500 | $15,000 |
| Site Specific Work Plan Preparations | 1 | LS | $7,500 | $7,500 |
| Organic Amendment Application - Surface Application by Blowing | | | | |
| Subcontractor Cost for Application (3 man crew and blower) | 2 | Event | $18,000 | $36,000 |
| Organic Amendment - Mushroom Compost | 1,100 | Yard | $27 | $29,700 |
| Wetland Seed Mix (40 lbs. per acre - applied during spring event) | 92 | lb. | $10 | $900 |
| Oversight of Amendment Application (1 person per event each event 3 days) | 2 | EA | $4,500 | $9,000 |
| Site Controls | | | | |
| Air Monitoring and Dust Control | 2 | EA | $1,000 | $2,000 |
| Indirect Costs | | | | |
| Annual Reporting | 1 | EA | $10,000 | $10,000 |
| Project Management (% of Installation, Equipment Costs) | 1 | LS | 15% | $15,800 |
| Contingency (% of Installation, Equipment Costs) | 1 | LS | 15% | $15,800 |
| | | | Total | $1,789,900 |

Acronyms:

BMPs - Best Management Practices

CY - cubic yard

EA - Each

GAL - gallon

IC - Institutional Control

IDW - Investigation Derived Waste

lb. - pound

lbs. - pounds

LS - Lump Sum

LT/PRB - Limestone Trench/Permeable Reactive Barrier

AR442926

Table 2. Detailed Cost Estimate of Selected Remedy

| Operation and Maintenance Costs | Quantity | Unit | Unit Rate | Cost |
|---|---|---|---|---|
| **Operation and Maintenance Costs (Annual)** | | | | |
| **LT/PRB Performance Monitoring (Projected over 30 years)** | | | | |
| Semi-Annual Monitoring - Labor and Expenses (1 day 2 people) | 1 | LS | $3,000 | $3,000 |
| Semi-Annual Monitoring - Laboratory | 10 | samples | $600 | $6,000 |
| | | | Subtotal | $9,000 |
| **Groundwater Monitoring & Institutional Controls Costs (Projected over 30 years)** | | | | |
| Annual Monitoring - Labor & Expenses (2 people 4 days) | 1 | event | $16,000 | $16,000 |
| Annual Monitoring - Laboratory | 32 | sample | $600 | $19,200 |
| Annual LUC, and Performance Reporting | 1 | report | $15,000 | $15,000 |
| IDW Classification & Disposal | 1 | YR | $2,000 | $2,000 |
| Project Management (Annual % of Monitoring Costs) | 1 | YR | 10% | $1,700 |
| Contingency (Annual % of Monitoring Costs) | 1 | YR | 15% | $2,500 |
| | | | Subtotal | $56,400 |
| **Operation and Maintenance Costs (Total)** | | | | |
| **Operation and Maintenance Costs (Annual)** | 30 | YR | $65,400 | $1,962,000 |
| **Periodic Reporting** | | | | |
| Five Year Review Reporting | 6 | EA | $15,000 | $90,000 |
| Update Institutional Controls Plan | 6 | EA | $2,000 | $12,000 |
| | | | Total | $2,064,000 |

Acronyms:

EA - Each

IDW - Investigation Derived Waste

LUC - Land Use Control

LS - Lump Sum

YR - year

Table 8. Detailed Cost Estimate of Selected Remedy

| Present Value Costs | Year | Total Cost | Total Cost per Year | Discount Factor | Present Value |
|---|---|---|---|---|---|
| **Limestone Trench/Permeable Reactive Barrier Performance Monitoring** | | | | | |
| Capital Cost | 0 | $1,548,300 | $1,548,300 | 1.000 | $1,548,300 |
| Annual Operations and Maintenance Costs | 1-30 | $270,000 | $9,000 | 12.409 | $111,700 |
| **Groundwater Monitoring & Institutional Controls** | | | | | |
| Capital Cost | 0 | $91,900 | $91,900 | 1.000 | $91,900 |
| Annual Operations and Maintenance Costs | 1-30 | $1,692,000 | $56,400 | 12.409 | $699,900 |
| Five Year Review Reporting/Update Institutional Controls Plan | 5 | $17,000 | $17,000 | 0.713 | $12,100 |
| Five Year Review Reporting/Update Institutional Controls Plan | 10 | $17,000 | $17,000 | 0.508 | $8,600 |
| Five Year Review Reporting/Update Institutional Controls Plan | 15 | $17,000 | $17,000 | 0.362 | $6,200 |
| Five Year Review Reporting/Update Institutional Controls Plan | 20 | $17,000 | $17,000 | 0.258 | $4,400 |
| Five Year Review Reporting/Update Institutional Controls Plan | 25 | $17,000 | $17,000 | 0.184 | $3,100 |
| Five Year Review Reporting/Update Institutional Controls Plan | 30 | $17,000 | $17,000 | 0.131 | $2,200 |
| **Soil Stabilization - Organic Amendment** | | | | | |
| Capital Cost | 0-2 | $149,700 | $74,850 | 1.000 | $149,700 |
| Annual Operations and Maintenance Costs | 2-30 | $0 | $0 | 12.409 | $0 |
| | | | | Total | $2,638,100 |

AR442928

**Discount Factor**

D=1/(1+P)^n

P = periodic interest rate = 0.07
n = number of payments

| Year | Discount Factor | Sum of Discount Factor |
|------|-----------------|------------------------|
| 1 | 0.934579439 | 0.934579439 |
| 2 | 0.873438728 | 1.808018168 |
| 3 | 0.816297877 | 2.624316044 |
| 4 | 0.762895212 | 3.387211256 |
| 5 | 0.712986179 | 4.100197436 |
| 6 | 0.666342224 | 4.76653966 |
| 7 | 0.622749742 | 5.389289402 |
| 8 | 0.582009105 | 5.971298506 |
| 9 | 0.543933743 | 6.515232249 |
| 10 | 0.508349292 | 7.023581541 |
| 11 | 0.475092796 | 7.498674337 |
| 12 | 0.444011959 | 7.942686297 |
| 13 | 0.414964448 | 8.357650744 |
| 14 | 0.387817241 | 8.745467985 |
| 15 | 0.36244602 | 9.107914005 |
| 16 | 0.338734598 | 9.446648603 |
| 17 | 0.31657439 | 9.763222993 |
| 18 | 0.295863916 | 10.05908691 |
| 19 | 0.276508333 | 10.33559524 |
| 20 | 0.258419003 | 10.59401425 |
| 21 | 0.241513087 | 10.83552733 |
| 22 | 0.225713165 | 11.0612405 |
| 23 | 0.210946883 | 11.27218738 |
| 24 | 0.19714662 | 11.469334 |
| 25 | 0.184249178 | 11.65358318 |
| 26 | 0.172195493 | 11.82577867 |
| 27 | 0.160930367 | 11.98670904 |
| 28 | 0.150402212 | 12.13711125 |
| 29 | 0.140562815 | 12.27767407 |
| 30 | 0.131367117 | 12.40904118 |

AR442929

**Attachment A**
**Site Specific Soil Cleanup Standards and Not-To-Exceed Concentrations**

**Removal Action Completed September 28, 2011**
**Former Fairmont Coke Works Site**
**Fairmont, West Virginia**

| | North Landfill | | South Landfill | | All Areas Outside North and South Landfills | |
|---|---|---|---|---|---|---|
| | Standard (mg/kg)[a] | Not-To-Exceed (mg/kg)[b] | Standard (mg/kg)[a] | Not-To-Exceed (mg/kg)[b] | Standard (mg/kg)[a] | Not-To-Exceed (mg/kg)[b] |
| 2,4-Dimethylphenol | 27.1 | 271 | 30.5 | 305 | 28.5 | 285 |
| 2-Methylnaphthalene | 88.5 | 885 | 99.6 | 996 | 93 | 930 |
| 2-Methylphenol | 44.6 | 446 | 50.2 | 502 | 46.9 | 469 |
| 3/4-Methylphenol | 4.25 | 42.5 | 4.78 | 47.8 | 4.47 | 44.7 |
| 4-Methylphenol | 4.25 | 42.5 | 4.78 | 47.8 | 4.47 | 44.7 |
| Acenaphthene | 429 | 4290 | 483 | 4830 | 451 | 4510 |
| Acenaphthylene | 429 | 4290 | 483 | 4830 | 451 | 4510 |
| Acetone | 9.95 | 99.5 | 11.2 | 112 | 10.5 | 105 |
| Anthracene | 1,850 | 18,500 | 2,090 | 20,900 | 1,950 | 19,500 |
| Arsenic | 10.6 | 106 | 11.9 | 119 | 11.2 | 112 |
| Barium | 8,650 | 86,500 | 9,730 | 97,300 | 9,095 | 90,950 |
| Benzene[c] | 0.82 | 4.1 | 0.923 | 4.6 | 0.86 | 4.3 |
| Benzo(a)pyrene | 2.3 | 23 | 2.3 | 23 | 2.3 | 23 |
| Beryllium | 4,660 | 4,660[d] | 5,240 | 5,240[d] | 4,898 | 4,898[d] |
| bis(2-Ethylhexyl)phthalate[e] | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 |
| Cadmium | 109 | 1,090 | 123 | 1,230 | 115 | 1,150 |
| Carbazole | 186 | 1860 | 209 | 2090 | 196 | 1960 |
| Carbon Disulfide | 73.5 | 735 | 82.7 | 827 | 77.4 | 774 |
| Chromium VI | 169 | 1,690 | 190 | 1,900 | 179 | 1,790 |
| Chromium, Total[e] | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 |
| Copper | 43,600 | 436,000 | 49,100 | 491,000 | 45,877 | 458,770 |
| Cyanide | 595 | 5,950 | 670 | 6,700 | 626 | 6,260 |
| Dibenzofuran | 30.5 | 305 | 34.3 | 343 | 32 | 320 |
| Ethylbenzene | 58.6 | 586 | 66 | 660 | 61.7 | 617 |
| Fluoranthene | 25,900 | 259,000 | 29,200 | 292,000 | 27,282 | 272,820 |
| Fluorene | 539 | 5,390 | 606 | 6,060 | 567 | 5,670 |
| Lead | 400 | 4,000 | 400 | 4,000 | 400 | 4,000 |
| Manganese | 3,840 | 38,400 | 4,320 | 43,200 | 4,041 | 40,410 |
| Naphthalene[c] | 0.62 | 3.1 | 0.698 | 3.5 | 0.65 | 3.3 |
| Phenanthrene | 1,850 | 18,500 | 2,090 | 20,900 | 1,950 | 19,500 |
| Phenol | 540 | 5,400 | 607 | 6,070 | 568 | 5,680 |
| Pyrene | 2,710 | 27,100 | 3,050 | 30,500 | 2,856 | 28,560 |
| Pyridine | 100 | 1,000 | 100 | 1,000 | 100 | 1,000 |
| Selenium | 75.5 | 755 | 85 | 850 | 79.5 | 795 |
| Silver | 123 | 1230 | 139 | 1,390 | 130 | 1,300 |
| Thallium | 14.9 | 149 | 16.8 | 168 | 15.7 | 157 |
| Toluene | 35.6 | 356 | 40.1 | 401 | 37.5 | 375 |
| USEPA BAP TEQ(-NDs | 2.3 | 23 | 2.3 | 23 | 2.3 | 23 |
| Vanadium | 21,000 | 21,000[d] | 23,600 | 23,600[d] | 22,081 | 22,081[d] |
| Xylenes (total) | 677 | 6,770 | 762 | 7,620 | 713 | 7,130 |
| Zinc | 55,200 | 552,000 | 62,100 | 621,000 | 58,095 | 580,950 |

**Notes:**

1. [a]To be compared to the 95 percent upper confidence limit (95 UCL) site-wide.

2. [b]To be compared on a point by point basis.  Not-to-exceed concentrations have been set at 10 times the site-specific standard, except where noted, as approved by USEPA.

3. [c]Not-to-exceed values have been set at 5 times the site-specific standard, as requested in the USEPA approval letter.

4. [d]Not-to-exceed concentration based on site-specific standard, as requested by USEPA.

5. [e]Site-specific standard exceeds 100 percent.  Thus standard and not-to-exceed concentration have been set at 100%, as requested in the USEPA approval letter.

AR442930

**Attachment B**

**Anoxic Limestone Drain/Reactive Compost Barrier
Pilot Study**

In October 2010, ExxonMobil initiated a pilot-scale study utilizing an anoxic (i.e., low oxygen) limestone drain (ALD) and reactive compost barrier (RCB) to remediate a series of groundwater seeps occurring along the hillside upgradient of the small stream draining the southwest corner of the Site (See Figure B-1). The groundwater seeps were characterized by low pH (approximately 3.5 pH), elevated concentrations of inorganics such as iron and aluminum and elevated concentrations of benzene.

The concept of the ALD/RCB is similar to a Limestone Trench/Permeable Reactive Barrier. ALDs generate bicarbonate alkalinity to increase the pH of groundwater passing through the system. The increase in pH facilitates precipitation of metals once that water moves to an oxygen-rich zone. The increased pH, along with RCB (spent mushroom compost) promotes geochemical conditions favorable to biodegradation of organic compounds such as benzene.

A trench approximately 5-ft wide by 121.5-ft long was excavated down to the underlying bedrock (approximately 10-ft deep), across the hillside aligned perpendicular to local groundwater flow. The ALD/RCB was installed in the trench in layers with the first layer installed directly on top of bedrock. Alternating layers of limestone and spent mushroom compost were installed with the first layer consisting of limestone (>90% calcium carbonate) which was approximately 1.5-feet thick at the bottom of the trench, followed by a 2.5- foot thick layer of spent mushroom compost, followed by a 1-foot thick layer of limestone and a finally a 2-foot thick layer of spent mushroom compost. Over the final layer of spent mushroom compost, a 40 mil thick PVC membrane was placed and then covered with a 1.5-foot thick layer of clay and then native fill to grade.

A series of three piezometers were installed upgradient of the ALD/RCB; three piezometers were installed within; and three piezometers were installed downgradient of the ALD/RCB. Benzene concentrations were observed to attenuate approximately 2 orders of magnitude primarily through anaerobic reduction and methanogenesis while passing through and just downgradient of the anoxic limestone trench. Benzene concentrations in the upgradient piezometers ranged between 360 and 2300 µg/L. Benzene concentrations downgradient of the ALD/RCB ranged between 2 and 32 µg/L. Methane concentrations downgradient of the pilot anoxic limestone trench increased significantly, indicating that anaerobic microbes were converting benzene to methane. Measurements indicated that pH levels decreased from approximately pH 4 in the upgradient piezometers to approximately pH 6 in the downgradient piezometers. Significant decreases in metals concentrations were not observed potentially due to the short travel distance and low dissolved oxygen present.

Additional information regarding the Pilot Study can be found in the RI/FS and other documents in the Administrative Record.



| PZ-10 | |
|---|---|
| Date | 4/1/2015 |
| Benzene (µg/L) | 67.0 D |
| Iron (mg/L) | 16.7 |
| Manganese (mg/L) | 2.77 |
| pH (SU) | 5.83 |

| PZ-4 | |
|---|---|
| Date | 3/31/2015 |
| Benzene (µg/L) | 1900 D |
| Iron (mg/L) | 369 |
| Manganese (mg/L) | 15.9 |
| pH (SU) | 3.84 |

| PZ-1 | |
|---|---|
| Date | 4/1/2015 |
| Benzene (µg/L) | 2300 D |
| Iron (mg/L) | 378 |
| Manganese (mg/L) | 18.7 |
| pH (SU) | 4.43 |

| PZ-3 | |
|---|---|
| Date | 3/27/2015 |
| Benzene (µg/L) | 2000 D |
| Iron (mg/L) | 330 |
| Manganese (mg/L) | 22.6 |
| pH (SU) | 3.74 |

| PZ-6 | |
|---|---|
| Date | 3/27/2015 |
| Benzene (µg/L) | 300 D |
| Iron (mg/L) | 338 |
| Manganese (mg/L) | 16.6 |
| pH (SU) | 6.34 |

| PZ-11 | |
|---|---|
| Date | 3/31/2015 |
| Benzene (µg/L) | 43.0 D |
| Iron (mg/L) | 110 |
| Manganese (mg/L) | 10.5 |
| pH (SU) | 3.67 |

| GWSW-002R | |
|---|---|
| Date | 3/31/2015 |
| Benzene (µg/L) | 0.500 U |
| Iron (mg/L) | 259 |
| Manganese (mg/L) | 10.5 |
| pH (SU) | 5.79 |

| PZ-7 | |
|---|---|
| Date | 3/31/2015 |
| Benzene (µg/L) | 32.0 D |
| Iron (mg/L) | 259 |
| Manganese (mg/L) | 13.1 |
| pH (SU) | 5.6 |

| PZ-12 | |
|---|---|
| Date | 4/1/2015 |
| Benzene (µg/L) | 1700 D |
| Iron (mg/L) | 292 |
| Manganese (mg/L) | 15.1 |
| pH (SU) | 5.97 |

| PZ-13 | |
|---|---|
| Date | 4/1/2015 |
| Benzene (µg/L) | 2.70 |
| Iron (mg/L) | 1.27 |
| Manganese (mg/L) | 3.03 |
| pH (SU) | 6.76 |

| PZ-9 | |
|---|---|
| Date | 3/31/2015 |
| Benzene (µg/L) | 28.0 D |
| Iron (mg/L) | 312 |
| Manganese (mg/L) | 17.2 |
| pH (SU) | 6.32 |

| PZ-2 | |
|---|---|
| Date | 3/27/2015 |
| Benzene (µg/L) | 360 |
| Iron (mg/L) | 223 |
| Manganese (mg/L) | 15.5 |
| pH (SU) | 6.08 |

| GWSW-001 | |
|---|---|
| Date | 3/30/2015 |
| Benzene (µg/L) | 0.500 U |
| Iron (mg/L) | 192 |
| Manganese (mg/L) | 12.6 |
| pH (SU) | 6.31 |

| PZ-8 | |
|---|---|
| Date | 3/31/2015 |
| Benzene (µg/L) | 2.10 |
| Iron (mg/L) | 187 J |
| Manganese (mg/L) | 13.4 |
| pH (SU) | 5.9 |

| PZ-5A | |
|---|---|
| Date | 3/27/2015 |
| Benzene (µg/L) | 65.0 D |
| Iron (mg/L) | 180 |
| Manganese (mg/L) | 12.7 |
| pH (SU) | 6.23 |

| PZ-5B | |
|---|---|
| Date | 3/31/2015 |
| Benzene (µg/L) | 25.0 D [25.0 D] |
| Iron (mg/L) | 268 J [266 J] |
| Manganese (mg/L) | 19.7 [18.6] |
| pH (SU) | 5.98 |

| PZ-5C | |
|---|---|
| Date | 3/31/2015 |
| Benzene (µg/L) | 4.40 |
| Iron (mg/L) | 66.6 |
| Manganese (mg/L) | 1.28 |
| pH (SU) | 6.85 |

LEGEND:

- EXISITING MONITORING WELL
- MONITORING WELL (INSTALLED 2010)
- MONITORING WELL (INSTALLED MAY 2014)
- GROUNDWATER/SURFACE WATER SAMPLING POINT (INSTALLED 2012)
- GROUNDWATER/SURFACE WATER SAMPLING POINT (INSTALLED 2015)
- SEDIMENT SAMPLE (COLLECTED NOVEMBER 2012)
- SEEP (NO LONGER PRESENT)
- EXISTING ROUX PIEZOMETER (SURVEYED IN 2015)
- HISTORIC SURFACE WATER LOCATIONS (1994)
- PIEZOMETER (INSTALLED MARCH 2015)
- ROUX ANOXIC LIMESTONE TRENCH (SURVEYED IN MARCH 2015)
- PHYTOREMEDIATION AREA (APPROXIMATE LOCATION)
- SURFACE WATER FEATURE (APPROXIMATE LOCATION)
- RELEASE LINE
- HISTORICAL/POTENTIAL SOURCE AREAS (REMOVED)
- APPROXIMATE PROPERTY BOUNDARY
- X EXISTING FENCE
- CORRUGATED METAL PIPE (CMP)
- 950 GROUNDWATER CONTOUR (DASHED WHERE INFERRED)
- APPROXIMATE GROUNDWATER FLOW DIRECTION
- MILD ANAEROBIC REDUCTION
- MODERATE ANAEROBIC REDUCTION
- STRONG ANAEROBIC REDUCTION
- 6 FORMER IMPOUNDMENT
- 7 WASTE SLUDGE AND BREEZE STORAGE AREA
- mg/L MILLIGRAMS PER LITER
- µg/L MICROGRAMS PER LITER
- D ANALYZED AT A DILUTION
- J ESTIMATED VALUE
- U NOT DETECTED ABOVE SPECIFIED REPORTING LIMIT
- NA NOT ANALYZED

NOTE:

1. AERIAL PHOTOGRAPH PROVIDED BY GOOGLE EARTH PRO, SEPTEMBER 2013.
2. HORIZONTAL DATUM IS NAD 83 WV SPCS – NORTH ZONE. VERTICAL DATUM IS NAVD 1988.
3. GWSW-002 WAS REINSTATED IN MARCH 2015 BECAUSE THE PREVIOUS SAMPLE LOCATION WAS ERODED.
4. CENTERLINE OF SHARON STEEL RUN AND TRIBUTARY, PZ-1 THROUGH PZ-13, AND GWSW-001 THROUGH GWSW-008 WERE SURVEYED BY ARCADIS ON APRIL 4, 2015.
5. RESULTS FOR GWSW-001 AND GWSW-002 ARE PROVIDED FOR REFERENCE.

0 20' 40'
GRAPHIC SCALE

EXXONMOBIL ENVIRONMENTAL SERVICES COMPANY
FAIRMONT COKE WORKS SITE
FAIRMONT, WEST VIRGINIA

**TRENCH EVALUATION RESULTS**

ARCADIS

FIGURE
**B-1**

CITY: SYRACUSE, NY DIV/GROUP: ENVCADD DB: G STOWELL, E KRAHMER PIC: E. LYNCH PM/TM: R. PRICE TR: C. FOSTER LYR: ON=*;OFF=REF, (FRZ) PAGESETUP: ---- PLOTSTYLETABLE: PLTFULL.CTB PLOTTED: 5/27/2015 10:55 AM BY: KRAHMER, ERIC
LAYOUT: 7 SAVED: 5/27/2015 10:55 AM ACADVER: 19.1S (LMS TECH)
XREFS: 85925XLD IMAGES: 2013 Aerial West.jpg PROJECTNAME: ----

# APPENDIX C

# RESPONSIVENESS SUMMARY

AR442933

[PAGE INTENTIONALLY LEFT BLANK]

AR442934

# RESPONSIVENESS SUMMARY
# FOR THE PROPOSED REMEDIAL ACTION PLAN
# FOR THE SHARON STEEL/FAIRMONT COKE WORKS
# SUPERFUND SITE

### FAIRMONT, MARION COUNTY, WEST VIRGINIA

Public Comment Period
July 9, 2016 to August 8, 2016

**Overview**

On July 9, 2016, EPA released the Proposed Remedial Action Plan (Propose Plan) for the Sharon Steel/Fairmont Coke Works Superfund Site (Site), and announced the opening of the 30-day public comment period. In the Proposed Plan, EPA identified its proposed remedial action (Preferred Alternative) for the Site. On July 14, 2016, EPA and WVDEP held a public meeting in Fairmont, West Virginia to present the Proposed Plan to the local community and to seek comment. At this meeting, representatives from EPA and the WVDEP discussed the Site history, environmental investigations, feasibility studies, proposed response actions and answered general questions about Site conditions.

This Responsiveness Summary provides a summary of issues raised during the public comment period, including comments made during the July 14, 2016 public meeting. EPA carefully evaluated the comments submitted. Citizens submitting comments included area residents and local government.

1. Comment: A citizen noted that future buildings constructed in the area of the Site that has benzene contamination in the underlying groundwater would be subject to air monitoring and in follow-up asked whether the air monitoring would be performed with a continuous monitoring device or whether a periodic check would be performed.

**EPA Response: For future buildings constructed in the Vapor Intrusion Protection Area, EPA is requiring that such buildings be constructed with vapor barriers and venting techniques along the base of the building. EPA has found that it is generally less expensive and more protective to construct new buildings in that manner than it is to conduct air sampling over time. In most cases, barriers and vents will passively prevent soil gas from collecting in a building with no further energy or sampling expenses. Usually a single sampling event is conducted after construction is completed to confirm safe conditions. In the event that elevated concentrations are detected, the situation can be remedied by placing small fans in the vent pipes to improve ventilation.**

AR442935

**Continuous air sampling devices are generally not used in these circumstances.  If there were existing buildings within the Vapor Intrusion Protection Area, EPA would perform an indoor air sampling event in those buildings during the colder time of year.  During the cooler months, the conditions are most likely to draw vapors through cracks and discontinuities in the concrete slab/foundation into the building.**

2.  <u>Comment:</u> A citizen asked whether the potential for soil vapor intrusion presents an unacceptable risk to current residents living in the area.

**EPA Response: Detailed studies performed along the northern boundary of the Site confirmed that area residents are not at risk for soil vapor intrusion. The studies identified the following four factors that led to the finding that even the homes nearest to the property boundary are not at risk:**

- **<u>Limited area of benzene contamination</u>. There are 13 monitoring well locations spanning across the northern boundary of the Site.  Only one of the 13 monitoring wells, MW-12S, has had detected concentrations of benzene in groundwater samples, which leads EPA to conclude that there is an isolated area with elevated benzene in the vicinity of monitoring well MW-12S.  Most significantly, the three monitoring wells (MW-32S, MW-33S and MW-34S) placed in the area of the nearest homes were non-detect for benzene.**

- **<u>Groundwater flow direction.</u>  Groundwater is naturally flowing away from the residential area.  Local topography can be described as having a relatively steep slope up a mountainside directly north of Suncrest Blvd; groundwater flows southerly toward the middle of the Site before trending west toward the Unnamed Tributary.  Therefore, groundwater is naturally flowing away from the residential area.**

- **<u>Clay-type soil in the area.</u>  Well logs describe the geology in the vicinity of the Site, including the uppermost 15 feet at MW-33S, to be primarily clay.  In addition, MW-32 has a total of 3 feet of sand within the uppermost 27 feet of formation soil; the remaining 24 feet is composed of clay and silt.  The geology is significant because tight fine soils, such as clay and silt, resist transmission of soil vapors.**

- **<u>Natural biodegradation of vapor phase benzene in soil.</u>  The fate and transport of benzene vapors in soil has been the subject of significant study in recent years, primarily because benzene is a large component found in gasoline.  In short, benzene is readily degraded by microorganisms in biologically active soils and would be expected to migrate less than 30 feet beyond the edge of a benzene plume.  MW- 12S is approximately 100 feet away from the nearest residence.**

AR442936

3. <u>Comment:</u>  Several citizens and local officials asked if ExxonMobil was still involved with cleanup efforts at the Site and who would be financially responsible for implementing the Selected Remedy after the ROD is issued.

**EPA Response:  All environmental investigations and response actions undertaken at the Site from September 1997 through the present have been funded by ExxonMobil in accordance with enforceable agreements entered into by ExxonMobil and EPA or WVDEP.**

**EPA anticipates that shortly after issuing the ROD, EPA will request that ExxonMobil negotiate an enforceable agreement, known as a consent decree, wherein ExxonMobil would agree to implement the Selected Remedy, including operations, monitoring and maintenance at the conclusion of the remedial action.  In the event that the parties reach a proposed settlement, that enforceable agreement would be filed in U.S District Court and be released for a 30-day public comment period prior to being entered, or signed, by a U.S. District Court Judge.  EPA expects that ExxonMobil will continue its cooperative efforts to remediate the Site.**

4. <u>Comment:</u>  A citizen asked if the Site property is redeveloped and put into productive reuse, will EPA and ExxonMobil continue to investigate the Site and make sure that it is safe?

**EPA Response:  Yes.  EPA will complete "Five-Year Reviews" to ensure that the Selected Remedy remains protective of human health and the environment no less than every five years.  See 40 CFR 300.430(f)(4)(ii).  This periodic review is a legal requirement to ensure protectiveness at all Superfund sites when the selected remedy results in hazardous substances, pollutants or contaminants remaining at the Site above levels that allow for unrestricted use.  The five-year review process is comprehensive including but not limited to a site inspection; data review, and an assessment to determine if exposure assumptions, toxicity data, cleanup levels, and remedial action objectives used at the time of the remedy selection are still valid.**

**In the case of the FCW Site, the Selected Remedy allows for hazardous substances, pollutants or contaminants to remain on-Site and does not allow the Site property to be redeveloped for residential use and requires new buildings constructed within the Vapor Intrusion Protection Area to include soil vapor mitigation measures.  Therefore, the FCW Site will be subject to Five-Year Reviews.**

**In addition, as part of the Project XL Agreement summarized in 2.0 (Site History and Enforcement Activities) of the Decision Summary portion of the ROD, ownership of the Site property was transferred to the Fairmont Coke Works Custodial Trust, pursuant to a Trust Agreement under which the WVDEP functions as the Trustee.  In accordance with the Trust Agreement, WVDEP will be working closely with the City of Fairmont and other local officials to put the Site property back into productive reuse in a manner that fits community interests.  WVDEP's close association with the future use of the Site property provides even greater**

AR442937

**assurance that the future land use will be consistent with use restrictions and remain protective.**

5. <u>Comment:</u> A citizen asked EPA to confirm that the Selected Remedy would include more frequent environmental monitoring than just the monitoring required to perform a review every five years.

**EPA Response: Yes, the Selected Remedy will include more frequent monitoring. The Selected Remedy requires comprehensive long-term environmental monitoring necessary and appropriate to track the performance of the Limestone Trench/Permeable Reactive Barrier (LT/PRB) in accordance with the approved remedial design.  The specific details, such as parameters, laboratory detection limits and sampling frequencies will be developed during the remedial design, and will be incorporated into a remedial design plan which must be approved by EPA, in consultation with WVDEP.  In addition, long-term groundwater monitoring at the perimeter of the Site will be required to confirm that groundwater with contaminants of concern that exceed MCLs or risk-based goals remains within the Site boundary.**

6. <u>Comment:</u>  A citizen stated that she understood that the Selected Remedy would maintain Institutional Controls preventing residential land use or the extraction of groundwater from the aquifer beneath the Site for use as a potable water source.  She then asked if use of the underlying groundwater for geothermal purposes would be prohibited.

**EPA Response: The Selected Remedy does not specifically prohibit using the underlying aquifer for geothermal use.  If any geothermal use at the Site were to be proposed it would be subject to local and state regulations as appropriate. Additionally, use of the groundwater for geothermal purposes would require a risk analysis to be performed to consider the novel potential exposure scenarios that may be presented by geothermal use.  As a general observation, an open loop geothermal system would likely not be appropriate in the vicinity of the Site, as withdrawal and/or injection of potentially large volumes of water could alter natural groundwater flow patterns.  However, a closed-loop system utilizing non-toxic heat transfer liquid such as potable water may be acceptable pending further study and review.**

7. <u>Comment:</u>  A citizen asked if the subsurface geology in the vicinity of the Site has characteristics that result in all the groundwater ultimately migrating to the Monongahela River.

**EPA Response:  Yes, the groundwater in the vicinity of the Site ultimately migrates to the Monongahela River.  Groundwater beneath the Site generally flows very slowly in a western direction until it discharges to the Unnamed Tributary.  The Unnamed Tributary flows through a relatively steep ravine along the boundary between the FCW Site and the Big John's Salvage Superfund Site further to the west, before discharging to the Monongahela River approximately 1,600 feet downstream.**

AR442938

8. Comment:  Several citizens expressed words of support for Alternative 5, identified as the "Preferred Alternative" in the Proposed Plan.

**EPA Response: EPA appreciates the input received from the community concerning this important matter.  EPA received no negative comments regarding Alternative 5 and EPA received no comments supporting any of the other Alternatives evaluated in the Proposed Plan.**

EPA received one written comment on the Proposed Plan, via email.  The following is a summary of the comment received.  The complete email can be viewed in the Administrative Record.

9. Comment:  In written correspondence, a citizen stated her support for the selection of Alternative 5 (Limestone Trench/Permeable Reactive Barrier (LT/PRB); Remediation of Wetlands; Institutional Controls.  The citizen also stated her concern whether a property, that has been as contaminated as the Sharon Steel/Fairmont Coke Works Site had been, could ever truly be reclaimed.  The citizen also asserted that authorities should not approve a change to the existing land use restriction which prevents recreational or residential use of the Site.

**EPA Response:  The nature and extent of contamination at the Site is well understood.  Under EPA oversight, ExxonMobil performed a Remedial Investigation at the Site which included a Human Health Risk Assessment (Risk Assessment) completed in 2016 in a manner consistent with Agency guidance.  The Risk Assessment evaluated potential risks that could be presented to people using the Site under various land use scenarios.**

**As stated in the ROD, in 2006 a Declaration of Deed Restrictions was recorded on the land records for the Site property.  That Declaration imposes land use restrictions on Site property prohibiting residential use and the extraction of groundwater from beneath the Site for potable use.**

**Based on the 2013 Risk Assessment, EPA determined that the Site property could not be safely be reused for residential purposes.  Accordingly, based on existing information found in the Administrative Record, EPA would not support a proposal to modify the existing land use restriction to allow residential use of the Site.  Therefore, the Selected Remedy requires the maintenance of the existing Institutional Control to prevent residential land use of Site property.**

**The Risk Assessment also evaluated a recreational land use scenario using data from environmental samples collected at the Site and exposure assumptions listed in RAGS Table 4 in Appendix B of the Risk Assessment.  The Risk Assessment documented that an unacceptable risk would be presented to child recreational users exposed to surface water in the Unnamed Tributary due to elevated manganese concentrations.  Such exposure to surface water was the only exposure route that resulted in an unacceptable risk to people under the recreational use**

AR442939

scenario.  The Risk Assessment documented that existing surface soil at the Site would not present an unacceptable risk to recreational users.  Accordingly, based on existing information, EPA would likely not object to a proposal to modify the existing land use restriction to allow recreational use provided that the concentration of manganese in surface water is reduced to below the risk-based performance standard listed in Section 12.2 (Description of the Selected Remedy and Performance Standards) of the ROD or the potential exposure pathway to the surface water is eliminated.

It is also worth noting that EPA will complete "Five-Year Reviews," as discussed in EPA's response to Comment 4, above, to ensure that the Selected Remedy is protective of human health and the environment no less than every five years.

AR442940

# APPENDIX D

# ADMINISTRATIVE INDEX SUMMARY

AR442941

[PAGE INTENTIONALLY LEFT BLANK]

AR442942

<u>SHARON STEEL CORP (FAIRMONT COKE WORKS)</u>            *
<u>OU 1 REMEDIAL ADMINISTRATIVE RECORD FILE</u>
<u>INDEX OF DOCUMENTS</u>

II.  <u>REMEDIAL ENFORCEMENT PLANNING</u>

    1.  Administrative Order on Consent for Remedial          **
       Investigation/Feasibility Study (RI/FS) In The Matter
       of:  Sharon Steel Corporation-Fairmont Coke Works,
       Fairmont, WV, Exxon Corporation, Respondent, Docket
       No. III-97-103-DC, 9/17/97.

    2.  Administrative Order by Consent for Removal            **
       Response Action In The Matter Of:  Sharon Steel
       Corporation-Fairmont Coke Works Site, Fairmont, West
       Virginia, Exxon Corporation, Respondent, Docket No.
       111-99-004-DC, 12/11/98.

    3.  First Modification to the Administrative Order by       **
       Consent for Removal Response Action In The Matter Of:
       Sharon Steel Corporation-Fairmont Coke Works Site,
       Fairmont, WV, Exxon Corporation, Respondent, Docket
       No. III-99-004-DC, 5/21/99.

    4.  Order, in the Matter of State of West Virginia v.
       ExxonMobil Corporation and Green Bluff Development,
       Inc., Civil Action No. 1:02CV160, 1/24/03.
       P. 200001-200027.

    5.  Agreement and Covenant Not to Sue the Fairmont Coke
       Works Site Custodial Trust, In the Matter of:
       Fairmont Coke Works Site; Fairmont Coke Works Site
       Custodial Trust, Settling Respondent, Docket No. CERC-
       03-2004-0001PP, 6/15/04.  P. 200028-200047.  An August
       30, 2004, cover letter to Ms. Stephanie Timmermeyer,
       WV Department of Environmental Protection (WVDEP),
       from Ms. Bonnie Pugh Winkler, U.S. EPA, is attached.

---

\*  Administrative Record File available 7/8/2016, **updated //.**
\*\*  Document is incorporated by reference from the *Fairmont
   *Coke Works Removal Administrative Record File* finalized
   June 12, 2000.

AR442943

6.  Quitclaim Deed, Made by and between Green Bluff Development Inc., and Fairmont Coke Works Site Custodial Trust, 10/20/04.  P. 200048-200116.

7.  Letter to Robert Jackmore, Exxon Mobil Corporation, from Mr. Bruce McDaniel, City of Fairmont, re: Releasing coal and coke storage area for development, 1/4/07.  P. 200117-200118.

8.  Letter to Mr. Mark Tampoya, The Water Works LLC, from Mr. James Burke, U.S. EPA, re:  Comfort Letter, 2/7/07.  P. 200119-200142.  The June 15, 2004, Agreement and Covenant Not to Sue the Fairmont Coke Works Site Custodial Trust, Docket No. CERC-03-2004-0001PP, is attached.

9.  Letter to Mr. Tom Bass, WVDEP, from Mr. Jay Rogers, City of Fairmont, re:  Request for Release for Transfer of real estate request, 6/8/11.  P. 200143-200145.  A description of the real estate survey is attached.

10.  Letter to Maj. Gen. James Hoyer, State Armory Board, from Mr. Shawn Garvin, U.S. EPA, re:  Consent to transfer Prospective Purchaser Agreement (PPA) covenants to the State Armory Board, 12/18/15. P. 200146-200176.  Related documents are attached.

AR442944

III-IV.   REMEDIAL RESPONSE PLANNING

    1.   Agency for Toxic Substances and Disease Registry (ATSDR) Public Health Assessment for Sharon Steel Corporation (a/k/a Fairmont Coke Works), Fairmont, Marion County, West Virginia, 11/18/97.  P. 300001-300054.

    2.   Report:  Project XL Final Project Agreement,     **
prepared by the U.S. EPA and the West Virginia Department of Environmental Protection, 5/24/99.

    3.   Report:  Remedial Investigation/Feasibility Study (RI/FS) Work Plan, Fairmont Coke Works Site, Fairmont, West Virginia, prepared by ARCADIS U.S., Inc. (ARCADIS), 9/28/11.  P. 300055-300382.

    4.   Electronic memorandum to Mr. Eric Newman, U.S. EPA, from Mr. Robert Anderson, ARCADIS, re:  Transmittal of site photographs and upcoming site visit, 10/13/11. P. 300383-300388.  Site photographs are attached.

    5.   Report:  Remedial Investigation/Feasibility Study (RI/FS) Work Plan, Addendum 1, Fairmont Coke Works Site, Fairmont, West Virginia, prepared by ARCADIS U.S., Inc. (ARCADIS), 11/18/11.  P. 300389-300399. Related electronic memoranda are attached.

    6.   Electronic memorandum to Mr. Eric Newman, U.S. EPA, from Mr. Michael Lamarre, ExxonMobil Environmental Services Company, re:  Transmittal of site photos, 12/27/11.  P. 300400-300404.  A December 21, 2011, transmittal electronic memoranda to Mr. Michael Lamarre, ExxonMobil Environmental Services Company, from Mr. Richard Price, ARCADIS, and site photos are attached.

    7.   Electronic memorandum to Mr. Eric Newman, U.S. EPA, from Mr. Rob Anderson, ARCADIS, re:  Monitoring MNA parameters for April 2012 sampling event, 4/12/12. P. 300405-300407.  An April 11, 2012, electronic memorandum to Mr. Eric Newman, U.S. EPA, from Mr. Rob

AR442945

Anderson, ARCADIS, regarding FCW groundwater sampling, is attached.

8.   Electronic memorandum to Mr. Eric Newman, U.S. EPA, from Mr. Rob Anderson, ARCADIS, re:  Response to request to complete MNA analysis in April groundwater monitoring, 4/23/12.  P. 300408-300411.  Related electronic memoranda are attached.

9.   Letter to Mr. Michael Lamarre, ExxonMobil Environmental Services, from Mr. Eric Newman, U.S. EPA, re:  Draft RI/FS Work Plan Comments, 5/14/12. P. 300412-300430.

10.  Letter to Mr. Eric Newman, U.S. EPA, from Mr. Richard Anderson, ARCADIS, re:  Responses to U.S. EPA comments on RI/FS Work Plan, 6/20/12.  P. 300431-300477.

11.  Comments on Remedial Investigation/Feasibility Study Work Plan, Noteworthy Concerns Remaining Related to the Eco-Risk Sections, 7/9/12.  P. 300478-300480.

12.  Report:  Remedial Investigation/Feasibility Study Work Plan, Report Body, Tables, Figures, Appendices A - B, Fairmont Coke Works Site, Fairmont, West Virginia, prepared by ARCADIS, 9/11, revised 8/3/12. P. 300481-309292.

13.  Report:  Remedial Investigation/Feasibility Study Work Plan, Appendices C — E Part 1 of 5, Fairmont Coke Works Site, Fairmont, West Virginia, prepared by ARCADIS, 9/11, revised 8/3/12.  P. 309293-351329.

14.  Report:  Remedial Investigation/Feasibility Study   ΔΔ Work Plan, Appendix E Part 2 of 5, Fairmont Coke

---

ΔΔ   This document — Appendix F from both Appendices E & G of the Remedial Investigation/Feasibility Study Work Plan, is made up of Laboratory Reports and Chains of Custody, which are too voluminous and large in file size to include in the online file.  This document can be viewed at the U.S. EPA Region 3 Offices upon request.  These documents are part of the AR Collection No. 64534.

4

AR442946

Works Site, Fairmont, West Virginia, prepared by
ARCADIS, 9/11, revised 8/3/12.

15.  Report:  Remedial Investigation/Feasibility Study   ΔΔ
     Work Plan, Appendix E Part 3 of 5, Fairmont Coke
     Works Site, Fairmont, West Virginia, prepared by
     ARCADIS, 9/11, revised 8/3/12.

16.  Report:  Remedial Investigation/Feasibility Study   ΔΔ
     Work Plan, Appendix E Part 4 of 5, Fairmont Coke
     Works Site, Fairmont, West Virginia, prepared by
     ARCADIS, 9/11, revised 8/3/12.

17.  Report:  Remedial Investigation/Feasibility Study
     Work Plan, Appendix E Part 5 of 5, Fairmont Coke
     Works Site, Fairmont, West Virginia, prepared by
     ARCADIS, 9/11, revised 8/3/12.  P. 351330-359010.

18.  Report:  Remedial Investigation/Feasibility Study
     Work Plan, Appendix F, Fairmont Coke Works Site,
     Fairmont, West Virginia, prepared by ARCADIS, 9/11,
     revised 8/12.  P. 359011-402468.

19.  Report:  Remedial Investigation/Feasibility Study
     Work Plan, Appendix G Part 1 of 3, Fairmont Coke
     Works Site, Fairmont, West Virginia, prepared by
     ARCADIS, 9/11, revised 8/12.  P. 402469-426829.

20.  Report:  Remedial Investigation/Feasibility Study   ΔΔ
     Work Plan, Appendix G Part 2 of 3, Fairmont Coke
     Works Site, Fairmont, West Virginia, prepared by
     ARCADIS, 9/11, revised 8/12.

21.  Report:  Remedial Investigation/Feasibility Study
     Work Plan, Appendix G Part 3 of 3, Fairmont Coke
     Works Site, Fairmont, West Virginia, prepared by
     ARCADIS, 9/11, revised 8/12.  P. 426830-431802.

22.  Report:  Remedial Investigation/Feasibility Study Work
     Plan, Appendices H - J, Fairmont Coke Works Site,
     Fairmont, West Virginia, prepared by ARCADIS, 9/11,
     revised 8/12.  P. 431803-432272.

AR442947

23.   Letter to Mr. Michael Lamarre, ExxonMobil
      Environmental Services, from Mr. Eric Newman, U.S.
      EPA, re:  Comments on August 2012 RI/FS Work Plan,
      8/30/12.  P. 432273-432278.  The first page of Consent
      Decree, Civil Action No. 1:08CV124, is attached.

24.   Letter to Mr. Eric Newman, U.S. EPA, from Mr. Thomas
      Bass, WVDEP, re:  August 2012 Site Visit 29 and
      installation expansion of the road across the Site,
      8/30/12.  P. 432279-432282.

25.   Letter to Mr. Michael Lamarre, ExxonMobil
      Environmental Services, from Mr. Eric Newman, U.S.
      EPA, re:  Request for electronic data submission,
      3/7/13.  P. 432283-432286.

26.   Electronic memorandum to Mr. Eric Newman, U.S. EPA,
      and Ms. Kathleen Patnode, U.S. Fish and Wildlife
      Service, from Mr. Bruce Pluta, U.S. EPA, re:  Big John
      Salvage unnamed tributary watershed, 3/12/13.
      P. 432287-432288.  Related electronic memoranda are
      attached.

27.   Letter to Mr. Bruce Frink, ExxonMobil Environmental
      Services, from Mr. Eric Newman, U.S. EPA, re:
      Comments on the Draft RI/FS Report, 11/6/13.
      P. 432289-432312.  Related documents are attached.

28.   Letter to Mr. Eric Newman, U.S. EPA, from          ***
      Mr. Robert Anderson, ARCADIS, re:  Response to
      U.S. EPA comments on RI/FS Report, 1/17/14.
      P. 432313-432368.  Related documents are attached.

29.   Letter to Mr. Jake McDougal, WV Department of
      Environmental Protection (WVDEP), from Mr. Eric
      Newman, U.S. EPA, re:  Request to identify West
      Virginia State Applicable Relevant and Appropriate
      Requirements (ARARs), 2/6/14.  P. 432369-432376.
      A Table:  Summary of Key ARARs for Big John Salvage
      Removal Alternatives, is attached.

---

***   Document has been redacted to protect the privacy of
      individuals.  Redactions are evident from the face of the
      document.

AR442948

30. Memorandum to Mr. Eric Newman, U.S. EPA, from Ms. Jennifer Hubbard, U.S. EPA, re:  Review of response to RI comments for human health risk assessment issues, 2/12/14.  P. 432377-432382.  Suggested Guidance for Application of Manganese RfD to Specific Scenarios and an electronic transmittal memorandum from Ms. Jennifer Hubbard, U.S. EPA, to Mr. Eric Newman, Mr. Mark Leipert, and Mr. Bruce Pluta, U.S. EPA, are attached.

31. Electronic memorandum to Mr. Eric Newman, U.S. EPA, from Mr. Jason McDougal, WVDEP, re:  Transmittal of State ARARs, 2/24/14.  P. 432383-432386.  Summary of Initial ARARs for Fairmont Coke (Sharon Steel) Table attached.

32. Letter Report to Mr. Eric Newman, U.S. EPA, from Mr. Robert Anderson, ARCADIS, re:  RI/FS – Additional Groundwater Investigation Work Plan, 3/28/14.  P. 432387-432413.  An electronic transmittal memorandum to Mr. Eric Newman, U.S. EPA, Mr. Charles Armstead and Ms. Jamie Hopen, WVDEP, and Mr. Joe Carter, TechLaw, Inc., from Mr. Robert Anderson, ARCADIS, is attached.

33. Letter to Mr. Robert Anderson, ARCADIS, from Mr. Eric Newman, U.S. EPA, re:  Acceptance of additional groundwater well installation, 4/4/14.  P. 432414-432414.

34. Electronic memorandum to Mr. Eric Newman, U.S. EPA, from Mr. Robert Anderson, ARCADIS, re:  Property parcel figures, 4/17/14.  P. 432415-432417.  Figure X: Approximate Area of Impacted Materials at BJS/FCW, and Figure 1:  Fairmont Coke Works Property Boundary with Parcel Overlay, are attached.

35. Letter Report to Mr. Eric Newman, U.S. EPA, from     ***
Mr. Robert Anderson, ARCADIS, re:  RI/FS Surface Soil Polynuclear Aromatic Hydrocarbon (PAH) Investigation Work Plan, 6/13/14.  P. 432418-432421.

36. Letter to Mr. Robert Anderson, ARCADIS, from     ***
Mr. Eric Newman, U.S. EPA, re:  Acceptance of

AR442949

off-site surface soil samples proposal, 6/13/14.
P. 432422-432423.  A June 13, 2014, electronic
memorandum to Mr. Eric Newman, U.S. EPA, from Mr.
Robert Anderson, ARCADIS, regarding transmittal of the
*Surface Soil PAH Investigation Work Plan*, and an
electronic memorandum to Mr. Robert Anderson, ARCADIS,
from Mr. Eric Newman, U.S. EPA, regarding transmittal
of EPA's acceptance letter, are attached.

37.   Letter Report to Mr. Eric Newman, U.S. EPA, from      ***
      Mr. Robert Anderson, ARCADIS, re:  Revised RI/FS
      Surface Soil PAH Investigation Work Plan, 7/14/14.
      P. 432424-432430.  Related electronic memoranda are
      attached.

38.   Letter Report to Mr. Eric Newman, U.S. EPA, from      ***
      Mr. Robert Anderson, ARCADIS, re:  Remedial
      Investigation/Feasibility Study (RI/FS) - Surface Soil
      PAH Investigation – Summary Report, 7/21/14.
      P. 432431-432479.  Related electronic memoranda are
      attached.

39.   Letter Report to Mr. Eric Newman, U.S. EPA, from      ***
      Mr. Robert Anderson, ARCADIS, re:  RI/FS Surface
      Soil PAH Investigation – Summary Report, 8/12/14.
      P. 432480-432523.

40.   Letter Report to Mr. Eric Newman, U.S. EPA, from      ***
      Mr. Robert Anderson, ARCADIS, re:  RI/FS Surface
      Soil PAH Investigation – Work Plan - Revised, 8/12/14.
      P. 432524-432528.

41.   Electronic memorandum to Mr. Bruce Frink,            ***
      ExxonMobil Environmental Services, from Mr. Eric
      Newman, U.S. EPA, re:  Review and approval of the
      Surface Soil PAH Investigation Work Plan and Summary
      Report, 8/14/14.  P. 432529-432530.  An August 12,
      2014, electronic transmittal memorandum to Mr. Eric
      Newman, from Ms. Janet Connolly, ARCADIS, is attached.

42.   Letter Report to Mr. Eric Newman, U.S. EPA, from
      Mr. Robert Anderson, ARCADIS, re:  RI/FS – Cyanide in
      Groundwater Work Plan, 9/16/14.  P. 432531-432536.  A
      September 16, 2014, electronic transmittal memorandum

AR442950

to Mr. Eric Newman, U.S. EPA, Mr. Jason McDougal, WVDEP, and Mr. Joe Carter, TechLaw, Inc., from Mr. Robert Anderson, is attached.

43.  Letter Report to Mr. Eric Newman, U.S. EPA, from Mr. Robert Anderson, ARCADIS, re:  RI/FS – Cyanide in Groundwater Work Plan - Revised, 9/16/14.  P. 432537-432543.  Related electronic memoranda are attached.

44.  Electronic memorandum to Mr. David Mack and Mr. Robert Anderson, ARCADIS, Mr. Jason McDougal, WVDEP, and Mr. Joe Carter, TechLaw, Inc., from Mr. Eric Newman, U.S EPA, re:  Acceptance of Cyanide in Groundwater Work Plan, 9/16/14.  P. 432544-432546.  Related electronic memoranda are attached.

45.  Letter Report to Mr. Eric Newman, U.S. EPA, from Mr. Robert Anderson, ARCADIS, re:  RI/FS – Preliminary Sample Results – Cyanide in Groundwater, 9/25/14.  P. 432547-432554.  An electronic transmittal memorandum is attached.

46.  Electronic memorandum to Mr. Eric Newman, Ms. Patricia Flores, and Ms. Jennifer Hubbard, U.S. EPA, and Mr. Rob Anderson, ARCADIS, from Ms. Janet Keating-Connolly, ARCADIS, re:  Response to question whether the maximum contaminant level (MCL) of cyanide in groundwater applies to free or total cyanide, 9/26/14.  P. 432555-432556.  Related electronic memoranda are attached.

47.  Electronic memorandum to Mr. Jason McDougal, WVDEP, from Mr. Robert Anderson, ARCADIS, re:  Cyanide in groundwater – field measured pH results for wells that were resampled, 9/26/14.  P. 432557-432559.  Related electronic memoranda are attached.

48.  Electronic memorandum to Mr. Eric Newman, U.S. EPA, from Ms. Patricia Flores, U.S. EPA, re:  Review of preliminary sample results for cyanide in groundwater, 10/2/14.  P. 432560-432561.

49.  Electronic memorandum to Mr. Eric Newman, U.S. EPA, from Mr. Robert Anderson, ARCADIS, re:  Transmittal of

AR442951

drilling logs for recently installed wells, 10/7/14.
P. 432562-432577.  April 22–May 21, 2014 drilling logs
and related electronic memoranda are attached.

50.  Electronic memorandum to Mr. Eric Newman, U.S. EPA,
from Ms. Jennifer Hubbard, U.S. EPA, re:  Cyanide
sampling methods, 10/8/14.  P. 432578-432652.  Related
documents are attached.

51.  Electronic memorandum to Ms. Jennifer Hubbard,      ***
Ms. Patricia Flores-Brown, Mr. Mark Leipert, Mr.
Joseph McDowell, Mr. Gene Nance, U.S. EPA, Mr. Joe
Carter and Mr. Gene Nance, TechLaw, Inc., and
Mr. Jake McDougal, WVDEP, from Mr. Eric Newman, U.S.
EPA, re:  Review of sample results for benzene/total
cyanide/free cyanide in groundwater, 10/8/14.
P. 432653-432659.  Related electronic memoranda are
attached.

52.  Electronic memorandum to Mr. Eric Newman, U.S EPA, and
Mr. Jason McDougal, WVDEP, from Mr. Robert Anderson,
ARCADIS, re:  Submittal of approach for additional
investigation of cyanide in groundwater, 10/15/14.
P. 432660-432660.

53.  Electronic memorandum to Mr. Robert Anderson, ARCADIS,
and Mr. Jason McDougal, WVDEP, from Mr. Eric Newman,
re:  Concurrence with additional cyanide investigation
in groundwater, 10/16/14.  P. 432661-432662.  An
October 15, 2014, electronic memorandum to Mr. Eric
Newman, U.S. EPA, and Mr. Jason McDougal WVDEP, from
Mr. Robert Anderson, ARCADIS, regarding an approach
for additional investigation of cyanide in
groundwater, is attached.

54.  Letter Report to Mr. Eric Newman, U.S. EPA, from
Mr. Robert Anderson, ARCADIS, re:  RI/FS – Additional
Groundwater Investigation Work Plan – October 2014,
10/17/14.  P. 432663-432669.  An electronic
transmittal memorandum to Mr. Eric Newman, U.S. EPA
and Mr. Jason McDougal, WVDEP, from Mr. David Mack,
ARCADIS, is attached.

AR442952

55. Letter to Mr. Robert Anderson, ARCADIS, from
    Mr. Eric Newman, U.S. EPA, re:  Acceptance of RI/FS
    Work Plan Amendment, 10/19/14.  P. 432670-432672.
    Electronic transmittal memoranda are attached.

56. Electronic memorandum to Mr. Joe Carter, TechLaw,
    Inc., Mr. Eric Newman, U.S. EPA, and Mr. Jason
    McDougal, WVDEP, from Mr. David Mack, ARCADIS, re:
    Comments on the Remedial Investigation/Feasibility
    Study - Additional Groundwater Investigation Work Plan
    – October 2014, 10/21/14.  P. 432673-432674.  Related
    emails are attached.

57. Letter Report to Mr. Eric Newman, U.S. EPA, from     ***
    Mr. Robert Anderson, ARCADIS, re:  Revised RI/FS
    Report, 11/12/14.  P. 432675-432738.

58. Report:  Revised Remedial Investigation/             ***
    Feasibility Study Report, Fairmont Coke Works
    Site, Fairmont, West Virginia, prepared by ARCADIS,
    11/12/14.  P. 432739-432982.

59. Electronic memorandum to Mr. Eric Newman, U.S. EPA,
    from Mr. Robert Anderson, ARCADIS, re:  Response to
    comments on the status of well installation, 12/8/14.
    P. 432983-432990.  Related figures and electronic
    memoranda are attached.

60. Memorandum to Mr. Eric Newman, U.S. EPA, from Mr.
    Bruce Pluta, U.S. EPA, re:  Response to comments and
    November 2014 Revised RI/FS, 12/12/14.  P. 432991-
    432995.

61. Electronic memorandum to Mr. Eric Newman, U.S. EPA,
    Mr. Jake McDougal WVDEP, and Mr. Joe Carter, TechLaw,
    Inc., from Mr. Robert Anderson, ARCADIS, re:
    Submittal of draft cyanide in groundwater results,
    1/22/15.  P. 432996-433027.  Related documents are
    attached.

62. Electronic memorandum to Ms. Patricia Flores and Mr.
    Eric Newman, U.S. EPA, from Ms. Jennifer Hubbard, U.S.
    EPA, re:  Cyanide in groundwater results, 1/26/15.

AR442953

P. 433028-433030.   Related electronic memoranda are attached.

63. Electronic memorandum to Mr. Robert Anderson, ARCADIS, and Mr. Bruce Frink, ExxonMobil Environmental Service, from Mr. Eric Newman, U.S. EPA, re:  Cyanide in groundwater results, 1/28/15.  P. 433031-433035. Related documents are attached.

64. Electronic memorandum to Mr. Eric Newman, U.S. EPA, from Ms. Jennifer Hubbard, U.S. EPA, re:  Comments on uncertainties around cyanide vapor intrusion decision, 1/28/15.  P. 433036-433037.  A January 28, 2015, Fairmont Coke Cyanide and Vapor Intrusion: Uncertainty Assessment table, is attached.

65. Letter to Mr. Bruce Frink, ExxonMobil Environmental Services, from Mr. Eric Newman, U.S. EPA, re: Comments on the November 2014 RI/FS Report, 2/10/15. P. 433038-433056.  Related documents are attached.

66. Electronic memorandum to Mr. Eric Newman, U.S. EPA, from Ms. Jennifer Hubbard, U.S. EPA, re:  Correction regarding EPA/WVDEP comments on the RI/FS, 2/10/15. P. 433057-433060.  A February 10, 2015, electronic memorandum to Mr. Bruce Frink, ExxonMobil Environmental Services, and Mr. Robert Anderson, ARCADIS, from Mr. Eric Newman, U.S. EPA, regarding EPA/WVDEP comments on the RI/FS, and a Summary of Risks and Recommendations for the Development of Remedial Action Objectives Table, is attached.

67. Letter Report to Mr. Eric Newman, U.S. EPA, from Mr. Robert Anderson, ARCADIS, re:  RI/FS – Comment Letter Work Plan, 3/6/15.  P. 433061-433070.  An electronic transmittal memorandum to Mr. Eric Newman, U.S. EPA, and Mr. Jason McDougal, WVDEP, from Mr. David Mack, ARCADIS, is attached.

68. Electronic memorandum to Mr. Bruce Frink, ExxonMobil Environmental Services, and Mr. Robert Anderson, ARCADIS, from Mr. Eric Newman, U.S. EPA, re:  Site visit on March 23, 2015, and comments on the RI/FS – Comment Letter Work Plan, 3/9/15.  P. 433071-433073.

AR442954

A March 6, 2015, electronic memorandum to Mr. Eric
Newman, U.S. EPA, and Mr. Jason McDougal, WVDEP, from
Mr. David Mack, ARCADIS, regarding transmittal of the
RI/FS - Comment Letter Work Plan, and Figure 1:
Proposed Sample Locations, are attached.

69. Letter Report to Mr. Eric Newman, U.S. EPA, from Mr.
Robert Anderson, ARCADIS, re:  Remedial
Investigation/Feasibility Study (RI/FS) — Additional
Groundwater Investigation Summary Report, 4/1/15.
P. 433074-433153.  An April 1, 2015, electronic
memorandum to Mr. Eric Newman, U.S. EPA, Mr. Jason
McDougal, WVDEP, and Mr. Joe Carter, TechLaw, Inc.,
from Mr. Robert Anderson, ARCADIS, regarding
transmittal of the *Final Additional Groundwater
Investigation Summary*, and a January 22, 2015,
electronic memorandum regarding cyanide in groundwater
results, are attached.

70. Letter Report to Mr. Eric Newman, U.S. EPA, from Mr.
Robert Anderson, ARCADIS, re:  Remedial
Investigation/Feasibility Study (RI/FS) — Comment
Letter Work Plan, 4/10/15.  P. 433154-433170.  An
April 13, 2015, electronic transmittal memorandum to
Mr. Eric Newman, U.S. EPA, Mr. Jason McDougal, WVDEP,
and Mr. Joe Carter, TechLaw, Inc., from Mr. Robert
Anderson, ARCADIS, is attached.

71. Electronic memorandum to Mr. Robert Anderson, ARCADIS,
from Mr. Eric Newman, U.S. EPA, re:  Transmittal of
surface water concentrations data, 4/15/16.
P. 433171-433191.  Related documents are attached.

72. Electronic memorandum to Mr. Jason McDougal, WVDEP,
from Mr. Robert Anderson, ARCADIS, re:  Preliminary
groundwater results - transmittal of field pH readings
for groundwater samples, 4/24/15.  P. 433192-433193.
Table X:  Recorded pH — March/April 2015 Groundwater
Sampling Table and related electronic memoranda are
attached.

73. Electronic memorandum to Mr. Eric Newman, U.S. EPA,
from Ms. Jennifer Hubbard, U.S. EPA, re:  Review of
RI/FS revision, 9/29/15.  P. 433194-433195.  A

13

September 3, 2015, electronic memorandum to Mr. Joe
Carter, TechLaw, Inc., Mr. Jason McDougal, WVDEP, Ms.
Jennifer Hubbard, Mr. Bruce Pluta, and Mr. Mark
Leipert, U.S. EPA, and Ms. Kathy Patnode, U.S. Fish &
Wildlife Service, from Mr. Eric Newman, U.S. EPA,
regarding expected submittal of a revised RI/FS, is
attached.

74.    Report:  Fairmont Coke Works Screening-Level
       Ecological Risk Assessment, Fairmont, West Virginia,
       prepared by ARCADIS, revised 6/15.  P. 433196-433512.

75.    Report:  Draft Groundwater Investigation Report –
       Western Portion of FCW Site, Fairmont Coke Works Site,
       Fairmont, West Virginia, prepared by ARCADIS, 6/3/15.
       P. 433513-433588.

76.    Electronic memorandum to Mr. Eric Newman, U.S. EPA,
       from Mr. Jason McDougal, WVDEP, re:  Comments on
       Western End Report, 6/4/15.  P. 433589-433589.

77.    Electronic memorandum to Mr. Eric Newman, Mr. Bruce
       Pluta, and Mr. Mark Leipert, U.S. EPA, and Ms. Kathy
       Patnode, U.S. Fish & Wildlife Service, from Ms.
       Jennifer Hubbard, U.S. EPA, re:  Comments on Western
       End Report, 6/11/15.  P. 433590-433590.

78.    Report:  Site-Wide Human Health Risk Assessment,
       Fairmont Coke Works Site, Fairmont, West Virginia,
       prepared by ARCADIS, 6/19/15.  P. 433591-435630.

79.    Letter to Mr. Eric Newman, U.S. EPA, from Mr. Robert
       Anderson, ARCADIS, re:  Response to U.S. EPA comments
       on November 12, 2014, Revised RI/FS Report, 6/22/15.
       P. 435631-435663.

80.    Report:  Revised Remedial Investigation/Feasibility
       Study Report, Fairmont Coke Works Site, Fairmont, West
       Virginia, prepared by ARCADIS, revised 6/22/15.
       P. 435664-435961.

81.    Electronic memorandum to Mr. Eric Newman, U.S. EPA,
       and Mr. Bruce Frink, ExxonMobil Environmental
       Services, from Mr. Robert Anderson, ARCADIS, re:

AR442956

Approval for distribution and copying of ExxonMobil's Revised RI/FS, 7/7/15.  P. 435962-435962.  A July 7, 2015, electronic memorandum to Mr. Robert Anderson, ARCADIS, and Mr. Bruce Frink, ExxonMobil Environmental Services, from Mr. Eric Newman, regarding request for approval on distribution and copying of ExxonMobil's Revised RI/FS, is attached.

82. Memorandum to Mr. Eric Newman, U.S. EPA, from Ms. Jennifer Hubbard, U.S. EPA, re:  June 2015 RI/FS Revision, 7/16/15.  P. 435963-435968.  A July 16, 2015, electronic transmittal memorandum, is attached.

83. Memorandum to Mr. Eric Newman, U.S. EPA, from Mr. Bruce Pluta, U.S. EPA, re:  Response to comments and RI/FS, 7/24/15.  P. 435969-435970.

84. Letter to Mr. Bruce Frink, ExxonMobil Environmental Services, from Mr. Eric Newman, U.S. EPA, re: Comments on the June 2015 Revised RI/FS Report, 8/7/15.  P. 435971-435979.

85. Electronic memorandum to Mr. Eric Newman, U.S. EPA, from Mr. Jason McDougal, WVDEP, re:  No further comments on the RI/FS, 9/29/15.  P. 435980-435980.

86. Table, Table 2:  GWSW Sample Results – Compared to Human Health Screening Values, Groundwater Investigation Report – Western Portion of FCW Site, 9/3/15.  P. 435981-435982.

87. WVDEP Oversight of SWA Delineation Event at Fairmont Coke Works Site, Fairmont, WV, 11/11/15.  P. 435983-435986.  A November 20, 2015, electronic transmittal memorandum to Mr. Eric Newman, U.S. EPA, from Mr. Jason McDougal, WVDEP, is attached.

88. Electronic memorandum to Mr. Eric Newman, U.S. EPA, from Mr. Robert Anderson, ARCADIS, re:  Assessment of wet areas, 11/13/15.  P. 435987-435987.

89. Letter Report to Mr. Eric Newman, U.S. EPA, from Mr. Robert Anderson, ARCADIS, re:  RI/FS – Seasonally Wet Areas Investigation Work Plan, 12/2/15.

AR442957

P. 435988-435998.  An electronic transmittal memorandum to Mr. Eric Newman, U.S. EPA, Mr. Jason McDougal, WVDEP, and Mr. Joe carter, TechLaw, Inc., from Mr. Robert Anderson, ARCADIS, is attached.

90.  Electronic memorandum to Mr. Eric Newman, U.S. EPA, from Mr. Jason McDougal, WVDEP, re:  Comments on the Redevelopment Plan Human Health Risk Assessment (HHRA) Evaluation, 12/3/15.  P. 435999-435999.

91.  Memorandum to Mr. Eric Newman, U.S. EPA, from Mr. Bruce Pluta, U.S. EPA, re:  Review of December 2015 RI/FS – Seasonally Wet Areas Investigation Work Plan, 12/7/15.  P. 436000-436002.  Electronic transmittal memoranda are attached.

92.  Electronic memorandum to Mr. Eric Newman, U.S. EPA, from Mr. Robert Anderson, ARCADIS, re:  Agreement to omit sample collection at SWA-3 area, 12/9/15. P. 436003-436004.  December 7, 2015, electronic memoranda regarding comments on the RI/FS Seasonally Wet Areas Investigation Work Plan, are attached.

93.  Electronic memorandum to Mr. Eric Newman, U.S. EPA, from Ms. Kathleen Patnode, U.S. Fish and Wildlife Service, re:  Comments on Fairmont wetlands, 1/26/16. P. 436005-436005.

94.  Electronic memorandum to Mr. Eric Newman, U.S. EPA, from, Mr. Robert Anderson, ARCADIS, re:  Response to questions regarding limestone trench, 2/11/16. P. 436006-436007.  A January 28, 2016, electronic memorandum to Mr. Robert Anderson, ARCADIS, from Mr. Eric Newman, U.S. EPA, regarding wetlands areas/eco-risk, is attached.

95.  Letter Report to Mr. Eric Newman, U.S. EPA, from Mr. Robert Anderson, ARCADIS, re:  RI/FS – Seasonally Wet Areas Investigation Report, 2/16/16.  P. 436008-436453.  An, electronic transmittal memorandum to Mr. Eric Newman, U.S. EPA, and Mr. Joe Carter, TechLaw, Inc., from Mr. Robert Anderson, ARCADIS, is attached.

AR442958

96.  Electronic memorandum to Mr. Eric Newman and Ms.
     Patricia Flores, U.S. EPA, from Ms. Jennifer Hubbard,
     U.S. EPA, re:  Vapor intrusion figures, 3/7/16.
     P. 436454-436456.  Related electronic memoranda are
     attached.

97.  Memorandum to Mr. Eric Newman, U.S. EPA, from
     Mr. Bruce Pluta, U.S. EPA, re:  Review of February
     2016 Seasonally Wet Areas Investigation Report,
     3/11/16.  P. 436457-436459.  Electronic transmittal
     memoranda are attached.

98.  Electronic memorandum to Mr. Eric Newman, U.S. EPA,
     from Mr. David Mack, ARCADIS, re:  Figure of location
     of proposed police barracks in comparison to the
     seasonally wet areas, 3/18/16.  P. 436460-436461.
     Draft Figure 1:  Seasonally Wet Area Sample Locations,
     is attached.

99.  Electronic memorandum to Mr. Eric Newman, U.S. EPA,
     from Mr. Jason McDougal, WVDEP, re:  Transmittal of
     unnamed tributary sampling data, 4/5/16.  P. 436462-
     436475.  Sampling data and related electronic
     memoranda are attached.

100. Electronic memorandum to Mr. Eric Newman, U.S. EPA,
     from Mr. David Montali, WVDEP, re:  303(d) listing of
     unnamed tributary/Monongahela River RN, 126.94,
     4/19/16.  P. 436476-436967.  The *2014 West Virginia
     Integrated Water Quality Monitoring and Assessment
     Report*, prepared by WVDEP, is attached.

101. Electronic memorandum to Mr. Eric Newman, U.S. EPA,
     from Mr. Jason McDougal, WVDEP, re:  Comments on the
     April 2016 RI/FS, 5/9/16.  P. 436968-436968.

102. Electronic memorandum to Mr. Eric Newman, U.S. EPA,
     from Ms. Jennifer Hubbard, U.S. EPA, re:  Transmittal
     of risk summary tables for site risks and on-site soil
     risks, 6/15/16.  P. 436969-436972.  Fairmont Coke 2016
     Soil Risk Update and Fairmont Coke 2016 Update –
     Attachment 2: Summary of Risks and Recommendations for
     the Development of Remedial Action Objectives Tables,
     are attached.

AR442959

103. Electronic memorandum to Mr. Eric Newman, U.S. EPA, from Ms. Jennifer Hubbard, U.S. EPA, re: Review of updated soil risk tables, 6/16/16.  P. 436973-436973.

104. Electronic memorandum to Mr. Eric Newman, U.S. EPA, from Ms. Jennifer Hubbard, U.S. EPA, re: Review of RI/FS Revision, 6/16/16.  P. 436974-436974.

105. Report: Remedial Investigation/Feasibility Study Report, Fairmont Coke Works Site, Fairmont, West Virginia, prepared by ARCADIS, 11/14, final revision 6/16/16.  P. 436975-442356.

106. Proposed Plan, Sharon Steel/Fairmont Coke Works Superfund Site, Fairmont, Marion County, West Virginia, 7/16.  P. 442357-442410.

107. **Report: Remedial Investigation/Feasibility Study ΔΔΔ Report, Tables & Figures, Fairmont Coke Works Site, Fairmont, West Virginia, prepared by ARCADIS, 11/14, final revision 6/16/16.  P. 2249134.**

108. **Letter to Mr. Eric Newman, U.S. EPA, from Mr. Bruce Frink, ExxonMobil Environmental Services Company, re: RI/FS Report Certification, 7/12/16.  P. 2249135.**

109. **Proposed Amendment to Quality Assurance Project Plan for Pre-Design Investigation, Fairmont Coke Works Site, Fairmont, WV, 5/17.  P. 2249133.  A July 28, 2017 electronic transmittal memorandum to Mr. Eric Newman, U.S. EPA, from Mr. David Mack, ARCADIS, and Attachment A – Laboratory Quality Assurance Manual and Standard Operating Procedures, are attached.**

110. **Letter to Mr. Eric Newman, U.S. EPA, from Mr. William Huggins, Jr., WVDEP, re: Review of the Pre-Design Investigation Work Plan – Limestone Trench Remedial Alternative, 6/8/17.  P. 2249136.**

---

ΔΔΔ      This document appears out of order because it was not included with the balance of the Remedial Investigation/Feasibility Study Report.

AR442960

111. Electronic memorandum to Mr. Bruce Frink, ExxonMobil
     Environmental Services, from Mr. Eric Newman, U.S.
     EPA, re:  Transmittal of comments and approval of Pre-
     Design Investigation for Permeable Reactive
     Barrier/Limestone Trench Work Plan, 6/9/17.
     P. 2249138.  A letter to Mr. Bruce Frink, ExxonMobil
     Environmental Services, from Mr. Eric Newman, U.S.
     EPA, regarding the Work Plan comments, is attached.

112. Proposed Amendment (#4) to Fairmont Coke Works Site
     Field Sampling Plan, Pre-Design Investigation,
     Procedure for Collection of Pre-Design Data, Fairmont
     Coke Works Site, Fairmont, WV, 7/17.  P. 2249132.  A
     July 28, 2017, electronic transmittal memorandum to
     Mr. Eric Newman, U.S. EPA, from Mr. David Mack,
     ARCADIS, is attached.

113. Report:  <u>Pre-Design Investigation Work Plan –
     Limestone Trench Remedial Alternative, Fairmont Coke
     Works Site, Fairmont, West Virginia</u>, 4/27/17, revised
     7/28/17.  P. 2249139.

114. Memorandum to Ms. Jennifer Hubbard, U.S. EPA, from
     Ms. Janet Keating-Connolly, ARCADIS, re:  Site-Wide
     Human Health Risk Assessment Supplement, 10/10/17.
     P. 2249137.  Related documents attached.

115. Memorandum to Site File, U.S. EPA, from Mr. Eric
     Newman, U.S. EPA, re:  Technical Memorandum –
     Potential for Vapor Intrusion and Rationale for
     Establishing a Vapor Intrusion Protection Area (VIPA),
     10/24/17.  P. 2249142.  Two figures are attached.

AR442961

V.   COMMUNITY INVOLVEMENT/CONGRESSIONAL CORRESPONDENCE/IMAGERY

1.   U.S. EPA National Priorities Listing, Sharon      **
     Steel Corp (Fairmont Coke Works), 12/96.

2.   U.S. EPA Community Update:  Fairmont Coke Works Site,
     entitled, "What's Up at the Fairmont Coke Works?"
     6/07.  P. 500001-500002.

3.   U.S. EPA Fact Sheet:  Sharon Steel Corporation –
     Fairmont Coke Works Superfund Site, Fairmont, West
     Virginia, entitled, "Cleanup Continues – Redevelopment
     Plans Underway," 4/08.  P. 500003-500004.

4.   U.S. EPA Fact Sheet:  Sharon Steel Corporation –
     Fairmont Coke Works Superfund Site, Fairmont, West
     Virginia, entitled, "Project Overview:  Cleanup
     Continues – Redevelopment Plans Underway," 11/08.
     P. 500005-500006.

5.   U.S. EPA Fact Sheet:  Sharon Steel Corporation –
     Fairmont Coke Works Superfund Site, Fairmont, West
     Virginia, entitled, "Project Overview:  Cleanup
     Continues – Redevelopment Plans Underway," 5/09.
     P. 500007-500008.

6.   U.S. EPA Fact Sheet:  Sharon Steel Corporation –
     Fairmont Coke Works Superfund Site, Fairmont, West
     Virginia, entitled, "Project Overview:  Cleanup
     Continues – Redevelopment Plans Underway," 1/10.
     P. 500009-500010.

7.   U.S. EPA Fact Sheet:  Sharon Steel Corporation –
     Fairmont Coke Works Superfund Site, Fairmont, West
     Virginia, entitled, "Project Overview:  Cleanup
     Continues – Redevelopment Plans Underway," 6/10.
     P. 500011-500012.

8.   U.S. EPA Fact Sheet:  Sharon Steel Corporation –
     Fairmont Coke Works Superfund Site, Fairmont, West
     Virginia, entitled, "Project Overview:  Cleanup Work
     Nearly Complete," 11/10.  P. 500013-500014.

AR442962

9.  U.S. EPA Fact Sheet:  Sharon Steel Corporation –
    Fairmont Coke Works Superfund Site, Fairmont, West
    Virginia, entitled, "Project Overview:  Soil Removal
    Complete," 5/11.  P. 500015-500016.

10. Memorandum to Members of the Fairmont Community
    Liaison Panel, Agency & Company Representatives, from
    Ms. Mary Green, Ann Green Communications, Inc., re:
    Progress at the Site, 5/8/14.  P. 500017-500018.  A
    May 8, 2014, electronic transmittal memorandum from
    Ms. Gail Miller, Ann Green Communications, Inc. is
    attached.

11. Letter to Ms. Patricia Hickman, WVDEP, from          ***
    Mr. Kevin Sansalone, City of Fairmont, re:
    Reestablishing the Real Property Management
    Committee, 9/16/15.  P. 500019-500019.

12. **U.S. EPA Public Notice, Sharon Steel/Fairmont Coke
    Works Superfund Site, re:  Proposed Remedial Action
    Plan Released, 7/9/16.  P. 2249141.**

13. **Transcript of Public Meeting, Proposed Remedial Action
    Plan, Sharon Steel/Fairmont Coke Works Superfund Site,
    7/14/16.  P. 2249131.**

14. **Electronic memorandum to Mr. Eric Newman, U.S. EPA,  ***
    from Ms. Sharon Hildebrand, Member of the Public,
    re:  Proposed Plan, 7/23/16.  P. 2249143.**

AR442963

VI.   REMOVAL RESPONSE PROJECTS

1.   Memorandum to Mr. Abraham Ferdas, U.S. EPA, from   **
     Ms. Melissa Pennington, U.S. EPA, re:  Request for
     approval of removal action at the Fairmont Coke Works
     Site, 6/6/00.

2.   Report:  Final Report, Iron and Manganese (Total
     Maximum Daily Load) TMDLs for the Unnamed Tributary at
     Sharon Steel, West Virginia, prepared by U.S. EPA,
     Region 3, 9/01.  P. 600001-600065.  A Decision
     Rationale is for the report is attached.

3.   Action memorandum to Mr. Abraham Ferdas, U.S. EPA,
     from Mr. Hilary Thornton, U.S. EPA, re:  Request for
     non-time critical removal action, 7/21/03.
     P. 600066-600105.  A memorandum to Mr. Barry Breen,
     U.S. EPA, from Mr. Abraham Ferdas, U.S. EPA, regarding
     transmittal of the Action Memorandum approving a
     ceiling increase and modification of scope, is
     attached.

4.   Packet of Correspondence and Amendments to Phase I
     Response Action Plan (Waste Management Area), 4/16/03-
     5/21/04.  P. 600106-600149.

5.   Report:  Response Action Plan (Phase II) for Process
     Area Removal Action at the Fairmont Coke Works Site,
     prepared by ExxonMobil Environmental Services, 7/6/05.
     P. 600150-600192.

6.   Letter to Mr. Thomas Aruta, ExxonMobil Refining &
     Supply Company, from Mr. Eric Newman, U.S. EPA, re:
     Phase I Response Action Plan proposed Amendments #6 &
     #7, 1/4/07.  P. 600193-600194.

7.   Report:  Investigation Work Plan for Light Oil Storage
     (LOS) Area at the Fairmont Coke Works Site, Fairmont,
     WV, prepared by Camp, Dresser, & McKee, Inc., 3/1/07.
     P. 600195-600201.

8.   Report:  Investigation Work Plan for Light Oil Storage
     (LOS) Area at the Fairmont Coke Works Site, Fairmont,

22

AR442964

<u>WV, Revision 1</u>, prepared by Camp, Dresser, & McKee, Inc., 3/28/07.  P. 600202-600209.

9.   Memorandum to Ms. Jennifer Hubbard, U.S. EPA, from Mr. Eric Newman, U.S. EPA, re:  Request for review of performance standards established in the Action Memoranda/RAP, 5/30/07.  P. 600210-600220.  Related documents are attached.

10.  Letter to Mr. Brian Harrison, Exxon/Mobil Refining & Supply - Global Remediation, from Mr. Eric Newman, U.S. EPA, re:  Proposal to establish performance standard for pyridine in soil, 6/18/07.  P. 600221-600221.

11.  Memorandum to Mr. Brian Harrison, Exxon/Mobil Refining & Supply - Global Remediation, from Mr. Wendell Barner, CDM, re:  Proposal for site-wide soil cleanup value for benzo(a)pyrene, 8/6/07.  P. 600222-600223.

12.  Letter to Mr. Brian Harrison, ExxonMobil Refining and Supply - Global Remediation, from Mr. Eric Newman, U.S. EPA, re:  Revised Response Action Plan Amendment 10, 11/13/07.  P. 600224-600225.

13.  Letter to Mr. Eric Newman, U.S. EPA, from Mr. Brian Harrison, Exxon Mobil Corporation, re:  Site-wide soil performance standards for polycyclic aromatic hydrocarbons (PAHs), 12/19/07.  P. 600226-600229. Tables 1 and 2 are attached.

14.  Letter to Mr. Brian Harrison, Exxon/Mobil Environmental Refining & Supply - Global Remediation, from Mr. Eric Newman, U.S. EPA, re:  PAH site-specific performance standards, 12/31/07.  P. 600230-600230.

15.  Report:  <u>Trip Report - October 2007 Sediment Sampling Event, Fairmont Coke/Sharon Steel Site, Fairmont, WV</u>, prepared by TechLaw, Inc., 2/11/08.  P. 600231-600249.

16.  Letter to Mr. Eric Newman, U.S. EPA, from Mr. Robert Anderson, ARCADIS U.S., Inc. (ARCADIS), re:  Site Conceptual Model and Pilot Scale Remedial Alternatives

AR442965

Investigation for the LOS Area, 2/12/08.  P. 600250-600260.

17.  Memorandum to Mr. Brian Harrison, ExxonMobil, from Mr. Mark Hurban, ARCADIS, re:  Corrective actions for management of waste materials for off-site disposal, 7/10/08.  P. 600261-600274.

18.  Letter to Mr. Eric Newman, U.S. EPA, from Mr. Robert Anderson, ARCADIS, re:  Evaluating post-remediation sampling with risk-based soil concentrations for the protection of groundwater, 10/1/08.  P. 600275-600303.

19.  Report:  Light Oil Storage (LOS) Area – Remedial Action Plan, Fairmont Coke Works Site, Fairmont, West Virginia, prepared by ARCADIS, 10/6/08.  P. 600304-600492.

20.  Letter to Dr. Brian Harrison, Exxon/Mobil Environmental Service Company, from Mr. Eric Newman, U.S. EPA, re:  Evaluating post-remediation application of cleanup goals, 10/20/08.  P. 600493-600494.

21.  Letter to Dr. Brian Harrison, ExxonMobil Environmental Services Company, from Mr. Eric Newman, U.S. EPA, re:  Comments on Light Oil Storage (LOS) Response Action Plan, 10/22/08.  P. 600495-600496.

22.  Letter to Mr. Eric Newman, U.S. EPA, from Mr. Robert Anderson, ARCADIS, re:  Proposed not-to-exceed level for measuring attainment of cleanup goals, 12/19/08. P. 600497-600502.  A Draft Table 1. Summary of State Approaches to Evaluate Compliance with Soil Cleanup Standards, is attached.

23.  Letter to Mr. Rob Anderson, ARCADIS, from Mr. Eric Newman, U.S. EPA, re:  Proposed not-to-exceed concentrations/post-remediation application of cleanup goals at Site, 1/8/09.  P. 600503-600504.

24.  Map, Manhole Location Depicted on a Portion of *Map Showing Survey of Sampling and Monitoring Points at the Old Sharon Steel Plant Site* Map, 1/19/09. P. 600505-600505.

AR442966

25. Figure, Figure 1:  Light Oil Storage Area In-Situ
    Waste Characterization Sampling Plan, revised 2/09.
    P. 600506-600506.

26. Report:  Closure Report for Coal Storage and Coke
    Handling Area, Fairmont Coke Works Site, Fairmont,
    West Virginia, prepared by ARCADIS, 2/26/09.
    P. 600507-600841.

27. Electronic memorandum to Mr. Dan Kemp, ARCADIS, from
    Mr. Eric Newman, U.S. EPA, re:  Comments on proposal
    to revisit pipe in byproducts area 2/12, 7/7/09.
    P. 600842-600847.  Related electronic memoranda are
    attached.

28. Letter Report to Mr. Eric Newman, U.S. EPA, from
    Mr. Robert Anderson, ARCADIS, re:  Work Plan for
    Additional Power Probe Borings in Former Processing
    Area, 9/16/09.  P. 600848-600851.

29. Letter Report to Mr. Eric Newman, U.S. EPA, from
    Mr. Robert Anderson, ARCADIS, re:  LOS Area Post-
    Excavation Work Plan, 10/20/09.  P. 600852-600854.

30. Proposed Amendment (#11) to Fairmont Coke Works
    Remedial Action Plan for Site Removal Action,
    10/23/09.  P. 600855-600872.

31. Letter to Brig. Gen. Melvin Burch, WV Army National
    Guard, from Mr. Michael Lamarre, Exxon Mobil, re:
    Follow-up to October 21, 2009, meeting, 10/27/09.
    P. 600873-600874.

32. Report:  Light Oil Storage Area Post Excavation
    Assessment, Fairmont Coke Works Site, Fairmont, West
    Virginia, prepared by ARCADIS, 11/11/09.  P. 600875-
    600983.

33. Figure, Pipe Removal Decision Matrix, 11/16/09.
    P. 600984-600984.

34. Report:  Field Sampling Plan, Fairmont Coke Works Site
    Remediation Project, Fairmont, Marion County, West

AR442967

<u>Virginia</u>, prepared by ARCADIS, revised 11/19/09.
P. 600985-601156.

35. Letter Report to Mr. Michael Lamarre, ExxonMobil,
Environmental Services, from Mr. Robert Anderson,
ARCADIS, re:  Coal Storage Area/Coke Handling Area –
Hot Spot Assessment Work Plan, 12/29/09.  P. 601157-
601159.

36. Standard Operating Procedure (SOP), Pipe Plugging
Procedure, 1/18/10.  P. 601160-601161.

37. Report:  <u>Site-Wide Groundwater Monitoring Plan,
Fairmont Coke Works Site, Fairmont, West Virginia</u>,
prepared by ARCADIS, 2/5/10.  P. 601162-601246.  A
February 5, 2010, electronic transmittal memorandum to
Mr. Eric Newman, U.S. EPA, from Mr. Robert Anderson,
ARCADIS, is attached.

38. Letter Report to Mr. Michael Lamarre, ExxonMobil,
Environmental Services, from Mr. Robert Anderson,
ARCADIS, re:  Former Light Oil Storage Area Grading
Plan, 2/22/10.  P. 601247-601250.

39. Electronic memorandum to Mr. Dan Kemp, ARCADIS,
Mr. Eric Newman, U.S. EPA, and Mr. Joe Carter,
TechLaw, Inc. from Mr. Thomas Bass, WVDEP, re:
Response to Former Light Oil Storage Area Grading
Plan, 2/24/10.  P. 601251-601252.  A February 23,
2010, electronic transmittal memorandum to Mr. Eric
Newman, U.S. EPA, Mr. Joe Carter, TechLaw, Inc. and
Mr. Thomas Bass, WVDEP from Mr. Dan Kemp, ARCADIS, is
attached.

40. Draft letter to Mr. Eric Newman, U.S. EPA, from
WVDEP's Division of Land Restoration, re:  Site-Wide
Groundwater Monitoring Plan, 3/1/10.  P. 601253-
601253.

41. Memorandum to Mr. Eric Newman, U.S. EPA, from Mr.
Bruce Rundell, U.S. EPA, re:  Hydrogeologic review of
Groundwater Monitoring Plan, 3/11/10.  P. 601254-
601254.

AR442968

42. Letter to Mr. Michael Lamarre, ExxonMobil Environmental Services, from Mr. Eric Newman, U.S. EPA, re:  EPA's comments on Site-Wide Groundwater Monitoring Plan, 3/16/10.  P. 601255-601256.

43. Letter Report to Mr. Michael Lamarre, ExxonMobil Environmental Service, from Mr. Robert Anderson, ARCADIS, re:  In Situ Sampling Plan for Overburden Near Mod 1, 3/29/10.  P. 601257-601259.

44. Electronic memorandum to Mr. Michael Lamarre, ExxonMobil Environmental Services, from Mr. Eric Newman, U.S. EPA, re:  Confirmation of receipt of comments on backfill at the Site, 4/13/10.  P. 601260-601265.  Documents regarding backfill at the Site are attached.

45. Letter Report to Mr. Eric Newman U.S. EPA, from Mr. Michael Lamarre, ExxonMobil Environmental Service, re:  Stream Water Quality Investigation, 4/20/10.  P. 601266-601279.  A March 29, 2010, sampling report is attached.

46. Letter to Mr. Michael Lamarre, ExxonMobil Environmental Services, from Mr. Eric Newman, U.S. EPA, re:  Acceptance of Coal Storage Area/Coke Handling Area Hot Spot Assessment, Conclusions, and Proposed Further Actions, 4/20/10.  P. 601280-601282.  Related electronic memoranda are attached.

47. Letter Report to Mr. Michael Lamarre, ExxonMobil Environmental Service, from Mr. Robert Anderson, ARCADIS, re:  Plan for Removal of Tar-Like Materials Adjacent to the LOS Area, 5/6/10.  P. 601283-601289.

48. Electronic memorandum to Mr. Michael Lamarre, ExxonMobil Environmental Services, from Mr. Eric Newman, U.S. EPA, re:  Approval of plan regarding imported fill, 5/7/10.  P. 601290-601292.  A May 7, 2010, electronic memorandum to Mr. Eric Newman, U.S. EPA, from Mr. Michael Lamarre, ExxonMobil Environmental Services, regarding a request for response on use of imported fill, is attached.

AR442969

49. Letter to Mr. Michael Lamarre, ExxonMobil
    Environmental Service, from Mr. Thomas Bass, WVDEP,
    re:  Approval of the Plan for Removal of Tar-Like
    Materials Adjacent to the LOS Area, 5/10/10.
    P. 601293-601293.

50. Letter Report to Mr. Michael Lamarre, ExxonMobil
    Environmental Service, from Mr. Robert Anderson,
    ARCADIS, re:  March 2010 - Baseline Site-Wide
    Groundwater Monitoring Report, 7/8/10.  P. 601294-
    601414.

51. Letter Report to Mr. Michael Lamarre, ExxonMobil
    Environmental Service, from Mr. Robert Anderson,
    ARCADIS, re:  Coal Storage Area/Coke Handling Area -
    Hot Spot Removal Report, 7/9/10.  P. 601415-601451.

52. Letter Report to Mr. Eric Newman, U.S. EPA, from
    Mr. Robert Anderson, ARCADIS, re:  Assessment of
    Potential Waste Locations Work Plan, 8/4/10.
    P. 601452-601456.

53. Meeting Minutes, Coke Works/Fairmont Armed Forces
    Reserve Center (AFRC) Site Issues, 8/25/10.
    P. 601457-601461.  AFRC Site Figures are attached.

54. Letter Report to Mr. Eric Newman, U.S. EPA, from
    Mr. Robert Anderson, ARCADIS, re:  Work Plan for
    Removal of Off-Site Material at Areas 2 & 3, 10/14/10.
    P. 601462-601467.

55. Electronic memorandum to Mr. Matthew Swensson,
    ARCADIS, from Mr. Eric Newman, U.S. EPA, re:  Approval
    of proposed Work Plans for Removal of Off-Site
    Material, 10/15/10.  P. 601468-601469.  An October 14,
    2010, electronic memorandum to Mr. Eric Newman, U.S.
    EPA, Mr. Joe Carter, TechLaw, Inc., and Mr. Thomas
    Bass, WVDEP, from Mr. Matthew Swensson, ARCADIS,
    regarding submittal of *Work Plans for Removal of Off-
    Site Material*, is attached.

56. Memorandum to Mr. Eric Newman, U.S. EPA, from Ms.
    Jennifer Hubbard, U.S. EPA, re:  Human health risk

AR442970

assessment review of Groundwater Monitoring and LOS
Reports, 11/15/10.  P. 601470-601471.

57.  Letter Report to Mr. Michael Lamarre, ExxonMobil
     Environmental Services, from Mr. Robert Anderson,
     ARCADIS, re:  September 2010 – Baseline Site-Wide
     Groundwater Monitoring Report, 12/21/10.  P. 601472-
     601515.

58.  Memorandum to Mr. Eric Newman, U.S. EPA, from Ms.
     Jennifer Hubbard, U.S. EPA, re:  Human health risk
     assessment review of December 2010 Groundwater Report,
     3/17/11.  P. 601516-601517.

59.  Letter to Mr. Michael Lamarre, ExxonMobil
     Environmental Services, from Mr. Eric Newman, U.S.
     EPA, re:  LOS Area Closeout Report, 3/25/11.
     P. 601518-601539.

60.  Electronic memorandum to Mr. Eric Newman U.S. EPA,
     from Mr. Michael Lamarre, ExxonMobil Environmental
     Services, re:  Seep Area #1 access agreement, 4/23/11.
     P. 601540-601541.  Related electronic memoranda are
     attached.

61.  Electronic memorandum to Mr. Eric Newman, U.S. EPA,
     from Mr. Robert Anderson, ARCADIS, re:  Erosion
     repairs, 7/5/11.  P. 601542-601547.  Related
     electronic memoranda and Site photos are attached.

62.  Electronic memorandum to Mr. Eric Newman, U.S. EPA,
     from Mr. Robert Anderson, ARCADIS, re:  Transmittal of
     erosion repair photos, 7/7/11.  P. 601548-601552.
     Related electronic memoranda are attached.

63.  Electronic memorandum to Mr. Michael Lamarre,
     ExxonMobil Environmental Services, from Mr. Eric
     Newman, U.S. EPA, re:  E & S trouble spots at Site,
     7/27/11.  P. 601553-601553.

64.  Letter to Mr. Eric Newman, U.S. EPA, from Mr. Michael
     Lamarre, ExxonMobil Environmental Services, re:
     Certification of Compliance – Final Report, Non-Time
     Critical Removal Action, 9/20/11.  P. 601554-601555.

AR442971

65.  U.S. EPA Pollution Report #455 and Final, Fairmont
     Coke Works, 9/28/11.  P. 601556-601567.

66.  Letter to Mr. Michael Lamarre, ExxonMobil
     Environmental Services, from Mr. James Webb, U.S. EPA,
     re:  Approval of Final Report and transition from Non-
     Time Critical Removal Action to Remedial
     Investigation/Feasibility Study, 9/28/11.  P. 601568-
     601569.

67.  Electronic memorandum to Mr. Bruce Pluta, U.S. EPA,
     and Ms. Kathleen Patnode, U.S. Fish & Wildlife
     Service, from Mr. Eric Newman, U.S. EPA, re:  Soil
     sample and erosion repair, 10/13/11.  P. 601570-
     601571.  An October 13, 2011, electronic memorandum to
     Mr. Eric Newman, U.S. EPA, from Mr. Robert Anderson,
     ARCADIS, regarding erosion repair and the upcoming
     site visit, is attached.

68.  Electronic memorandum to Mr. Eric Newman, U.S. EPA,
     from Mr. Rob Anderson, ARCADIS, re:  Transmittal of
     and comments on Penn State University (PSU) Soil Test
     Report, 10/14/11.  P. 601572-601581.  PSU Soil Test
     Report and related electronic memoranda are attached.

69.  U.S. EPA Newsletter:  Technology News and Trends,
     Issue 56, EPA 542-N-11-005, 11/11.  P. 601582-601587.

AR442972

## GUIDANCE DOCUMENTS

1.   Memorandum to State of Oregon Department of Environmental
     Quality Staff, from Mr. Dennis Ades, Ms. RaeAnn Haynes, and
     Ms. Jennifer Wigal, State of Oregon Department of
     Environmental Quality, re:  Implementation Instructions for
     Free and Total Cyanide Water Quality Criteria (CAS #:  57-
     12-5), 11/14/12.

2.   City of Fairmont Planning and Zoning Code, effective
     5/28/15.

AR442973

# APPENDIX E

# WVDEP CONCURRENCE LETTER

AR442974

[PAGE INTENTIONALLY LEFT BLANK]

AR442975



**west virginia** department of environmental protection

Division of Land Restoration
601 57th Street SE
Charleston, WV 25304
Phone: 304-926-0455

Jim Justice, Governor
Austin Caperton, Cabinet Secretary
dep.wv.gov

December 8, 2017

Ms. Karen Melvin, Director
Hazardous Site Cleanup Division
U.S. EPA Region 3
1650 Arch Street
Mail Code 3HS00
Philadelphia, PA 19103-2029

**RE:     State Concurrence with the Record of Decision (ROD), December 2017**
**Sharon Steel/Fairmont Coke Works Superfund Site**
**Fairmont, Marion County, West Virginia**
**EPA Identification No. WVD000800441**

Dear Ms. Melvin:

This letter is to officially express that the State of West Virginia, Department of Environmental Protection, Office of Environmental Remediation (OER) has reviewed and is in concurrence with the ROD dated December 2017 for the Sharon Steel/Fairmont Coke Works Superfund Site (site), located in Fairmont, Marion County, West Virginia.

The OER has participated in the investigation, as well as the evaluation and selection of the remedies proposed for the site.  The State looks forward to the implementation of the selected remedies, which we believe will be protective both to human health and the environment, as well as provide for cost-effective remediation of the site.

Sincerely,

Casey E. Korbini
Deputy Director for Remediation Programs,
Division of Land Restoration

ec:     Eric Newman, Remedial Project Manager, U.S. EPA
ec:     Jason McDougal, Program Manager, OER
ec:     William Huggins Jr., Project Manager, OER

Promoting a healthy environment.

AR442976

# APPENDIX B



NOTES:

1. SEE FIGURE 2 FOR RELEASE LINE POINT COORDINATES.
2. CMP – CORRUGATED METAL PIPE

LEGEND:

- FAIRMONT COKE WORKS SITE PROPERTY BOUNDARY
- RELEASE LINE
- FCW SITE
- UNNAMED TRIBUTARY #1 AND SURROUNDING AREA

0 180' 360'
GRAPHIC SCALE

REMEDIAL DESIGN/REMEDIAL ACTION CONSENT DECREE
SHARON STEEL/FAIRMONT COKE WORKS SUPERFUND SITE

**APPENDIX B - SITE MAP**
**(AERIAL PHOTOGRAPH FROM GOOGLE EARTH, DATED OCTOBER 5, 2016)**

ARCADIS

FIGURE
1

| | THE RELEASE LINE | | |
|---|---|---|---|
| POINT | NORTHING | EASTING | ELEVATION |
| 1 | 363722.229 | 1792203.829 | 918.91 |
| 2 | 363735.664 | 1792241.333 | 915.98 |
| 3 | 363747.307 | 1792270.980 | 914.81 |
| 4 | 363767.498 | 1792304.283 | 918.77 |
| 5 | 363794.587 | 1792330.599 | 915.68 |
| 6 | 363815.386 | 1792371.344 | 917.26 |
| 7 | 363828.026 | 1792422.332 | 918.10 |
| 8 | 363842.657 | 1792467.643 | 917.08 |
| 9 | 363850.749 | 1792512.341 | 918.43 |
| 10 | 363842.478 | 1792586.169 | 923.87 |
| 11 | 363832.806 | 1792639.926 | 925.07 |
| 12 | 363813.123 | 1792684.168 | 928.19 |
| 13 | 363786.333 | 1792725.689 | 930.70 |
| 14 | 363770.866 | 1792748.620 | 933.83 |
| 15 | 363737.235 | 1792831.367 | 938.52 |
| 16 | 363733.883 | 1792875.263 | 939.48 |
| 17 | 363730.233 | 1792788.474 | 902.41 |
| 18 | 363748.994 | 1792930.848 | 904.50 |
| 19 | 363776.934 | 1792979.505 | 906.28 |
| 20 | 363781.169 | 1793014.253 | 910.45 |
| 21 | 363756.699 | 1793056.249 | 915.11 |
| 22 | 363735.472 | 1793086.601 | 916.55 |
| 23 | 363709.172 | 1793118.028 | 921.23 |
| 24 | 363654.460 | 1793152.140 | 924.93 |
| 25 | 363621.699 | 1793193.559 | 927.97 |
| 26 | 363614.106 | 1793248.801 | 930.21 |
| 27 | 363592.247 | 1793289.393 | 931.01 |
| 28 | 363601.366 | 1793311.727 | 931.99 |
| 29 | 363604.421 | 1793337.639 | 933.00 |
| 30 | 363636.845 | 1793332.001 | 933.10 |
| 31 | 363668.626 | 1793346.069 | 934.37 |
| 32 | 363705.980 | 1793375.797 | 935.24 |
| 33 | 363727.008 | 1793404.670 | 937.51 |
| 34 | 363759.320 | 1793435.960 | 939.78 |
| 35 | 363740.824 | 1793454.225 | 939.10 |
| 36 | 363711.332 | 1793488.919 | 942.45 |
| 37 | 363722.155 | 1793541.942 | 942.26 |
| 38 | 363754.418 | 1793578.007 | 943.95 |
| 39 | 363791.541 | 1793609.687 | 947.14 |
| 40 | 363810.910 | 1793620.020 | 946.46 |
| 41 | 363897.010 | 1793601.560 | 969.35 |
| 42 | 364070.510 | 1793656.390 | 982.69 |
| 43 | 364125.600 | 1793691.290 | 986.79 |
| 44 | 364148.370 | 1793716.610 | 989.67 |

WEST VIRGINIA STATE PLANE NORTH NAD83

REMEDIAL DESIGN/REMEDIAL ACTION CONSENT DECREE
SHARON STEEL/FAIRMONT COKE WORKS SUPERFUND SITE

**RELEASE LINE COORDINATES**



FIGURE

**2**

CITY:(Reqd) DWGROUP:(Reqd) DIB:(Reqd) LD:(Opt) PIC:(Opt) PM:(Reqd) TM:(Opt) LYR:(Opt)ON+*OFF+*REF*
C:\Users\aschilling\OneDrive - ARCADIS\BIM 360 Docs\EXXONMOBIL\XOM FAIRMONT COKEWORKS T&M 2010\201BB\008925.170101-DWG\Appendix B-Fig2. Coordinates.dwg  LAYOUT 2  SAVED: 7/13/2018 11:54 AM  ACADVER: 21.0S (LMS TECH)  PAGESETUP: ----  PLOTSTYLETABLE: PLTFULL.CTB
PLOTTED: 7/13/2018 1:48 PM  BY SCHILLING, ADAM
XREFS:   IMAGES:   PROJECTNAME: ----

# APPENDIX C

**REMEDIAL DESIGN/REMEDIAL ACTION**

**STATEMENT OF WORK**

**SHARON STEEL/FAIRMONT COKE WORKS SUPERFUND SITE**

**Fairmont, Marion County, State of West Virginia**

**EPA Region III**

**August 2018**

## TABLE OF CONTENTS

1.      INTRODUCTION ..................................................................................................1

2.      COMMUNITY INVOLVEMENT ........................................................................3

3.      REMEDIAL DESIGN ...........................................................................................4

4.      REMEDIAL ACTION ...........................................................................................8

5.      REPORTING ......................................................................................................13

6.      DELIVERABLES ...............................................................................................13

7.      SCHEDULES ......................................................................................................20

8.      STATE PARTICIPATION ..................................................................................22

9.      REFERENCES ...................................................................................................23

# 1.    INTRODUCTION

**1.1    Purpose of the SOW**. This Statement of Work (SOW) sets forth the procedures and requirements for implementing the Work.

**1.2    Structure of the SOW**

- Section 2 (Community Involvement) sets forth EPA's and Settling Defendant's (SD's) responsibilities for community involvement.

- Section 3 (Remedial Design) sets forth the process for developing the RD, which includes the submission of specified primary deliverables.

- Section 4 (Remedial Action) sets forth requirements regarding the completion of the RA, including primary deliverables related to completion of the RA.

- Section 5 (Reporting) sets forth SD's reporting obligations.

- Section 6 (Deliverables) describes the content of the supporting deliverables and the general requirements regarding SD's submission of, and EPA's review of, approval of, comment on, and/or modification of, the deliverables.

- Section 7 (Schedules) sets forth the schedule for submitting the primary deliverables, specifies the supporting deliverables that must accompany each primary deliverable, and sets forth the schedule of milestones regarding the completion of the RA.

- Section 8 (State Participation) addresses State participation.

- Section 9 (References) provides a list of references, including URLs.

**1.3**    The Record of Decision (ROD) relating to the Sharon Steel/Fairmont Coke Works Superfund Site was signed by EPA on December 19, 2017.  The Selected Remedy is referred to in the ROD as Alternative 5, Limestone Trench/Permeable Reactive Barrier (LT/PRB); Remediation of Wetlands; Institutional Controls (ICs).

For purposes of the Consent Decree, the Remedial Action and the "Scope of the Remedy" consist of the following elements:

(a)    Perform pre-design groundwater sampling and hydrostratigraphic characterization to refine understanding of the concentrations and flow paths of benzene, metals and pH in groundwater and optimize permeable reactive wall alignment at the western portion of the Site.  Perform treatability study(s) to determine the most appropriate treatment media to utilize in the reactive permeable barrier designed to elevate pH and otherwise achieve the Performance Standards.

(b)    Install a LT/PRB extending from the groundwater (saturated) surface to the base of the intermediate aquifer (may include upper weathered bedrock zone as appropriate), nominally aligned perpendicular to the natural flow of groundwater.  The specific treatment media and 3-dimensional wall alignment will be determined during the Remedial Design.  Effectiveness of the LT/PRB will be measured by achieving the Performance Standards identified below.  Performance

1

monitoring in groundwater to demonstrate the effectiveness of the LT/PRB will be performed as described in the Site-Wide Monitoring Plan (see Section 6.7(e)). Non-point source subsurface groundwater discharge from the Affected Property to surface water must not contribute to an exceedance of the West Virginia Surface Water Quality Standards appropriate for secondary use recreation and protection of aquatic life. Additionally, non-point source subsurface groundwater discharge from the Affected Property to surface water must not contribute to an exceedance of the risk-based manganese Performance Standard for protection of recreational use (children). The specific Performance Standards for surface water are as follows:

| | | | |
|---|---|---|---|
| (1) | pH | 6-9 | |
| (2) | iron | 1.5 | mg/L |
| (3) | aluminum | 0.75 | mg/L |
| (4) | cyanide (as free cyanide HCN+CN-) | 22 | µg/L |
| (5) | benzene | 51 | µg/L |
| (6) | manganese | 6[1] | mg/L |

The estimated timeframe in the ROD to reach the Performance Standards is not itself a Performance Standard.

(c)     Apply organic material capable of reducing the bioavailability of inorganic Contaminants of Concern (COCs) in Wetland Areas 1 and 3 (ROD Figure 2). The specific amendments and application rates will be determined during the Remedial Design. Disturbed areas shall be seeded with a native wetland seed mix approved by EPA that is comprised of regionally native species. Successful wetland remediation will achieve:

(1)     85% cover of planted vegetation, including naturally occurring native volunteer vegetative species suited to the habitat, within three years;

(2)     less than 10% areal cover of invasive species; and,

(3)     cover plants must not exhibit significant evidence of metal toxicity.

Annual wetland vegetation monitoring will occur for 5 years or until 90% of areal cover is achieved, whichever is earlier.

(d)     Maintain the existing ICs to prevent residential land use and the extraction of groundwater from the aquifer beneath the Site for use as a potable water source. Additional ICs will be implemented to require vapor mitigation for any new

---

[1] The Performance Standard for manganese in surface water is the calculated risk-based standard (Hazard Index equals 1.0) for recreational use (child)

habitable buildings constructed within the Vapor Intrusion Protection Area (VIPA) (ROD Figure 9) unless EPA determines that a building-specific vapor intrusion evaluation shows that mitigation is unnecessary.  The owner or developer of the property will be responsible for building-specific VI investigation and the installation and operation of any VI engineering control. The default pre-emptive vapor mitigation will include, at a minimum, a foundation vapor barrier and subsurface piping for a passive subslab venting system that can be converted to an active sub-slab depressurization system if necessary, or equivalent mitigation measures as approved by EPA.  Prior to occupancy, indoor air samples will be collected from within the building(s) to confirm the efficacy of the passive venting system.  If indoor air sample concentrations exceed the higher of background concentrations or EPA risk-based criteria, the passive venting system will be activated and operated as an active subslab depressurization system, until such time as EPA, in consultation with WVDEP, determines that the subsurface contamination no longer poses a vapor intrusion risk.  ICs will also identify the VIPA as an area where construction workers required to work in a subsurface trench may be subject to conditions where a hazardous atmosphere could reasonably be expected to exist, and standard precautions such as Occupational Safety and Health Administration (OSHA)-mandated protocol to provide ventilation and proper respiratory protection will be required.  In addition, ICs will prohibit any activity that would interfere with the operation of the LT/PRB, which includes the system's groundwater monitoring wells.

(e)     Perform long-term groundwater and surface water monitoring in accordance with the EPA-approved Site-Wide Monitoring Plan to measure the performance of the LT/PRB in accordance with the EPA-approved design.  Monitoring may also include pore water sampling, as appropriate.  The design must include an operation, maintenance and monitoring plan capable of demonstrating groundwater flow patterns and the continued effectiveness of the treatment system over time.  Long-term groundwater monitoring at the perimeter of the Site will also be required to confirm that groundwater with COCs identified in the ROD exceeding Maximum Contaminant Levels (MCLs) promulgated pursuant to Section 42 U.S.C. §§ 300f et seq. of the Safe Drinking Water Act and codified at 40 C.F.R. Part 141, or risk-based goals remains within the Site boundary.

**1.4**    The terms used in this SOW that are defined in CERCLA, in regulations promulgated under CERCLA, or in the Consent Decree (CD), have the meanings assigned to them in CERCLA, in such regulations, or in the CD, except that the term "Paragraph" or "¶" means a paragraph of the SOW, and the term "Section" means a section of the SOW, unless otherwise stated.

## 2.        COMMUNITY INVOLVEMENT

**2.1    Community Involvement Responsibilities**

3

(a)     EPA has the lead responsibility for developing and implementing community involvement activities at the Site. Previously during the RI/FS phase, EPA developed a Community Involvement Plan (CIP) for the Site. Pursuant to 40 C.F.R. § 300.435(c), EPA shall review the existing CIP and determine whether it should be revised to describe further public involvement activities during the Work that are not already addressed or provided for in the existing CIP.

(b)     If requested by EPA, SD shall participate in community involvement activities, including participation in (1) the preparation of information regarding the Work for dissemination to the public, with consideration given to including mass media and/or Internet notification, and (2) public meetings that may be held or sponsored by EPA to explain activities at or relating to the Site. SD's support of EPA's community involvement activities may include providing online access to initial submissions and updates of deliverables to (1) any Community Advisory Groups, and (2) other entities to provide them with a reasonable opportunity for review and comment. EPA may describe in its CIP SD's responsibilities for community involvement activities. All community involvement activities conducted by SD at EPA's request are subject to EPA's oversight.

(c)     **SD's CI Coordinator**. If requested by EPA, SD shall, within 15 days, designate and notify EPA of SD's Community Involvement Coordinator (SD's CI Coordinator). SD may hire a contractor for this purpose. SD's notice must include the name, title, and qualifications of the SD's CI Coordinator. SD's CI Coordinator is responsible for providing support regarding EPA's community involvement activities, including coordinating with EPA's CI Coordinator regarding responses to the public's inquiries about the Site.

### 3.      REMEDIAL DESIGN

**3.1    RD Work Plan**. SD shall submit a Remedial Design (RD) Work Plan (RDWP) for EPA approval. The RDWP must include:

(a)     Plans and schedules for implementing all RD activities identified in this SOW, in the RDWP, or required by EPA to be conducted to develop the RD;

(b)     A description of the overall management strategy for performing the RD, including a proposal for phasing of design and construction, if applicable;

(c)     A description of the proposed general approach to contracting, construction, operation, maintenance, and monitoring of the Remedial Action (RA) as necessary to implement the Work;

(d)     A description of the responsibility and authority of all organizations and key personnel involved with the development of the RD;

4

(e)     Descriptions of any areas requiring clarification and/or anticipated problems (e.g., data gaps);

(f)     Description of any proposed additional pre-design investigation;

(g)     Description of any proposed additional treatability study;

(h)     Descriptions of any applicable permitting requirements and other regulatory requirements;

(i)     Description of plans for obtaining access in connection with the Work, such as property acquisition, property leases, and/or easements; and

(j)     Preliminary versions of the following supporting deliverables described in ¶ 6.7 (Supporting Deliverables): Health and Safety Plan; Emergency Response Plan; Field Sampling Plan; and, Quality Assurance Project Plan.

**3.2**     SD shall meet regularly with EPA to discuss design issues as necessary, as directed or determined by EPA.

**3.3**     **Pre-Design Investigation**. The purpose of the Pre-Design Investigation (PDI) is to address data gaps by conducting additional field investigations.

(a)     **PDI Work Plan**. A PDI Work Plan (PDIWP) was submitted for EPA approval and revised in July 2017 based on EPA comments received on June 9, 2017. The PDIWP included:

(1)     An evaluation and summary of existing data and description of data gaps;

(2)     A sampling plan including media to be sampled, contaminants or parameters for which sampling will be conducted, location (areal extent and depths), and number of samples; and

(3)     Cross references to quality assurance/quality control (QA/QC) requirements set forth in the Quality Assurance Project Plan (QAPP) as described in ¶ 6.7(d).

(b)     The PDI field activities were completed in 2017. A PDI Evaluation Report shall be submitted with the RDWP.  This report must include:

(1)     Summary of the investigations performed;

(2)     Summary of investigation results;

(3)     Preliminary treatability study results;

(4)     Summary of validated data (i.e., tables and graphics);

(5)        Data validation reports and laboratory data reports;

(6)        Narrative interpretation of data and results;

(7)        Results of statistical and modeling analyses;

(8)        Photographs documenting the work conducted; and

(9)        Conclusions and recommendations for RD, including design parameters and criteria.

(c)        As described below, the PDI results will be used in the 30% design to develop preliminary LT/PRB alignment.  Final LT/PRB alignment will be presented in the 95% remedial design. EPA may require SD to supplement the PDI Evaluation Report and/or to perform additional pre-design studies.

## 3.4    Treatability Study

(a)        SD is performing a Treatability Study (TS) for the purpose of selecting appropriate treatment media for the Limestone Trench/Permeable Reactive Barrier.

(b)        The TS is being conducted in accordance with the treatability testing provisions in the PDIWP that was submitted for EPA approval and was revised in July 2017 based on EPA comments.

(c)        Preliminary treatability testing results shall be included in the PDI Report that will be submitted with the RDWP. The preliminary treatability study results will be used in the 30% design to select treatment media.  Final treatability test results shall be included in the 95% remedial design and shall be used to develop the final configuration of treatment media in the 95% design.

(d)        EPA may require SD to supplement the TS Evaluation Report and/or to perform additional treatability studies.

## 3.5    Preliminary (30%) RD. SD shall submit a Preliminary (30%) RD with the RDWP for EPA's comment. The Preliminary RD must include:

(a)        A design criteria report, as described in the *Remedial Design/Remedial Action Handbook*, EPA 540/R-95/059 (June 1995);

(b)        A description of the preliminary wall alignment based on the PDI results;

(c)        A description of the selected treatment media based on the preliminary treatability results;

(d)        Preliminary drawings and specifications;

(e)     Descriptions of permit requirements, if applicable;

(f)     Preliminary Operation and Maintenance (O&M) Plan and O&M Manual;

(g)     A description of how the RA will be implemented in a manner that minimizes environmental impacts in accordance with EPA's *Principles for Greener Cleanups* (Aug. 2009);

(h)     A description of monitoring and control measures to protect human health and the environment, such as air monitoring and dust suppression, during the RA;

(i)     Any proposed revisions to the RD schedule included in the approved RDWP or the RA Schedule that is set forth in ¶ 7.3 (RA Schedule); and

(j)     Updates of all supporting deliverables required to accompany the RDWP and the following additional supporting deliverables described in ¶ 6.7 (Supporting Deliverables): Site Wide Monitoring Plan; Construction Quality Assurance/Quality Control Plan; O&M Plan; O&M Manual; and Institutional Controls Implementation and Assurance Plan.

**3.6**   **Pre-Final (95%) RD**. SD shall submit the Pre-final (95%) RD for EPA's comment. The Pre-final RD must be a continuation and expansion of the previous design submittal and must address EPA's comments regarding the Preliminary RD. The Pre-final RD will serve as the approved Final (100%) RD if EPA approves the Pre-final RD without comments. The Pre-final RD must include:

(a)     A complete set of construction drawings and specifications that are: (1) certified by a registered professional engineer; (2) suitable for procurement; and (3) follow the Construction Specifications Institute's MasterFormat 2012;

(b)     A survey and engineering drawings showing existing Site features, such as elements, property borders, easements, and Site conditions;

(c)     Results of treatability studies, media selection, groundwater flow modeling, and wall configuration;

(d)     Pre-Final versions of the same elements and deliverables as are required for the Preliminary RD;

(e)     A specification for photographic documentation of the RA;

(f)     Updates of all supporting deliverables required to accompany the Preliminary (30%) RD; and

(g)     Any proposed revisions to the RA schedule that is set forth in ¶ 7.3 (RA Schedule).

7

3.7     **Final (100%) RD**. SD shall submit the Final (100%) RD for EPA approval. The Final RD must address EPA's comments on the Pre-final RD and must include final versions of all Pre-final RD deliverables.

## 4.     REMEDIAL ACTION

4.1     **RA Work Plan**. SD shall submit a RA Work Plan (RAWP) for EPA approval that includes:

   (a)     A proposed RA Construction Schedule using critical path method or other format approved by EPA and

   (b)     An updated health and safety plan that covers activities during the RA.

4.2     Independent Quality Assurance Team. SD shall notify EPA of SD's designated Independent Quality Assurance Team (IQAT). The IQAT will be independent of the Supervising Contractor. SD may hire a third party for this purpose. SD's notice must include the names, titles, contact information, and qualifications of the members of the IQAT. The IQAT will have the responsibility to determine whether Work is of expected quality and conforms to applicable plans and specifications. The IQAT will have the responsibilities as described in ¶ 2.1.3 of the *Guidance on EPA Oversight of Remedial Designs and Remedial Actions Performed by Potentially Responsible Parties*, EPA/540/G-90/001 (Apr. 1990).

4.3     **Meetings and Inspections**

   (a)     **Preconstruction Conference**. SD shall hold a preconstruction conference with EPA and others as directed or approved by EPA and as described in the *Remedial Design/Remedial Action Handbook*, EPA 540/R-95/059 (June 1995). SD shall prepare minutes of the conference and shall distribute the minutes to all Parties.

   (b)     **Periodic Meetings**. During the construction portion of the RA (RA Construction), SD shall meet regularly with EPA, and others as directed or determined by EPA, to discuss construction issues. SD shall distribute an agenda and list of attendees to all Parties prior to each meeting. SD shall prepare minutes of the meetings and shall distribute the minutes to all Parties.

   (c)     **Inspections**

      (1)     EPA or its representative shall conduct periodic inspections of the Work. At EPA's request, the Supervising Contractor or other designee shall accompany EPA or its representative during inspections.

      (2)     SD shall provide office space for EPA personnel to perform their oversight duties. The minimum office requirements are a private office with at least 120 square feet of floor space, an office desk with chair, a two-drawer file cabinet, and a telephone with a private line, access to

facsimile, reproduction, and personal computer equipment, wireless internet access, and sanitation facilities or as otherwise agreed to by EPA.

(3)     Upon notification by EPA of any deficiencies in the RA Construction, SD shall take all necessary steps to correct the deficiencies and/or bring the RA Construction into compliance with the approved Final RD, any approved design changes, and/or the approved RAWP. If applicable, SD shall comply with any schedule provided by EPA in its notice of deficiency.

## 4.4     Emergency Response and Reporting

(a)     **Emergency Response and Reporting**. If any event occurs during performance of the Work that causes or threatens to cause a release of Waste Material on, at, or from the Site and that either constitutes an emergency situation or that may present an immediate threat to public health or welfare or the environment, SD shall: (1) immediately take all appropriate action to prevent, abate, or minimize such release or threat of release; (2) immediately notify the authorized EPA officer (as specified in ¶ 4.4(c)) orally; and (3) take such actions in consultation with the authorized EPA officer and in accordance with all applicable provisions of the Health and Safety Plan, the Emergency Response Plan, and any other deliverable approved by EPA under the SOW.

(b)     **Release Reporting**. Upon the occurrence of any event during performance of the Work that SD is required to report pursuant to Section 103 of CERCLA, 42 U.S.C. § 9603, or Section 304 of the Emergency Planning and Community Right-to-know Act (EPCRA), 42 U.S.C. § 11004, SD shall immediately notify the authorized EPA officer orally.

(c)     The "authorized EPA officer" for purposes of immediate oral notifications and consultations under ¶ 4.4(a) and ¶ 4.4(b) is the EPA Project Coordinator, the EPA Alternate Project Coordinator (if the EPA Project Coordinator is unavailable), or the EPA Region III Hotline at 215-814-3255 (if neither EPA Project Coordinator is available).

(d)     For any event covered by ¶ 4.4(a) and ¶ 4.4(b), SD shall: (1) within 7 days after the onset of such event, submit a report to EPA describing the actions or events that occurred and the measures taken, and to be taken, in response thereto; and (2) within 30 days after the conclusion of such event, submit a report to EPA describing all actions taken in response to such event.

(e)     The reporting requirements under ¶ 4.4 are in addition to the reporting required by CERCLA § 103 or EPCRA § 304.

## 4.5     Off-Site Shipments

9

(a)     SD may ship hazardous substances, pollutants, and contaminants from the Site to an off-Site facility only if it complies with Section 121(d)(3) of CERCLA, 42 U.S.C. § 9621(d)(3), and 40 C.F.R. § 300.440. SD will be deemed to be in compliance with CERCLA § 121(d)(3) and 40 C.F.R. § 300.440 regarding a shipment if SD obtains a prior determination from EPA that the proposed receiving facility for such shipment is acceptable under the criteria of 40 C.F.R. § 300.440(b).

(b)     SD may ship Waste Material from the Site to an out-of-state waste management facility only if, prior to any shipment, it provides notice to the appropriate state environmental official in the receiving facility's state and to the EPA Project Coordinator. This notice requirement will not apply to any off-Site shipments when the total quantity of all such shipments does not exceed 10 cubic yards. The notice must include the following information, if available: (1) the name and location of the receiving facility; (2) the type and quantity of Waste Material to be shipped; (3) the schedule for the shipment; and (4) the method of transportation. SD also shall notify the state environmental official referenced above and the EPA Project Coordinator of any major changes in the shipment plan, such as a decision to ship the Waste Material to a different out-of-state facility. SD shall provide the notice after the award of the contract for RA construction and before the Waste Material is shipped.

(c)     SD may ship Investigation Derived Waste (IDW) from the Site to an off-Site facility only if it complies with Section 121(d)(3) of CERCLA, 42 U.S.C. § 9621(d)(3), 40 C.F.R. § 300.440, *EPA's Guide to Management of Investigation Derived Waste*, OSWER 9345.3-03FS (Jan. 1992), and any IDW-specific requirements contained in the ROD. Wastes shipped off-Site to a laboratory for characterization, and RCRA hazardous wastes that meet the requirements for an exemption from RCRA under 40 CFR § 261.4(e) shipped off-site for treatability studies, are not subject to 40 C.F.R. § 300.440.

## 4.6     RA Construction Completion

(a)     For purposes of this ¶ 4.6, "RA Construction" comprises, for any RA that involves the construction and operation of a system to achieve Performance Standards (for example, groundwater or surface water restoration remedies), the construction of such system and the performance of all activities necessary for the system to function properly and as designed.

(b)     **Inspection of Constructed Remedy**. SD shall schedule an inspection to review the construction and operation of the system and to review whether the system is functioning properly and as designed. The inspection must be attended by SD and EPA and/or their representatives. A re-inspection must be conducted if requested by EPA.

(c)     **Shakedown Period**. There shall be a shakedown period of up to one year for EPA to review whether the remedy is functioning properly and performing as designed. SD shall provide such information as EPA requests for such review.

(d)     **RA Report**. Following the shakedown period, SD shall submit an "RA Report" requesting EPA's determination that RA Construction has been completed. The RA Report must: (1) include statements by a registered professional engineer and by SD's Project Coordinator that construction of the system is complete and that the system is functioning properly and as designed; (2) include a demonstration, and supporting documentation, that construction of the system is complete and that the system is functioning properly and as designed; (3) include as-built drawings signed and stamped by a registered professional engineer; (4) be prepared in accordance with Chapter 2 (Remedial Action Completion) of EPA's *Close Out Procedures for NPL Sites* guidance (May 2011), as supplemented by *Guidance for Management of Superfund Remedies in Post Construction*, OLEM 9200.3-105 (Feb. 2017); and (5) be certified in accordance with ¶ 6.5 (Certification).

(e)     If EPA determines that RA Construction is not complete, EPA shall so notify SD. EPA's notice must include a description of, and schedule for, the activities that SD must perform to complete RA Construction. EPA's notice may include a schedule for completion of such activities or may require SD to submit a proposed schedule for EPA approval. SD shall perform all activities described in the EPA notice in accordance with the schedule.

(f)     If EPA determines, based on the initial or any subsequent RA Report, that RA Construction is complete, EPA shall so notify SD.

## 4.7     Certification of RA Completion

(a)     **Monitoring Report**. SD shall submit a Monitoring Report to EPA requesting EPA's Certification of RA Completion. The report must: (1) include certifications by a registered professional engineer and by SD's Project Coordinator that the RA is complete; (2) be prepared in accordance with Chapter 2 (Remedial Action Completion) of EPA's *Close Out Procedures for NPL Sites* guidance (May 2011), as supplemented by *Guidance for Management of Superfund Remedies in Post Construction*, OLEM 9200.3-105 (Feb. 2017); (3) contain monitoring data to demonstrate, as set forth in the Site-Wide Monitoring Plan, that Performance Standards have been achieved; and (4) be certified in accordance with ¶ 6.5 (Certification).

(b)     If EPA concludes that the RA is not Complete, EPA shall so notify SD. EPA's notice must include a description of any deficiencies. EPA's notice may include a schedule for addressing such deficiencies or may require SD to submit a schedule for EPA approval. SD shall perform all activities described in the notice in accordance with the schedule.

11

(c)     If EPA concludes, based on the initial or any subsequent Monitoring Report requesting Certification of RA Completion, that the RA is Complete, EPA shall so certify to SD. This certification will constitute the Certification of RA Completion for purposes of the CD, including Section XV of the CD (Covenants by Plaintiffs). Certification of RA Completion will not affect SD's remaining obligations under the CD.

**4.8**    **Periodic Review Support Plan (PRSP)**. SD shall submit the PRSP for EPA approval. The PRSP addresses the studies and investigations that SD shall conduct to support EPA's reviews of whether the RA is protective of human health and the environment in accordance with Section 121(c) of CERCLA, 42 U.S.C. § 9621(c) (also known as "Five-year Reviews"). SD shall develop the plan in accordance with *Comprehensive Five-year Review Guidance*, OSWER 9355.7-03B-P (June 2001), and any other relevant five-year review guidance documents.

**4.9**    **Certification of Work Completion**

(a)     **Work Completion Inspection**. SD shall schedule an inspection for the purpose of obtaining EPA's Certification of Work Completion. The inspection must be attended by SD and EPA and/or their representatives.

(b)     **Work Completion Report**. Following the inspection, SD shall submit a report to EPA requesting EPA's Certification of Work Completion. The report must: (1) include certifications by a registered professional engineer and by SD's Project Coordinator that the Work, including all O&M activities, is complete; and (2) be certified in accordance with ¶ 6.5 (Certification). If the Monitoring Report submitted under ¶ 4.7(a) includes all elements required under this ¶ 4.9(b), then the Monitoring Report suffices to satisfy all requirements under this ¶ 4.9(b).

(c)     If EPA concludes that the Work is not complete, EPA shall so notify SD. EPA's notice must include a description of the activities that SD must perform to complete the Work. EPA's notice must include specifications and a schedule for such activities or must require SD to submit specifications and a schedule for EPA approval. SD shall perform all activities described in the notice or in the EPA-approved specifications and schedule.

(d)     If EPA concludes, based on the initial or any subsequent report requesting Certification of Work Completion, that the Work is complete, EPA shall so certify in writing to SD. Issuance of the Certification of Work Completion does not affect the following continuing obligations: (1) activities under the Periodic Review Support Plan; (2) obligations under Sections VIII (Property Requirements), XIX (Retention of Records), and XVIII (Access to Information) of the CD; (3) Institutional Controls obligations as provided in the Institutional Controls Implementation and Assurance Plan (ICIAP); and (4) reimbursement of EPA's Future Response Costs under Section X (Payments for Response Costs) of the CD.

12

## 5.    REPORTING

5.1    **Progress Reports**. Commencing with the month following lodging of the CD and until EPA approves the RA Construction Completion, SD shall submit progress reports to EPA on a monthly basis, or as otherwise requested by EPA. The reports must cover all activities that took place during the prior reporting period, including:

(a)    The actions that have been taken toward achieving compliance with the CD;

(b)    A summary of all results of sampling, tests, and all other data received or generated by SD;

(c)    A description of all deliverables that SD submitted to EPA;

(d)    A description of all activities relating to the RD or RA Construction that are scheduled for the next six weeks;

(e)    An updated RD or RA Construction Schedule, together with information regarding percentage of completion, delays encountered or anticipated that may affect the future schedule for implementation of the Work, and a description of efforts made to mitigate those delays or anticipated delays;

(f)    A description of any modifications to the work plans or other schedules that SD has proposed or that have been approved by EPA; and

(g)    A description of all activities undertaken in support of the Community Involvement Plan (CIP) during the reporting period and those to be undertaken in the next six weeks.

5.2    **Notice of Progress Report Schedule Changes**. If the schedule for any activity described in the Progress Reports, including activities required to be described under ¶ 5.1(d), changes, SD shall notify EPA of such change at least 7 days before performance of the activity.

## 6.    DELIVERABLES

6.1    **Applicability**. SD shall submit deliverables for EPA approval or for EPA comment as specified in the SOW. If neither is specified, the deliverable does not require EPA's approval or comment. Paragraphs 6.2 (In Writing) through 6.4 (Technical Specifications) apply to all deliverables. Paragraph 6.5 (Certification) applies to any deliverable that is required to be certified. Paragraph 6.6 (Approval of Deliverables) applies to any deliverable that is required to be submitted for EPA approval.

6.2    **In Writing**. As provided in ¶ 92 of the CD, all deliverables under this SOW must be in writing unless otherwise specified.

13

6.3     **General Requirements for Deliverables.** All deliverables must be submitted by the deadlines in the RD Schedule or RA Schedule, as applicable. SD shall submit all deliverables to EPA in electronic form. Technical specifications for sampling and monitoring data and spatial data are addressed in ¶ 6.4. All other deliverables shall be submitted to EPA in the electronic form specified by the EPA Project Coordinator. If any deliverable includes maps, drawings, or other exhibits that are larger than 8.5" by 11", SD shall also provide EPA with paper copies of such exhibits.

6.4     **Technical Specifications**

(a)     Sampling and monitoring data should be submitted in standard regional Electronic Data Deliverable (EDD) format. Other delivery methods may be allowed if electronic direct submission presents a significant burden or as technology changes.

(b)     Spatial data, including spatially-referenced data and geospatial data, should be submitted: (1) in the ESRI File Geodatabase format; and (2) as unprojected geographic coordinates in decimal degree format using North American Datum 1983 (NAD83) or World Geodetic System 1984 (WGS84) as the datum. If applicable, submissions should include the collection method(s). Projected coordinates may optionally be included but must be documented. Spatial data should be accompanied by metadata, and such metadata should be compliant with the Federal Geographic Data Committee (FGDC) Content Standard for Digital Geospatial Metadata and its EPA profile, the EPA Geospatial Metadata Technical Specification. An add-on metadata editor for ESRI software, the EPA Metadata Editor (EME), complies with these FGDC and EPA metadata requirements and is available at https://edg.epa.gov/EME/.

(c)     Each file must include an attribute name for each site unit or sub-unit submitted. Consult https://www.epa.gov/geospatial/geospatial-policies-and-standards for any further available guidance on attribute identification and naming.

(d)     Spatial data submitted by SD does not, and is not intended to, define the boundaries of the Site.

6.5     **Certification.** All deliverables that require compliance with this ¶ 6.5 must be signed by the SD's Project Coordinator, or other responsible official of SD, and must contain the following statement:

I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I have no personal knowledge that the information submitted is

14

other than true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

**6.6**     **Approval of Deliverables**

     (a)     **Initial Submissions**

         (1)     After review of any deliverable that is required to be submitted for EPA approval under the CD or the SOW, EPA shall: (i) approve, in whole or in part, the submission; (ii) approve the submission upon specified conditions; (iii) disapprove, in whole or in part, the submission; or (iv) any combination of the foregoing.

         (2)     EPA also may modify the initial submission to cure deficiencies in the submission if: (i) EPA determines that disapproving the submission and awaiting a resubmission would cause substantial disruption to the Work; or (ii) previous submission(s) have been disapproved due to material defects and the deficiencies in the initial submission under consideration indicate a bad faith lack of effort to submit an acceptable deliverable.

     (b)     **Resubmissions**. Upon receipt of a notice of disapproval under ¶ 6.6(a) (Initial Submissions), or if required by a notice of approval upon specified conditions under ¶ 6.6(a), SD shall, within 21 days or such longer time as specified by EPA in such notice, correct the deficiencies and resubmit the deliverable for approval. After review of the resubmitted deliverable, EPA may: (1) approve, in whole or in part, the resubmission; (2) approve the resubmission upon specified conditions; (3) modify the resubmission; (4) disapprove, in whole or in part, the resubmission, requiring SD to correct the deficiencies; or (5) any combination of the foregoing.

     (c)     **Implementation**. Upon approval, approval upon conditions, or modification by EPA under ¶ 6.6(a) (Initial Submissions) or ¶ 6.6(b) (Resubmissions), of any deliverable, or any portion thereof: (1) such deliverable, or portion thereof, will be incorporated into and enforceable under the CD; and (2) SD shall take any action required by such deliverable, or portion thereof. The implementation of any non-deficient portion of a deliverable submitted or resubmitted under ¶ 6.6(a) or ¶ 6.6(b) does not relieve SD of any liability for stipulated penalties under Section XIV (Stipulated Penalties) of the CD.

**6.7**     **Supporting Deliverables**. SD shall submit each of the following supporting deliverables for EPA approval, except as specifically provided. SD shall develop the deliverables in accordance with all applicable regulations, and guidance documents and policies as appropriate (see Section 9 (References)). SD shall update each of these supporting deliverables as necessary or appropriate during the course of the Work, and/or as requested by EPA.

(a)     **Health and Safety Plan**. The Health and Safety Plan (HASP) describes all activities to be performed to protect on site personnel and area residents from physical, chemical, and all other hazards posed by the Work. SD shall develop the HASP in accordance with EPA's Emergency Responder Health and Safety and Occupational Safety and Health Administration (OSHA) requirements under 29 C.F.R. §§ 1910 and 1926. The HASP should cover RD activities and should be, as appropriate, updated to cover activities during the RA and updated to cover activities after RA completion. EPA does not approve the HASP, but will review it to ensure that all necessary elements are included and that the plan provides for the protection of human health and the environment.

(b)     **Emergency Response Plan**. The Emergency Response Plan (ERP) must describe procedures to be used in the event of an accident or emergency at the Site (for example, power outages, water impoundment failure, slope failure, etc.). The ERP must include:

(1)     Name of the person or entity responsible for responding in the event of an emergency incident;

(2)     Plan and date(s) for meeting(s) with the local community, including local, State, and federal agencies involved in the cleanup, as well as local emergency squads and hospitals;

(3)     Spill Prevention, Control, and Countermeasures (SPCC) Plan (if applicable), consistent with the regulations under 40 C.F.R. Part 112, describing measures to prevent, and contingency plans for, spills and discharges;

(4)     Notification activities in accordance with ¶ 4.4(b) (Release Reporting) in the event of a release of hazardous substances requiring reporting under Section 103 of CERCLA, 42 U.S.C. § 9603, or Section 304 of the Emergency Planning and Community Right-to-know Act (EPCRA), 42 U.S.C. § 11004; and

(5)     A description of all necessary actions to ensure compliance with ¶ 11 (Emergencies and Releases) of the CD in the event of an occurrence during the performance of the Work that causes or threatens a release of Waste Material from the Site that constitutes an emergency or may present an immediate threat to public health or welfare or the environment.

(c)     **Field Sampling Plan**. The Field Sampling Plan (FSP) addresses all sample collection activities. The FSP must be written so that a field sampling team unfamiliar with the project would be able to gather the samples and field information required. SD shall develop the FSP in accordance with *Guidance for Conducting Remedial Investigations and Feasibility Studies*, EPA/540/G 89/004 (Oct. 1988).

(d)  **Quality Assurance Project Plan**. The Quality Assurance Project Plan (QAPP) augments the FSP and addresses sample analysis and data handling regarding the Work. The QAPP must include a detailed explanation of SD's quality assurance, quality control, and chain of custody procedures for all treatability, design, compliance, and monitoring samples. SD shall develop the QAPP in accordance with *EPA Requirements for Quality Assurance Project Plans*, QA/R-5, EPA/240/B-01/003 (Mar. 2001, reissued May 2006); *Guidance for Quality Assurance Project Plans*, QA/G-5, EPA/240/R 02/009 (Dec. 2002); and *Uniform Federal Policy for Quality Assurance Project Plans*, Parts 1-3, EPA/505/B-04/900A though 900C (Mar. 2005). The QAPP also must include procedures:

(1)  To ensure that EPA and the State and their authorized representatives have reasonable access to laboratories used by SD in implementing the CD (SD's Labs);

(2)  To ensure that SD's Labs analyze all samples submitted by EPA pursuant to the QAPP for quality assurance monitoring;

(3)  To ensure that SD's Labs perform all analyses using EPA-accepted methods (i.e., the methods documented in *USEPA Contract Laboratory Program Statement of Work for Inorganic Analysis*, ILM05.4 (Dec. 2006); *USEPA Contract Laboratory Program Statement of Work for Organic Analysis*, SOM01.2 (amended Apr. 2007); and *USEPA Contract Laboratory Program Statement of Work for Inorganic Superfund Methods (Multi-Media, Multi-Concentration)*, ISM01.2 (Jan. 2010)) or other methods acceptable to EPA;

(4)  To ensure that SD's Labs participate in an EPA-accepted QA/QC program or other QA/QC program acceptable to EPA;

(5)  For SD to provide EPA and the State with notice at least 30 days prior to any sample collection activity;

(6)  For SD to provide split samples and/or duplicate samples to EPA and the State upon request;

(7)  For EPA and the State to take any additional samples that they deem necessary;

(8)  For EPA and the State to provide to SD, upon request, split samples and/or duplicate samples in connection with EPA's and the State's oversight sampling; and

(9)  For SD to submit to EPA and the State all sampling and tests results and other data in connection with the implementation of the CD.

(e)     **Site Wide Monitoring Plan**. The purpose of the Site Wide Monitoring Plan (SWMP) is to obtain information, through short- and long- term monitoring, about the movement of and changes in contamination throughout the Site, during implementation of the RA; to obtain information regarding contamination levels to determine whether Performance Standards (PS) are achieved; and to obtain information to determine whether to perform additional actions, including further Site monitoring. The SWMP must include:

(1)     Description of the environmental media to be monitored;

(2)     Description of the data collection parameters and data quality objectives, including existing and proposed monitoring devices and locations, schedule and frequency of monitoring, analytical parameters to be monitored, and analytical methods employed;

(3)     Description of the performance monitoring for groundwater that will be used to demonstrate the effectiveness of the LT/PRB;

(4)     Description of how performance data will be analyzed, interpreted, and reported, and/or other Site-related requirements;

(5)     Description of verification sampling procedures;

(6)     Description of reporting that will be generated in connection with monitoring, including sampling schedules, laboratory records, monitoring reports, and reports to EPA and State agencies; and

(7)     Description of proposed additional monitoring and data collection actions (such as increases in frequency of monitoring, and/or installation of additional monitoring devices in the affected areas) in the event that results from monitoring devices indicate changed conditions (such as higher than expected concentrations of the contaminants of concern or groundwater contaminant plume movement).

(8)     Upon written request by SD and approval by EPA, the number of monitoring locations, the specific parameters, and the frequency of monitoring may be reduced over time.

(f)     **Construction Quality Assurance/Quality Control Plan (CQA/QCP)**. The purpose of the Construction Quality Assurance Plan (CQAP) is to describe planned and systemic activities that provide confidence that the RA construction will satisfy all plans, specifications, and related requirements, including quality objectives. The purpose of the Construction Quality Control Plan (CQCP) is to describe the activities to verify that RA construction has satisfied all plans, specifications, and related requirements, including quality objectives. The CQA/QCP must:

18

(1)     Identify, and describe the responsibilities of, the organizations and personnel implementing the CQA/QCP;

(2)     Describe the specifications required to be met to achieve Completion of RA Construction;

(3)     Describe the activities to be performed: (i) to provide confidence that specifications will be met; and (ii) to determine whether construction quality objectives have been met;

(4)     Describe verification activities, such as inspections, sampling, testing, monitoring, and production controls, under the CQA/QCP;

(5)     Describe industry standards and technical specifications used in implementing the CQA/QCP;

(6)     Describe procedures for tracking construction deficiencies from identification through corrective action;

(7)     Describe procedures for documenting all CQA/QCP activities; and

(8)     Describe procedures for retention of documents and for final storage of documents.

(g)     **O&M Plan**. The O&M Plan describes the requirements for inspecting, operating, and maintaining the RA. SD shall develop the O&M Plan in accordance with *Guidance for Management of Superfund Remedies in Post Construction*, OLEM 9200.3-105 (Feb. 2017). The O&M Plan must include the following additional requirements:

(1)     Description of PS required to be met to implement the ROD;

(2)     Description of activities to be performed: (i) to provide confidence that PS will be met; and (ii) to determine whether PS have been met;

(3)     **O&M Reporting**. Description of records and reports that will be generated during O&M, such as daily operating logs, laboratory records, records of operating costs, reports regarding emergencies, personnel and maintenance records, monitoring reports, and monthly and annual reports to EPA and State agencies;

(4)     Description of corrective action in case of systems failure, including: (i) alternative procedures to prevent the release or threatened release of Waste Material which may endanger public health and the environment or may cause a failure to achieve PS; (ii) analysis of vulnerability and additional resource requirements should a failure occur; (iii) notification

19

and reporting requirements should O&M systems fail or be in danger of imminent failure; and (iv) community notification requirements; and

(5)     Description of corrective action to be implemented in the event that PS are not achieved; and a schedule for implementing these corrective actions.

(h)     **O&M Manual**. The O&M Manual serves as a guide to the purpose and function of the equipment and systems that make up the remedy. SD shall develop the O&M Manual in accordance with *Guidance for Management of Superfund Remedies in Post Construction*, OLEM 9200.3-105 (Feb. 2017).

(i)     **Institutional Controls Implementation and Assurance Plan**. The Institutional Controls Implementation and Assurance Plan (ICIAP) describes plans to implement, maintain, and enforce the Institutional Controls (ICs) at the Site. SD shall develop the ICIAP in accordance with *Institutional Controls: A Guide to Planning, Implementing, Maintaining, and Enforcing Institutional Controls at Contaminated Sites*, OSWER 9355.0-89, EPA/540/R-09/001 (Dec. 2012), and *Institutional Controls: A Guide to Preparing Institutional Controls Implementation and Assurance Plans at Contaminated Sites*, OSWER 9200.0-77, EPA/540/R-09/02 (Dec. 2012). The ICIAP must include the following additional requirements:

(1)     Locations of recorded real property interests (e.g., easements, liens) and resource interests in the property that may affect ICs (e.g., surface, mineral, and water rights) including accurate mapping and geographic information system (GIS) coordinates of such interests; and

(2)     Legal descriptions and survey maps that are prepared according to current American Land Title Association (ALTA) Survey guidelines and certified by a licensed surveyor.

## 7.     SCHEDULES

**7.1     Applicability and Revisions**. All deliverables and tasks required under this SOW must be submitted or completed by the deadlines or within the time durations listed in the RD and RA Schedules set forth below. SD may submit proposed revised RD Schedules or RA Schedules for EPA approval. Upon EPA's approval, the revised RD and/or RA Schedules supersede the RD and RA Schedules set forth below, and any previously-approved RD and/or RA Schedules.

20

**7.2     RD Schedule**

| | Description of Deliverable, Task | ¶ Ref. | Deadline |
|---|---|---|---|
| 1 | RDWP | 3.1 | 30 days after the date of lodging of the CD |
| 2 | PDI Report | 3.3(a) | 30 days after the date of lodging of the CD |
| 3 | Preliminary (30%) RD | 3.5, | 30 days after the date of lodging of the CD |
| 4 | Pre-final (90/95%) RD | 3.6 | 120 days after SD receives EPA comments on Preliminary (30%) RD |
| 5 | Final (100%) RD | 3.7 | 45 days after SD receives EPA comments on Pre-final RD |

### 7.3    RA Schedule

|   | Description of Deliverable / Task | ¶ Ref. | Deadline |
|---|---|---|---|
| 1 | Award RA contract | | 60 days after EPA Approval of Final Remedial Design or 60 days after Effective Date, whichever is later |
| 2 | RAWP | 4.1 | 60 days after Award of RA Contract or 60 days after Effective Date, whichever is later |
| 3 | Designate IQAT | 4.2 | 60 days after Award of RA Contract or 60 days after Effective Date, whichever is later |
| 4 | Pre-Construction Conference | 4.3(a) | In accordance with schedule in approved RAWP |
| 5 | Start of Construction | | In accordance with schedule in approved RAWP |
| | Completion of Construction | | |
| 6 | Pre-final Inspection | 4.6(b) | 45 days after completion of construction |
| 7 | Pre-final Inspection Report | 4.6(d) | 30 days after completion of Pre-Final Inspection |
| 8 | Final Inspection | | 21 days after completion of work punch list identified in Pre-Final Inspection Report |
| 9 | RA Report | 4.6(d) | 60 days after completion of Shakedown Period |
| 10 | Monitoring Report | 4.7(a) | 60 days after SD has determined that monitoring data demonstrate that Performance Standards have been achieved |
| 11 | Work Completion Report | 4.9(b) | 30 days after SD has determined that Work is Complete |
| 12 | Periodic Review Support Plan | 4.8 | Five years after Start of RA Construction |

## 8.    STATE PARTICIPATION

8.1    **Copies**. SD shall, at any time it sends a deliverable to EPA, send a copy of such deliverable to the State. EPA shall, at any time it sends a notice, authorization, approval, disapproval, or certification to SD, send a copy of such document to the State.

8.2    **Review and Comment**. The State will have a reasonable opportunity for review and comment prior to:

(a)    Any EPA approval or disapproval under ¶ 6.6 (Approval of Deliverables) of any deliverables that are required to be submitted for EPA approval; and

22

(b)    Any approval or disapproval of the Construction Phase under ¶ 4.6 (RA Construction Completion), any disapproval of, or Certification of RA Completion under ¶ 4.7 (Certification of RA Completion), and any disapproval of, or Certification of Work Completion under ¶ 4.9 (Certification of Work Completion).

## 9.    REFERENCES

9.1    The following regulations and guidance documents, among others, may apply to the Work. Any item for which a specific URL is not provided below is available on one of the two EPA Web pages listed in ¶ 9.2:

(a)    A Compendium of Superfund Field Operations Methods, OSWER 9355.0-14, EPA/540/P-87/001a (Aug. 1987).

(b)    CERCLA Compliance with Other Laws Manual, Part I: Interim Final, OSWER 9234.1-01, EPA/540/G-89/006 (Aug. 1988).

(c)    Guidance for Conducting Remedial Investigations and Feasibility Studies, OSWER 9355.3-01, EPA/540/G-89/004 (Oct. 1988).

(d)    CERCLA Compliance with Other Laws Manual, Part II, OSWER 9234.1-02, EPA/540/G-89/009 (Aug. 1989).

(e)    Guidance on EPA Oversight of Remedial Designs and Remedial Actions Performed by Potentially Responsible Parties, OSWER 9355.5-01, EPA/540/G-90/001 (Apr.1990).

(f)    Guidance on Expediting Remedial Design and Remedial Actions, OSWER 9355.5-02, EPA/540/G-90/006 (Aug. 1990).

(g)    Guide to Management of Investigation-Derived Wastes, OSWER 9345.3-03FS (Jan. 1992).

(h)    Permits and Permit Equivalency Processes for CERCLA On-Site Response Actions, OSWER 9355.7-03 (Feb. 1992).

(i)    Guidance for Conducting Treatability Studies under CERCLA, OSWER 9380.3-10, EPA/540/R-92/071A (Nov. 1992).

(j)    National Oil and Hazardous Substances Pollution Contingency Plan; Final Rule, 40 C.F.R. Part 300 (Oct. 1994).

(k)    Guidance for Scoping the Remedial Design, OSWER 9355.0-43, EPA/540/R-95/025 (Mar. 1995).

(l)     Remedial Design/Remedial Action Handbook, OSWER 9355.0-04B, EPA/540/R-95/059 (June 1995).

(m)     EPA Guidance for Data Quality Assessment, Practical Methods for Data Analysis, QA/G-9, EPA/600/R-96/084 (July 2000).

(n)     Comprehensive Five-year Review Guidance, OSWER 9355.7-03B-P, 540-R-01-007 (June 2001).

(o)     Guidance for Quality Assurance Project Plans, QA/G-5, EPA/240/R-02/009 (Dec. 2002).

(p)     Institutional Controls: Third Party Beneficiary Rights in Proprietary Controls (Apr. 2004).

(q)     Quality management systems for environmental information and technology programs -- Requirements with guidance for use, ASQ/ANSI E4:2014 (American Society for Quality, February 2014).

(r)     Uniform Federal Policy for Quality Assurance Project Plans, Parts 1-3, EPA/505/B-04/900A though 900C (Mar. 2005).

(s)     Superfund Community Involvement Handbook, SEMS 100000070 (January 2016), https://www.epa.gov/superfund/community-involvement-tools-and-resources.

(t)     EPA Guidance on Systematic Planning Using the Data Quality Objectives Process, QA/G-4, EPA/240/B-06/001 (Feb. 2006).

(u)     EPA Requirements for Quality Assurance Project Plans, QA/R-5, EPA/240/B-01/003 (Mar. 2001, reissued May 2006).

(v)     EPA Requirements for Quality Management Plans, QA/R-2, EPA/240/B-01/002 (Mar. 2001, reissued May 2006).

(w)     USEPA Contract Laboratory Program Statement of Work for Inorganic Analysis, ILM05.4 (Dec. 2006).

(x)     USEPA Contract Laboratory Program Statement of Work for Organic Analysis, SOM01.2 (amended Apr. 2007).

(y)     EPA National Geospatial Data Policy, CIO Policy Transmittal 05-002 (Aug. 2008), https://www.epa.gov/geospatial/geospatial-policies-and-standards and https://www.epa.gov/geospatial/epa-national-geospatial-data-policy.

(z)     Summary of Key Existing EPA CERCLA Policies for Groundwater Restoration, OSWER 9283.1-33 (June 2009).

24

(aa)  Principles for Greener Cleanups (Aug. 2009), https://www.epa.gov/greenercleanups/epa-principles-greener-cleanups.

(bb)  Providing Communities with Opportunities for Independent Technical Assistance in Superfund Settlements, Interim (Sep. 2009).

(cc)  USEPA Contract Laboratory Program Statement of Work for Inorganic Superfund Methods (Multi-Media, Multi-Concentration), ISM01.2 (Jan. 2010).

(dd)  Close Out Procedures for National Priorities List Sites, OSWER 9320.2-22 (May 2011).

(ee)  Groundwater Road Map: Recommended Process for Restoring Contaminated Groundwater at Superfund Sites, OSWER 9283.1-34 (July 2011).

(ff)  Recommended Evaluation of Institutional Controls: Supplement to the "Comprehensive Five-Year Review Guidance," OSWER 9355.7-18 (Sep. 2011).

(gg)  Construction Specifications Institute's MasterFormat 2012, available from the Construction Specifications Institute, http://www.csinet.org/masterformat.

(hh)  Updated Superfund Response and Settlement Approach for Sites Using the Superfund Alternative Approach, OSWER 9200.2-125 (Sep. 2012)

(ii)  Institutional Controls: A Guide to Planning, Implementing, Maintaining, and Enforcing Institutional Controls at Contaminated Sites, OSWER 9355.0-89, EPA/540/R-09/001 (Dec. 2012).

(jj)  Institutional Controls: A Guide to Preparing Institutional Controls Implementation and Assurance Plans at Contaminated Sites, OSWER 9200.0-77, EPA/540/R-09/02 (Dec. 2012).

(kk)  EPA's Emergency Responder Health and Safety Manual, OSWER 9285.3-12 (July 2005 and updates), https://www.epaosc.org/_HealthSafetyManual/manual-index.htm.

(ll)  Broader Application of Remedial Design and Remedial Action Pilot Project Lessons Learned, OSWER 9200.2-129 (Feb. 2013).

(mm)  Guidance for Evaluating Completion of Groundwater Restoration Remedial Actions, OSWER 9355.0-129 (Nov. 2013).

(nn)  Groundwater Remedy Completion Strategy: Moving Forward with the End in Mind, OSWER 9200.2-144 (May 2014).

(oo)    Guidance for Management of Superfund Remedies in Post Construction, OLEM 9200.3-105 (Feb. 2017), https://www.epa.gov/superfund/superfund-post-construction-completion.

**9.2**    A more complete list may be found on the following EPA Web pages:

Laws, Policy, and Guidance: https://www.epa.gov/superfund/superfund-policy-guidance-and-laws

Test Methods Collections: https://www.epa.gov/measurements/collection-methods

**9.3**    For any regulation or guidance referenced in the CD or SOW, the reference will be read to include any subsequent modification, amendment, or replacement of such regulation or guidance. Such modifications, amendments, or replacements apply to the Work only after SD receives notification from EPA of the modification, amendment, or replacement.

# APPENDIX D

# APPENDIX D

## DRAFT FORM OF PROPRIETARY CONTROL

**Marion County Parcel Identification No(s). of the Property is**: [List Parcel(s) Here]
**GRANTOR:** [West Virginia Department of Environmental Protection, Trustee of the Fairmont Coke Works Site /State of West Virginia, for the use and benefit of the State Armory Board]
**PROPERTY ADDRESS:** [Lafayette Street, Fairmont, West Virginia, 26554]

## ENVIRONMENTAL COVENANT

This is an Environmental Covenant executed pursuant to the Uniform Environmental Covenants Act, W.Va. Code § 22-22B-1 et seq. ("the Act"), to restrict the activities on, and uses of, the following described property, identified in Paragraph 1, to the access requirements and use restrictions in this document.  This Environmental Covenant has been approved by the United States Environmental Protection Agency, Region III ("EPA").

**1.    Property affected**.  The affected property ("Property") is located on Lafayette Street, Fairmont, West Virginia 26554.  The Property comprises a portion of the Sharon Steel/Fairmont Coke Works Superfund Site ("Site").

[Insert legally sufficient description of the real property subject to the Environmental Covenant. Include the specific GIS information in a .dwg or .shp format meeting the requirements of 60CSR3-4.2.f.4.  If the description is longer than one page, it may be included as an attachment]

A complete description of the Property is attached to this Environmental Covenant as [Exhibit A].  A map of the Property is attached to this Environmental Covenant as [Exhibit B].

**2.    Property Owner/GRANTOR**.  [West Virginia Department of Environmental Protection ("WVDEP"), as Trustee of the Fairmont Coke Works Site Custodial Trust] is the owner of record of the Property ("Owner") and the GRANTOR of this Environmental Covenant. GRANTOR's contact information is:

[Director
West Virginia Department of Environmental Protection
Division of Land Restoration
601 57th Street SE
Charleston, WV 25034]

**3.    Holder/GRANTEE**.  The following are the GRANTEES and "holders" of this Environmental Covenant, as that term is defined in W.Va. Code §§ 22-22B-2(6) and 22-22B-3(a):

Exxon Mobil Corporation
22777 Springwoods Village Parkway
c/o Kevin Vaughn, N1.4A.481

# APPENDIX D

## DRAFT FORM OF PROPRIETARY CONTROL

Spring, TX 77389

Any person, including a person that owns an interest in the Property, the state or federal agency determining or approving the environmental response project pursuant to which an environmental covenant is created, or a municipality or other unit of local government may be a "holder" of an environmental covenant.  W.Va. Code § 22-22B-3(a).

**4.**     **Agency.**  For the purpose of this Environmental Covenant, the United States Environmental Protection Agency, Region III, is the "Agency," within the meaning of W.Va. Code § 22-22B-2(2).

**5.**     **Description of Contamination and Remedy**.

The Property has been identified by EPA as part of the Site under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9605, which was placed on the National Priorities List, set forth at 40 C.F.R. Part 300, Appendix B, by publication in the Federal Register on December 23, 1996, 61 Fed. Reg. 67656.  Exxon Mobil Corporation has undertaken various environmental clean-up measures at the Site, including implementation, pursuant to a [_____2018] Consent Decree, of the long-term remedial action for the Site ("Response Actions"), which EPA selected in a December 19, 2017 Record of Decision ("ROD").  The Response Actions selected in the ROD include the implementation of certain Institutional Controls to limit land and water use, provide access rights necessary to perform the response actions and restrict use of the Site which could interfere with the implementation, protectiveness and integrity of the remedial action on the Site, including the Property.

Detailed documentation on the information contained in the ROD may be found in the Administrative Record, which is available for inspection at the locations specified in Paragraph 12, below.

This Environmental Covenant is a requirement of the Consent Decree captioned United States of America and State of West Virginia v. ExxonMobil Corporation, Civil Action No. [xxxxxx] in the United States District Court for Northern District of West Virginia, for the Sharon Steel/Fairmont Coke Works Superfund Site, dated [XXXX XX, 2018].

In 2004, EPA entered into a Prospective Purchaser Agreement ("PPA") with the Fairmont Coke Works Site Custodial Trust (Trust) for the Site, including the Property.  The Trust was created to promote safe reuse of the Site for commercial or industrial purposes.  The PPA can be viewed online at https://semspub.epa/src/document/03/2228283.  The PPA establishes that the Trust and any future property owners that certify their knowledge of and commitment to be bound by the terms of the PPA, including but not limited to land use restrictions and access requirements, may, at the sole discretion of EPA, receive the same rights, benefits and obligations of the PPA.  Any such certification and subsequent transfer of rights, benefits and obligations shall be in accordance with the requirements and provisions of the PPA.

**APPENDIX D**

**DRAFT FORM OF PROPRIETARY CONTROL**

      **6.**    <u>**Use Restrictions.**</u>  The Property is subject to the following activity and use limitations, which the then-current owner of the Property, and its tenants, agents, employees and other persons under its control, shall abide by:

      a.      Residential land use, including residential-style use such as a school, day care center, nursing home, or similar facility, is prohibited;

      b.      Extraction of groundwater from the aquifer beneath the Property for use as a potable water source is prohibited;

[For parcels within the Vapor Intrusion Protection Area – include restrictions (c) and (d), below]

      c.      [Any new structures within the geographical area referred to as the Vapor Intrusion Protection Area ("VIPA") described in Section 5.3 of the ROD and depicted on ROD Figure 9 (Exhibit C) at the Site will be constructed with vapor mitigation methods to minimize potential risk of inhalation of contaminants unless owner or developer demonstrates to EPA's satisfaction that VI mitigation is not necessary;]

      d.      [Any excavation or drilling within the VIPA shall require advance notice to EPA and WVDEP and procedures for proper management of any residual contamination that may be encountered;]

      e.      [Future construction workers who are required to work in a subsurface trench within the VIPA that may be subject to a hazardous atmosphere shall be notified that standard precautions, such as OSHA-mandated protocol to provide ventilation and proper respiratory protection, are required;]

      f.      The Property shall not be used in any manner that would interfere with, adversely affect, or impair the integrity, protectiveness or efficacy of the selected remedy.

      g.      Within 24 hours of any spills of any kind that occur on the Property, the West Virginia Spill Line at 800-642-3074, and the National Response Center at 1-800-424-8802 shall be notified.

      **7.**    <u>**Access Requirements.**</u>  In addition to any rights of access already possessed by the United States and the State of West Virginia, this Environmental Covenant grants to the United States, EPA, the State of West Virginia, WVDEP, the Holder and all other persons performing response actions at the Site under EPA and/or WVDEP oversight, access at all reasonable times to the Property for the purposes of performing and/or overseeing response actions at the Site and implementing and enforcing this Environmental Covenant.

_____ExxonMobil_____ WVDEP _____ EPA              

**APPENDIX D**

**DRAFT FORM OF PROPRIETARY CONTROL**

      **8.**    <u>Notice of Transfer or Change in Use of Property.</u>  The then-current owner of the Property shall provide written notice to WVDEP, EPA and the Holder no later than ten (10) days before transfer of a specified interest in the Property subject to this Environmental Covenant, changes in use of the Property, application for building permits regarding the Property, or proposals for any Site work affecting the contamination on the Property.

      **9.**    <u>Compliance Inspections.</u>  The then-current owner shall conduct inspections of the Property to monitor compliance with this Environmental Covenant at least one (1) time per year, and shall submit two (2) signed copies of the inspection monitoring report to the WVDEP, Division of Land Restoration, and EPA within thirty (30) days of the inspection.

      **10.**    <u>Amendment or Termination by Consent.</u>  This Environmental Covenant shall not be amended, modified, or terminated by consent except by written instrument executed in accordance with W.Va. Code § 22-22B-10, by and between the Owner at the time of the proposed amendment, modification, or termination; the WVDEP; EPA; and the Holders of this Environmental Covenant. Within five (5) days of executing an amendment, modification, or termination of this Environmental Covenant, the then-current owner shall record such amendment, modification, or termination with the Marion County Clerk, and within five (5) days thereafter, the then-current owner shall provide a true copy of the recorded amendment, modification, or termination to the WVDEP, EPA and Holders.

      **11.**    <u>Notice of Foreclosure.</u>  The then-current owner of the Property shall provide the WVDEP and EPA written notice of the pendency of any foreclosure referred to in W.VA. Code § 22-22B-9(a)(4) within seven (7) calendar days of becoming aware of such pendency.

      **12.**    <u>Administrative Record.</u>  The Administrative Record can be viewed at the Marion County Public Library located at 321 Monroe Street in Fairmont, West Virginia and is also available at the EPA Region III Office located at 1650 Arch Street in Philadelphia, Pennsylvania.  The Administrative Record can be viewed online at https://semspub.epa.gov/src/collections/03/AR/WVD000800441, and select the **Remedial** Collection Description.

      **13.**    <u>Effect of the Environmental Covenant.</u>  All restrictions and other requirements described in this Environmental Covenant shall run with the land and shall be binding upon the Owner and its grantees, lessees, authorized agents, employees, or persons acting under their direction or control unless terminated or amended (including assignment) in accordance with W.Va. Code §§ 22-22B-9 or 22-22B-10.

      **14.**    <u>Recording</u>.  WVDEP shall record this Environmental Covenant in the Land Records of Marion County following the EPA's, the Holder's and the Owner's approval of this Environmental Covenant, and shall send proof of the recording to the EPA, WVDEP, the Holder, and each person holding a recorded interest in the Property within 30 days of recordation.

## APPENDIX D

## DRAFT FORM OF PROPRIETARY CONTROL

**15.    Communications with WVDEP, EPA and Holder**.  Communications with the WVDEP and the EPA regarding this Environmental Covenant shall be sent to:

Director
West Virginia Department of Environmental Protection
Division of Land Restoration
601 57th Street SE
Charleston, WV 25034

Chief, DE/VA/WV Remedial Branch (3HS23)
U.S. Environmental Protection Agency, Region III
1650 Arch Street
Philadelphia, PA 19103

Kevin J. Vaughan, Esq.
Exxon Mobil Corporation
22777 Springwoods Village Parkway
N1.4A.481
Spring, TX 77389

with a copy to:

Steven M. Jawetz
Beveridge & Diamond, PC
1350 I Street, NW, Suite 700
Washington, DC 20005

**16.    Compliance Enforcement.**  This Environmental Covenant may be enforced in accordance with W.Va. Code § 22-22B-11.

**17.    Severability**.  The paragraphs of this Environmental Covenant shall be severable and should any part hereof be declared invalid or unenforceable, the remainder shall continue in full force and effect between the parties.

**18.    Attachments**.  The following Exhibits are attached to this Environmental Covenant:

Exhibit A - Deed for the Property
Exhibit B – Property Map
[Exhibit C – Vapor Intrusion Protection Area [Custodial Trust property only]]

# APPENDIX D

## DRAFT FORM OF PROPRIETARY CONTROL

ACKNOWLEDGMENTS
The following have executed this Environmental Covenant on the dates indicated.

**[FOR CUSTODIAL TRUST ENVIRONMENTAL COVENANT]  OWNER/GRANTOR, Trustee, Fairmont Coke Works Site Custodial Trust And West Virginia Department of Environmental Protection**

Printed Name: ___Robert D. Rice_____

Title: ____Director, Division of Land Restoration_____

_____     _____
Signature                                                          Date

I, _____, a Notary Public in and for the County of _____, State of _____, do hereby certify that the Owner/Grantor whose name is signed above, this day executed this document in my presence or this day acknowledged same to be true act and deed of said Owner/Grantor.

Given under my hand this the _____ day of _____, 20_____.
My commission expires _____.

_____
Notary Public

## APPENDIX D

## DRAFT FORM OF PROPRIETARY CONTROL

**[FOR STATE ARMORY BOARD ENVIRONMENTAL COVENANT]**
**OWNER/GRANTOR, State Armory Board**

Printed Name: _[Insert Name]_____

Title: _[Insert Title]_____

_____     _____
Signature                                                              Date

I, _____, a Notary Public in and for the County of _____, State of _____, do hereby certify that the Owner/Grantor whose name is signed above, this day executed this document in my presence or this day acknowledged same to be true act and deed of said Owner/Grantor.

Given under my hand this the _____ day of _____, 20____.
My commission expires _____.

_____
Notary Public

## APPENDIX D

## DRAFT FORM OF PROPRIETARY CONTROL

**HOLDER/GRANTEE, Exxon Mobil Corporation**

Printed Name: _____

Title: _____

_____     _____
Signature                                                           Date

I, _____, a Notary Public in and for the County of
_____, State of _____, do hereby
certify that _____, whose name is signed above as the
representative of the Holder/Grantee, this day executed this document in my
presence or this day acknowledged same to be true act and deed of said
Holder/Grantee.

Given under my hand this the _____ day of _____, 20____.
My commission expires _____.

_____
Notary Public

Page 8 of 10

## APPENDIX D

## DRAFT FORM OF PROPRIETARY CONTROL


**APPROVED by the United States Environmental Protection Agency, Region III**

Printed Name:   Karen Melvin

Title:           Director, Hazardous Site Cleanup Division


_____        _____
Signature                                                          Date


I, _____, a Notary Public in and for the County of _____, State of _____, do hereby certify that _____, whose name is signed above as the representative of the agency, this day executed this document in my presence or this day acknowledged same to be true act and deed of said holder(s).

Given under my hand this the _____ day of _____, 20_____.
My commission expires _____.


_____
Notary Public


[DISTRIBUTION LIST TO FOLLOW]


Page 9 of 10

**APPENDIX D**

**DRAFT FORM OF PROPRIETARY CONTROL**


The Clerk will return copies of the recorded document to:

> Robert D. Rice, Director
> West Virginia Department of Environmental Protection
> Division of Land Restoration
> 601 57th Street SE
> Charleston, WV 25034

> Charlie Root, Chief
> DE/VA/WV Remedial Branch (3HS23)
> U.S. Environmental Protection Agency, Region III
> 1650 Arch Street
> Philadelphia, PA 19103

> Kevin J. Vaughan, Esq.
> Exxon Mobil Corporation
> 22777 Springwoods Village Parkway
> N1.4A.481
> Spring, TX 77389

> Steven M. Jawetz
> Beveridge & Diamond, PC
> 1350 I Street, NW, Suite 700
> Washington, DC 20005